***Solicitation Version***

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| America's Car-Mart, Inc., *et al.*,[1] | ) | Case No. [26-XXXXX] (___) |
| Debtors. | ) | |

**JOINT PREPACKAGED CHAPTER 11 PLAN OF**
**AMERICA'S CAR-MART, INC. AND CERTAIN OF ITS AFFILIATES**


**MAYER BROWN LLP**

Charles S. Kelley (TX Bar No. 11199580)
700 Louisiana Street, Suite 3400
Houston, TX 77002-2730
Telephone: (713) 238-3000
Email: ckelley@mayerbrown.com

Richard A. Stieglitz
Michelle A. Orgera
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 506-2500
Email: rstieglitz@mayerbrown.com
morgera@mayerbrown.com

Louis S. Chiappetta
Jamie R. Netznik
Joshua R. Gross
71 S. Wacker Drive
Chicago, IL 60606
Telephone: (312) 782-0600
Email: lchiappetta@mayerbrown.com
jnetznik@mayerbrown.com
jgross@mayerbrown.com

**PROPOSED COUNSEL FOR THE DEBTORS AND DEBTORS-IN-POSSESSION**


**Dated: November 24, 2026**

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each of the Debtors' tax identification numbers, are: America's Car-Mart, Inc. (1141); Colonial Auto Finance, Inc. (3258); Texas Car-Mart, Inc. (3909); America's Car Mart, Inc. (1606); Colonial Underwriting, Inc. (3159); and Auto Finance Investors, Inc. (1385). The location of Debtor America's Car-Mart, Inc.'s corporate headquarters and the Debtors' service address in these Chapter 11 Cases is 1805 North 2nd Street, Suite 401, Rogers, Arkansas 72756.

# TABLE OF CONTENTS


**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**

A. Defined Terms ... 1
B. Rules of Interpretation ... 17
C. Computation of Time ... 17
D. Governing Law ... 18
E. Reference to Monetary Figures ... 18
F. Reference to the Debtors, the Wind Down Debtors, or the Wind Down Trust ... 18
G. Controlling Document ... 18

**ARTICLE II.**
**ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY CLAIMS**

A. Administrative Expense Claims ... 19
B. Professional Compensation ... 19
C. DIP Claims ... 21
D. Priority Tax Claims ... 21
E. Statutory Fees ... 21
F. Restructuring Expenses ... 22

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A. Classification of Claims ... 22
B. Treatment of Claims and Interests ... 23
C. Special Provision Governing Unimpaired or Reinstated Claims ... 27
D. Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ... 27
E. Elimination of Vacant Classes ... 27
F. Voting Classes; Presumed Acceptance by Non-Voting Classes ... 27
G. Controversy Concerning Impairment ... 27
H. Subordinated Claims ... 27

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A. Sale Transaction ... 28
B. The Wind Down Trust ... 28
C. Dissolution and Wind Down Transactions ... 34

**ARTICLE V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A. Assumption and Rejection of Executory Contracts and Unexpired Leases ... 38
B. Claims Based on Rejection of Executory Contracts or Unexpired Leases ... 38
C. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ... 39
D. Modifications, Amendments, Supplements, Restatements, or Other Agreements ... 41
E. Reservation of Rights ... 41
F. Nonoccurrence of Effective Date ... 42

G. Indemnification Obligations ..... 42

ARTICLE VI.
PROVISIONS GOVERNING DISTRIBUTIONS

A. Timing and Calculation of Amounts to Be Distributed ..... 42
B. Disbursing Agent ..... 42
C. Delivery of Distributions and Undeliverable or Unclaimed Property ..... 43
D. Compliance with Tax Requirements ..... 44
E. Foreign Currency Exchange Rate ..... 45
F. Surrender of Cancelled Instruments or Securities ..... 45
G. Allocations ..... 45
H. No Postpetition Interest on Claims ..... 46
I. Setoffs and Recoupment ..... 46
J. Claims Paid or Payable by Third Parties ..... 46

ARTICLE VII.
PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A. General Bar Date; Allowance of Claims ..... 47
B. Claims and Interests Administration Responsibilities ..... 48
C. Adjustment to Claims or Interests Without Objection ..... 48
D. Disallowance of Claims ..... 49
E. Amendments to Claims ..... 49
F. No Distributions Pending Allowance ..... 49
G. Single Satisfaction of Claims ..... 49

ARTICLE VIII.
SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A. Compromise and Settlement of Claims, Interests, and Controversies ..... 50
B. Satisfaction of Claims and Termination of Interests ..... 50
C. Term of Injunctions or Stays ..... 51
D. Release of Liens ..... 51
E. Releases by the Debtors ..... 51
F. Releases by Releasing Parties ..... 52
G. Exculpation ..... 52
H. Injunction ..... 53
I. **Releases of Preference Actions** ..... 54
J. Protection Against Discriminatory Treatment ..... 54
K. Recoupment ..... 55
L. Subordination Rights ..... 55
M. Document Retention ..... 55

ARTICLE IX.
CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A. Conditions Precedent to the Effective Date ..... 55
B. Waiver of Conditions ..... 56

## ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A. Modification and Amendments Prior to Confirmation ........ 56
B. Effect of Confirmation on Modifications ........ 57
C. Revocation or Withdrawal of the Plan ........ 57

## ARTICLE XI. RETENTION OF JURISDICTION

A. Retention of Jurisdiction ........ 57

## ARTICLE XII. MISCELLANEOUS PROVISIONS

A. Immediate Binding Effect ........ 60
B. Additional Documents ........ 60
C. Reservation of Rights ........ 60
D. Successors and Assigns ........ 60
E. Service of Documents ........ 61
F. Term of Injunctions or Stays ........ 62
G. Entire Agreement ........ 62
H. Exhibits ........ 62
I. Nonseverability of Plan Provisions ........ 62
J. Votes Solicited in Good Faith ........ 63
K. Request for Expedited Determination of Taxes ........ 63
L. Closing of Chapter 11 Cases ........ 63
M. No Stay of Confirmation Order ........ 63
N. Waiver or Estoppel ........ 63
O. Dissolution of Statutory Committees ........ 64

**Exhibits**

Exhibit A – Stalking Horse Purchase Agreement

# INTRODUCTION

America's Car-Mart, Inc., and its affiliated debtors, as debtors and debtors-in-possession in the above-captioned chapter 11 cases, jointly propose this prepackaged chapter 11 plan for the resolution of outstanding Claims against, and Interests in, the Debtors. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims against and Interests in such Debtor. Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in Article I.A of the Plan or the Bankruptcy Code or Bankruptcy Rules. Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, Assets, results of operations, and historical financial information, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

**ALL HOLDERS OF CLAIMS THAT ARE ELIGIBLE TO VOTE ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A. *Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below.

1. "***363 Sale***" means the sale of the Purchased Assets pursuant to section 363 of the Bankruptcy Code in accordance with the terms of the Purchase Agreement and Sale Order.

2. "***503(b)(9) Claim***" means a Claim pursuant to section 503(b)(9) of the Bankruptcy Code for the value of goods received by the Debtors in the 20 days immediately prior to the Petition Date and sold to the Debtors in the ordinary course of the Debtors' business.

3. "***ACM Captive Policies***" means the insurance policies issued by ACM Insurance.

4. "***ACM Insurance***" means non-Debtor ACM Insurance Company, an Arkansas corporation.

5. "***ACM Insurance Equity***" means the equity interests in ACM Insurance, 100% of which were issued to and are owned by CRMT.

6. "***Administrative Expense Claim***" means any Claim (excluding DIP Claims, but including any Claim for services provided by an Ordinary Course Professional between the Petition Date and the Effective Date) for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Debtors' Estates and operating the Debtors' businesses and (ii) any Allowed requests for compensation or expense reimbursement for making

a substantial contribution in the Chapter 11 Cases pursuant to section 503(b)(3), (4), and (5) of the Bankruptcy Code.

7. "***Affiliate***" has the meaning set forth in section 101(2) of the Bankruptcy Code when used in reference to a Debtor, and when used in reference to an Entity other than a Debtor, means any other Entity that controls, is controlled by, or is under common control with such Entity, other than a Debtor.

8. "***AFI***" means Debtor Auto Finance Investors, Inc., a Texas corporation.

9. "***AFI Preferred Interests***" means the Preferred Series C shares issued by AFI, of which 500,000 shares with a par value of $1.00 per share are issued and outstanding as of the Petition Date.

10. "***AFI Preferred Liquidation Preference***" means $500,000.00 in the aggregate, consisting of $1.00 per issued, outstanding share of AFI Preferred Interests as of the Petition Date, plus accrued, unpaid dividends (if any).

11. "***Allowed***" means with reference to any Claim or Interest, (i) any Claim or Interest arising on or before the Effective Date (a) as to which no objection to allowance has been interposed within the time period set forth in the Plan (if any) and such Claim or Interest is not Disputed or (b) as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective Holder, (ii) any Claim or Interest as to which the liability of the Debtors and the amount thereof have been determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, (iii) any Claim or Interest expressly allowed under the Plan, (iv) any Claim representing an Assumed Liability that the Purchaser has determined should be Allowed, or (v) any Claim (other than an Assumed Liability) or Interest that the Wind Down Trustee has determined should be Allowed; *provided* that notwithstanding the foregoing, the Wind Down Trust or Purchaser (as applicable) will retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

12. "***Alternative Transaction***" means a Sale Transaction on terms that the Debtors have determined in good faith, pursuant to the Bidding Procedures Order, is more favorable to the Estates and their stakeholders than the Stalking Horse Sale Transaction.

13. ***"Approved Budget"*** has the meaning set forth in the DIP Orders.

14. "***Assets***" means all of the Debtors' property, rights, and interests that are property of the Estates pursuant to section 541 of the Bankruptcy Code.

15. "***Assumed Liabilities***" has the meaning set forth in the Purchase Agreement.

16. "***Avoidance Actions***" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 502, 510, 544, 545, 548 through 553, and 724(a) of the Bankruptcy Code or under similar or related state or federal statutes and common

law, including fraudulent conveyance and transfer laws. For the avoidance of doubt, the term "Avoidance Actions" excludes Preference Actions.

17. "***Ballots***" means the ballots distributed to certain Holders of Impaired Claims entitled to vote on the Plan upon which such Holders shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

18. "***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as modified, amended or supplemented from time to time and in effect during the pendency of the Chapter 11 Cases.

19. "***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

20. "***Bankruptcy Local Rules***" means the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas.

21. "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, in each case, as modified, amended or supplemented from time to time.

22. "***Bar Date***" means, with respect to any particular Claim, the General Bar Date, the Professional Fee Claims Bar Date, any Rejection Damages Bar Date, or such other applicable date set by the Bankruptcy Court as the last day for Filing Proofs of Claim or requesting allowance of Administrative Expense Claims in the Chapter 11 Cases for such Claim, as applicable.

23. "***Bidding Procedures Order***" means an order entered by the Bankruptcy Court approving procedures for the Debtors' postpetition marketing, solicitation and, if applicable, auction and related procedures, with respect to the pursuit of an Alternative Transaction.

24. "***Business Day***" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

25. "***Cash***" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

26. "***Cause of Action***" means any action, claim, cause of action, controversy, third-party claim, dispute, demand, right, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, account, defense, remedy, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, Secured or Unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract, in tort, in law, or in equity or pursuant to any other theory of law. For the avoidance of doubt, a "Cause of Action" includes: (a) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter

5 of the Bankruptcy Code (including Avoidance Actions); (d) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state or foreign law fraudulent transfer or similar claim.

27. "***Chapter 11 Cases***" means each individual case or the jointly administered cases pending under chapter 11 of the Bankruptcy Code for each individual Debtor or the Debtors, as applicable, in the Bankruptcy Court.

28. "***Claim***" has the meaning set forth in section 101(5) of the Bankruptcy Code, as against any Debtor.

29. "***Claims Register***" means the official register of Claims against and Interests in the Debtors maintained by the Noticing and Claims Agent.

30. "***Class***" means a category of Claims against or Interests in the Debtors as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

31. "***Confirmation***" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

32. "***Confirmation Date***" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

33. "***Confirmation Hearing***" means the hearing held by the Bankruptcy Court to consider final approval of the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code and Confirmation of the Plan pursuant to section 1128(a) of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

34. "***Confirmation Order***" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement on a final basis as containing adequate information pursuant to section 1125 of the Bankruptcy Code, which order may include the Sale Order.

35. "***Consummation***" means the occurrence of the Effective Date.

36. "***CRMT***" means Debtor America's Car-Mart, Inc., a Texas corporation, the direct or indirect parent of each of the other Debtors.

37. "***CRMT Common Interests***" means all outstanding common stock issued by Debtor CRMT before the Petition Date and any warrants or other instruments that may provide for the acquisition of any common stock of Debtor CRMT.

38. "***Cure Claim***" means a monetary Claim based upon a Debtor's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed, or assumed and assigned, by such Debtor pursuant to section 365 of the Bankruptcy Code.

39. "***Cure Notice***" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include (a) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases, (b) Cure Claims to be paid in connection therewith and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

40. "***D&O Liability Insurance Policies***" means all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") maintained by any of the Debtors with respect to directors, managers, officers, and employees of the Debtors.

41. "***Debtor-Related Matters***" means any matter arising from, in whole or in part, the Debtors, as such Entities existed prior to or after the Petition Date (including the management, ownership, or operation thereof); their Estates; the Wind Down Trust; any restructuring transactions contemplated by this Plan or otherwise; these Chapter 11 Cases; the Debtors' in- or out-of-court restructuring, financing and sale efforts; the Debtors' intercompany transactions; the Prepetition Loan Documents; the DIP Facility Documents (and any payments or transfers in connection therewith); any documents or instruments creating or governing equity Interests in any Debtor; the Sale Transaction; the Stalking Horse Purchase Agreement (regardless of whether a Stalking Horse Sale Transaction is consummated) or any other Purchase Agreement; the Transition Services Agreement; the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors; the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan; the business or contractual arrangements between any Debtor and any Released Party; the restructuring or proposed restructuring of any Claim or Interest before or during the Chapter 11 Cases; or any Restructuring, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Sale Order, the Plan, the Confirmation Order, in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the DIP Facility, the DIP Facility Documents, the Sale Transaction, and other documents (including the Definitive Documentation); the Chapter 11 Cases; the filing of the Chapter 11 Cases; the Sales Process; the pursuit of Confirmation; the pursuit of Consummation; the solicitation of votes with respect to the Plan; the administration and implementation of the Plan and the Sales Process, including the issuance or distribution of any property pursuant to the Plan and the Sales Process; the Definitive Documentation; or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing.

42. "***Debtors***" means, collectively, the following: America's Car-Mart, Inc.; Colonial Auto Finance, Inc.; Texas Car-Mart, Inc.; America's Car Mart, Inc.; Colonial Underwriting, Inc.; and Auto Finance Investors, Inc. Except as otherwise expressly provided in the Plan to the contrary, references in the Plan to the Debtors shall mean the Wind Down Trust to the extent context requires.

43. "***Definitive Documentation***" means, without limitation, the following definitive documents and agreements: (a) this Plan and all exhibits hereto, including the Plan Supplement documents, in form and substance acceptable to the Prepetition Agent and the DIP Agent; (b) the Confirmation Order, in form and substance acceptable to the Prepetition Agent and the DIP Agent;

(c) the Disclosure Statement; (d) the Solicitation Materials; (e) the Purchase Agreement, including the exhibits and schedules thereto, in form and substance acceptable to the Purchaser; (f) the Sale Order, if not incorporated as part of the Confirmation Order, in form and substance acceptable to the Purchaser; (g) any documentation or budget related to the Wind Down Account, in form and substance acceptable to the Prepetition Agent and the DIP Agent; (h) the DIP Orders, in form and substance acceptable to the Prepetition Agent and the DIP Agent; (i) the DIP Facility Documents, in form and substance acceptable to the Prepetition Agent and the DIP Agent; (j) all "first day" motions, applications, and other documents that any Debtor intends to file with the Bankruptcy Court and seeks to have heard on an expedited basis at the "first-day hearing" in the Chapter 11 Cases and any proposed orders related thereto; (k) the Wind Down Trust Agreement in form and substance acceptable to the Prepetition Agent and the DIP Agent; (l) any provision in any documentation regarding (i) releases of Claims, Causes of Action, and Avoidance Actions, in form and substance acceptable to the Prepetition Agent and the DIP Agent, or (ii) Assumed Liabilities or Purchased Contracts under the Purchase Agreement, in form and substance acceptable to the Purchaser; (m) such other agreements, instruments, and documentation as may be necessary or reasonably desirable to consummate and document the Restructuring and Sale Transaction; and (n) to the extent not included, any motions and related proposed orders seeking approval of each of the above. For the avoidance of doubt, the Definitive Documentation shall be in form and substance acceptable to the Debtors and, unless otherwise indicated in this Plan, reasonably acceptable to the Prepetition Agent and the DIP Agent.

44. "***DIP Agent***" means Silver Point Finance, LLC, in its capacity as administrative agent and collateral agent under the DIP Facility.

45. "***DIP Claim***" means any Claim of the DIP Agent or any DIP Lender on account of or arising from, under or in connection with the DIP Facility.

46. "***DIP Facility***" means the senior secured superpriority debtor-in-possession financing facility to be provided by the DIP Lenders, all as set forth in, and consistent with and subject to, the terms and conditions of the DIP Facility Documents.

47. "***DIP Facility Documents***" means all agreements, documents, instruments, and amendments related to the DIP Facility, including any DIP Order, and any guaranty agreements, pledge and collateral agreements, UCC financing statements, or other perfection documents, subordination agreements, fee letters, and any other security agreements.

48. "***DIP Lenders***" means the lenders party to the DIP Facility Documents in their respective capacities as such.

49. "***DIP Liens***" means the Liens granted to the DIP Agent under the DIP Orders to secure the DIP Claims.

50. "***DIP Orders***" means together, the Interim DIP Order and the Final DIP Order.

51. "***DIP Secured Parties***" means collectively, the DIP Lenders and the DIP Agent, in their respective capacities under the DIP Facility.

52. “***Disallowed***” means, with respect to any Claim, or any portion thereof, that such Claim, or such portion thereof, is not Allowed; *provided* that a Disputed Claim shall not be considered Disallowed until so determined by entry of a Final Order.

53. “***Disbursing Agent***” means the Wind Down Trust, or the Entity or Entities selected by the Wind Down Trust to make or facilitate distributions pursuant to the Plan (which may be the Wind Down Trustee or the Purchaser).

54. “***Disclosure Statement***” means the *Disclosure Statement for the Debtors’ Joint Prepackaged Chapter 11 Plan*, dated as of November 24, 2026, as may be amended, supplemented, or modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

55. “***Disputed***” means, with respect to any Claim or Interest, that such Claim or Interest (a) is not yet Allowed, (b) is not Disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable, (c) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law, or (d) is or is hereafter listed in the Schedules (if any) as contingent, unliquidated, or disputed and for which a Proof of Claim is or has been timely Filed in accordance with any applicable bar date or bar date order.

56. “***Dissolution Transactions***” means the transactions that the Debtors or Wind Down Trustee determine to be necessary or appropriate to implement the terms of the Plan, and ultimately result in the dissolution or other termination of the corporate entities that comprise the Debtors and the Wind Down Debtors.

57. “***Distribution Record Date***” means the record date for purposes of making distributions under the Plan on account of Allowed Claims and Interests, which date shall be the Confirmation Date, other than with respect to CRMT Common Interests (as to which the Distribution Record Date shall be the Effective Date), or, in each case, such other date as designated in an order of the Bankruptcy Court.

58. “***Effective Date***” means, as to the applicable Debtor, the date that is the first Business Day on which: (a) no stay of the Confirmation Order or Sale Order (if separately entered) is in effect; (b) all conditions precedent specified in Article IX have been satisfied or waived (in accordance with Article IX.B); and (c) the Plan becomes effective.

59. “***Entity***” has the meaning set forth in section 101(15) of the Bankruptcy Code.

60. “***Estate***” means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

61. “***Estate Earn Out***” means, in connection with the Stalking Horse Sale Transaction, the right of the Wind Down Debtors or Wind Down Trust, as set forth in the agreement governing the Roll Over Debt or other applicable agreement or instrument, to receive 15% of the collections and other proceeds from certain of the Purchased Assets.

62. “***Excluded Assets***” has the meaning set forth in the Purchase Agreement.

63. "***Exculpated Party***" means each of the following solely in its capacity as such and to the maximum extent permitted by law: (a) the Debtors; and (b) Adam C. Paul, Gilbert Nathan, Michael Wartell, and Jonathan Buba, in their capacities as independent directors, independent managers, and members of the special committees of the boards of the respective Debtors, as the case may be.

64. "***Executory Contract***" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

65. "***Federal Judgment Rate***" means the federal judgment rate in effect as of the Petition Date, compounded annually.

66. "***File***," "***Filed***," or "***Filing***" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Noticing and Claims Agent or the Bankruptcy Court through the PACER or CM/ECF website.

67. "***Final Decree***" means the decree contemplated under Bankruptcy Rule 3022.

68. "***Final DIP Order***" means the order of the Bankruptcy Court approving the DIP Facility on a final basis.

69. "***Final Order***" means an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which has not been reversed, vacated, or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided* that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

70. "***First Amendment Payments Letter***" means that certain First Amendment Payments Letter executed by CRMT on June 19, 2026, in connection with the First Amendment to the Prepetition Credit Agreement.

71. "***General Bar Date***" means the date that is 30 calendar days following the Effective Date.

72. "***General Unsecured Claim***" means any Claim that is not secured, subordinated, or entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court (other than an Intercompany Claim). For the avoidance of doubt, no deficiency claim of the Prepetition Secured Parties shall constitute a General Unsecured Claim.

73. "***Governmental Unit***" has the meaning set forth in section 101(27) of the Bankruptcy Code.

74. "***Holder***" means a Person or Entity holding a Claim against or Interest in a Debtor, as applicable.

75. "***Impaired***" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

76. "***Indemnification Obligations***" means each of the Debtors' indemnification obligations, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, employment contracts, or any other applicable contract or agreement for the current and former directors, officers, and other applicable employees or representatives of the Debtors.

77. "***Intercompany Claim***" means any Claim against a Debtor held by another Debtor.

78. "***Intercompany Interest***" means any Interest in a Debtor held by another Debtor.

79. "***Interest***" means any equity interest (as defined in section 101(16) of the Bankruptcy Code) in any Debtor, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, or other instrument, evidencing any fixed or contingent ownership interest in the Debtors, whether or not transferable, including any option, warrant, or other right, contractual or otherwise, to acquire any such interest, that existed immediately before the Effective Date.

80. "***Interim DIP Order***" means the order of the Bankruptcy Court approving the DIP Facility on an interim basis.

81. "***Internal Revenue Code***" means the Internal Revenue Code of 1986, as amended.

82. "***IRS***" means the Internal Revenue Service.

83. "***Judicial Code***" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

84. "***Lien***" has the meaning set forth in section 101(37) of the Bankruptcy Code.

85. "***Noticing and Claims Agent***" means Omni Agent Solutions, Inc., the noticing, claims, and solicitation agent proposed to be retained by the Debtors in the Chapter 11 Cases.

86. "***Ordinary Course Professional***" means a professional services provider employed by any Debtor in the ordinary course of business and which is not required to be employed by the Debtors pursuant to section 327(a) of the Bankruptcy Code.

87. "***Other Priority Claim***" means any Claim that is entitled to priority of payment under section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim or a Priority Tax Claim.

88. "***Other Secured Claims***" means Secured Claims other than Priority Tax Claims, DIP Claims, or Prepetition Secured Loan Claims.

89. "***Person***" has the meaning set forth in section 101(41) of the Bankruptcy Code.

90. "***Petition Date***" means the date on which each Debtor Filed its voluntary petition for relief commencing the Chapter 11 Cases.

91. "***Plan***" means this chapter 11 plan, as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules, and the terms of the Plan, including the Plan Supplement and all exhibits, supplements, appendices, and schedules to the Plan.

92. "***Plan Supplement***" means the documents supplementing the Plan including, as applicable, (a) the Purchase Agreement, (b) the Schedule of Assumed Executory Contracts and Unexpired Leases, (c) the Wind Down Trust Agreement (which shall include the identity of the Wind Down Trustee), (d) the Schedule of Retained Causes of Action, and (e) any other document necessary or desirable to effectuate the Plan or that is contemplated by the Plan. The Plan Supplement is incorporated into the Plan and may be amended, modified, replaced, or supplemented by the Debtors, in each case, in form and substance acceptable to the Debtors and, unless otherwise indicated in this Plan, reasonably acceptable to the Prepetition Agent and the DIP Agent.

93. "***Preference Action***" means any actual or potential claim or cause of action to avoid, pursuant to section 547 of the Bankruptcy Code, or similar applicable state or federal statutes and common law, a transfer of property of the Debtors, whether or not litigation has been commenced with respect to such claim as of the Effective Date.

94. "***Prepetition Agent***" means Silver Point Finance, LLC, in its capacity as Administrative Agent and Collateral Agent (as such terms are defined in the Prepetition Credit Agreement) under the Prepetition Credit Agreement.

95. "***Prepetition Credit Agreement***" means that certain *Credit and Guaranty Agreement*, dated as of October 30, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time) by and among America's Car Mart, Inc., Colonial Auto Finance, Inc., Texas Car-Mart, Inc., and CRMT, the Guarantor Subsidiaries (as defined therein) party thereto, the Prepetition Agent, and lenders party thereto from time to time.

96. "***Prepetition Equity Priority Assets***" means the following assets, to the extent they are Wind Down Trust Assets, and the proceeds thereof: (i) amounts payable to CRMT on account of its ownership of the ACM Insurance Equity and the rights of the Debtors under and proceeds from the ACM Captive Policies; (ii) the Wind Down Debtors' residual interest in cash posted as cash collateral to support letters of credit; and (iii) Excluded Assets that constitutes real property.

97. "***Prepetition Lender Priority Amount***" means the amount of Prepetition Secured Loan Claims that are Allowed under clauses (i), (ii) and (iv) of ARTICLE III.B.3.b.

98. "***Prepetition Lender Priority Assets***" means all Wind Down Trust Assets other than Prepetition Equity Priority Assets.

99. "***Prepetition Lender Recoveries***" means, without duplication, (a) the principal amount of Roll Over Debt issued on account of the Prepetition Secured Loan Claims (but, for the avoidance of doubt, not the Roll Over Debt issued on account of the DIP Claims) and (b) other amounts indefeasibly paid in Cash, pursuant to this Plan and the Wind Down Trust Agreement (but, for the avoidance of doubt, not pursuant to the DIP Orders), to the Holders of Prepetition Secured Loan Claims or the Holders of Wind Down Trust Senior Interests, but shall not include the payment or reimbursement of Restructuring Expenses or any Cash payments on the Roll Over Debt.

100. "***Prepetition Loan Documents***" means the Prepetition Credit Agreement and all other agreements, documents, instruments, and amendments related thereto, including any guaranty agreements, pledge and collateral agreements, UCC financing statements, or other perfection documents, subordination agreements, fee letters, and any other security agreements.

101. "***Prepetition Secured Loan Claims***" means all Claims held by the Prepetition Secured Parties on account of, arising under, or relating to their respective capacities as lender or agent under the Prepetition Loan Documents.

102. "***Prepetition Secured Parties***" means the Prepetition Agent and each of the lenders party to the Prepetition Credit Agreement.

103. "***Prepetition Secured Party Liens***" means all Liens granted to the Prepetition Agent to secure the Prepetition Secured Loan Claims.

104. "***Priority Tax Claim***" means a Claim held by a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

105. "***Pro Rata***" means the proportion that an Allowed Claim or an Allowed Interest bears to the aggregate amount of Allowed Claims, Allowed Interests, or other matter so referenced, as the context requires.

106. "***Professional***" means an Entity employed pursuant to a Bankruptcy Court order in accordance with section 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

107. "***Professional Fee Claims***" means a Claim for the compensation of the Professionals and other professionals and the reimbursement of expenses incurred by such professionals through and including the Effective Date to the extent such fees and expenses have not been previously paid, including, for the avoidance of doubt, any costs, fees, expenses, or commissions (including with respect to any investment banking transaction fees or commissions) incurred in connection with the Restructuring; *provided* that Claims or Administrative Expense Claims payable to an Ordinary Course Professional shall not constitute Professional Fee Claims for purposes of the Plan.

108. "***Professional Fee Claims Bar Date***" means the deadline for Filing requests for payment of Professional Fee Claims of Professionals, which shall be 60 days after the Effective Date.

109. "***Professional Fee Escrow Account***" means an interest-bearing account or accounts funded by the Debtors on the Effective Date in an amount equal to the Professional Fee Reserve Amount, pursuant to Article II.B.

110. "***Professional Fee Reserve Amount***" means the total amount of Professional Fee Claims estimated in accordance with Article II.B.

111. "***Proof of Claim***" means a proof of Claim or Interest Filed against any of the Debtors in the Chapter 11 Cases.

112. "***Purchase Agreement***" means either (i) the Stalking Horse Purchase Agreement or (ii) in the event the Debtors elect to proceed with an Alternative Transaction, the asset purchase agreement(s) governing such transaction (including all schedules and exhibits thereto, as the same may be amended, modified, or supplemented from time to time pursuant to the terms hereof or thereof).

113. "***Purchased Assets***" has the meaning set forth in the Purchase Agreement.

114. "***Purchased Contracts***" has the meaning set forth in the Purchase Agreement.

115. "***Purchaser***" means the "Buyer" under the Purchase Agreement (including any Purchase Agreement with respect to an Alternative Transaction) and any of its permitted successors, assigns, and designees, in each case, solely in its capacity as such.

116. "***Reinstated***" or "***Reinstatement***" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

117. "***Rejection Damages Bar Date***" means the date that is 30 calendar days following the later to occur of (i) the Effective Date, or (ii) the date of service of notice of rejection of the applicable Executory Contract or Unexpired Lease, or such other date as may be established by order of the Bankruptcy Court.

118. "***Rejection Damages Claim***" means any Claim arising out of the rejection of any Executory Contract or Unexpired Lease pursuant to section 365 of the Bankruptcy Code.

119. "***Related Party***" means, with respect to a specified Person, (x) each of such Person's predecessors, successors, assigns, current or former shareholders, subsidiaries, affiliates, affiliated investment funds or investment vehicles, managed or advised accounts, funds, or other entities, and investment advisors, sub-advisors, managers, direct and indirect equity holders, portfolio companies, and management companies, (y) each of the respective current and former directors, officers, principals, managers, members, partners (including limited partners), employees, trustees, independent contractors, managed accounts or funds, fund advisors, investment advisors, advisory board members, management companies, investment bankers, financial advisors, restructuring advisors, accountants, actuaries, agents, consultants, representatives, attorneys, and other

consultants and professional advisors of such Person or of any Person listed in the foregoing clause (x), and (z) each of the respective heirs, executors, estates, and nominees of such Person or of any Person listed in the foregoing clauses (x) and (y).

120. "***Released Party***" means each of the following solely in its capacity as such: (a) the Debtors; (b) the DIP Agent; (c) the DIP Lenders; (d) the Prepetition Secured Parties; (e) the Purchaser; and (f) each Related Party of each Entity in clause (a) through clause (e) solely in its capacity as such; *provided* that, a Person shall only be a Released Party if it is also a Releasing Party.

121. "***Releasing Party***" means each of the following solely in its capacity as such: (a) all the Released Parties; (b) all Holders of Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth in Article VIII.F herein but did not otherwise affirmatively opt out of such releases; and (c) each Related Party of each Entity in the foregoing clauses (a) and (b), solely to the extent such Related Party may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clauses (a) and (b).

122. "***Residual Assets***" means all Wind Down Trust Assets (including Cash derived from any source) that are available for distribution from the Wind Down Trust following the payment of Wind Down Trust Expenses.

123. "***Restructuring***" means all actions that may be necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary to effectuate, the Plan.

124. "***Restructuring Expenses***" means the prepetition and postpetition reasonable and documented professional fees and expenses incurred by the DIP Secured Parties and the Prepetition Secured Parties in connection with or arising as a result of the Restructuring, the Sale Transaction, the Plan, or the Chapter 11 Cases in all cases in accordance with and subject to the terms and conditions of the DIP Orders, and which, without further order of, or application to the Bankruptcy Court by such professionals, including, the requirement for the filing of retention applications, fee applications, or any applications in the Chapter 11 Cases, shall be Allowed as an Administrative Expense Claim upon incurrence and shall not be subject to any offset, defense, counter-claim, reduction, or credit.

125. "***Retained Causes of Action***" means all Causes of Action that are not released, waived, or transferred pursuant to the Plan or any Sale Transaction; *provided*, *however*, that the Retained Causes of Action shall not include any Claims or Causes of Action against a Released Party.

126. "***Roll Over Debt***" means the indebtedness to be issued by the Purchaser or an affiliate thereof to the DIP Secured Parties and Prepetition Secured Parties in connection with the Stalking Horse Sale Transaction.

127. "***Sale Hearing***" means the hearing held by the Bankruptcy Court to consider entry of the Sale Order, which may be the Confirmation Hearing, as such hearing may be adjourned or continued from time to time.

128. ***"Sale Order"*** means the order of the Bankruptcy Court approving the Purchase Agreement and the Sale Transaction, which order may be, but is not required to be, part of the Confirmation Order.

129. "***Sale Transaction***" means the sale by the Debtors that are party to the Purchase Agreement of all of their respective right, title, and interest in, to and under the Purchased Assets to the Purchaser in accordance with the terms of the Purchase Agreement and the Sale Order.

130. "***Sale Transaction Documents***" means the Sale Order, the Purchase Agreement, and all other documents required to consummate the Sale Transaction (with respect to such other documents required to consummate the Sale Transaction, in form and substance acceptable to each applicable party thereto).

131. "***Sales Process***" means the prepetition and postpetition marketing and sales process for the Debtors' Assets or for an alternative restructuring, financing, refinancing, recapitalization, or other material transaction with respect to the business or capital structure of the Debtors.

132. "***Schedule of Assumed Executory Contracts and Unexpired Leases***" means the schedule of Executory Contracts and Unexpired Leases to be assumed on the Effective Date, as may be amended from time to time prior to the Effective Date or as otherwise permitted pursuant to the Purchase Agreement.

133. "***Schedule of Retained Causes of Action***" means the schedule of Retained Causes of Action to be retained and transferred to the Wind Down Trust (if any), which shall be included in the Plan Supplement, as the same may be modified, amended, or supplemented from time to time by the Debtors; *provided* that, in each case, any such modifications, amendments, or supplements shall be consistent with the Purchase Agreement and in form and substance reasonably acceptable to the Prepetition Agent and the DIP Agent.

134. "***Schedules***" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code (unless such filing obligation has been excused by order of the Bankruptcy Court) and in substantial conformance with the official bankruptcy forms, as the same may have been amended, modified, or supplemented from time to time.

135. ***"SEC"*** means the United States Securities and Exchange Commission.

136. "***Secured Claim***" means a Claim (i) secured by a Lien on collateral to the extent of the value of such collateral as (a) set forth in the Plan, (b) agreed to by the Holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, or (ii) secured by the amount of any right of setoff of the Holder thereof in accordance with section 553 of the Bankruptcy Code.

137. "***Security***" has the meaning set forth in section 101(49) of the Bankruptcy Code.

138. "***Securities Act***" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

139. "***Solicitation Materials***" means any documents, forms, ballots, notices, and other materials provided in connection with the solicitation of votes on the Plan pursuant to sections 1125 and 1126 of the Bankruptcy Code.

140. "***Stalking Horse Purchase Agreement***" means that certain Asset Purchase Agreement dated as of November 24, 2026, in the form attached hereto as **Exhibit A**, among Purchaser and certain of the Debtors, including all schedules and exhibits thereto, as the same may be amended, modified, or supplemented from time to time pursuant to the terms hereof or thereof.

141. "***Stalking Horse Sale Transaction***" means the Sale Transaction consummated pursuant to the Stalking Horse Purchase Agreement.

142. "***Transition Services Agreement***" has the meaning specified in the Stalking Horse Purchase Agreement.

143. "***U.S. Trustee***" means the Office of the United States Trustee for Region 7.

144. "***U.S. Trustee Fees***" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

145. "***Unclaimed Property***" means any distribution under the Plan on account of an Allowed Claim whose Holder has not: (a) accepted such distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Wind Down Trust of an intent to accept such distribution; (c) responded to the Debtors' or Wind Down Trustee's (as applicable) requests for information necessary to facilitate such distribution; or (d) taken any other action necessary to facilitate such distribution.

146. "***Unexpired Lease***" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 or 1123 of the Bankruptcy Code.

147. "***Unimpaired***" means, with respect to a Class of Claims or Interests, a Class consisting of Claims or Interests that are not "impaired" within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash or Reinstatement.

148. "***Unsecured***" means, with respect to a Claim, not Secured.

149. "***Wind Down Account***" means a segregated account created as of the Effective Date and initially funded with the Wind Down Amount on or prior to the Effective Date.

150. "***Wind Down Amount***" means Cash funded on or prior to the Effective Date in an amount agreed upon by the Debtors and the DIP Secured Parties as sufficient to fund (i) the Debtors' good faith estimate of all amounts payable to Holders of Claims or Interests under the Plan that are not Assumed Liabilities and (ii) the reasonably anticipated costs necessary for the administration and wind down of the Wind Down Trust and the Wind Down Debtors, including the costs of maintaining the Wind Down Debtors and any permits, licenses, or other authorizations held by them until their dissolution, an estimated amount of reasonable fees and expenses that may

be incurred by professionals for services rendered to the Wind Down Trust after the Effective Date, and U.S. Trustee Fees.

151. "***Wind Down Debtors***" means, individually or collectively, the Debtors after the occurrence of the Effective Date until dissolution pursuant to the terms of the Plan.

152. "***Wind Down Transactions***" means the transactions that the Debtors or Wind Down Trustee, as applicable, determine to be necessary or appropriate to implement the terms of the Plan, including maintaining, transferring, or surrendering any permits, licenses, or other authorizations held by the Wind Down Debtors and managing ACM Insurance and collecting amounts recoverable on account thereof and on account of the ACM Captive Policies, and that ultimately result in the complete liquidation, deregistration, delisting, and dissolution or other termination of the corporate existence of the Debtors and the Wind Down Debtors.

153. "***Wind Down Trust***" means the trust established on the Effective Date pursuant to Article IV.B.1 of the Plan and the Wind Down Trust Agreement to manage the Wind Down Debtors, hold and administer the Wind Down Trust Assets, and implement the Wind Down Transactions.

154. "***Wind Down Trust Agreement***" means the agreement creating and governing the Wind Down Trust, to be filed in the Plan Supplement.

155. "***Wind Down Trust Assets***" means (i) any Assets of the Debtors' Estates that are not sold pursuant to the Sale Transaction, including, but not limited to, (x) the Excluded Assets, (y) any Cause of Action expressly enumerated in the Schedule of Retained Causes of Action, and (z) any residual amount in the Professional Fee Escrow Account after payment of Allowed Professional Fee Claims; *provided* that any permits, licenses, or other authorizations issued by a Governmental Unit that are not transferable under applicable law shall not constitute Wind Down Trust Assets and shall remain with the applicable Wind Down Debtor, (ii) the Wind Down Account, (iii) all rights of the Debtors under the Purchase Agreement and any related agreements, including the right to receive the Estate Earn Out, (iv) amounts payable to CRMT on account of its ownership of the ACM Insurance Equity and the rights of the Debtors under and proceeds from the ACM Captive Policies; *provided* that the ACM Insurance Equity shall not itself be a Wind Down Trust Asset and shall instead continue to be held by CRMT following the Effective Date; and (v) the equity or membership interests of the Wind Down Debtors (including CRMT).

156. "***Wind Down Trust Expenses***" means any and all reasonable and documented fees, costs, and expenses incurred by the Wind Down Trust, the Wind Down Trustee, or the Wind Down Debtors (or any Person, entity, or professional engaged to assist the Wind Down Trustee) in connection with the Wind Down Transactions, including, without limitation, any reasonable and documented administrative fees, attorneys' or other professionals' fees and expenses, insurance fees, taxes, escrow expenses and fees payable under 28 U.S.C. § 1930, costs associated with any maintenance of any going concern as part of the wind down of such going concern's business operations, costs to maintain the existence and good standing of the Wind Down Debtors and any permits, licenses, or other authorizations held by them, or costs to maintain certain assets while they are held.

157. “***Wind Down Trust Interests***” means the Wind Down Trust Senior Interests and the Wind Down Trust Junior Interests.

158. “***Wind Down Trust Junior Interests***” means the beneficial interests in the Wind Down Trust issued by the Wind Down Trust to Holders of CRMT Common Interests pursuant to Article III of the Plan.

159. “***Wind Down Trust Senior Interests***” means the beneficial interests in the Wind Down Trust issued by the Wind Down Trust to Holders of Prepetition Secured Loan Claims pursuant to Article III of the Plan.

160. “***Wind Down Trustee***” means the Person or Persons identified in the Plan Supplement (as determined by the Debtors, the Prepetition Agent, and the DIP Agent) and appointed as of the Effective Date, who will serve as the trustee of the Wind Down Trust and implement the Wind Down Transactions.

B. *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified, or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (3) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan; (4) unless otherwise specified, all references herein to “Articles” are references to Articles of the Plan; (5) unless otherwise stated, the words “herein,” “hereof,” and “hereto” refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) the words “include” and “including,” and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words “without limitation;” (8) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (9) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; and (10) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases.

C. *Computation of Time*

Unless otherwise expressly stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction, action, or event shall or may occur pursuant to the Plan is a day that is not a Business

Day, then such transaction, action, or event shall instead occur on the next succeeding Business Day.

D. *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code, Bankruptcy Rules, and Bankruptcy Local Rules) or unless otherwise expressly stated herein, the laws of the State of New York without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that the corporate or limited liability company governance matters relating to the Debtors shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor.

E. *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to the lawful currency of the United States of America, unless otherwise expressly provided herein.

F. *Reference to the Debtors, the Wind Down Debtors, or the Wind Down Trust*

Except as otherwise expressly provided in the Plan to the contrary, references in the Plan to the Debtors, the Wind Down Debtors, or the Wind Down Trust shall mean the Debtors, the Wind Down Debtors, and the Wind Down Trust, as applicable, to the extent the context requires, and references to any Debtor, as applied to the period following the Effective Date, means the Wind Down Debtor, to the extent the context requires.

G. *Controlling Document*

In the event of an inconsistency between the Plan, the Disclosure Statement, or any other Final Order (other than the Confirmation Order or Sale Order, as applicable) referenced in the Plan (or any exhibits, schedules, appendices, supplements or amendments to any of the foregoing, other than the Plan Supplement), the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and any exhibit to the Plan or the Plan Supplement, the terms of the relevant exhibit or document in the Plan Supplement shall control (unless stated otherwise in such exhibit or Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order or Sale Order and the Plan, the Confirmation Order or Sale Order, as applicable, shall control.

## ARTICLE II.
## ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, DIP Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A. Administrative Expense Claims

Except as provided below with respect to Professional Fee Claims, and except to the extent that a Holder of an Allowed Administrative Expense Claim agrees with the Debtors, Wind Down Debtors, Wind Down Trust, Wind Down Trustee, or Purchaser (as applicable) to a less favorable treatment with respect to such Holder, each Holder of an Allowed Administrative Expense Claim that is unpaid as of the Effective Date shall receive, on account and in full satisfaction of such Allowed Administrative Expense Claim, Cash in an amount equal to the Allowed amount of such Administrative Expense Claim, to be paid on or as soon as is reasonably practicable after the latest of (1) the Effective Date, (2) the date that such Allowed Administrative Expense Claim becomes Allowed, and (3) the date that such Allowed Administrative Expense Claim becomes due and owing in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities; *provided*, *however*, that: (a) Allowed Administrative Expense Claims representing liabilities incurred on or after the Petition Date in the ordinary course of business by the Debtors shall be paid by the Debtors, Wind Down Debtors, Wind Down Trust, Wind Down Trustee, or Purchaser (as applicable), in accordance with the terms and conditions of the particular transactions and agreements relating to such liabilities (including the Purchase Agreement) without any further action by the Holders of such Claims or further approval of the Bankruptcy Court; and (b) Holders of such Administrative Expense Claims shall not be required to File Proofs of Claim or other requests for payment; *provided* that, in the event of a dispute with respect to any asserted Administrative Expense Claim, the Holder of such asserted Administrative Expense Claim or the Debtors, Wind Down Debtors, Wind Down Trust, Wind Down Trustee, or Purchaser (as applicable) may seek appropriate relief in the Bankruptcy Court, which shall have exclusive jurisdiction with respect to any such dispute. Nothing in this Article deems a disputed Administrative Expense Claim Allowed or waives any defense.

B. *Professional Compensation*

1. <u>Final Fee Applications</u>

All final requests for payment of Professional Fee Claims of Professionals, including such Professional Fee Claims incurred during the period from the Petition Date through and including the Effective Date, shall be Filed and served on the Debtors, the Wind Down Debtors, the Wind Down Trust, or the Wind Down Trustee, as applicable, no later than 60 days after the Effective Date. Each such final request will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, and once approved by the Bankruptcy Court, such Allowed Professional Fee Claims shall be promptly paid in Cash from the Professional Fee Escrow Account up to the full Allowed amount of such claims. Ordinary Course Professionals shall not be required to File any Proof of Claim, fee application, or other request for payment except in the case of a dispute between such Ordinary Course Professional and the Debtors, Wind Down Debtors, or Wind Down Trust; *provided* that the compensation of any such Ordinary Course Professional shall be subject to the terms of any order of the Bankruptcy Court in connection therewith.

Objections to any Professional Fee Claim of Professionals must be Filed and served on the Debtors, the Wind Down Debtors, the Wind Down Trust, or the Wind Down Trustee, as applicable, and the applicable Professional no later than 21 days after such Professional Fee Claim is Filed with the Bankruptcy Court.

2. Professional Fee Escrow Account

On the Effective Date, the Debtors shall establish and fund, and the Wind Down Trust shall hold, the Professional Fee Escrow Account with Cash equal to the "Professional Fee Reserve Amount" described in Article II.B.3 herein. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals and the other professionals with Professional Fee Claims. The Debtors shall fund and reserve the Professional Fee Escrow Account until payment in full of the Allowed Professional Fee Claims. The Professional Fee Escrow Account and funds therein shall not be considered property of the Estates of the Debtors, the Wind Down Debtors, or the Wind Down Trust. The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Disbursing Agent or the Wind Down Trustee from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed, and the amount of all other Professional Fee Claims shall be paid in Cash to the applicable professionals by the Disbursing Agent or the Wind Down Trustee from the Professional Fee Escrow Account on the Effective Date. After all such Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall be released to the Wind Down Account and shall constitute Residual Assets.

3. Professional Fee Reserve Amount

No later than five Business Days prior to the Effective Date, the Debtors shall solicit Professionals and the other professionals with Professional Fee Claims for estimates of their unpaid Professional Fee Claims before and as of the Effective Date, and such Professionals and other professionals shall deliver such estimate to the Debtors in writing via email two Business Days prior to the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of any such professional's final request for payment of Professional Fee Claims. If any professional does not timely provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such professional.

4. Post-Effective Date Fees and Expenses

Except as otherwise expressly provided in the Plan, from and after the Effective Date, the Disbursing Agent, the Wind Down Trust, or the Wind Down Trustee (as applicable) shall, in the ordinary course of business and without any further notice or application to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable, actual, and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred on or after the Effective Date by the Professionals and other professionals (including any fees related to the preparation of Professional fee applications). Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors, the Wind Down Debtors, the Wind Down Trust, or the Wind Down Trustee (as applicable) may employ and pay any Professional or other professional for fees and

expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C. *DIP Claims*

Notwithstanding anything to the contrary herein, except to the extent that the Holders of DIP Claims agree to less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for release of all DIP Claims, on the Effective Date, the Holders of the DIP Claims shall receive their Pro Rata shares of (a) upon the Effective Date, all Cash then held by the Debtors other than (i) the Wind Down Amount, (ii) the Professional Fee Reserve Amount, and (iii) Cash required under the Plan for other payments on the Effective Date, and (b) upon the closing of the Stalking Horse Sale Transaction, Roll Over Debt issued in connection with the Stalking Horse Sale Transaction, in a principal amount equal to the total outstanding amount of DIP Claims that are not satisfied in Cash.

In the event of an Alternative Transaction, the DIP Claims shall be indefeasibly paid in Cash in full at closing; *provided* that, in the case of an Alternative Transaction that includes a credit bid provided by the Prepetition Secured Parties and/or DIP Secured Parties, the DIP Claims shall be deemed satisfied as a result of the consummation of such Alternative Transaction.

D. *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Priority Tax Claim, each Allowed Priority Tax Claim will (a) be assumed in full by the Purchaser or Reinstated as an obligation of a purchased Debtor if so provided under the Purchase Agreement, (b) be paid in full in Cash, or (c) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. In the case of clause (b), such Allowed Priority Tax Claim will be payable on the later to occur of the Effective Date and the date that is 10 Business Days after the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, or, in either case, as soon as practicable thereafter.

E. *Statutory Fees*

All U.S. Trustee Fees due and payable prior to, and that remain unpaid as of, the Effective Date shall be paid by the applicable Debtors on the Effective Date. No U.S. Trustee Fees shall be paid on the initial funding of the Wind Down Account. U.S. Trustee Fees shall only be paid on subsequent disbursement of Cash by the Wind Down Trust. Any U.S. Trustee Fees that may be owed by the Debtors or the Wind Down Trust, as applicable, after the Confirmation Date related to the reduction to Cash of non-Cash assets shall be paid by the Wind Down Trust until the Chapter 11 Cases are closed, dismissed, or converted. If no disbursements are made by the Debtors or the Wind Down Trust for any quarter post-confirmation, only the minimum U.S. Trustee Fee will be owed in accordance with 28 U.S.C. § 1930(a)(6). The Wind Down Trust shall file post-confirmation operating reports with respect to its operations and disbursements until these Chapter 11 Cases are closed, dismissed, or converted to cases under chapter 7 of the Bankruptcy Code.

F. *Restructuring Expenses*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date or as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the DIP Orders, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, and without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two Business Days before the anticipated Effective Date; *provided* that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On or as soon as practicable after the Effective Date, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors or the Wind Down Trust, as applicable. In addition, the Debtors or the Wind Down Trust, as applicable, shall continue to pay pre- and post-Effective Date, when due, all Restructuring Expenses related to implementation, consummation, and defense of the Plan or the transactions thereunder, whether incurred before, on, or after the Effective Date, without any requirement for Bankruptcy Court review or approval.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A. *Classification of Claims*

The Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest fits within the description of that Class and is classified in other Class(es) to the extent that any portion of the Claim or Interest fits within the description of such other Class(es). A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of Claims and Interests against the Debtors pursuant to the Plan is as follows:

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Prepetition Secured Loan Claims | Impaired | Entitled to Vote |
| 4 | General Unsecured Claims | Unimpaired | Presumed to Accept |
| 5 | Intercompany Claims | Unimpaired/Impaired | Presumed to Accept/ Deemed to Reject |

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 6 | Intercompany Interests | Unimpaired/Impaired | Presumed to Accept/ Deemed to Reject |
| 7 | AFI Preferred Interests | Unimpaired | Presumed to Accept |
| 8 | CRMT Common Interests | Impaired | Deemed to Reject |

B. *Treatment of Claims and Interests*

1. Class 1 — Other Priority Claims

a. *Classification*: Class 1 consists of all Other Priority Claims.

b. *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each Allowed Other Priority Claim will (i) be assumed in full by the Purchaser or Reinstated as an obligation of a purchased Debtor if so provided under the Purchase Agreement, (ii) be paid in full in Cash, or (iii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. In the case of clause (ii), such Allowed Other Priority Claims will be payable on the later to occur of the Effective Date and the date that is 10 Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, or, in either case, as soon as reasonably practicable thereafter.

c. *Voting*: Class 1 is Unimpaired under the Plan. Holders of Class 1 Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2. Class 2 — Other Secured Claims

a. *Classification*: Class 2 consists of all Other Secured Claims.

b. *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Wind Down Trustee, as applicable, each Holder shall receive either (i) Cash equal to the full Allowed amount of its Claim, (ii) Reinstatement of such Holder's Claim and payment of such Claim in full by either the Wind Down Trust or (with respect to an Allowed Other Secured Claim secured by any Purchased Assets) the Purchaser, (iii) the return to or abandonment of the collateral securing such Holder's Claim, or (iv) such other treatment as may otherwise be agreed to by such Holder and the Debtors.

c. *Voting*: Class 2 is Unimpaired under the Plan. Holders of Class 2 Other Secured Claims are conclusively presumed to have accepted the Plan

pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3. Class 3 — Prepetition Secured Loan Claims

a. *Classification*: Class 3 consists of all Prepetition Secured Loan Claims.

b. *Allowance*: Prepetition Secured Loan Claims shall be deemed Allowed in (i) the principal amount of $311,600,000 (including capitalized in-kind interest and fees), less amounts converted into loans under the DIP Facility pursuant to the "Roll Up" as defined in the DIP Orders, *plus* (ii) all accrued and unpaid interest through the Effective Date at the applicable contractual default rate, other than interest on loans that are converted into loans under the DIP Facility pursuant to the "Roll Up," *plus* (iii) "Prepayment Premium" (as defined in the Prepetition Credit Agreement) as of the Petition Date in the amount of $47,800,000, *plus* (iv) the "First Amendment Exit Payment" (as defined in the First Amendment Payments Letter) in the amount of $15,000,000, *plus* (v) without duplication, all reasonable and documented fees, expenses, and other amounts arising under and payable under and in accordance with the Prepetition Loan Documents.

c. *Treatment*: Except to the extent that the Holders of Prepetition Secured Loan Claims agree to less favorable treatment, in exchange for full and final satisfaction, settlement, and release of each Allowed Prepetition Secured Loan Claim, the Holders of the Allowed Prepetition Secured Loan Claims shall receive their Pro Rata shares of: (i) upon the closing of the Stalking Horse Sale Transaction, 100% of all Roll Over Debt issued in connection with the Stalking Horse Sale Transaction, other than the Roll Over Debt (if any) issued in satisfaction of DIP Claims; (ii) upon the Effective Date, all Cash then held by the Debtors other than (A) the Wind Down Amount, (B) the Professional Fee Reserve Amount, and (C) Cash required for other distributions and payments on the Effective Date (including the DIP Claims); and (iii) the Wind Down Trust Senior Interests.

d. *Voting*: Class 3 is Impaired under the Plan. Holders of Class 3 Prepetition Secured Loan Claims will be entitled to vote to accept or reject the Plan, with such vote occurring prior to the Petition Date. If the Debtors, pursuant to the Bidding Procedures Order, designate an Alternative Transaction as the successful bid (other than an Alternative Transaction that includes a credit bid provided by the Prepetition Secured Parties and/or DIP Secured Parties), then each acceptance by a Holder of Prepetition Secured Loan Claims shall automatically be deemed withdrawn, unless (i) the DIP Agent, the Prepetition Agent, or an Affiliate or designee of either of them is the Purchaser under the designated Alternative Transaction, (ii) such Holder has consented to the designated Alternative Transaction, in its sole discretion, or (iii) the Alternative Transaction provides sufficient up-front Cash consideration to pay (x) the DIP Claims in full in Cash, (y) no less

than the Prepetition Lender Priority Amount on account of the Prepetition Secured Loan Claims, and (z) all Restructuring Expenses, and the Plan is modified so as to provide for such payments in Cash to the Prepetition Secured Parties on the Effective Date.

4. Class 4 — General Unsecured Claims

a. *Classification*: Class 4 consists of all General Unsecured Claims.

b. *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed General Unsecured Claim, each Allowed General Unsecured Claim will (i) be assumed in full by the Purchaser or Reinstated as an obligation of a purchased Debtor if so provided under the Purchase Agreement, (ii) be paid in full in Cash, or (iii) otherwise receive treatment sufficient to render such Claim Unimpaired. In the case of clause (ii), such Allowed General Unsecured Claims will be payable on the later to occur of the Effective Date and the date that is 10 Business Days after the date on which such General Unsecured Claim becomes an Allowed General Unsecured Claim, or, in either case, as soon as reasonably practicable thereafter.

c. *Voting*: Class 4 is Unimpaired under the Plan. Holders of Class 4 General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

5. Class 5 — Intercompany Claims

a. *Classification*: Class 5 consists of all Intercompany Claims.

b. *Treatment*: All Intercompany Claims will be unaltered and otherwise unaffected by the Plan, or canceled as of the Effective Date, in the Debtors' discretion.

c. *Voting*: Class 5 is Unimpaired/Impaired under the Plan. Holders of Class 5 Intercompany Claims are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

6. Class 6 — Intercompany Interests

a. *Classification*: Class 6 consists of all Intercompany Interests.

b. *Treatment*: All Intercompany Interests shall be maintained under the Plan, solely for purposes of administrative convenience or canceled on the Effective Date, in the Debtors' discretion, subject to the consent of the Prepetition Secured Parties; *provided* that, to the extent set forth in the

Purchase Agreement, any Intercompany Interests that constitute Purchased Assets will be sold to the Purchaser on the Effective Date.

c. *Voting*: Class 6 is Unimpaired/Impaired under the Plan. Holders of Class 6 Intercompany Interests are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

7. Class 7 — AFI Preferred Interests

a. *Classification*: Class 7 consists of all AFI Preferred Interests.

b. *Treatment*: Except to the extent that a Holder of an Allowed AFI Preferred Interest agrees to less favorable treatment, in full and final satisfaction of such Allowed AFI Preferred Interest, each Holder of an Allowed AFI Preferred Interest will receive its Pro Rata share of the AFI Preferred Liquidation Preference.

c. *Voting*: Class 7 is Unimpaired under the Plan. Holders of Class 7 AFI Preferred Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

8. Class 8 — CRMT Common Interests

a. *Classification*: Class 8 consists of all CRMT Common Interests.

b. *Treatment*: All CRMT Common Interests will be canceled, released, and extinguished as of the Effective Date, and Holders of CRMT Common Interests shall not receive or retain any property under the Plan on account of such CRMT Common Interests.

Notwithstanding the foregoing, each Holder of an Allowed CRMT Common Interest representing issued and outstanding common stock as of the Distribution Record Date shall receive (i) any amounts payable on or before the Effective Date to Holders of CRMT Common Interests pursuant to an Alternative Transaction, and (ii) Wind Down Trust Junior Interests equal to the number of shares of CRMT Common Interests held by such Holder as of the Effective Date.

Unless and until the Allowed amount of DIP Claims has been paid in full in Cash or otherwise deemed satisfied and the Allowed amount of Prepetition Secured Loan Claims has been paid in full through Prepetition Lender Recoveries or otherwise deemed satisfied, all distributions made on account of CRMT Common Interests (including on account of Wind Down Trust Junior Interests) shall be deemed to be made on account of amounts that would otherwise be payable to the Prepetition Secured Parties.

c. *Voting*: Class 8 is deemed to reject, and the Debtors will seek Confirmation under section 1129(b) of the Bankruptcy Code on account of such deemed rejection.

C. *Special Provision Governing Unimpaired or Reinstated Claims*

Nothing under the Plan shall affect the Debtors', the Purchaser's, the Wind Down Trust's, or the Wind Down Trustee's (as applicable) claims, Causes of Action, rights, or defenses in respect of any Unimpaired Claims or Reinstated Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims or Reinstated Claims.

D. *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B of the Plan. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

E. *Elimination of Vacant Classes*

Any Class of Claims that does not contain an Allowed Claim or a Claim temporarily Allowed by the Bankruptcy Court for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F. *Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote and no Holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

G. *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

H. *Subordinated Claims*

The allowance, classification, and treatment of all Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to

section 510 of the Bankruptcy Code, the Debtors, Wind Down Trust, or the Wind Down Trustee (as applicable) reserve(s) the right to reclassify any Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A. *Sale Transaction*

On the Effective Date or such other date on which the applicable Purchase Agreement is consummated, subject to the satisfaction or waiver of the conditions precedent to closing set forth in the applicable Purchase Agreement, the applicable Debtors shall consummate the Sale Transaction and the related Purchased Assets shall vest in the Purchaser free and clear of all Liens, Claims, charges, or encumbrances pursuant to section 1123 of the Bankruptcy Code and the Sale Transaction Documents, other than any Assumed Liabilities, in each case, to the extent provided in the Sale Order. Upon entry of the Sale Order by the Bankruptcy Court, all matters provided for under the Purchase Agreement and the other Sale Transaction Documents will be deemed authorized and approved without any requirement or further act or action by the Debtors or the Debtors' governing bodies. The applicable Debtors are authorized to execute and deliver, and to consummate the transactions contemplated by the Sale Transaction Documents, as well as to execute, deliver, file, record and issue any documents, or agreements in connection therewith, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity.

Section 363(f) of the Bankruptcy Code provides that the Debtors' assets may be sold free and clear of any and all liens, claims, interests, and encumbrances with any such liens, claims, interests, and encumbrances attaching to the proceeds of the Sale Transaction. The Debtors shall seek findings in the Sale Order that the applicable requirements of section 363(f) are satisfied. To the extent a party objects to the Sale Transaction on the basis that it holds a lien or encumbrance on the Purchased Assets, any such party could be compelled to accept a monetary satisfaction of such claims under section 363(f)(5) of the Bankruptcy Code. In addition, to the extent the Debtors discover any party may hold a lien on all, or a portion of, the Assets, the Debtors have provided such party with notice of, and an opportunity to object to, the Sale Transaction. Absent objection, each such party will be deemed to have consented to the sale of the Purchased Assets.

The transactions contemplated by the Sale Transaction Documents are undertaken by the applicable Debtors and the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided therein to consummate the Sale Transaction shall not affect the validity of such sale, unless such authorization and consummation of such sale are duly stayed pending such appeal. The Purchaser is a good-faith purchaser within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

B. *The Wind Down Trust*

1. Creation of Wind Down Trust; Vesting of Wind Down Trust Assets in the Wind Down Trust

The Wind Down Trust shall be formed as of the Effective Date to effect the Wind Down Transactions. The corpus of the Wind Down Trust shall consist of the Wind Down Trust Assets. On the Effective Date, pursuant to the Plan and in accordance with the Wind Down Trust Agreement, the Wind Down Trust Assets shall be irrevocably transferred to and vest in the Wind Down Trust free and clear of any and all actual or alleged prepetition and postpetition Claims, Causes of Action, Interests, Liens, other encumbrances and liabilities of any kind, in each case that have been or could have been asserted against the Debtors, their Estates or their property (including, but not limited to, Claims based on successor liability) based on any acts or omissions prior to the Effective Date, except as expressly set forth in the Plan and the Wind Down Trust Agreement. From and after the Effective Date, all proceeds of the Wind Down Trust Assets shall be paid to the Wind Down Trust to be applied in accordance with the Plan. Upon the transfer of the Wind Down Trust Assets to the Wind Down Trust, the Debtors will have no reversionary or further interest in or with respect to the Wind Down Trust Assets. The Wind Down Trust shall have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the Wind Down Trust's purpose of receiving, selling, or otherwise realizing value of Wind Down Trust Assets, distributing the proceeds therefrom in accordance with the Plan and the Wind Down Trust Agreement and liquidating, dissolving and winding-up the affairs of the Debtors, the Wind Down Debtors, and the Wind Down Trust.

Notwithstanding any prohibition of assignability under applicable non-bankruptcy law, on the Effective Date and periodically thereafter if additional assets become known and subject to the Wind Down Trust's administration, the Debtors shall be deemed to have automatically transferred to the Wind Down Trust all of their right, title and interest in such assets. In accordance with sections 363, 365, and/or 1141 of the Bankruptcy Code, as applicable, all such assets shall automatically irrevocably vest in the Wind Down Trust free and clear of all Claims and Liens, subject only to Allowed Claims until paid in full, as set forth in the Plan, and the reasonable fees and expenses of administering the Wind Down Trust, including, without limitation, the reasonable fees and expenses of the Wind Down Trustee, as provided in the Wind Down Trust Agreement. Thereupon, the Debtors shall have no interest in or with respect to such additional assets or the Wind Down Trust.

The vesting of the Wind Down Trust Assets, as authorized by the Plan, shall not be construed to destroy or limit any such Assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Wind Down Trust as if such Asset or right was still held by the Debtors.

On the Effective Date, the Wind Down Trust shall issue Wind Down Trust Senior Interests to Holders of Prepetition Secured Loan Claims and Wind Down Trust Junior Interests to Holders of CRMT Common Interests, in each case in accordance with Article III of the Plan. Additional information regarding the Wind Down Trust will be set forth in the Plan Supplement, including the identity of the Wind Down Trustee, the form of Wind Down Trust Agreement, funding mechanism, administration, assets to be held, liabilities assumed, and tax treatment.

The Wind Down Trust Junior Interests shall not be transferable except by will, intestate succession, or operation of law. The Wind Down Trust Interests (a) shall not be evidenced by any certificate or other instrument, (b) shall not bear any stated rate of interest, (c) shall not confer upon any Holder any voting, dividend, or other rights of a stockholder or equity holder of any Debtor, the Wind Down Trust, the Purchaser, or any other Entity, (d) shall not represent any equity or ownership interest in any Debtor, the Wind Down Trust, the Purchaser, or any other Entity, and (e) are solely a right to receive distributions, if any, in accordance with, and subject to, the terms of the Plan. The Wind Down Trust Interests are not intended to be "securities" within the meaning of the Securities Act. However, to the extent that any such interests are deemed to be securities, the offer and sale of any such Wind Down Trust Interests pursuant to the Plan shall be exempt from registration under section 5 of the Securities Act (and any applicable "blue sky laws") under section 1145(a)(1) of the Bankruptcy Code.

The Wind Down Trust is intended to qualify as a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d) and to be treated as a grantor trust for U.S. federal income tax purposes consistent with Revenue Procedure 94-45, with the Holders of Wind Down Trust Interests treated as the grantors and owners of their respective shares of the Wind Down Trust Assets. All parties (including the Debtors, the Wind Down Debtors, the Wind Down Trustee, and Holders of Wind Down Trust Interests) shall report consistently with such treatment, including with respect to the valuation of the Wind Down Trust Assets as determined in good faith by the Wind Down Trustee. The Wind Down Trustee may establish one or more disputed ownership funds or reserves, and may make elections under Treasury Regulation section 1.468B-9, in each case as it determines appropriate. The Wind Down Trust shall distribute its net income and net proceeds from the sale of Wind Down Trust Assets, if any, at least annually, subject to the retention of reasonable reserves as provided in the Plan and the Wind Down Trust Agreement.

The Wind Down Trust shall terminate upon the earlier of (a) the completion of the Wind Down Transactions, the liquidation of all Wind Down Trust Assets, and the making of all distributions required under the Plan and the Wind Down Trust Agreement, and (b) the third anniversary of the Effective Date; *provided* that the Bankruptcy Court, upon motion by the Wind Down Trustee filed within six months before such anniversary (or the end of any extension period), may extend the term of the Wind Down Trust for a finite period if such extension is necessary to complete the liquidation of the Wind Down Trust Assets and the distributions contemplated by the Plan.

2. <u>Wind Down Trustee</u>

On the Effective Date, the Wind Down Trustee shall be the sole authorized representative of the Wind Down Trust, with authority to render all services necessary to effectuate the terms of this Plan as they relate to the Wind Down Trust. From and after the Effective Date, the Wind Down Trustee shall be deemed to have been appointed as the representative of each of the Estates by the Bankruptcy Court pursuant to section 1123(b)(3)(B) of the Bankruptcy Code except to the extent limited by the Wind Down Trust Agreement; *provided* that nothing in this Plan, the Confirmation Order, or the Wind Down Trust Agreement shall limit or restrain the ability of the Wind Down Trustee to pursue Retained Causes of Action on behalf of all of the Estates.

On the Effective Date, the authority, power, and incumbency of the Persons acting as managers, directors, and officers of the Wind Down Debtors shall vest in the Wind Down Trustee. The Wind Down Trustee shall be appointed the sole manager, sole director, and sole officer of the Wind Down Debtors, as applicable, and shall succeed to the powers of the Debtors' managers, directors, and officers. From and after the Effective Date, the Wind Down Trustee shall be the sole representative of the Wind Down Trust and shall have the authority to sell, liquidate, or otherwise dispose of any and all of the Wind Down Trust Assets without any additional notice to or approval from the Bankruptcy Court, subject to Article IV.B.6 and Article IV.B.7 of the Plan.

The powers, authority, responsibilities, and duties of the Wind Down Trustee shall be governed by this Plan, the Confirmation Order, the Wind Down Trust Agreement, and other applicable Plan Supplement documents. The Wind Down Trustee may execute, deliver, file, or record such documents, instruments, releases, and other agreements, and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan as they relate to the Wind Down Trust. The Wind Down Trustee shall be selected by the Debtors, the Prepetition Agent, and the DIP Agent and disclosed in the Plan Supplement. Any successor Wind Down Trustee shall be appointed pursuant to the Wind Down Trust Agreement. Additional information regarding the Wind Down Trustee will be set forth in the Plan Supplement, including further details with respect to the Wind Down Trustee's responsibilities and authority, powers and limitations, compensation, and professionals.

The Wind Down Trustee shall act as a fiduciary for the Holders of Wind Down Trust Interests. The Wind Down Trustee shall not be liable for any act or omission in such capacity except to the extent determined by a Final Order to constitute gross negligence, fraud, or willful misconduct, and shall be indemnified solely from the Wind Down Trust Assets to the extent provided in the Wind Down Trust Agreement. The Wind Down Trustee may be removed for cause by order of the Bankruptcy Court, or as otherwise provided in the Wind Down Trust Agreement. The Wind Down Trustee shall provide Holders of Wind Down Trust Interests, the Prepetition Agent, and the DIP Agent with periodic reports, no less frequently than semi-annually, of the assets and liabilities of the Wind Down Trust as of the end of the reporting period and the receipts, disbursements, reserves, and distributions of the Wind Down Trust that were made during the reporting period, which may be satisfied by filing such reports on the docket of the Chapter 11 Cases. Such reports also will describe the changes in the Wind Down Trust's assets during the reporting period and the actions taken by the Wind Down Trustee during the period. Although the financial statements contained in such reports will not be audited, they shall be prepared in accordance with generally accepted accounting principles. The Wind Down Trustee shall also distribute to the Holders of the Wind Down Trust Interests a periodic report if, in the opinion of the Wind Down Trustee, a material event relating to the Wind Down Trust's assets has occurred.

3. Wind Down Transactions

The Wind Down Trustee shall retain the authority to take all necessary actions to wind down the operations of the Wind Down Trust and dissolve the Wind Down Debtors, to the extent required by applicable law. Subject in all respects to the terms of this Plan, the Wind Down Trustee shall have the power and authority to take any action necessary to dissolve the Wind Down Debtors, and may: (i) file a certificate of dissolution for each Wind Down Debtor, together with all other necessary corporate and company documents, to effect the dissolution of such Wind

Down Debtor under applicable laws; (ii) complete and file all final or otherwise required federal, state, and local tax returns and pay all required taxes, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of any of the Debtors, the Wind Down Debtors, their respective Estates, or the Wind Down Trust for any tax incurred during the administration of these Chapter 11 Cases, as determined under applicable tax laws; and (iii) represent the interests of the Debtors, the Wind Down Debtors, their respective Estates, and the Wind Down Trust before any taxing authority in all tax matters, including any action, suit, proceeding, or audit.

Any applicable filing by the Wind Down Trustee of any certificates of dissolution (or similar documentation) of the Wind Down Debtors shall be authorized and approved in all respects without further action under applicable law, regulation, order, or rule, including any action by the stockholders, members, officers, board of directors, or board of managers of the Debtors or any of their respective Affiliates. As the Wind Down Debtors will be dissolved upon completion of the administration of this Plan, no new corporate organizational documents will be executed by the Wind Down Trustee other than the Wind Down Trust Agreement.

4. Fees and Expenses of the Wind Down Trustee

The Wind Down Trust Expenses shall be paid after the Effective Date solely using the Wind Down Trust Assets, subject to the Plan and any restrictions on the use of such assets herein. The Wind Down Trustee, on behalf of the Wind Down Trust, may employ, without further order of the Bankruptcy Court, professionals (including professionals previously employed by the Debtors) to assist in carrying out duties for the Wind Down Trust and may compensate and reimburse the expenses of such professionals in the ordinary course, without further order of the Bankruptcy Court, from the Wind Down Account; *provided* that the Wind Down Trustee's retention of professionals shall be subject to the consent of the Prepetition Agent and the DIP Agent, which consent shall not be unreasonably withheld, conditioned, or delayed.

5. Settlement of Claims

Except as otherwise provided in the Plan, on and after the Effective Date, the Wind Down Trustee may compromise or settle any Claims related to the Wind Down Trust Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for Wind Down Trust Expenses, professionals' fees, disbursements, expenses, or related support services (including fees relating to the preparation of Professional fee applications) without application to the Bankruptcy Court.

6. Sales of Assets by the Wind Down Trust

The Wind Down Trustee may sell or liquidate Wind Down Trust Assets on commercially reasonable terms that it determines are in the best interests of the Wind Down Trust, without further Bankruptcy Court approval except as required by the Confirmation Order or applicable law. Any transfer to the Prepetition Secured Parties or Purchaser must be for fair value or constitute a distribution expressly authorized by the Plan and may not impair required reserves or distributions

to other Holders. No such transfer shall include Retained Causes of Action unless expressly authorized by the Plan or a further Bankruptcy Court order.

7. Abandonment of Assets by the Wind Down Trust

The Wind Down Trustee may, with the consent of the Prepetition Agent, on no less than 14 days' written notice to the U.S. Trustee, abandon any Wind Down Trust Assets that the Wind Down Trustee determines are burdensome to the Wind Down Trust, including any pending adversary proceeding or other legal action commenced or commenceable by any Debtor prior to the Effective Date that constitutes a Wind Down Trust Asset; *provided* that if the U.S. Trustee provides a written objection to the Wind Down Trustee prior to the expiration of such 14-day period with respect to the proposed abandonment of any Wind Down Trust Asset, then such property may be abandoned only pursuant to an order by the Bankruptcy Court.

8. Plan Distributions

a. Sources of Consideration for Plan Distributions

On the Effective Date, the Debtors will fund the Debtors' up-front Cash distributions and reserves under the Plan with (i) the Debtors' available Cash on hand, including Cash from operations and the proceeds of the DIP Facility, and (ii) the net Cash proceeds of any Sale Transaction.

b. Professional Fee Escrow Account

The Professional Fee Reserve Amount shall be held in trust in a segregated Professional Fee Escrow Account by the Wind Down Trustee for distributions or payment in accordance with the terms of Article II of the Plan.

c. Distributions to Holders of Wind Down Trust Interests

The Wind Down Trustee shall make distributions to Holders of Wind Down Trust Interests at reasonable intervals in light of the liquidation of Wind Down Trust Assets, which shall be no less than every six months unless a *de minimis* amount of Cash is then available for distribution. The Wind Down Trustee shall schedule a distribution as soon as reasonably practicable after the Wind Down Trust or any Wind Down Debtor receives any proceeds of the Estate Earn Out or of an Alternative Transaction.

Distributions from the Wind Down Trust shall be paid, in each case on a Pro Rata basis, (a) *first*, solely from Prepetition Equity Priority Assets, to the Holders of Wind Down Trust Junior Interests until such Holders of Wind Down Trust Junior Interests have received $2,500,000 in distributions in the aggregate; (b) *second*, to the Holders of Wind Down Trust Senior Interests until Prepetition Lender Recoveries have equaled the Prepetition Lender Priority Amount, and (c) *third* to the Holders of Wind Down Trust Junior Interests. For the avoidance of doubt, the Holders of Wind Down Trust Senior Interests may receive distributions under clause (b) of this paragraph from Prepetition Lender Priority Assets regardless of whether any distributions have been made under clause (a) from Prepetition Equity Priority Assets.

The Wind Down Trustee shall have the right to enforce the rights of the Wind Down Debtors and Wind Down Trust to receive the Estate Earn Out (in the case of the Stalking Horse Sale Transaction) and any other amounts payable to such parties in connection with any Sale Transaction, and no amendment to any agreement or other instrument or document governing or relating in any way to the Estate Earn Out or such other amounts may be amended, modified, supplemented, or terminated in a manner that could adversely affect the payment of the Estate Earn Out or such other amounts without the prior written consent of the Wind Down Trustee (and, unless the Prepetition Lender Recoveries have equaled the Prepetition Lender Priority Amount, the Prepetition Agent), notwithstanding anything to the contrary in any such agreement, instrument, or document.

Neither the Purchaser nor any of the Prepetition Secured Parties shall have any obligation to identify, locate, or make distributions to Holders of CRMT Common Interests or Wind Down Trust Junior Interests, which shall be the sole responsibility of the Wind Down Trustee in accordance with the Plan and the Wind Down Trust Agreement.

C. *Dissolution and Wind Down Transactions*

1. Corporate Existence

On or after the Effective Date, each of the Debtors whose equity is not purchased through a Sale Transaction will be subject to a Dissolution Transaction. The equity or membership interests of each Wind Down Debtor will vest in the Wind Down Trust pursuant to this Plan. For the avoidance of doubt, the Wind Down Debtors, including CRMT, will continue to exist after the Effective Date for the limited purpose of completing the Wind Down Transactions, honoring the obligations of the Debtors under the Transition Services Agreement, and holding and maintaining any permits, licenses, or other authorizations issued by a Governmental Unit that are not transferable under applicable law. Promptly after completing the Wind Down Transactions, the Wind Down Debtors shall be dissolved by the Wind Down Trustee.

2. Dissolution Transactions

On or after the Effective Date, the Debtors or the Wind Down Trustee will enter into such Dissolution Transactions with respect to each Debtor whose equity is not purchased through a Sale Transaction and will take such actions as may be necessary or appropriate to merge, dissolve, or otherwise terminate the corporate existence of the Debtors, without the need for shareholder approval. The actions to effect the Dissolution Transactions may include: (i) the execution and delivery of appropriate agreements or other documents of transfer, merger, consolidation, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law, as well as other terms to which these entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms as these entities may agree; (iii) the filing of appropriate certificates or articles of merger, consolidation, continuance, or dissolution or similar instruments with the applicable governmental authorities; and (iv) the taking of all other actions that the Wind Down Trustee determines to be necessary or appropriate,

including making other filings or recordings that may be required by applicable law in connection with the Dissolution Transactions.

3. Recourse Solely to Purchaser or Wind Down Trust

All Claims against and Interests in the Debtors are deemed satisfied, waived, and released as to the Debtors in exchange for the treatment of such Claims and Interests under the Plan, and Holders of Allowed Claims and Interests against any Debtor will have recourse only to the Purchaser (solely with respect to Claims that constitute Assumed Liabilities under the Purchase Agreement or that are otherwise payable by the Purchaser pursuant to the Sale Transaction Documents) or the Wind Down Trust (as to all other Claims and Interests) subject in all respects to the provisions of the Plan and the Sale Transaction Documents.

4. Cancellation of Existing Securities and Agreements

On the Effective Date, except to the extent otherwise expressly provided in the Plan (including with respect to the Prepetition Loan Documents and the equity or membership interests of the Wind Down Debtors that vest in the Wind Down Trust), (i) all notes, bonds, debentures, instruments, certificates, credit agreements, indentures, collateral documents, guarantees, filings, recordings, registrations, and other Securities, documents, and instruments evidencing, securing, or governing Claims or Interests, and any Claims and Interests that are not represented by certificates or other instruments, shall be canceled, terminated, released, and surrendered automatically without any action on the part of any party, (ii) all Liens of any nature on any assets of any Debtor securing, or purporting to secure, such Claims shall be fully, finally, and irrevocably released and extinguished automatically without any action on the part of any party (and (x) the Debtors are hereby irrevocably authorized to make such filings, recordings, registrations, and notifications, and take such other actions, as the Debtors shall deem necessary or advisable to carry out such release and extinguishment and (y) the Holders of such Claims shall take such actions and execute such instruments as the Debtors may reasonably request to carry out such release and extinguishment) and (iii) the obligations of the Debtors in respect of such Claims or in any way related thereto or arising therefrom (except with respect to any Indemnification Obligations, which obligations shall be assumed and assigned as set forth in Article V.G of the Plan) shall be deemed satisfied in full, terminated, canceled, released, and of no force or effect against the Debtors, the Wind Down Debtors, or the Wind Down Trust, without any further action on the part of the Debtors, the Wind Down Debtors, the Wind Down Trust, or any other Person.

Holders of or parties to such canceled instruments, Securities, and other documentation will have no rights arising from or relating to such instruments, Securities, and other documentation, or the cancellation thereof, except the rights provided for pursuant to the Plan. To the extent applicable, the Debtors' corporate charters shall be deemed amended by the Confirmation Order to provide that no nonvoting equity securities will be issued and to otherwise comply with the requirements of section 1123(a)(6) of the Bankruptcy Code.

Notwithstanding the foregoing, cancellation of AFI Preferred Interests and CRMT Common Interests shall not cancel or release the distribution rights preserved in Article III.B. Those rights shall survive cancellation and dissolution and remain enforceable against the Wind

Down Trust solely to the extent of its express obligations under the Plan. The Wind Down Trustee shall preserve the equity records necessary to identify eligible Holders and make any distributions.

5. Corporate Governance, Directors and Officers

a. Certificates of Incorporation and Bylaws

Consistent with the Plan, upon the completion of the Wind Down Transactions for each applicable Debtor, all of such Debtor's existing certificates of incorporation and bylaws will be automatically deemed to be canceled; accordingly, no new certificates of incorporation and bylaws will be necessary for any Debtors. Certain of the Debtors may continue to exist after the Effective Date as Wind Down Debtors for the purpose of completing the Wind Down Transactions.

b. Directors and Officers

As of the Effective Date, the term of the current members of the boards of directors or boards of managers, as applicable, of each of the Debtors shall expire automatically and each person serving as a director, manager, or officer of each Debtor shall be deemed to have resigned and cease to serve automatically. Consistent with the Plan, the Wind Down Trust Assets will vest in the Wind Down Trust effective as of the Effective Date and, thus, no individuals will serve as directors, officers, or voting trustees after the Effective Date for any Wind Down Debtors. The Wind Down Trustee will be the sole member, manager, director, officer, or other governing body or controlling authority of each Wind Down Debtor as of the Effective Date until such time that such entity completes its respective Dissolution Transactions.

6. Insurance Policies

To the extent that any of the Debtors' insurance policies constitute Executory Contracts, such insurance policies and any agreements, documents, or instruments relating thereto, are treated as and deemed to be Executory Contracts under the Plan and shall be assumed by the Debtors and assigned to the Wind Down Trust on the Effective Date or transferred to the Purchaser as Purchased Assets, as applicable, notwithstanding anything to the contrary in Article V hereof. All other insurance policies shall remain property of the applicable Wind Down Debtor, subject to the rights of the Wind Down Trust, or be transferred to the Purchaser as Purchased Assets, as applicable.

7. D&O Liability Insurance Policies

Notwithstanding anything in the Plan to the contrary, including in Article V hereof, as of the Effective Date, the Debtors shall be deemed to assume and vest in the Wind Down Trust all D&O Liability Insurance Policies (including tail coverage liability insurance) pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' assumption of each of the D&O Liability Insurance Policies. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be Filed, and shall survive the Effective Date. On the Effective

Date, all D&O Liability Insurance Policies shall remain property of the applicable Wind Down Debtor, subject to the rights of the Wind Down Trust, consistent with the Confirmation Order without further order of the Bankruptcy Court.

8. Preservation of Causes of Action

Except as provided in the Plan, or in any contract, instrument, release, or other agreement entered into or delivered in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Wind Down Trust will retain and may enforce any claims, demands, rights, and causes of action that any Estate may hold against any Person to the extent not satisfied, settled, and released under the Plan or otherwise, including the Retained Causes of Action; *provided* that the Wind Down Trust will not retain any Causes of Action that are assigned to Purchaser as Purchased Assets in connection with the Sale Transaction or Causes of Action (including Preference Actions) released hereunder. The Wind Down Trustee may pursue any such retained claims, demands, rights, or causes of action, as appropriate, in accordance with the best interests of the Wind Down Trust. Except to the extent any such claim is expressly satisfied, settled, and released herein, in accordance with and subject to any applicable law, the Debtors' inclusion or failure to include any Cause of Action on the Schedule of Retained Causes of Action shall not be deemed an admission, denial, or waiver of any claims, demands, rights, or causes of action that any Debtor or Estate may hold against any Person. Except to the extent any such claim is expressly satisfied, settled, and released herein, the Debtors intend to preserve those claims, demands, rights, or causes of action designated as Retained Causes of Action.

9. Substitution in Pending Legal Actions

On the Effective Date, the Wind Down Trust, the Wind Down Trustee, or the Purchaser, as applicable, shall be deemed to be substituted as the party to any litigation in which the Debtors are a party, including (but not limited to) (i) pending contested matters or adversary proceedings in the Bankruptcy Court, (ii) any appeals of orders of the Bankruptcy Court, and (iii) any state court or federal or state administrative proceedings or any other applicable jurisdiction pending as of the Petition Date. The Wind Down Trustee and its professionals are not required to, but may, take such steps as are appropriate to provide notice of such substitution.

10. Effectuating Documents; Further Transactions

The Debtors (prior to the Effective Date) and the Wind Down Trustee (on or after the Effective Date) are authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and evidence the terms and conditions of the Plan, the Purchase Agreement, and the Dissolution Transactions, in each case, in the name of and on behalf of any Debtor or the Wind Down Trust, as applicable, without the need for any approvals, authorizations, or consents except those expressly required pursuant to the Plan.

Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, real estate transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee or other similar tax or governmental assessment:

(a) any transfer made by the Debtors to the Wind Down Trust; (b) any transfer made by the Debtors and, if applicable, the Wind Down Trust to the Purchaser pursuant to the Plan, the Purchase Agreement, and/or the Sale Order; (c) any sales made by the Wind Down Trust to liquidate such assets in the Wind Down Trust and convert such assets into Cash; (d) the making or assignment of any lease or sublease; (e) any Dissolution Transaction; and (f) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale, or assignments executed in connection with any of the foregoing or pursuant to the Plan.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A. *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein (which exclusion includes the Indemnification Obligations and the D&O Liability Insurance Policies), all Executory Contracts or Unexpired Leases not previously assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court or not included on the Schedule of Assumed Executory Contracts and Unexpired Leases, will be deemed rejected, in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code other than those Executory Contracts or Unexpired Leases that are (a) identified on the Schedule of Assumed Executory Contracts and Unexpired Leases, (b) the subject of a motion to assume that is pending on the Confirmation Date, or (c) the subject of an unresolved cure dispute as of the Effective Date (and shall be assumed, assumed and assigned, or rejected, as applicable, upon the resolution of such cure dispute in accordance with the Sale Transaction Documents).

Entry of the Confirmation Order and/or Sale Order, as applicable, shall constitute the Bankruptcy Court's order approving the assumptions, assumptions and assignments, or rejections, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each Executory Contract or Unexpired Lease comprising a Purchased Contract shall vest in and be fully enforceable by the Purchaser in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court. Notwithstanding anything to the contrary in the Plan, the Debtors reserve the right, with the consent of or at the direction of the Purchaser (with respect to Executory Contracts or Unexpired Leases subsequently designated as Purchased Contracts), or with the consent of the Prepetition Agent and the DIP Agent, to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases at any time prior to the Effective Date on no less than two Business Days' notice to the applicable non-Debtor counterparties.

Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date.

B. *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court on or prior to the Rejection Damages Bar Date. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Wind Down Debtors, the Wind Down Trust, the Estates, the Purchaser, or their property (as applicable), without the need for any objection by the Wind Down Trust, Wind Down Trustee, or Purchaser (as applicable), or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied and released, notwithstanding anything in the Proof of Claim to the contrary.** All Allowed Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.B of the Plan.

C. *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under an Executory Contract or Unexpired Lease assumed hereunder, as reflected on the applicable Cure Notice, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the proposed cure amount (if any) in Cash by the Purchaser (to the extent provided for by the Purchase Agreement) or by the Debtors on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

1. Cure of Defaults for Purchased Contracts Under the Purchase Agreement

Consistent with the Purchase Agreement and subject to the terms and conditions therein, within three Business Days after the Petition Date, or, with respect to any Executory Contract or Unexpired Lease that becomes a Purchased Contract after the Petition Date, within three Business Days after such designation, the Debtors shall deliver a Cure Notice, in form and substance reasonably acceptable to the Purchaser, of potential assumption and assignment and proposed cure of the Purchased Contracts to the applicable counterparty (each a "***Contract Counterparty***"), which shall specify: (a) that such contract is contemplated to be assumed and assigned to the Purchaser as a Purchased Contract in connection with the Sale Transaction; (b) the proposed Cure Claim with respect to each Purchased Contract; and (c) that each respective Contract Counterparty may file an objection (a "***Contract Objection***") to the proposed assumption and assignment of the applicable Purchased Contract or the proposed Cure Claim, if any. Such Contract Objection must (i) be in writing; (ii) comply with the Bankruptcy Rules and the Bankruptcy Local Rules; (iii) be Filed with the Bankruptcy Court, together with proof of service, on or before 5:00 p.m. (Central Time) on the date that is 21 days after the date the Debtors served the Cure Notice (the "***Cure Notice Objection Deadline***"); (iv) be served, so such objection is actually received on or before the Cure Notice Objection Deadline on counsel to the Debtors, counsel to the DIP Secured Parties, counsel to the Purchaser, and the U.S. Trustee; and (v) state with specificity the grounds for such objection, including, without limitation, the asserted amount of the fully liquidated Cure Claim and the legal and factual bases for any unliquidated portion of the Cure Claim that the Contract

Counterparty believes is required to be paid under section 365(b)(1)(A) and (B) of the Bankruptcy Code for the applicable Purchased Contract, along with the specific nature and dates of any alleged defaults, the pecuniary losses, if any, resulting therefrom, and the conditions giving rise to any such defaults. If a Contract Counterparty files a Contract Objection in a manner that is consistent with the requirements set forth above and the parties are unable to consensually resolve the dispute before the Sale Hearing, the amount to be paid or reserved with respect to such Contract Objection will be determined at the Sale Hearing or such other date determined by the Bankruptcy Court.

2. Cure of Defaults for Other Assumed Executory Contracts and Unexpired Leases

For all other Executory Contracts or Unexpired Leases not deemed "Purchased Contracts" (if any), at least 14 days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed cure amounts to the applicable third parties. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount paid or proposed to be paid by the Debtors or the Wind Down Trust to such counterparty must be Filed with the Bankruptcy Court and served on and actually received by the Debtors at least seven days before the Confirmation Hearing. **Any counterparty that fails to timely object to the proposed assumption or proposed cure amount shall be deemed to have assented to such assumption and cure amount, and any such objection shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against the Debtors or the Wind Down Trust, without the need for any objection by the Wind Down Trust or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.**

Any Cure Claim shall be deemed fully satisfied and released upon payment by the Debtors, the Wind Down Debtors, the Wind Down Trust, or the Purchaser, as applicable, of the amount set forth in the applicable Cure Notice or, if the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is determined by a Final Order to be greater than the applicable amount set forth in the Cure Notice, the amount of such Allowed Cure Claim; *provided*, *however*, that following entry of a Final Order resolving any such dispute, the applicable Debtor shall, with the consent of or at the direction of the Purchaser, have the right to reject any Executory Contract or Unexpired Lease within 30 days of such resolution. The Wind Down Trust or Purchaser, as applicable, may also settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.

If there is any dispute regarding any Cure Claim, the ability of the Wind Down Trust or the Purchaser, as applicable, to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Wind Down Trust, as applicable, and the counterparty to the Executory Contract or Unexpired Lease, in each case with the consent of or at the direction of the Purchaser. Notwithstanding the foregoing, to the extent the dispute relates solely to any Cure Claims, the applicable Debtor may, with the consent of the Purchaser, assume the Executory Contract or Unexpired Lease prior to the resolution of any such dispute; *provided*, *however*, that the Debtor or Purchaser reserves Cash in an amount sufficient to pay the full amount reasonably

asserted as the required Cure Claim by the contract counterparty; *provided further, however*, that following entry of a Final Order resolving any such dispute, the applicable Debtor shall, with the consent of the Purchaser, have the right to reject any Executory Contract or Unexpired Lease within 30 days of such resolution.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Sale Transaction Documents, this Plan, or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy or insolvency-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D. *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

E. *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan or the Sale Transaction Documents, shall constitute an admission by the Debtors, the Wind Down Debtors, the Wind Down Trust, the Purchaser, or the Wind Down Trustee (as applicable) that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor, the Wind Down Trust, the Purchaser, or the Wind Down Trustee (as applicable) has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Wind Down Debtors, the Wind Down Trust, the Purchaser, or the Wind Down Trustee (as applicable) shall have 30 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

F. *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

G. *Indemnification Obligations*

All Indemnification Obligations shall not be impaired by Confirmation of the Plan or entry of the Confirmation Order and shall instead be assumed by the Purchaser and remain intact, irrevocable, and shall survive the entry of the Confirmation Order and Effective Date of the Plan on terms no less favorable to such current and former directors, officers, managers, equity holders, employees, attorneys, accountants, investment bankers, and other professionals of any of the Debtors and such current and former directors', officers', and managers' respective Affiliates than the Indemnification Obligations in place prior to the Petition Date. The Purchaser shall be responsible for payment and performance of these obligations. Nothing in the Plan impairs any beneficiary's rights under the D&O Liability Insurance Policies or creates an indemnification right that did not exist before the Petition Date.

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

A. *Timing and Calculation of Amounts to Be Distributed*

Unless the Plan provides otherwise, each Holder shall receive its distribution on the Effective Date or as soon as reasonably practicable thereafter, or after its Claim becomes Allowed. An Allowed portion shall be paid notwithstanding a dispute over the remainder, subject to Article VII. An act or payment due on a non-Business Day may be completed on the next Business Day and deemed timely. Except as required by the Plan or applicable law, no interest, dividends, or accruals are payable because a distribution occurs after the Effective Date.

The Wind Down Trustee may seek Bankruptcy Court approval of proposed reserves and interim distributions, and no interim distribution may prejudice a senior entitlement.

Assets and liabilities shall be accounted for separately by Debtor; subsidiary value may reach CRMT only through distributions or other transactions permitted by the Plan and applicable law. The Wind Down Trustee shall use the equity records and, where appropriate, the transfer agent and securities depository to identify and pay Holders as of the applicable Distribution Record Date.

The Disbursing Agent shall use the transfer agent's and securities depository's records as of the Distribution Record Date and pay eligible Holders within 10 Business Days after the Effective Date, subject to necessary reconciliation and applicable withholding.

B. *Disbursing Agent*

All distributions under the Plan shall be made by the Disbursing Agent or by the Purchaser, as applicable. Neither the Disbursing Agent nor the Purchaser shall be required to give any bond

or surety or other security for the performance of its duties under the Plan unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Wind Down Trust, but the Wind Down Trust shall not bear any costs of any security required to be provided by the Purchaser.

a. Powers of the Disbursing Agent

The Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

b. Expenses Incurred On or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent on or after the Effective Date, and any reasonable and documented compensation and expense reimbursement claims (including reasonable and documented attorney fees and expenses), made by the Disbursing Agent shall be paid in Cash by the Purchaser, the Wind Down Trust, or the Wind Down Trustee (as applicable).

c. No Liability

Except on account of gross negligence, fraud, or willful misconduct, the Disbursing Agent shall have no (a) liability to any party for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (b) obligation or liability to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or any other date on which a distribution is made or who does not otherwise comply with the terms of the Plan.

C. *Delivery of Distributions and Undeliverable or Unclaimed Property*

1. <u>Delivery of Distributions</u>

a. Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims and Interests maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims and Interests. The Disbursing Agent shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

b. Delivery of Distributions in General

Except as otherwise provided herein, the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests as of the Distribution Record Date at the address

for each such Holder as indicated on the Debtors' records as of the date of any such distribution; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Debtors or the Wind Down Trustee (as applicable).

c. Delivery of Distributions on Prepetition Secured Loan Claims

The Prepetition Agent shall be deemed to be the Holder of all Prepetition Secured Loan Claims for purposes of distributions to be made hereunder, other than distributions made on account of Wind Down Trust Senior Interests, and all such distributions shall be made to the Prepetition Agent. As soon as practicable following compliance with the requirements set forth in Article VI of the Plan, the Prepetition Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed Prepetition Secured Loan Claims in accordance with the terms of the Prepetition Loan Documents, subject to any modifications to such distributions in accordance with the terms of the Plan.

d. Delivery of Distributions on DIP Claims

The DIP Agent shall be deemed to be the Holder of all DIP Claims for purposes of distributions to be made hereunder, and all distributions on account of such DIP Claims shall be made to the DIP Agent. As soon as practicable following compliance with the requirements set forth in Article VI of the Plan, the DIP Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of DIP Claims in accordance with the terms of the DIP Facility Documents, subject to any modifications to such distributions in accordance with the terms of the Plan.

e. Minimum Distributions

No distribution is required to be made by the Disbursing Agent on account of an Allowed Claim if the amount to be distributed to the Holder of such Claim on the applicable distribution date has an economic value of less than $50.

2. <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that any distribution to any Holder is returned as undeliverable, no distribution to such Holder shall be made unless and until the Debtors or the Wind Down Trust, as applicable, shall have determined the then-current address of such Holder, at which time such distribution shall be made to such Holder without interest; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the Effective Date. After such date, all unclaimed property or interests in property shall be returned to the Wind Down Trust and applied first to unpaid Plan obligations and reasonable reserves, with any remaining balance administered as Residual Assets pursuant to <u>Article IV.B.8.c</u> without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or interest in property shall be released and forever barred.

D. *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors, Wind Down Trustee, Purchaser, Disbursing Agent, and any applicable withholding agent shall comply with all applicable tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions until receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. For these purposes, all distributions made on behalf of the Debtors pursuant to the Plan shall if applicable be first in satisfaction of the portion of Claims that are not subject to any withholding tax obligation. All Persons holding Claims against any Debtor shall be required to provide any additional information reasonably necessary for the Debtors, Wind Down Trustee, Purchaser, Disbursing Agent, and any applicable withholding agent to comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, including an IRS Form W-8 or W-9, as applicable, and any other applicable tax forms. The Debtors, Wind Down Trust, Wind Down Trustee, Purchaser, and Disbursing Agent (as applicable) reserve the right to allocate all distributions made under the Plan in a manner that complies with all other legal requirements, such as applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim or Allowed Interest shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution.

E. *Foreign Currency Exchange Rate*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in *The Wall Street Journal*, National Edition, on the Effective Date.

F. *Surrender of Cancelled Instruments or Securities*

As a condition precedent to receiving any final distribution on account of its Allowed Claim or Interest, each Holder of a Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentation shall be deemed to be canceled pursuant to Article IV of the Plan, except to the extent otherwise provided in the Plan.

G. *Allocations*

The aggregate consideration to be distributed to each Holder of an Allowed Claim will be allocated first to the principal amount of such Allowed Claim, with any excess allocated to unpaid interest that accrued on such Allowed Claims, if any.

H. *No Postpetition Interest on Claims*

Unless otherwise expressly provided for in an order of the Bankruptcy Court, the Plan, the Confirmation Order, the DIP Facility Documents, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

I. *Setoffs and Recoupment*

The Debtors, the Wind Down Debtors, the Wind Down Trust, the Wind Down Trustee, or the Purchaser may, but shall not be required to, set off against, or recoup from, any Allowed Claim (other than an Allowed General Unsecured Claim) against a Debtor of any nature whatsoever that the applicable Debtor, Wind Down Trust, Wind Down Trustee, or Purchaser (as applicable) may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim against a Debtor hereunder shall constitute a waiver or release by the applicable Debtor, Wind Down Trust, Wind Down Trustee, or Purchaser (as applicable) of any such Claim it may have against the Holder of such Allowed Claim.

Notwithstanding anything to the contrary herein, the DIP Claims and any Plan distributions to be made on account of such DIP Claims shall not be subject to setoff or recoupment by the Debtors, the Wind Down Debtors, the Wind Down Trust, the Wind Down Trustee, or the Purchaser pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, and the Debtors, the Wind Down Debtors, the Wind Down Trust, the Wind Down Trustee, and the Purchaser hereby waive any and all rights of set off or recoupment against such DIP Claims.

J. *Claims Paid or Payable by Third Parties*

1. Claims Paid by Third Parties

The Debtors, the Wind Down Debtors, the Wind Down Trust, the Wind Down Trustee, or the Purchaser (as applicable), shall reduce in full an Allowed Claim (including any applicable Cure Claim of a Purchased Contract paid by the Purchaser), and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, Wind Down Debtor, Wind Down Trust, the Wind Down Trustee, or the Purchaser (as applicable); *provided* that the Debtors, the Wind Down Debtors, the Wind Down Trust, the Wind Down Trustee, or the Purchaser (as applicable) shall provide 21 days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and thereafter receives payment from a party that is not a Debtor, Wind Down Debtor, Wind Down Trust, the Wind Down Trustee, or the Purchaser (as applicable) on account of such Claim, such Holder shall, within 14 days of receipt thereof, repay or return the distribution to the Debtors, the Wind Down Debtors, the Wind Down Trust, the Wind Down Trustee, or the Purchaser (as applicable), to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the Petition Date. The failure of such

Holder to timely repay or return such distribution shall result in the Holder owing the Wind Down Trust, the Wind Down Trustee, or the Purchaser (as applicable) annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2. Claims Payable by Insurers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim, then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court; *provided* that the Debtors, the Wind Down Debtors, the Wind Down Trust, the Wind Down Trustee, or the Purchaser (as applicable), shall provide 21 days' notice to the Holder of such Claim prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.

3. Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS

A. *General Bar Date; Allowance of Claims*

In order to receive any distributions under the Plan, Holders of Claims (other than Class 3 Prepetition Secured Loan Claims, Rejection Damages Claims, Administrative Expense Claims, and Professional Fee Claims) whose Claims are ***not*** assumed by the Purchaser shall be required to File Proofs of Claim with the Bankruptcy Court or the Noticing and Claims Agent on or before the General Bar Date. **Any Holder of such Claims that fails to File a timely Proof of Claim shall be forever barred from receiving any distributions on account of such Claims from the Debtors, the Wind Down Debtors, the Wind Down Trust, or the Wind Down Trustee.**

Notwithstanding section 502(a) of the Bankruptcy Code, and except as otherwise set forth in the Plan, Holders of Claims (other than Claims subject to the preceding paragraph, Rejection Damages Claims, and Professional Fee Claims) and Interests need not File Proofs of Claim with the Bankruptcy Court or the Noticing and Claims Agent and shall not be subject to any claims-resolution process in the Bankruptcy Court in connection with such Claims. Any disputes with respect to any such Claims or Interests may be resolved by the Holder of such Claims or Interests

and the Wind Down Trustee or the Purchaser (as applicable) as if the Chapter 11 Cases had not been commenced; *provided* that, in the event of any dispute with respect to any such Claims or Interests payable by the Wind Down Trust, the Wind Down Trustee may (but shall not be required to) seek allowance (or disallowance) of any such Claims or Interests in the Bankruptcy Court.

Prior to the Effective Date, the Debtors, and, from and after the Effective Date, the Wind Down Trustee and Purchaser (as applicable), shall have the right to: (1) File objections to Claims or Interests that have not already been Allowed by Final Order, agreement, or this Plan; and (2) litigate any Disputed Claims or Interests (other than Professional Fee Claims or Rejection Damages Claims) in the Bankruptcy Court or any other court of competent jurisdiction. Notwithstanding any prior order of the Bankruptcy Court, other than with respect to Professional Fee Claims, prior to the Effective Date, the Debtors, and, from and after the Effective Date, the Wind Down Trustee and the Purchaser (as applicable), shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections to Disputed Claims or Interests and to compromise, settle, or otherwise resolve any Disputed Claims or Interests without approval of the Bankruptcy Court.

The Debtors, Wind Down Trustee, and Purchaser, as applicable, shall not be subject to any claims objection deadline or similar deadline for disputing Claims or Interests unless and until the Holder of such Claims or Interests Files a motion or application seeking allowance and payment of such Claims.

On or after the Effective Date, the Wind Down Trust, the Wind Down Trustee, or the Purchaser (as applicable) shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim or Interest immediately before the Effective Date. All settlements of Claims or Interests approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019, or otherwise shall be binding on all parties.

B. *Claims and Interests Administration Responsibilities*

Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Wind Down Trust, the Wind Down Trustee, or the Purchaser (as applicable), by order of the Bankruptcy Court, shall together have the sole authority to: (1) File, withdraw, or litigate to judgment objections to Claims or Interests; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. In any action or proceeding to determine the existence, validity, or amount of any General Unsecured Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such General Unsecured Claim are preserved as if the Chapter 11 Cases had not been commenced.

C. *Adjustment to Claims or Interests Without Objection*

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register without the Wind Down Trust, the Wind Down Trustee, or the Purchaser (as applicable)

having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

D. *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code (but which right of recovery is not otherwise released by the Plan) shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action (other than Causes of Action that constitute a Purchased Asset under the Purchase Agreement) against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors, the Wind Down Debtors, the Wind Down Trust or the Wind Down Trustee (as applicable).

**EXCEPT AS PROVIDED HEREIN, IN AN ORDER OF THE BANKRUPTCY COURT, OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM OR OTHER REQUESTS FOR ALLOWANCE AND/OR PAYMENT THAT ARE REQUIRED TO BE FILED BUT ARE FILED AFTER THE APPLICABLE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS AT OR PRIOR TO THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

E. *Amendments to Claims*

On or after the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

F. *No Distributions Pending Allowance*

Notwithstanding any other provision of this Plan to the contrary, no payment or distribution of any kind or nature provided under the Plan shall be made to the extent that all or any portion of any Claim is a Disputed Claim, including if an objection to a Claim or portion thereof is Filed as set forth in Article VII, unless and until such Disputed Claim becomes an Allowed Claim; *provided* that any portion of a Claim that is an Allowed Claim shall receive the payment or distribution provided under the Plan thereon notwithstanding that any other portion of such Claim is a Disputed Claim.

G. *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100% of such Allowed Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A. *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan, which distributions, releases, and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan, and the distributions, releases, and other benefits provided hereunder, shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that all such compromises and settlements are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and are fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Wind Down Trust, the Wind Down Trustee, or the Purchaser (as applicable) may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

In accordance with Bankruptcy Rule 9019, the Plan constitutes the good-faith compromise and settlement between the Debtors and the Prepetition Secured Parties regarding the matters set forth herein, and reflects and implements such compromise and settlement. Such compromise and settlement is made in exchange for consideration and is in the best interests of the Debtors' Estates, is within the reasonable range of possible litigation outcomes, is fair, equitable, and reasonable, and is an essential element of the resolution of these Chapter 11 Cases.

B. *Satisfaction of Claims and Termination of Interests*

Except as expressly provided in the Plan, Confirmation Order, or Sale Order, Claims and Interests shall receive only the treatment provided under the Plan, and Interests shall terminate as provided therein. Nothing in the Plan grants the Debtors a discharge prohibited by section 1141(d)(3) of the Bankruptcy Code. The Plan's settlements, releases, injunctions, and recourse limitations apply only to the extent permitted by applicable law. No provision eliminates a Holder's right to receive required Plan treatment or enforce an obligation expressly preserved under the Plan or Sale Transaction Documents.

C. *Term of Injunctions or Stays*

Unless otherwise provided herein, the Confirmation Order, or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date set forth in the order providing for such injunction or stay.

D. *Release of Liens*

**Except as otherwise expressly provided in the Confirmation Order, the DIP Orders, the Sale Order (solely with respect to any Permitted Encumbrances (as defined in the Purchase Agreement), Assumed Liabilities, and Other Secured Claims secured by Purchased Assets), the Plan, and/or the Plan Supplement, on the Effective Date and concurrently with the applicable distributions or other treatment made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates, including, without limitation, the Purchased Assets, shall be fully released, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Wind Down Trust and its successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Debtors, the Wind Down Debtors, the Wind Down Trust, the Wind Down Trustee, or the Purchaser (as applicable).**

E. *Releases by the Debtors*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is hereby released by the Debtors, their Estates, the Wind Down Debtors, and the Wind Down Trust (as applicable) from any and all Claims, Causes of Action, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, their Estates, the Wind Down Debtors, or the Wind Down Trust), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereafter arising, in law, equity, contract, tort, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, the Debtor-Related Matters. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Article VIII.E do not release (i) any post-Effective Date obligations (including Indemnification Obligations) of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (ii) any Claims or Causes of Action arising from any obligations of any party under the Purchase Agreement and Sale Order, or from any Causes of Action constituting Purchased Assets; (iii) any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct; or (iv) any Retained Causes of Action expressly enumerated in the Schedule of Retained Causes of Action.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors set forth in this Article VIII.E, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors or their Estates asserting any Claim or Cause of Action released pursuant to such releases.**

F. *Releases by Releasing Parties*

**As of the Effective Date, each Releasing Party hereby releases each Debtor, Estate, Wind Down Trust, and Released Party from any and all Claims, Causes of Action, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Wind Down Trust, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereafter arising, in law, equity, contract, tort, or otherwise, that such Releasing Party or its estate, heirs, executors, administrators, successors, or assigns would have been legally entitled to assert in his, her, or its own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor-Related Matters. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Article VIII.F do not release (i) any post-Effective Date obligations (including Indemnification Obligations) of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; (ii) any assumed Indemnification Obligations; (iii) any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct; or (iv) any Retained Causes of Action expressly enumerated in the Schedule of Retained Causes of Action.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Interests set forth in this Article VIII.F, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan and the Restructuring; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such releases.**

G. *Exculpation*

**Except as otherwise expressly provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby exculpated from, any Claim, Cause of Action, obligation, suit, judgment, damage, demand, loss, or liability for any claim related to any act or omission in connection with, relating to, or arising out of, the negotiation, solicitation, confirmation, execution, or implementation of, as applicable, the Debtor-Related Matters taking place between the earlier of the Petition Date and the date of appointment to any such role, as applicable, and the Effective Date, except for claims related to any act or omission that is determined in a Final Order to have constituted fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Confirmation Order shall provide that the Exculpated Parties (to the extent applicable) have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. For the avoidance of doubt, nothing in this Article VIII.G shall, nor shall it be deemed to, exculpate any Exculpated Party from (i) any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan; or (ii) any Retained Causes of Action expressly enumerated in the Schedule of Retained Causes of Action.**

H. *Injunction*

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released pursuant to Article VIII.E or Article VIII.F, satisfied pursuant to Article VIII.B, or are subject to exculpation pursuant to Article VIII.G, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind Down Debtors, the Wind Down Trust, the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property, including, without limitation, the Purchased Assets (other than the enforcement of Other Secured Claims secured by Purchased Assets), or the estates of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action; or (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims, Interests, or Causes of Action. Notwithstanding anything to the contrary in the foregoing, this injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to**

**implement the Plan from bringing an action in the Bankruptcy Court to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan. Subject in all respects to Article XI, no entity or person may commence or pursue a Claim or Cause of Action of any kind against any Released Party or Exculpated Party that arose or arises from, in whole or in part, the Chapter 11 Cases, the Debtors, the Wind Down Trust, the Plan, the Plan Supplement, the Disclosure Statement, the Sales Process, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Disclosure Statement, the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the distribution of property under the Plan, or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a colorable Claim or Cause of Action of any kind, including negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Released Party or Exculpated Party and (ii) expressly authorizing such entity or person to bring such Claim or Cause of Action against any such Released Party or Exculpated Party. The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and, only to the extent legally permissible and as provided for in Article XI, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action. For the avoidance of doubt, this Article VIII.H shall not preclude any Entity from taking any permitted action to enforce the provisions of the Plan, Confirmation Order, Sale Order, Purchase Agreement, or any other Definitive Documentation in a manner consistent with the terms thereof.**

I. ***Releases of Preference Actions***

**All Preference Actions shall be deemed to be released and waived as of the Effective Date.**

J. *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Entities, including Governmental Units, shall not discriminate against the Wind Down Debtors, Wind Down Trust or the Wind Down Trustee (as applicable) or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Wind Down Debtors, the Wind Down Trust or the Wind Down Trustee (as applicable), or another Entity with whom the Wind Down Debtors, the Wind Down Trust or the Wind Down Trustee (as applicable) have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases, or has not paid a debt that is subject to the Chapter 11 Cases.

K. *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors, the Wind Down Debtors, the Wind Down Trust, the Wind Down Trustee, or the Purchaser (as applicable), unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

L. *Subordination Rights*

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

M. *Document Retention*

On and after the Effective Date, the Wind Down Trust, the Wind Down Trustee, or the Purchaser (as applicable) may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Wind Down Trust, the Wind Down Trustee, or the Purchaser (as applicable).

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A. *Conditions Precedent to the Effective Date*

It shall be a condition to the occurrence of the Effective Date that the following conditions, as determined by the Debtors with the consent of the DIP Agent and the Prepetition Agent, shall have been satisfied (or waived pursuant to the provisions of Article IX.B of the Plan):

1. the Confirmation Order shall have been entered and shall not have been stayed, modified, or vacated on appeal;

2. the Sale Order shall have been entered (whether or not included as a part of the Confirmation Order), and shall not have been stayed, modified, or vacated on appeal;

3. the Sale Transaction shall have been consummated in accordance with the terms of the Purchase Agreement;

4. the Final DIP Order shall have been entered by the Bankruptcy Court and shall not have been breached or terminated, shall be in full force and effect, and no stay thereof shall be in effect;

5. the Debtors shall have fully funded the Professional Fee Escrow Account in an amount equal to the Professional Fee Reserve Amount;

6. all required governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan and the Sale Transaction Documents (to the extent such approvals are conditions precedent to the consummation of the Sale Transaction and are not waived by the applicable parties in accordance with the Purchase Agreement) shall have been obtained, shall not be subject to unfulfilled conditions, and shall be in full force and effect, and all applicable waiting periods shall have expired without any action having been taken by any competent authority that would restrain or prevent such transactions;

7. all documents and agreements necessary to implement the Plan and the Restructuring shall have been (a) tendered for delivery and (b) effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements (other than any conditions related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements;

8. the Bankruptcy Court shall have approved the Plan's releases, exculpation provisions, and injunction;

9. all Restructuring Expenses shall have been paid in Cash in full unless otherwise satisfied pursuant to the terms of the Plan or the Purchase Agreement; and

10. the Debtors shall have fully funded the Wind Down Account in an amount equal to the Wind Down Amount.

B. *Waiver of Conditions*

The conditions precedent to the Effective Date of the Plan set forth in Article IX.A may be amended, modified, supplemented, or waived in writing by mutual agreement of the Debtors, the DIP Agent, and the Prepetition Agent, without notice, leave, or order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A. *Modification and Amendments Prior to Confirmation*

The Debtors may amend, modify, or supplement the Plan before Confirmation and seek Confirmation without resolicitation to the extent permitted by the Bankruptcy Code and Bankruptcy Rules; *provided* that the Plan shall not be so amended, modified, or supplemented in any manner inconsistent with the DIP Orders, without the prior written consent of the Prepetition Agent and the DIP Agent. After Confirmation, the Debtors or Wind Down Trustee, as applicable, may modify the Plan under section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, or seek to cure defects, omissions, or inconsistencies in the Plan, Disclosure Statement, or Confirmation Order; *provided* that no post-confirmation modification shall be implemented to the extent it would adversely affect the rights of the Prepetition Secured Parties or the DIP Secured

Parties under the Prepetition Loan Documents, the DIP Orders, or the DIP Facility Documents, without the Prepetition Agent's or the DIP Agent's prior written consent, as applicable.

B. *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring prior to entry of the Confirmation Order are approved pursuant to section 1127(a) of the Bankruptcy Code and shall constitute a finding that such modifications or amendments to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C. *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan with respect to any or all Debtors prior to the Confirmation Date and to File subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation do not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity; or (iv) be used by the Debtors or any other Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims; *provided* that the foregoing reservation of rights shall not in any way amend, nullify, or void any action, act, or right ratified upon the Bankruptcy Court's entry of the Sale Order.

## ARTICLE XI.
## RETENTION OF JURISDICTION

A. *Retention of Jurisdiction*

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1. Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, Secured, Unsecured, or subordinated status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections relating to any of the foregoing;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3. resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or unexpired;

4. ensure that distributions to Holders of Allowed Claims or Interests are accomplished pursuant to the provisions of the Plan;

5. consider any modifications of the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, the Confirmation Order, the Sale Order or any contract, instrument, release, or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the Sale Order in each case, to remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order, the Sale Order, or any contract, instrument, release, or other agreement or document entered into, delivered, or created in connection with the Plan, the Disclosure Statement, the Confirmation Order, or the Sale Order in such manner as may be necessary or appropriate to consummate the Plan;

6. adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

7. adjudicate, decide, or resolve any and all matters related to Causes of Action by or against a Debtor, a Wind Down Debtor, the Wind Down Trustee, or the Wind Down Trust;

8. adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code;

9. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

10. enter and enforce any order for the sale of property pursuant to sections 363 or 1123 of the Bankruptcy Code, including, without limitation, the Confirmation Order and the Sale Order;

11. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

12. adjudicate, decide, or resolve any dispute and all matters related to the Sale Transaction and Sale Transaction Documents, including, without limitation, in connection with the Estate Earn Out;

13. adjudicate, decide, or resolve any dispute and all matters that may arise in connection with or related to the DIP Orders and the Debtors' use of cash collateral;

14. issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

15. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

16. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI.J of the Plan;

17. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

18. determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or the Sale Order;

19. adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein, including any transactions with respect to the Restructuring;

20. determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

21. hear and determine matters concerning state, local, and U.S. federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22. hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute or matter relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23. enforce all orders previously entered by the Bankruptcy Court;

24. enter final decrees concluding or closing the Chapter 11 Cases;

25. enforce the injunction, release, and exculpation provisions set forth in Article VIII of the Plan; and

26. hear any other matter not inconsistent with the Bankruptcy Code.

# ARTICLE XII.
# MISCELLANEOUS PROVISIONS

A. *Immediate Binding Effect*

Subject to any applicable statutory limitations, Article IX.A of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, the Confirmation Order, and the Sale Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Wind Down Debtors, or the Wind Down Trust, as applicable, and any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions provided for in the Plan, each Entity acquiring property under the Plan or the Confirmation Order or the Sale Order (including the Purchaser), and any and all non-Debtor parties to Executory Contracts and Unexpired Leases. All Claims and debts shall be fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B. *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan; *provided* that such Filings shall be in form and substance reasonably acceptable to the Prepetition Agent and the DIP Agent with respect to any such Filings that would materially affect the rights of such parties. The Debtors, the Wind Down Debtors, the Wind Down Trust, the Wind Down Trustee, or the Purchaser, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C. *Reservation of Rights*

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order. Prior to the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests.

D. *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

E. *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors, the Wind Down Debtors, the Wind Down Trust, the Wind Down Trustee, the Prepetition Agent, the DIP Agent, or the Purchaser (in the event of a Stalking Horse Sale Transaction), as applicable, shall be served on:

1. if to the Debtors or the Wind Down Debtors, to:

America's Car-Mart, Inc.
1805 North 2nd Street, Suite 401
Rogers, Arkansas 72756
Attention: Douglas Campbell
Brett Papasan
E-mail address: douglas.campbell@car-mart.com
brett.papasan@car-mart.com

- and -

Mayer Brown LLP
700 Louisiana Street, Suite 3400
Houston, Texas 77002-2730
Attention: Charles S. Kelley
E-mail address: ckelley@mayerbrown.com

Mayer Brown LLP
71 S. Wacker Drive
Chicago, Illinois 60606
Attention: Louis S. Chiappetta
E-mail address: lchiappetta@mayerbrown.com

Mayer Brown LLP
1221 Avenue of the Americas
New York, New York 10020
Attention: Richard A. Stieglitz
E-mail address: rstieglitz@mayerbrown.com

2. if to the Wind Down Trust or the Wind Down Trustee, to:

[To be set forth in Wind Down Trust Agreement]

3. if to the Prepetition Agent or the DIP Agent, to:

Silver Point Finance, LLC
Two Greenwich Plaza
Greenwich, Connecticut 06830
Attention: Timothy Lavelle
E-mail address: tlavelle@silverpointcapital.com
creditadmin@silverpointcapital.com

- and -

Milbank, LLP
55 Hudson Yards
New York, New York 10001
Attention: Matthew Brod
E-mail address: mbrod@milbank.com

4. if to the Purchaser, to:

The address(es) set forth in the Stalking Horse Purchase Agreement

F. *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to section 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan, the Confirmation Order, and the Sale Order shall remain in full force and effect in accordance with their terms.

G. *Entire Agreement*

Except as otherwise indicated, on the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

H. *Exhibits*

All exhibits and documents included in the Plan and the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://omniagentsolutions.com/ACM or the Bankruptcy Court's website at https://www.txsb.uscourts.gov/.

I. *Nonseverability of Plan Provisions*

If any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or

provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.

The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is the following: (a) valid and enforceable pursuant to its terms; (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Wind Down Debtors, the Wind Down Trust, or the Wind Down Trustee (as applicable), and the Prepetition Agent and the DIP Agent; and (c) nonseverable and mutually dependent.

J. *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities (if any) offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals nor the Wind Down Trust or Wind Down Trustee (as applicable) will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities (if any) offered and sold under the Plan and any previous plan.

K. *Request for Expedited Determination of Taxes*

The Debtors, the Wind Down Debtors, the Wind Down Trust, or the Wind Down Trustee, as the case may be, shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

L. *Closing of Chapter 11 Cases*

The Wind Down Trust or the Wind Down Trustee (as applicable) shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to issue a Final Decree closing the Chapter 11 Cases.

M. *No Stay of Confirmation Order*

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

N. *Waiver or Estoppel*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement or the Debtors', the Wind Down Debtors', the Wind Down Trust's, or the Wind Down Trustee's (as applicable) right to enter into settlements was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court or the Noticing and Claims Agent prior to the Confirmation Date.

O. *Dissolution of Statutory Committees*

On the Effective Date, any statutory committee formed in connection with the Chapter 11 Cases shall dissolve automatically and all members thereof (solely in their capacities as such) shall be released and discharged from all rights, duties, and responsibilities arising from, or related to, the Chapter 11 Cases.

* * * *

Respectfully submitted, as of the date first set forth below,

Dated: November 24, 2026
Rogers, AR

America's Car-Mart, Inc.,
on behalf of itself and all other Debtors

/s/ ______________________________
Douglas Campbell
President & Chief Executive Officer

**EXHIBIT A**

**EXECUTION VERSION**

ASSET PURCHASE AGREEMENT

by and among

AMERICA'S CAR-MART, INC.,

THE DIRECT AND INDIRECT SUBSIDIARIES OF AMERICA'S CAR-MART, INC.,

CARDINAL FINANCE LLC,

ACM-AR INC.,

ACM FINANCE INC.,

CLAYPOOL HOLDINGS, LLC,

and

CARDINAL ASSET HOLDINGS LLC

Dated as of November 24, 2026

# TABLE OF CONTENTS

ARTICLE 1
DEFINITIONS

**1.1 Certain Defined Terms ..... 5**
**1.2 Construction ..... 25**

ARTICLE 2
SALE AND PURCHASE OF ASSETS; LIABILITIES

**2.1 Sale of Purchased Assets. ..... 26**
**2.2 Liabilities. ..... 29**
**2.3 Consideration and Payment; Allocation ..... 31**
**2.4 Closing ..... 32**
**2.5 Deposit Amount ..... 34**

ARTICLE 3
REPRESENTATIONS AND WARRANTIES

**3.1 Representations and Warranties of Sellers ..... 35**
**3.2 Representations and Warranties of Buyer ..... 48**

ARTICLE 4
PRE-CLOSING COVENANTS

**4.1 Access and Information ..... 51**
**4.2 Ordinary Course of Business ..... 52**
**4.3 Notification of Certain Matters. ..... 55**
**4.4 Obligation to Consummate the Transactions ..... 55**
**4.5 Filings; Other Actions; Notification and Cooperation. ..... 56**

ARTICLE 5
ADDITIONAL COVENANTS

**5.1 Further Assurances ..... 61**
**5.2 Publicity ..... 62**
**5.3 Certain Tax Matters. ..... 62**
**5.4 Wrong Pockets ..... 64**
**5.5 Purchased Intellectual Property ..... 64**
**5.6 Bankruptcy Court Matters. ..... 64**
**5.7 Risk Retention Matters ..... 70**
**5.8 Books and Records ..... 71**
**5.9 Employee Matters. ..... 71**
**5.10 Corporate Existence ..... 75**
**5.11 Term Sheets ..... 75**
**5.12 Transition Services Agreement ..... 76**
**5.13 Escrow Agreement; Deposit Amount ..... 76**

ARTICLE 6
CONDITIONS TO OBLIGATIONS OF THE PARTIES


**6.1 Conditions to Obligations of Buyer and Sellers ......76**
**6.2 Conditions to Obligations of Buyer ......77**
**6.3 Conditions to Obligations of Sellers ......77**
**6.4 Frustration of Closing Conditions ......78**


ARTICLE 7
NO SURVIVAL OF REPRESENTATIONS, WARRANTIES AND PRE-CLOSING COVENANTS


**7.1 No Survival ......78**
**7.2 Release ......78**
**7.3 No Right of Set-Off ......80**
**7.4 No Rescission ......81**


ARTICLE 8
TERMINATION


**8.1 Termination ......81**
**8.2 Procedure and Effect of Termination. ......83**
**8.3 Retention of Deposit Amount; Exclusive Remedy. ......84**
**8.4 Return of Deposit Amount ......85**
**8.5 Break-up Fee; Expense Reimbursement. ......85**


ARTICLE 9
MISCELLANEOUS


**9.1 Governing Law, Jurisdiction, Venue and Service ......86**
**9.2 Notices. ......87**
**9.3 No Benefit to Third Parties ......89**
**9.4 Waiver ......89**
**9.5 Expenses ......89**
**9.6 Assignment ......89**
**9.7 Amendment ......89**
**9.8 Severability ......90**
**9.9 Equitable Relief. ......90**
**9.10 No Liability ......90**
**9.11 English Language ......91**
**9.12 Bulk Sales Statutes ......91**
**9.13 Counterparts ......91**
**9.14 Entire Agreement ......91**
**9.15 Conflicts; Privileges. ......91**
**9.16 Non-Business Day ......92**

EXHIBITS

Exhibit A – Form of Benefits Assignment and Assumption Agreement
Exhibit B – Form of Bidding Procedures Order
Exhibit C – Form of Bill of Sale
Exhibit D – Form of Intellectual Property Assignment Agreement
Exhibit E – Rollover Indebtedness Term Sheet
Exhibit F – Form of Transition Services Agreement
Exhibit G – Form of Escrow Agreement

ANNEXES

Annex I – ABS Platform

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of November 24, 2026 by and among (i) AMERICA'S CAR-MART, INC., a Texas corporation ("ACM"), (ii) the Additional Sellers (as defined below) (together with ACM, collectively, "Sellers" and each, a "Seller"), and (iii) Cardinal Finance LLC, an Arkansas limited liability company, ACM-AR Inc., an Arkansas corporation, ACM Finance Inc., an Arkansas corporation, Claypool Holdings, LLC, a Georgia limited liability company (the "Buyer Escrow Party"), and Cardinal Asset Holdings LLC, an Indiana limited liability company (all of the Persons set forth in this clause (iii), collectively, and together with their respective permitted successors, designees and assigns, "Buyer"). Each Seller and Buyer may be referred to herein individually as a "Party" and collectively as the "Parties."

## RECITALS

WHEREAS, Sellers are engaged in the business of selling older model used Vehicles and originating, servicing and otherwise dealing with Vehicle finance receivables and insurance (the "Business");

WHEREAS, Sellers and certain of their Affiliates (collectively, the "Debtors") intend to commence cases under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code") in the Bankruptcy Court (as defined below) on or about November 24, 2026 (the date on which such cases are commenced, the "Petition Date") (collectively, the "Chapter 11 Cases"), which Chapter 11 Cases are to be implemented through a prepackaged chapter 11 plan of reorganization (the "Plan");

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Sellers, the Purchased Assets and the Assumed Liabilities upon the terms and subject to the conditions set forth herein;

WHEREAS, on the date hereof, each Transaction Bonus Recipient executed and delivered a Transaction Bonus Agreement for the purpose of retaining each such Transaction Bonus Recipient through the Closing and maintaining and preserving the Business and the Purchased Assets during the Interim Period, each of which contemplates, among other things, the payment of such Transaction Bonus Recipient's applicable Transaction Bonus, subject to any withholding, upon the consummation of the Closing;

WHEREAS, following the date hereof and in accordance with Section 5.13, Buyer Escrow Party shall deposit an amount equal to $25,000,000.00 (the "Deposit Amount") with the Escrow Agent, which Deposit Amount shall be maintained by the Escrow Agent and shall be administered and payable in accordance with the Escrow Agreement and the terms hereof;

WHEREAS, the Purchased Assets and Assumed Liabilities are to be purchased and assumed by Buyer pursuant to the Sale Order (as hereinafter defined), free and clear of all Encumbrances (other than Permitted Encumbrances) and all Liabilities (other than Assumed Liabilities), all on the terms and subject to the conditions set forth in this Agreement and subject to entry of the Sale Order and the conditions set forth therein; and

WHEREAS, the contemplated Transactions are subject to the approval of the Bankruptcy Court, subject to higher and better offers as contemplated by the Bidding Procedures Order, and will be consummated only pursuant to the Sale Order to be entered by the Bankruptcy Court.

NOW, THEREFORE, in consideration of the mutual benefits to be derived from this Agreement, the representations, warranties, conditions, agreements and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1 **Certain Defined Terms**. As used herein, the following terms shall have the following meanings:

"ABS Liabilities" means all Liabilities arising under the ABS Transaction Documents of Sellers and all Liabilities of Sellers as Risk Retention Holders, including the Residual Certificates.

"ABS Platform" means the transactions contemplated by the Contracts listed on Annex I.

"ABS Transaction Documents" means, collectively, all Contracts relating to the ABS Platform to which a Seller is a party, which are each set forth on Section 1.1(a) of the Seller Disclosure Schedules.

"ACM" has the meaning set forth in the preamble hereto.

"ACM Arkansas" means America's Car Mart, Inc., an Arkansas corporation.

"ACM Insurance" means ACM Insurance Company, an Arkansas corporation.

"ACM SEC Documents" means, collectively, all forms, documents and reports required to be filed or furnished by ACM with the SEC since January 1, 2023.

"Acquisition Proposal" means any proposal, offer, indication of interest or inquiry, whether binding or non-binding and whether or not fully financed, from any Person or group other than Buyer or its Affiliates relating to any Alternative Transaction or other acquisition, lease, financing, merger, reorganization or similar transaction involving the Business or any material portion of the Purchased Assets.

"Additional Sellers" means, collectively, ACM Arkansas, Colonial, Texas Car-Mart, Inc., a Texas corporation, Auto Finance Investors, Inc., a Texas corporation, and Colonial Underwriting, Inc., an Arkansas corporation.

"Affiliate" means, with respect to a Person, any other Person that, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with such first Person, and a Person shall be deemed to be "controlled by" another Person if controlled in any manner whatsoever that results in control in fact by that other Person (or that other Person and any Person or Persons with whom that other Person is acting jointly or in concert), whether

directly or indirectly. For purposes of this definition, "control" and, with correlative meanings, the terms "controlled by" and "under common control with" mean, when used with respect to any specified Person, the possession, directly or indirectly, of the power to direct the management or policies of that Person, whether through the ownership of securities, by trust, by contract, or otherwise.

"Aggregate Consideration" means the aggregate consideration for the Purchased Assets, consisting of, collectively, (a) the Purchase Price, (b) the assumption by Buyer of the Assumed Liabilities in accordance with Section 2.2(a), and (c) the Rollover Indebtedness.

"Agreed Form" means, with respect to an Ancillary Agreement, the form of such Ancillary Agreement attached to a written agreement in which Buyer, Sellers and any other Person contemplated to be a party thereto have each acknowledged that it is ready, willing and able to execute and deliver, or cause to be executed and delivered, such Ancillary Agreement in accordance with the applicable subsection of Section 2.4 in the form so attached.

"Agreement" has the meaning set forth in the preamble hereto, and includes all schedules and exhibits hereto.

"Allocation" has the meaning set forth in Section 2.3(c).

"Alternative Transaction" means any transaction or series of transactions, including an asset sale, equity sale, merger, reorganization, recapitalization, foreclosure, credit bid, plan of reorganization or liquidation or other disposition, pursuant to which any Person other than Buyer or its Affiliates would acquire all or substantially all of the Business or Purchased Assets, other than (a) the Plan implementing the Transactions, (b) any non-sale refinancing of the DIP Facility or other debtor-in-possession financing, or (c) any transaction involving solely Excluded Assets; *provided* that, for the avoidance of doubt, any credit bids by Lenders or any of their Affiliates and any transaction with Lenders or any of their Affiliates as Successful Bidder or Back-up Bidder shall constitute an Alternative Transaction.

"Ancillary Agreements" means the Bill of Sale, the Confidentiality Agreement, the Intellectual Property Assignment Agreement, the Escrow Agreement, the Rollover Indebtedness Documents, the New Servicing Agreement, the Benefits Assignment and Assumption Agreement, the Transition Services Agreement and all other agreements, instruments, certificates and documents (if any) to be entered into or delivered by one or more Parties pursuant to, or in connection with, this Agreement or the Transactions.

"Antitrust Laws" means all antitrust or competition Laws, including the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and all other (whether U.S. or non-U.S.) supranational, international, national, federal, state and local Laws, that are designed or intended to require notification of, or prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"Assignable Contracts" has the meaning set forth in Section 5.6(k)(i).

"Associated Person" means, with respect to a Party, any of such Party's former, current and future Representatives, financing sources, consultants, equityholders, members, stockholders, shareholders, controlling Persons, managers, general or limited partners or assignees (or any former, current or future Representatives, financing sources, consultants, equityholders, members, stockholders, shareholders, controlling Persons, managers, general or limited partners or assignees of any of the foregoing).

"Assumed Benefit Plans" means the Benefit Plans set forth on Section 1.1(k) of the Seller Disclosure Schedules.

"Assumed Employee Liabilities" means (a) solely with respect to Transferred Employees (and any dependent or beneficiary thereof), (i) accrued but unpaid base wages, salaries, commissions, overtime and expense reimbursements and accrued but unused paid time off, sick leave, and vacation, in each case as of the Closing (including for the payroll period in which the Closing occurs), (ii) employer matching contributions under any Assumed Benefit Plan that is a defined contribution plan, in each case attributable to any payroll period ending at or prior to the Closing (including the payroll period in which the Closing occurs) and not yet due to be remitted as of the Closing, (iii) annual bonuses under any Benefit Plan in effect on the date hereof (A) for the performance period in which the Closing occurs, to the extent accrued as of the Closing, and (B) for any completed performance period, to the extent earned and unpaid as of the Closing, in each case as set forth on Section 1.1(b) of the Seller Disclosure Schedules, (iv) executive perquisite programs for the year in which the Closing occurs, to the extent earned or otherwise accrued but unpaid as of the Closing, as set forth on Section 1.1(b) of the Seller Disclosure Schedules, (v) Claims under any Assumed Benefit Plan that is a welfare benefit plan, whether incurred before, at or after the Closing and whether or not reported as of the Closing, and (vi) any and all Liabilities arising out of or relating to the hiring, employment, or termination of employment of any Transferred Employee by Buyer or any of its Affiliates, or the work performed or provision of services by any Transferred Employee for or on behalf of Buyer or any of its Affiliates, following the Closing, including any severance, in each case of clauses (i)-(vi), together with all payroll, employment and withholding Taxes relating thereto, (b) all Liabilities under the Assumed Benefit Plans, and (c) all Liabilities in respect of the Transaction Bonuses and the Supplemental Bonuses, for which, for the avoidance of doubt, Buyer has and retains all responsibility as provided for in Section 5.9(f) and Section 5.9(g).

"Assumed Liabilities" has the meaning set forth in Section 2.2(a).

"Auction" means the auction of the Purchased Assets contemplated by the Bidding Procedures Order.

"Back-up Bid Expiration Date" has the meaning set forth in Section 5.6(h).

"Back-up Bidder" has the meaning set forth in Section 5.6(h).

"Bankruptcy Code" has the meaning set forth in the recitals hereto.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas and any other court before which the Chapter 11 Cases or any appeal therefrom are heard.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and any local rules of the Bankruptcy Court.

"Benefit Plans" means (a) an "employee benefit plan" within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA, (b) a stock bonus, stock purchase, stock option, restricted stock, stock appreciation right or similar equity or equity-based plan, (c) any employment, offer letter, independent contractor agreement, commission agreement, or consulting agreement or (d) any other severance, deferred-compensation, commission, retirement, welfare-benefit, bonus, incentive, retention, change in control, transaction bonus, vacation, paid time off, sick leave or benefit arrangement, insurance or hospitalization program, flexible benefit plan, cafeteria plan or dependent care plan, whether pursuant to a plan, policy, program, agreement or arrangement, whether written or unwritten, and whether sponsored, maintained, adopted, established, contributed to or required to be contributed to, or participated in or required to be participated in by any Seller or any of its Affiliates or Subsidiaries for the benefit of any current or former employee, director, officer, consultant, independent contractor or agent (or any dependent or beneficiary thereof) or with respect to which any Seller or any of its Affiliates or Subsidiaries has or may have any Liability, but, for the avoidance of doubt, the term "Benefit Plan" shall not include any statutory plans administered by a Governmental Authority under applicable health, drug, pension, workers' compensation, or employment insurance legislation.

"Benefits Assignment and Assumption Agreement" means that certain Benefits Assignment and Assumption Agreement in substantially the form set forth on Exhibit A.

"Bidding Procedures" has the meaning set forth in Section 5.6(b)(i).

"Bidding Procedures Order" means an Order of the Bankruptcy Court substantially in the form attached as Exhibit B, approving procedures for soliciting, submitting and considering bids for the Purchased Assets, designating Buyer as the stalking-horse bidder, approving the Break-up Fee and the Expense Reimbursement on the terms set forth in Section 8.5, authorizing the Auction and otherwise satisfying the requirements of Section 5.6.

"Bidding Procedures Order Deadline" means the date that is 21 days after the Petition Date; *provided*, *however*, that if such date is not a Business Day, the Bidding Procedures Order Deadline shall automatically be extended to the first Business Day after such date; *provided*, *further*, that if entry of the Bidding Procedures Order has been scheduled or delayed past such date due to the Bankruptcy Court's availability, the Bidding Procedures Order Deadline shall automatically be extended to the earliest date after such date on which the Bankruptcy Court is available for and schedules the hearing with respect to the entry of the Bidding Procedures Order.

"Bill of Sale" means that certain Bill of Sale and Assignment and Assumption Agreement in substantially the form set forth on Exhibit C.

"Black Book Wholesale Value" means, as of the date of the Statement, the wholesale value of a Vehicle at the "Extra Clean" condition level as published for that day by Black Book, Inc. at www.blackbook.com.

"Books and Records" means all material books and records of Sellers (including all material records relating to active and non-active customer accounts).

"Break-up Fee" has the meaning set forth in Section 8.5(a).

"Business" has the meaning set forth in the recitals hereto.

"Business Day" means any day other than Saturday, Sunday or a day on which banking institutions in New York, New York are permitted or obligated by Law to remain closed.

"Business Employee" means each individual employed by any Seller or any of its Affiliates immediately prior to the Closing, whether on a full-time, part-time, temporary or casual basis, including any such individual (a) actively employed, (b) temporarily laid off or furloughed, or (c) who is on vacation, paid time off, sick leave, personal leave, leave of absence (including medical, disability (including short-term or long-term disability), military, workers' compensation, maternity, paternity or family leave) or other approved absence.

"Buyer" has the meaning set forth in the preamble hereto.

"Buyer Escrow Party" has the meaning set forth in the preamble hereto.

"Buyer Purchased Contract Schedule" has the meaning set forth in Section 5.6(k)(ii).

"Buyer Released Matters" has the meaning set forth in Section 7.2(a).

"Buyer Released Parties" has the meaning set forth in Section 7.2(d).

"Buyer Releasor" has the meaning set forth in Section 7.2(a).

"Buyer's Knowledge" means the actual knowledge of Chad Melchi after reasonable inquiry of his direct reports.

"Chapter 11 Cases" has the meaning set forth in the recitals hereto.

"Chattel Paper" has the meaning specified in the UCC.

"Claims" means, collectively, all rights, claims (as that term is defined in section 101(5) of the Bankruptcy Code), demands, causes of action, suits, counterclaims and cross-claims, whether class, individual, derivative or otherwise in nature, whether arising under contract or in Law or in equity, whether known or unknown, contingent or matured, liquidated or unliquidated and all rights and remedies with respect thereto.

"Closing" has the meaning set forth in Section 2.4(a).

"Closing Date" has the meaning set forth in Section 2.4(a).

"Closing Payment" means an amount equal to (a) the Purchase Price, *minus* (b) the Escrow Funds, *minus* (c) the Transaction Bonuses, *minus* (d) the Supplemental Bonuses.

"Closing Retail Inventory Amount" means the aggregate value of all Retail Inventory owned by Sellers as of the Closing Date, in each case, whether stored on-site, off-site, in-transit or

at third party reconditioning or other facilities, calculated in accordance with the Black Book Wholesale Value.

"COBRA" means the health plan coverage continuation requirements of Section 4980B of the Code and Section 601 *et seq.* of ERISA, and any similar state law.

"Code" means the U.S. Internal Revenue Code of 1986, as amended.

"Colonial" means Colonial Auto Finance, Inc., an Arkansas corporation.

"Confidentiality Agreement" means that certain Letter Agreement, dated as of May 29, 2026, by and between Birmingham Industrial Partners IV, Inc. and ACM.

"Confirmation Order" means an Order of the Bankruptcy Court confirming the Plan.

"Consumer Privacy Ombudsman" means the disinterested person appointed under section 332 of the Bankruptcy Code in connection with any sale or lease of personally identifiable information under section 363(b)(1)(B) of the Bankruptcy Code.

"Contract" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement or other arrangement, understanding, permission or commitment that, in each case, is legally binding, including any ABS Transaction Document.

"Contract Counterparty" means, with respect to any Purchased Contract, each non-Seller counterparty thereto.

"Contract Designation Period" means with respect to: (i) any Contract other than a Real Property Lease, from the date hereof until five Business Days prior to the Closing Date, and (ii) any Real Property Lease (other than an Excluded Location Lease), from the date hereof until the later of (A) the entry of an order by the Bankruptcy Court dismissing the Chapter 11 Cases, converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, confirming the Plan or entry of the Sale Order; and (B) 60 days following the Closing Date.

"Controlled Group Liabilities" means any and all Liabilities of Sellers or any of their ERISA Affiliates (a) under Title IV of ERISA, (b) under Sections 206(g), 302, or 303 of ERISA, (c) under Sections 412, 430, 431, 436, or 4971 of the Code, and (d) as a result of the failure to comply with the continuation coverage requirements of Section 601 *et seq.* of ERISA and Section 4980B of the Code.

"Cure Cost" or "Cure Costs" means all amounts that must be paid and all obligations that otherwise must be satisfied, pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and assignment of the Purchased Contracts to Buyer, in each case as agreed by Buyer and the applicable Contract Counterparty or as determined by the Bankruptcy Court; *provided* that Cure Costs shall not include any liabilities or amounts owed under an

Excluded Contract or Disputed Amount Contract unless and until such agreement becomes a Purchased Contract.

"Cure Notice" means the notice(s) of the proposed assumption and assignment of the Assignable Contracts and the proposed Cure Costs with respect thereto, to be filed with the Bankruptcy Court and served on the applicable Contract Counterparties in accordance with the Bidding Procedures Order.

"Current Representation" has the meaning set forth in Section 9.15(a).

"D&O Policies" means the directors' and officers' liability insurance policies of Sellers or their Affiliates and all claims and rights thereunder.

"Dealer Loan" means each consumer finance receivable, installment sale contract, retail installment contract, loan, note, account receivable or other payment right or consumer credit obligation arising from or relating to the origination, purchase, servicing or financing of Vehicle sales or related consumer finance activities of the Business, including all instruments, documents, Chattel Paper, accounts, general intangibles, financial assets, rights to payment, servicing rights, enforcement rights and related collateral, whether secured or unsecured and whether absolute, accrued, contingent or otherwise.

"Dealer Loan Collateral" means, individually and collectively, all assets of any Person granted to or otherwise in favor of Sellers or any of their Affiliates under any of the Dealer Loan Documents or otherwise as collateral security for the payment or performance of any Dealer Loan (or any portion thereof) or related obligation, including vehicle titles, liens and other collateral interests.

"Dealer Loan Documents" means all agreements, certificates and other documents evidencing, securing or otherwise executed in connection with any Dealer Loan, including promissory notes, credit agreements, loan agreements, guarantees, sureties, security agreements, chattel mortgages, vehicle titles, mortgages and deeds of trust, security deeds, and other security instruments of every type and nature (including any certificate of title or other evidence of ownership of any Vehicle), as applicable, in each case, evidencing, securing or otherwise executed by any Seller in conjunction with each of the Dealer Loans.

"Debtors" has the meaning set forth in the recitals hereto.

"Deposit Amount" has the meaning set forth in the recitals hereto.

"Deposit Retention Termination" has the meaning set forth in Section 2.5(b)(ii).

"Depositor" means ACM Funding, LLC, a Delaware limited liability company.

"Designated Person" has the meaning set forth in Section 9.15(b).

"DIP Facility" means the debtor-in-possession financing facility to be provided or arranged by Lenders and/or one or more of their Affiliates, as senior secured lenders, in an amount and on

terms to be determined in consultation with Sellers and approved by the Bankruptcy Court, as set forth in the DIP Order and the Plan.

"DIP Order" means the interim or final (whichever is then in effect) Order of the Bankruptcy Court approving or authorizing the Debtors' entry into, and performance under, the DIP Facility.

"Disputed Amount Contract" has the meaning set forth in Section 5.6(k)(v).

"Dodd-Frank Act" means the Dodd-Frank Wall Street Reform and Consumer Protection Act, as amended, and the rules and regulations promulgated thereunder.

"DOJ" means the Department of Justice of the United States, including the Antitrust Division thereof.

"Effect" has the meaning set forth in the definition of "Material Adverse Effect".

"Employee Equipment" means all mobile phones, laptop computers and other personal electronic devices owned by any Seller and used by any Transferred Employee as of immediately prior to the Closing in connection with the Business.

"Encumbrance" means any mortgage, Lien (statutory or otherwise), Claim, license, sublicense, pledge, security interest, charge, hypothecation, restriction, claim of ownership, lease, sublease, option, right of use or possession, preference, encroachment, restrictive covenant, right of first offer or refusal, title defect or other encumbrance or similar restriction of any kind or nature whatsoever, in each case howsoever the same arose or is evidenced.

"Enforceability Exceptions" has the meaning set forth in Section 3.1(b)(iii).

"Environmental Law" means any Law relating to pollution or protection of the environment or natural resources, or to exposure to Hazardous Materials.

"Equity Interests" means (a) with respect to any Person that is a limited liability company, membership interests in such limited liability company; (b) with respect to any Person that is a partnership, partnership interests in such partnership; (c) with respect to any Person that is a corporation, shares of capital stock of such corporation; and (d) with respect to any Person, any other equity or ownership interests in such Person, and any securities, rights, options, or other instruments directly or indirectly convertible into, or exercisable or exchangeable for, any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business that is a member of (a) a controlled group of corporations (as defined in Section 414(b) of the Code), (b) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), or (c) an affiliated service group (as defined in Section 414(m) of the Code or the regulations under Section 414(o) of the Code), any of which includes ACM or any of its Subsidiaries.

"Escrow Agent" means Citibank, N.A.

"Escrow Agreement" means that certain Escrow Agreement, to be entered into by and among the Escrow Agent, ACM and Buyer Escrow Party, in accordance with Section 5.13, in substantially the form set forth on Exhibit G.

"Escrow Funds" means (a) the Deposit Amount, *plus* (b) all interest, dividends, gains and other income earned under the Escrow Agreement.

"Excluded Assets" means: (a) all cash and cash equivalents of Sellers and each of their Subsidiaries; (b) all Equity Interests of Sellers and their Subsidiaries (other than the Equity Interests of the Depositor); (c) all deposits, security deposits, restricted cash, prepaid expenses, credits, refunds, escrows, surety bonds and financial assurances and rights to receive payments or recoveries arising under Excluded Assets or Excluded Liabilities; (d) Tax refunds, credits, rebates, prepayments and deferred Tax assets of Sellers and each of their Subsidiaries attributable to any Pre-Closing Tax Period, including all claims for and rights to receive any refunds, rebates or similar payments of Taxes, together with any interest payable thereon (collectively, "Tax Refunds"), except to the extent any such Tax Refunds are attributable to a liability that is assumed by Buyer pursuant to this Agreement; (e) all D&O Policies and other insurance policies of Sellers and each of their Subsidiaries and any claims thereunder; (f) all claims, intangible property, rights of set-off, indemnification rights and causes of action relating to Excluded Assets or Excluded Liabilities; (g) all intercompany receivables of Sellers and each of their Subsidiaries; (h) the rights of Sellers and any of their Affiliates under this Agreement and the Ancillary Agreements; (i) all Excluded Books and Records; (j) all goodwill and other intangible rights that are not Purchased Assets; (k) any and all claims and causes of action against current or former directors, officers, managers, and employees of Sellers based on acts or omissions prior to the Closing, and all rights under the D&O Policies; (l) any retainers or deposits held by estate professionals and any cash funding any professional fee escrow or any wind-down amount under the Plan or DIP Order; (m) all avoidance claims and causes of action under chapter 5 of the Bankruptcy Code and similar state law, and all proceeds thereof; (n) any Excluded Locations and Excluded Location Leases; (o) any Excluded Contracts (including all Benefit Plans (other than Assumed Benefit Plans) and all insurance Contracts, policies and administrative service arrangements related thereto); and (p)(i) all insurance policies, binders, and contracts of insurance and reinsurance issued, written or underwritten by ACM Insurance, whether current or historical or occurrence-based or claims-based and (ii) all rights, claims, causes, causes of actions or benefits of Sellers or any of their Affiliates under or arising from any of the policies, binders and contracts contemplated in the immediately preceding clause (i), in each case, whether related to events, circumstances or occurrences before, on or after the Closing.

"Excluded Books and Records" means: (a) all Books and Records relating to Transferred Employees that may not be transferred to Buyer by Law; (b) all minute books of any Seller; (c) all income Tax returns, income Tax records, income Tax reports and all notes, workpapers, files or documents relating thereto; (d) all Books and Records prepared in anticipation of or in connection with or otherwise related to the negotiation, execution or performance by Sellers under this Agreement or any Ancillary Agreement; (e) all Books and Records that Sellers are required by Law to retain; (f) all Books and Records that are subject to attorney-client privilege or other work product privilege and that cannot be transferred or disclosed to Buyer without Sellers' loss of such

privilege; (g) all Books and Records relating to the Chapter 11 Cases, the sale process, retained Claims, the administration or wind-down of any Seller, or any SEC reporting or audit; and (h) any other Books and Records relating exclusively to the Excluded Assets or Excluded Liabilities; *provided*, *however*, that in no event shall Excluded Books and Records include any Books and Records necessary to service, administer or collect the Receivables or otherwise necessary to fully realize the value of the Purchased Assets (and, with respect to any such items that Sellers are required by Law to retain, Buyer shall receive copies thereof), it being understood that Sellers may retain copies of such items solely as reasonably required for the administration and wind-down of the Chapter 11 Cases, subject to the confidentiality obligations herein and applicable Law.

"Excluded Contract" means any Contract that is not designated as a Purchased Contract pursuant to the terms of Section 5.6(k).

"Excluded Earnouts" means the obligation of Sellers to pay earnouts or other deferred or contingent consideration as required by the Contracts set forth on Section 1.1(c) of the Seller Disclosure Schedules.

"Excluded Employee Liabilities" means (a) all Liabilities in respect of any Business Employee who does not become a Transferred Employee (or any beneficiary thereof), including all accrued but unpaid wages, salaries and commissions, overtime, expense reimbursements, all accrued but unused vacation and paid time off, sick leave and all severance and similar termination pay and benefits, (b) all Liabilities under the WARN Act, (c) all Benefit Plans (other than Assumed Benefit Plans and Assumed Employee Liabilities) and all Liabilities arising thereunder or relating thereto including all Liabilities in respect of COBRA (except with respect to any obligation attaching to Buyer as a "successor employer" with respect to "M&A qualified beneficiaries" (as defined in Treasury Regulation Section 54.4980B-9) as required under COBRA relating to any period of time on or after the Closing Date), and (d) all change in control, retention, sale, transaction and other similar transaction-related payments payable under any Benefit Plan to any current or former Business Employee or other current or former service provider of Sellers or their Affiliates (whether or not a Transferred Employee), together with the employer portion of any payroll or employment Taxes payable in connection therewith (other than the Transaction Bonuses and the Supplemental Bonuses, as provided for in Section 5.9(f) and Section 5.9(g) hereto). For the avoidance of doubt, Controlled Group Liabilities will constitute Excluded Employee Liabilities. In addition, Excluded Employee Liabilities shall not include any Liability that is otherwise satisfied in full by a source other than Buyer or its Affiliates and Buyer's assumption of the Assumed Employee Liabilities shall not be construed in a manner to result in the duplication of benefits or other windfall to any Person.

"Excluded Liabilities" has the meaning set forth in Section 2.2(b).

"Excluded Locations" means the locations of the Business and other real property interests set forth on Section 1.1(d) of the Seller Disclosure Schedules.

"Excluded Location Leases" means the Real Property Leases applicable to the Excluded Locations.

"Existing Servicing Agreements" means the servicing agreements to be assumed and assigned to Buyer pursuant to section 365 of the Bankruptcy Code (and which shall be deemed Purchased Contracts), as set forth on Section 1.1(e) of the Seller Disclosure Schedules.

"Expense Reimbursement" has the meaning set forth in Section 8.5(b).

"External Events" has the meaning set forth in the definition of "Material Adverse Effect".

"Final Order" means an Order entered by the Bankruptcy Court, the implementation, operation, or effect of which has not been stayed and as to which Order (or any revision, modification, or amendment thereof) (a) the time to appeal or seek review or rehearing or writ of certiorari has expired and as to which no appeal or petition for review or rehearing or certiorari has been taken and is pending or (b) if an appeal, writ of certiorari, new trial, reargument or rehearing thereof has been sought, such order or judgment of the applicable Bankruptcy Court, or other court of competent jurisdiction shall have been affirmed by the highest court to which such Order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure or a similar rule of such other court of competent jurisdiction; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Code, may be filed relating to such order, shall not cause such order not to be a Final Order.

"Fraud" means an actual, knowing and intentional fraud under the Laws of the State of Delaware by a Party in such Party's making of the express representations and warranties in (a) ARTICLE 3 or (b) any certificate required to be delivered in accordance herewith; *provided*, *however*, that, "Fraud" shall not include and shall not be deemed to include any claim, assertion or cause of action based on constructive or imputed knowledge, equitable fraud, promissory fraud or any tort (including a claim for fraud) based on negligence, recklessness or any similar theory.

"FTC" means the Federal Trade Commission of the United States.

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governmental Authority" means (a) any governmental or public department, central bank, court, minister, governor-in-council, cabinet, commission, tribunal, board, bureau, agency, commissioner or instrumentality or other regulatory or administrative authority, whether international, multinational, national, federal, provincial, state, municipal, local, or other; (b) any subdivision or authority of any of the above; (c) any stock exchange; and (d) any quasi-governmental or private body exercising any regulatory, expropriation or Taxing Authority under or for the account of any of the above.

"Hazardous Materials" means any wastes, substances or materials that are defined or listed under any Environmental Laws as hazardous, toxic, pollutants or contaminants, or for which Liability or standards of conduct may be imposed, including (a) substances defined as "hazardous wastes", "hazardous substances", or "toxic substances" under any Environmental Laws and

(b) polychlorinated biphenyls, asbestos and asbestos-containing materials, per- and polyfluoroalkyl substances, and petroleum and petroleum products.

"HIPAA" has the meaning set forth in Section 3.1(k)(v).

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Insurance Policies" has the meaning set forth in Section 3.1(m).

"Intellectual Property" means, individually and collectively, all rights, priorities and privileges of any type or form of intellectual property, and all similar or equivalent proprietary rights, throughout the world, in each case whether copyrighted/patented/otherwise registered or protected (as applicable) or not, whether registered or unregistered, whether arising under United States, multinational or foreign Laws (whether statutory, common or civil law) or otherwise, and howsoever arising or evidenced. Without limiting the generality of the foregoing, the term "Intellectual Property" as used herein will specifically include such rights in: (a) all issued patents and patent applications, applications for reissues, or invention disclosures in any country or supranational jurisdiction, and any substitutions, divisions, continuations, continuations-in-part, reissues, renewals, confirmations, re-examinations, extensions, supplementary protection certificates and the like, and any provisional applications, of any such patents or patent applications, together with all rights to claim priority (including under the Paris Convention and the Patent Cooperation Treaty), and all inventions (whether or not patentable); (b) copyrights and other equivalent rights in works of authorship (including website, marketing and advertising content), mask works and database rights (including sui generis database rights), moral rights (or other similar rights) to the extent assignable and waivers or consents to the extent moral rights are not assignable under applicable Law, copyright registrations and applications for copyright registration; (c) designs, design registrations, design registration applications; (d) names, trade names, business names, corporate names, domain names, social media accounts and identifiers, website names and world wide web addresses, common law trademarks, trademark registrations, trademark applications, unregistered trademarks, service marks, trade dress and logos, slogans, and other similar designations of source or origin, together with all goodwill associated therewith; (e) rights in computer programs and software (whether in source code, object code, or other form), rights in artificial intelligence and machine learning tools and models (including model architectures, weights, checkpoints and training data and datasets); (f) trade secrets and all other confidential information, including know-how, inventions, proprietary processes, formulae, models, methodologies ("Trade Secrets"); (g) databases, data compilations and all data, including customer and account information, customer lists, credit applications, payment and servicing histories, vehicle, telematics and GPS/starter-interrupt data, marketing and lead data; (h) internet domain names, URLs and websites, social media accounts; (i) registrations, applications, renewals and extensions for any of the foregoing, and all foreign and international equivalents and counterparts thereof; and (j) any goodwill associated with any of the foregoing. For the avoidance of doubt, "Intellectual Property" includes unregistered rights and applications, and all foreign and international counterparts and equivalents of any of the foregoing.

"Intellectual Property Assignment Agreement" means that certain Intellectual Property Assignment Agreement in substantially the form set forth on Exhibit D.

"Interim Period" means the period between the date hereof and the earlier of (x) the Closing, and (y) the valid termination of this Agreement.

"Inventory" means all inventory of Sellers used or held for use in the Business, including all Vehicles, merchandise, finished goods, supplies and other inventories, wherever located.

"IRS" means the Internal Revenue Service or any successor Governmental Authority.

"Issuers" means each bankruptcy remote, special purpose entity that is a Subsidiary of ACM and issues Residual Certificates, including each Subsidiary of ACM set forth on Section 1.1(f) of the Seller Disclosure Schedules.

"Law" means, collectively, any applicable federal, state, local, domestic or foreign statute, law, code, ordinance, decree, order, rule, regulation or other legally enforceable requirement of any Governmental Authority.

"Leased Real Property" has the meaning set forth in Section 3.1(q)(vii).

"Lenders" means the lenders under the DIP Facility and the Prepetition Credit Facility, whether acting through an agent or otherwise.

"Liability" means any direct or indirect liability, indebtedness, guarantee, endorsement, loss, commitment, damage, deficiency, cost, royalty, penalty, duty, assessment, expenditure, charge, fee, fine, contribution, obligation, expense or responsibility (whether accrued, absolute, contingent, mature, unmatured or otherwise and whether known or unknown, fixed or unfixed, choate or inchoate, liquidated or unliquidated, secured or unsecured, due or to become due, and whether in contract or tort, in law, common law or in equity or granted by or arising in connection with statute, regulation or other applicable Law and whether or not resulting from third party claims) of every kind and description whatsoever, including all costs, interests, expenses and penalties related thereto (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), and regardless of when sustained, incurred, or asserted or when the relevant events occurred or circumstances existed.

"Lien" means any lien (as defined in section 101(37) of the Bankruptcy Code), encumbrance, obligation, indebtedness, claim (as defined in section 101(5) of the Bankruptcy Code), charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, rights of use, encroachments, judgments, rights of setoff, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use.

"Litigation" means any demand, suit, claim, counterclaim, action, cause of action, complaint, civil investigation demand, notice of violation, mediation, arbitration, investigation, examination, hearing, audit, assessment or other proceeding or litigation of any nature (whether civil, criminal, administrative, regulatory, appellate or otherwise at law or in equity) and whether by or before any Governmental Authority (including any arbitrator, mediator or similar dispute resolution body).

"Loss" means any loss, Liability, claim, damage, cost, expense, interest, award, judgment, penalty or Tax.

"Material Adverse Effect" means any event, change, circumstance, occurrence or effect (each, an "Effect") that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on the Business, Purchased Assets or the Assumed Liabilities; *provided*, *however*, that none of the following, and no Effect arising out of, attributable to or resulting from the following, alone or in combination, shall constitute or be taken into account in determining whether there has been or would reasonably be expected to be a Material Adverse Effect: (i) changes in general national, domestic, foreign or regional economic, financial or capital market, regulatory, political or geopolitical conditions (including changes in interest rates, foreign exchange rates or tariffs); (ii) changes or developments generally affecting the industries, industry sectors or geographical areas in which the Business operates; (iii) changes in Law or in GAAP, or the interpretation or enforcement thereof, after the date hereof; (iv) acts of war (whether or not declared), terrorism, sabotage or military action, pandemics, epidemics or other public health concerns (whether or not declared as such by any Governmental Authority) or any quarantine, lockdown, travel restriction, business restriction or trade restriction related thereto, natural disasters, fires, floods, hurricanes, haboobs, tornadoes or other weather events, or any other act of God, force majeure event or national or international calamity or crisis, in each case whether or not caused by any Person and whether arising or underway before, on or after the date hereof (clauses (i) through (iv), collectively, "External Events"); (v) the execution, existence, announcement, pendency or consummation of this Agreement or the Transactions; (vi) the filing, commencement, pendency or conduct of the Chapter 11 Cases and the reasonably anticipated effects thereof, including any Order of the Bankruptcy Court (including the DIP Order and the budgets therein) and any limitation on the operation of the Business imposed by any of the foregoing or by the Bankruptcy Code; (vii) any Effect exclusively on any Excluded Assets or Excluded Liabilities; (viii) any objections in the Bankruptcy Court to (A) this Agreement or any of the Transactions, (B) the Sale Order, (C) the Bidding Procedures Order or (D) the assumption or rejection of any Purchased Contract; (ix) the marketing and sale process for the Purchased Assets, including any Auction, Acquisition Proposal, Alternative Transaction or Superior Proposal; (x) any action taken or omitted to be taken at the written request or with the consent of Buyer or as expressly required by this Agreement; (xi) any failure to achieve any budgets (including the budgets in the DIP Order), projections, forecasts, estimates, plans, predictions, performance metrics or operating statistics (but not the underlying causes of any such failure to the extent such underlying cause is not otherwise excluded from this definition and it being understood that Sellers' breach of any covenant herein is expressly not excluded from this definition); (xii) any matters arising out of or relating to any notices under the WARN Act delivered by any Seller in connection with the Chapter 11 Cases or the Transactions; or (xiii) the identity of Buyer or any of its Affiliates, or any action taken by Buyer or its Affiliates with respect to the Transactions or any breach by Buyer of its obligations under this Agreement, except, in the case of any External Event, to the extent such External Event has a material and disproportionate effect on the Purchased Assets and the Assumed Liabilities, taken as a whole, relative to other similarly situated participants in the industries in which the Business operates, and then only to the extent of such incremental material and disproportionate effect.

"Material Contract" has the meaning set forth in Section 3.1(n)(i).

"Material Partner" has the meaning set forth in Section 3.1(o).

"Mayer Brown" has the meaning set forth in Section 9.15(a).

"New Inventory" means used Vehicles purchased by Sellers during the Interim Period in accordance with Section 4.6 using proceeds from the DIP Facility and which are owned by Sellers immediately prior to the Closing.

"New Inventory Amount" means the aggregate cash amounts actually paid by Sellers to acquire the New Inventory (including auction, buyer and documentation fees, transportation costs and title and registration costs incurred in connection therewith).

"New Servicing Agreement" means the servicing agreement negotiated and finalized in accordance with the Rollover Indebtedness Term Sheet and Section 5.11.

"Notice" has the meaning set forth in Section 9.2(a).

"Order" means any administrative decision or award, decree, injunction, judgment, order, or writ of any Governmental Authority.

"Ordinary Course" means, with respect to an action taken by a Person, that such action is taken in the ordinary and usual course of the normal day-to-day operations of such Person consistent with its past practice and custom, as such practice and custom is, or may have been, modified as a result of the Chapter 11 Cases, in each case subject to (a) the commencement and pendency of the Chapter 11 Cases, (b) the Bankruptcy Code and (c) any Order of the Bankruptcy Court, including the DIP Order.

"Outside Date" means February 21, 2027.

"Owned Real Property" means the real property set forth on Section 1.1(g) of the Seller Disclosure Schedules, together with all buildings, structures, fixtures, facilities and improvements located thereon and all easements, rights-of-way, privileges and other rights appurtenant thereto.

"Party" and "Parties" have the meanings set forth in the preamble hereto.

"Permit" means, with respect to any Person, any permit, license, grant, authorization, consent, registration, certificate, franchise, certification, variance, exemption, Order or approval or similar authorization of any Governmental Authority having jurisdiction over the Person.

"Permitted Encumbrance" means any (a) Encumbrance for utilities and Taxes not yet due or delinquent or for those Taxes being contested in good faith by appropriate proceedings, in each case solely to the extent constituting an Assumed Liability; (b) Encumbrances that will be released at the Closing with no Liability to Buyer or its Affiliates; (c) Encumbrance incurred or deposit made to a Governmental Authority in connection with any Permit; (d) with respect to the Leased Real Property and Owned Real Property, (i) all matters of record, including covenants, restrictions, easements, and other encumbrances on title to real property, (ii) all applicable zoning, entitlement, building, conservation restrictions and other land use and environmental regulations, (iii) matters that would be shown on a current survey or by an inspection of any of the Leased Real Property

or Owned Real Property and (iv) all exceptions, restrictions, easements, charges, rights-of-way and other Encumbrances set forth in any permits, any deed restrictions, groundwater or land use limitations or other institutional controls utilized in connection with any required environmental remedial actions, or other state, local or municipal franchise applicable to Sellers or any of their respective properties; (e) Encumbrances that affect the underlying fee interest of any Leased Real Property; (f) Encumbrances of lessors and licensors arising under lease agreements or license agreements; and (g) non-exclusive licenses of Intellectual Property granted in the Ordinary Course; *provided* that in no event shall any Encumbrance or Liability securing indebtedness for borrowed money, any judgment Lien, or any Encumbrance or Liability that would otherwise be released by operation of the Sale Order constitute a Permitted Encumbrance.

"Person" means any individual, partnership, limited partnership, limited liability partnership, limited liability company, unlimited liability company, joint stock company, joint venture, syndicate, sole proprietorship, corporation, unincorporated association, trust, trustee, executor, administrator or other legal personal representative, or any other legal entity, including a Governmental Authority, and pronouns having a similarly extended meaning.

"Petition Date" has the meaning set forth in the recitals hereto.

"Plan" has the meaning set forth in the recitals hereto.

"Post-Closing Tax Period" means any taxable period beginning after the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period beginning after the Closing Date.

"PPACA" has the meaning set forth in Section 3.1(k)(v).

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and, with respect to any Straddle Period, the portion of such Straddle Period ending on and including the Closing Date.

"Prepetition Credit Facility" means that certain Credit and Guaranty Agreement, dated as of October 30, 2025, by and among Sellers and certain of their Subsidiaries, Lenders (as defined therein), and Silver Point Finance, LLC, together with all related credit, guaranty, security and other financing documents, as amended, restated, supplemented or otherwise modified from time to time.

"Purchase Price" means an amount equal to the sum of (a) $10,000,000.00, *plus* (b) the Real Property Amount, *plus* (c) the Closing Retail Inventory Amount, *plus* (d) the New Inventory Amount.

"Purchased Assets" has the meaning set forth in Section 2.1(a).

"Purchased Business Information" means all books, financial information and other information, customer lists and customer data, including customer personally identifiable information, customer contact information, mailing lists, correspondence (in any format, including emails) with customers, research and development reports, records, files, ledgers, documentation, instruments, research, papers, data, advertising, promotion and marketing materials and information,

sales or technical literature or similar information, all cybersecurity protocols, breach logs, insurance coverage disclosures, incident response plans, operational guides, employee handbooks, workflow checklists, forms of contracts, proposals, pricing models, or historical vendor quotes, source code, architecture documentation, software deployment protocols, system logs, operating manuals, procedures, process documentation, compliance records, audit working papers, IT system documentation, standard forms, and any other Business information (in any format) used in, related to, or necessary for the continued operation of the Business that, in each case, is in the possession or control of any Sellers; *provided* that, if for any reason Buyer is prohibited from obtaining possession of any of the foregoing, Buyer shall have the right to make copies of such Purchased Business Information unless prohibited by applicable Law.

"Purchased Contracts" has the meaning set forth in Section 5.6(k)(ii).

"Purchased Intellectual Property" means all Intellectual Property used in the operation of the Business and owned, licensed or held by Sellers other than Intellectual Property related exclusively to an Excluded Asset or Excluded Liability.

"Purchased Permits" has the meaning set forth in Section 2.1(a)(vii).

"Real Property Amount" means an amount equal to $13,662,985.

"Real Property Leases" means the leases, subleases, licenses or other occupancy agreements, including all amendments, schedules, exhibits and addendums thereto, for real property set forth on Section 1.1(h) of the Seller Disclosure Schedules.

"Receivable" means, individually and collectively, all amounts (whether current or non-current) that constitute, as of the Closing, accounts receivable, notes receivable and other indebtedness (of any kind or nature whatsoever) due and owed by any Person to any Seller (or in which any Seller has any right, title or interest), including the Dealer Loans, in each case, howsoever such amount arose or is evidenced, and whether or not any Seller's right to payment of such amounts has been earned by actual performance.

"Registered IP" has the meaning set forth in Section 3.1(i).

"Release Certificate" has the meaning set forth in Section 2.5(c).

"Representatives" means, with respect to any Person, such Person's Affiliates and its and their respective directors, officers, employees, agents, attorneys, accountants, financial advisors, investment bankers and other advisors.

"Residual Certificate" means each asset-backed certificate issued under the ABS Platform, each of which constitutes a Risk Retention Interest and which are set forth on Section 1.1(i) of the Seller Disclosure Schedules.

"Retail Inventory" means Vehicles (other than New Inventory) owned by Sellers immediately prior to the Closing that are intended for sale to consumers, including (a) first-buy Vehicles, (b) repossessed Vehicles, to the extent such Vehicles are in a condition to be sold to consumers and (c) other ancillary types of Vehicles (including transfer, trade and return Vehicles).

"Retention Award Agreements" has the meaning set forth in Section 5.9(d)(vi).

"Risk Retention Holder" means, with respect to any securitization transaction, the entity that acts as sponsor or originator, or its majority-owned Affiliate, that holds Risk Retention Interests as required by the applicable U.S. Risk Retention Rules.

"Risk Retention Interest" means the portion of the equity, notes, membership interests or other securities representing the first-loss tranche or other retained interest in a securitization transaction required to be held under the applicable U.S. Risk Retention Rules.

"Rollover Indebtedness" means refinanced indebtedness of Sellers contemplated by the Rollover Indebtedness Term Sheet.

"Rollover Indebtedness Documents" means the Contracts and other documents evidencing the Rollover Indebtedness negotiated and finalized in accordance with the Rollover Indebtedness Term Sheet and Section 5.11.

"Rollover Indebtedness Term Sheet" means that certain term sheet set forth on Exhibit E.

"Sale Hearing" means the hearing conducted in the Bankruptcy Court to consider approval of the motion in respect of the Sale Order and the Transactions (which hearing may be held together with the hearing on confirmation of the Plan), which hearing the Parties shall use reasonable best efforts to cause to be conducted no later than the date that is 35 calendar days after the Petition Date (or such later date as the Bankruptcy Court's calendar permits).

"Sale Order" means an Order of the Bankruptcy Court, in form and substance reasonably acceptable to Buyer and Sellers, which order shall, among other things (i) approve this Agreement and the Transactions, (ii) authorize the sale of the Purchased Assets to Buyer free and clear of all Encumbrances (other than Permitted Encumbrances) and all Liabilities (other than Assumed Liabilities) pursuant to sections 105, 363(f) and 365, and, if authorized through a Plan, 1123 and 1141, of the Bankruptcy Code, (iii) authorize the assumption and assignment to Buyer of the Purchased Contracts pursuant to section 365 of the Bankruptcy Code, (iv) contain findings of fact and conclusions of law that Buyer is a "good faith" purchaser entitled to the protections of section 363(m) of the Bankruptcy Code and is not a successor to Sellers, (v) find that Buyer did not engage in any conduct which would allow this Agreement to be set aside pursuant to section 363(n) of the Bankruptcy Code, and (vi) contain such other terms that are otherwise acceptable to Sellers and Buyer in their reasonable discretion.

"Sale Order Deadline" means 35 days after the Petition Date; *provided*, *however*, that if such date is not a Business Day, the Sale Order Deadline shall automatically be extended to the first Business Day after such date; *provided*, *further*, that if the Sale Hearing has been scheduled or delayed past such date due to the Bankruptcy Court's availability, the Sale Order Deadline shall automatically be extended to the earliest date after such date on which the Bankruptcy Court is available for and schedules the Sale Hearing.

"SEC" means the U.S. Securities and Exchange Commission.

"Seller" has the meaning set forth in the preamble hereto.

"Seller Board" means the board of directors of ACM.

"Seller Claims" has the meaning set forth in Section 2.1(a)(xvii).

"Seller Disclosure Schedules" means the disclosure schedules of Sellers delivered by ACM pursuant to this Agreement, as supplemented or amended from time to time in accordance with this Agreement.

"Seller Released Matters" has the meaning set forth in Section 7.2(d).

"Seller Releasee" has the meaning set forth in Section 7.2(a).

"Seller Releasors" has the meaning set forth in Section 7.2(d).

"Seller Support Obligations" has the meaning set forth in Section 5.1(b).

"Sellers" has the meaning set forth in the preamble hereto.

"Sellers' Knowledge" means the actual knowledge of the individuals set forth on Section 1.1(j) of the Seller Disclosure Schedules after reasonable inquiry of those individuals who are each of their direct reports.

"Special Committee" means the special committee of the Seller Board established to, among other things, review and consider the Transactions.

"Statement" has the meaning set forth in Section 2.3(b).

"Straddle Period" has the meaning set forth in Section 5.3(b)(ii).

"Subsidiary" of any Person means any other Person (a) more than 50% of whose outstanding shares of capital stock or other equity or voting securities or interests representing the right to vote for the election of directors or other managing authority of such other Person are, now or hereafter, owned or controlled, directly or indirectly, by such first Person, or (b) which does not have outstanding shares of capital stock or other equity or voting securities or interests with such right to vote, as may be the case in a partnership, joint venture or unincorporated association, but more than 50% of whose ownership interests representing the right to make decisions for such other Person are, now or hereafter, owned or controlled, directly or indirectly, by such first Person; *provided* that, in the case of each of the foregoing clauses (a) and (b), such other Person shall be deemed to be a Subsidiary only so long as such ownership or control exists.

"Successful Bidder" has the meaning set forth in Section 5.6(h).

"Superior Proposal" means any bona fide written Acquisition Proposal that (a) constitutes a Qualified Bid (as defined in the Bidding Procedures Order), and (b) the Seller Board (after considering the recommendation of the Special Committee) determines in good faith is more favorable to the estate and its stakeholders than the Transactions, taking into account all relevant factors, including value, certainty of financing, conditionality, regulatory risk and timing of closing.

"Supplemental Bonus" has the meaning set forth in Section 5.9(g).

"Supplemental Bonus Amount" has the meaning set forth in Section 5.9(g).

"Supplemental Bonus Recipient" has the meaning set forth in Section 5.9(g).

"Tax Refunds" has the meaning set forth in the definition of "Excluded Assets".

"Tax Return" means any return, declaration, report, election, notice, filing, claim for refund, information return or statement relating to Taxes, including any schedule or attachment thereto, filed or maintained, or required to be filed or maintained, in connection with the calculation, determination, assessment or collection of any Tax and includes any amended returns required as a result of examination adjustments made by the IRS or other Taxing Authority.

"Taxes" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, sales, use, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"Taxing Authority" means any Governmental Authority or any quasi-governmental body exercising Tax regulatory authority.

"Third Party" means any Person other than Sellers, Buyer and their respective Affiliates and permitted successors and assigns.

"Trade Secrets" has the meaning set forth in the definition of "Intellectual Property".

"Transaction Bonus Agreement" has the meaning set forth in Section 5.9(f).

"Transaction Bonus Recipient" has the meaning set forth in Section 5.9(f).

"Transaction Bonuses" has the meaning set forth in Section 5.9(f).

"Transactions" means the transactions contemplated by this Agreement and the Ancillary Agreements.

"Transfer Taxes" has the meaning set forth in Section 5.3(b)(i).

"Transferred Employee" has the meaning set forth in Section 5.9(a).

"Transition Services Agreement" means that certain Transition Services Agreement in substantially the form set forth on Exhibit F.

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in any applicable jurisdiction.

"U.S. Risk Retention Rules" means the final rules issued under Section 941 of the Dodd-Frank Act regarding risk retention by sponsors of asset-backed securities.

"Vehicle" means any new or used, two-axled automobile, sport utility vehicle, van or light-duty truck, together with all accessions, parts and equipment sold or financed in connection therewith.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988 and any similar state, local, foreign or other applicable Law.

"Willful Breach" means a material breach of this Agreement resulting from an intentional act or omission taken with actual knowledge that the act or omission would, or would reasonably be expected to, constitute a material breach.

1.2 **Construction.** Except where the context otherwise requires, wherever used, the singular includes the plural (including, for the avoidance of doubt, that the use of the singular in reference to Buyer shall mean all Persons comprising Buyer), the plural the singular, the use of any gender shall be applicable to all genders and the word "or" is used in the inclusive sense (and/or). The table of contents of this Agreement, the captions of this Agreement and the headings of the Seller Disclosure Schedules are for convenience of reference only, shall not be deemed part of this Agreement or the Seller Disclosure Schedules and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provision contained in this Agreement. The terms "include," "includes" and "including" mean "include, without limitation," "includes, without limitation" and "including, without limitation," respectively, and do not limit the generality of any description preceding such term. The language of this Agreement shall be deemed to be the language mutually chosen by the Parties and no rule of strict construction shall be applied against any Party. Unless otherwise specified or where the context otherwise requires, (a) references in this Agreement to any Article, Section, Schedule, Annex or Exhibit are references to such Article, Section, Schedule, Annex or Exhibit of this Agreement; (b) references in any Section to any clause are references to such clause of such Section; (c) "hereof," "hereto," "hereby," "herein" and "hereunder" and words of similar import when used in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement; (d) references to a Person are also to its successors and permitted assigns and, in the case of any Governmental Authority, to any Person succeeding to its functions and capacities; (e) references to a Law include any amendment or modification to such Law, any successor provisions thereto and any rules or regulations issued thereunder, in each case, as in effect at the relevant time of reference thereto; (f) references to any agreement, instrument or other document in this Agreement refer to such agreement, instrument or other document as originally executed or, if subsequently amended, replaced or supplemented from time to time, as so amended, replaced or supplemented and in effect at the relevant time of reference thereto; (g) "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if"; (h) all references to "made available" mean, when used with respect to any document or other item of information, that such document or other item of information was provided or made available to Buyer in the virtual data room prepared by Sellers for the Transactions and made accessible to Buyer and its Representatives no later than one Business Day before the date hereof or in any docket filing or SEC filing no later than two Business Days before the date hereof; (i) references to monetary amounts are denominated in United States dollars and all references to "$"

shall be deemed to refer to United States dollars; (j) any reference with respect to any action to be taken, or any payment or other delivery to be made, "by" a particular Person will, unless the context specifically requires otherwise, be read to apply equally to the same being performed, paid or delivered (as applicable) by another Person on behalf of the subject Person (i.e., read as if "by, or otherwise on behalf of," was used); (k) any use of a defined term (including the terms "Assumed Liabilities," "Purchased Assets" and "Transactions") will, whenever the context requires or permits, apply to the whole of the same and to any portion thereof; (l) underscored references to any Article, Section, subsection, clause, Schedule, Annex or Exhibit refer to those portions of this Agreement; (m) unless the context otherwise clearly indicates, each defined term used in this Agreement shall have a comparable meaning when used in its plural or singular form; (n) where this Agreement states that a Party "shall," "will" or "must" perform in some manner or otherwise act or omit to act, it means that such Party is legally obligated to do so in accordance with this Agreement; and (o) except as otherwise expressly provided in this Agreement, references to the need to obtain the "consent" or "approval" of a Party mean the need to obtain the prior written consent of such Party, with the grant or withholding of, or refusal to grant, such consent being in the sole and absolute discretion of the Party from whom such consent is sought. The Parties have participated jointly in the negotiation and drafting of this Agreement and in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party (or any Affiliate thereof) by virtue of the authorship of any of the provisions of this Agreement. Disclosure of any fact or item in any schedule in the Seller Disclosure Schedules shall be deemed to have been disclosed with respect to every other schedule in the Seller Disclosure Schedules, notwithstanding the omission of an appropriate cross-reference, solely to the extent that it is reasonably apparent from the face of such disclosure that such disclosure is applicable to such schedule in the Seller Disclosure Schedules.

## ARTICLE 2
## SALE AND PURCHASE OF ASSETS; LIABILITIES

2.1 **Sale of Purchased Assets.**

(a) Purchase and Sale of Purchased Assets. Upon the terms and subject to the conditions of this Agreement, the Ancillary Agreements and the Sale Order, at and effective as of the Closing, each Seller shall sell, transfer, convey, assign and deliver to Buyer, and Buyer shall purchase and accept from such Seller, all of the direct or indirect right, title and interest of any Seller in and to all of the properties, rights, interests, claims, contracts, and assets of such Seller of every kind, character and description, whether real, personal or mixed, tangible or intangible, wherever located and whether now existing or hereafter acquired, and whether or not reflected on a balance sheet, constituting all assets of the Business, or used, useful, or held for use in, or related to, the Business, other than the Excluded Assets (individually, a "Purchased Asset" and collectively, the "Purchased Assets"), including the following:

(i) 100% of the Equity Interests of the Depositor and all rights, interests and assets necessary to service and administer the ABS Platform, including the ABS Transaction Documents and all related servicing, management, vendor, supplier and sub-servicer arrangements;

(ii) all Books and Records of Sellers (other than the Excluded Books and Records), including records relating to active and non-active customer accounts, Dealer Loans, customer accounts and the ABS Platform;

(iii) all Vehicle inventory, including all Vehicles acquired by any Seller prior to the Closing, and any books, records and titles associated with such Vehicle inventory;

(iv) all Receivables, Dealer Loans, Dealer Loan Collateral and all related payment, collection, servicing and enforcement rights;

(v) all Purchased Contracts that have been assumed and assigned to Buyer pursuant to Section 5.6(k);

(vi) the Residual Certificates;

(vii) all Permits and pending applications for Permits relating to the Business or any Purchased Asset, to the extent assignable or transferable or reissued (collectively, the "Purchased Permits");

(viii) all Purchased Intellectual Property, including all URLs, domain names, websites, website content, social media accounts, handles and pages, mobile applications, databases and data, customer consents, opt-ins and communication preferences (including consents under the Telephone Consumer Protection Act), telephone and toll-free numbers, SMS/MMS short codes and long codes (including short code 31681), email addresses, goodwill and rights to pursue infringement claims;

(ix) all tangible personal property used or held for use in the Business, including machinery, equipment, computers, information systems, supplies and other operating property;

(x) (A) copies of Sellers' or any of their Affiliates' personnel records and completed Form I-9s with respect to each Transferred Employee to the extent such records are not Excluded Books and Records; and (B) all Employee Equipment of such Transferred Employees;

(xi) all Owned Real Property (other than any Excluded Locations);

(xii) all Real Property Leases and dealership-location rights (other than the Excluded Location Leases and with respect to the Excluded Locations), together with related security deposits and lease records, to the extent not excluded under Section 5.6(k);

(xiii) all Assumed Benefit Plans and all rights and assets under or relating to the Assumed Benefit Plans, including all trusts, insurance contracts, administrative services, recordkeeping and similar Contracts, and all assets held in

any trust or funding vehicle relating thereto, in each case as provided in the Benefits Assignment and Assumption Agreement;

(xiv) all prepaid expenses, credits, security deposits, refunds and rights to receive payments or recoveries relating to any Purchased Asset, in each case, only to the extent not Excluded Assets and subject to payment by Buyer where expressly required under this Agreement;

(xv) all rights under warranties, indemnities and similar arrangements relating to the Purchased Assets or Assumed Liabilities;

(xvi) all goodwill and other intangible rights associated with the Business or the Purchased Assets, including all goodwill symbolized by the trademarks included in the Purchased Intellectual Property and all rights under any non-disclosure and confidentiality, noncompete, or nonsolicitation agreements with current or former employees, directors, officers, managers, consultants or other service providers of any Seller or with third parties for the benefit of any Seller, in each case to the extent relating to the Business, the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(xvii) all Claims relating to any Purchased Asset or Assumed Liability, other than any Excluded Asset, whether pending or contingent, and all proceeds and rights to payment arising therefrom (collectively, the "Seller Claims");

(xviii) without duplication, all deposits (including deposits in transit, but excluding any retainers held by advisors to any Seller, any professional fee escrow established pursuant to the DIP Order and all utility deposits and other similar deposits held by third parties on behalf of any Seller, and all rights to refunds, rebates, or credits in respect thereof) and other prepaid charges and expenses, credits, advance payments, charges and fees of any Seller that relate to the Purchased Assets;

(xix) subject to the right of any Seller to retain copies, all Purchased Business Information in the possession or control of any Seller, including their professionals, agents, contractors, or advisors, and whether in hard or electronic format;

(xx) the amount of, and all rights to any, insurance proceeds received by any of Sellers after the date hereof in respect of (i) the loss, destruction or condemnation of any Purchased Assets occurring prior to, on or after the Closing or (ii) any Assumed Liabilities;

(xxi) all other rights, demands, claims, credits, allowances, royalties, rebates, refunds and other rights in respect of promotional allowances or rights of setoff and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), other than against any Seller, arising out of or relating to the Business, the Purchased Assets or Assumed Liabilities;

(xxii) all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, products sold, or services provided, to any Seller or to the extent affecting the Business, any Purchased Assets or Assumed Liabilities;

(xxiii) all other assets that are related to, used in or which could be used in connection with the Purchased Assets or the Business (but excluding all of the Excluded Assets); and

(xxiv) each of the assets set forth in Section 2.1(a)(xxiv) of the Seller Disclosure Schedules,

in each case, free and clear of all Encumbrances (other than Permitted Encumbrances) and all Liabilities (other than Assumed Liabilities) except as otherwise expressly provided in the Sale Order.

(b) Excluded Assets. Notwithstanding anything to the contrary in this Agreement or any Ancillary Agreement, Buyer shall not acquire, and Sellers shall retain, the Excluded Assets. Notwithstanding anything to the contrary contained herein, in no event shall the Excluded Assets include any Purchased Intellectual Property or any Books and Records necessary to service, administer or collect the Receivables.

2.2 **Liabilities.**

(a) Assumed Liabilities. Upon the terms and subject to the conditions of this Agreement, the Sale Order and, if applicable, the Plan and Confirmation Order, at the Closing, Buyer shall assume and agree to pay, perform and discharge when due, all Liabilities of Sellers other than the Excluded Liabilities (individually, an "Assumed Liability" and collectively, the "Assumed Liabilities"), including the following:

(i) all Liabilities under the Purchased Contracts subject to the Sale Order, Plan and Confirmation Order, and as may be limited by the Bankruptcy Code and applicable Law;

(ii) all Cure Costs solely for the Purchased Contracts and all rejection damages with respect to Real Property Leases (to the extent they are not Excluded Location Leases) that are excluded or are deemed to be Excluded Contracts under Section 5.6(k);

(iii) all Liabilities arising after the Closing solely as a result of Buyer's or its Affiliates' ownership or operation of the Purchased Assets or the Business;

(iv) all Liabilities for Taxes arising out of, imposed with respect to or relating to the Assumed Liabilities, and Taxes of the Business or Purchased Assets, in each case attributable to a Post-Closing Tax Period; *provided* that, for the avoidance of doubt, sales Taxes arising in connection with the receipt of finance receivable payments after the Closing shall be considered attributable to a Post-

Closing Tax Period notwithstanding that such receivables were generated prior to Closing;

(v) any Transfer Taxes that are the responsibility of Buyer pursuant to Section 5.3(b)(i);

(vi) all Assumed Employee Liabilities;

(vii) all earnout, deferred purchase price and other similar payment obligations under the Purchased Contracts (other than any Excluded Earnout);

(viii) the obligation to maintain and store the Books and Records (other than the Excluded Books and Records) following the Closing as provided in Section 5.8;

(ix) all ABS Liabilities, whether arising before, at or following the Closing, subject to the Sale Order;

(x) all Liabilities under or relating to the Purchased Permits;

(xi) all accounts payable and accrued Liabilities of Sellers, other than any Liability expressly included in the Excluded Liabilities;

(xii) all Liabilities under vehicle service contracts and the accident protection program of the Business;

(xiii) all Liabilities and Claims arising from or relating to the Existing Servicing Agreements and the Dealer Loans, subject to the Sale Order, and as may be limited by the Bankruptcy Code and applicable Law; and

(xiv) each of the Liabilities expressly set forth in Section 2.2(a)(xiv) of the Seller Disclosure Schedules.

(b) Excluded Liabilities. Notwithstanding anything to the contrary in this Agreement or any Ancillary Agreement, Buyer shall not assume or be liable for, and Sellers shall retain and remain solely responsible for the following (collectively, the "Excluded Liabilities"):

(i) Excluded Earnouts;

(ii) Liabilities to the extent arising out of or relating to any Excluded Assets;

(iii) Liabilities to the extent arising out of or relating to any Excluded Locations (including any Excluded Location Leases or any other Contracts related to an Excluded Location);

(iv) Excluded Employee Liabilities;

(v) all Taxes (A) of Sellers, or (B) attributable to the Business or Purchased Assets, for any Pre-Closing Tax Periods (determined in accordance with Section 5.3(b)(ii)), in each case other than (x) any Liabilities for Taxes described in Sections 2.2(a)(iv) and 2.2(a)(v) and (y) payroll, employment, withholding, social security, unemployment and similar Taxes relating to any Assumed Employee Liability (whether attributable to a Pre-Closing Tax Period or a Post-Closing Tax Period);

(vi) rejection damages for Excluded Contracts (other than as contemplated by Section 2.2(a)(ii));

(vii) all Liabilities arising on or prior to the Closing out of or relating to investigations (or the outcomes of such investigations) by the Consumer Financial Protection Bureau and any other Litigation or Claim by any Governmental Authority relating to the origination or collection of any Dealer Loan, Receivable or other consumer finance obligation, or any Seller's failure or alleged failure to comply with any Law;

(viii) all Liabilities to the extent arising out of Claims brought by the SEC and any other state or federal regulatory bodies relating to ACM; and

(ix) each of the Liabilities set forth in Section 2.2(b)(ix) of the Seller Disclosure Schedules.

2.3 **Consideration and Payment; Allocation**.

(a) The aggregate consideration for the Purchased Assets shall consist of (i) the payment of the Purchase Price, (ii) the assumption by Buyer of the Assumed Liabilities in accordance with Section 2.2(a), including payment of Cure Costs, and (iii) the Rollover Indebtedness. At the Closing, Buyer shall pay to Sellers the Closing Payment by wire transfer of immediately available funds to an account designated by Sellers in writing.

(b) ACM shall prepare and deliver to Buyer, no later than three Business Days prior to the Closing Date, a statement (the "Statement") setting forth in reasonable detail ACM's calculation of the Closing Retail Inventory Amount and the New Inventory Amount, together with reasonable supporting documentation, including, for each Vehicle, (i) category (Retail Inventory, New Inventory, Wholesale Inventory, Third Party Inventory), (ii) year, (iii) make, (iv) model, (v) title status, (vi) VIN, (vii) mileage and (viii) physical location/lot. The Statement shall be prepared in good faith and in accordance with this Agreement, the Plan and, in the case of Retail Inventory, the Black Book Wholesale Value, as applicable. During the period after the delivery of the Statement and prior to the Closing Date, Sellers shall provide Buyer and its Representatives, upon reasonable advance notice and during normal business hours, with (A) reasonable access to the Books and Records, work papers and other documents that were used in the preparation of, or otherwise relate to, the Statement, and (B) a reasonable opportunity to discuss the Statement with the applicable officers and management of Sellers, including Sellers' internal and external accountants, in each case solely to verify the accuracy of such

amounts; *provided* that nothing herein shall require Sellers to disclose any information to Buyer or its Representatives if such disclosure (x) would, in the reasonable judgment of Sellers, be in violation of Law applicable to Sellers or the terms of any Contract to which any Seller is a party, or (y) is, in the reasonable judgment of Sellers, subject to an attorney-client or attorney work-product privilege or would result in the waiver of any applicable attorney-client privilege; *provided*, *further*, that if a Seller withholds access or information pursuant to clauses (x) or (y), such Seller shall promptly notify Buyer that access or information is being withheld and identify the applicable exclusion being relied upon, and shall use reasonable best efforts to provide such information to the extent possible without implicating such exclusion, including by providing redacted versions of documents or summaries thereof. The Parties shall cooperate in good faith to resolve any differences they may have with respect to the Statement.

(c) Sellers shall prepare and deliver to Buyer a proposed allocation of the Aggregate Consideration (including the Assumed Liabilities) among the Purchased Assets in accordance with applicable Tax Laws, including section 1060 of the Code, within 90 days following the Closing (the "Allocation"). Buyer shall have a reasonable opportunity to review and comment on the proposed Allocation, and the Parties shall cooperate in good faith to resolve any differences. Any unresolved dispute shall be submitted to an independent nationally recognized accounting firm jointly selected by the Parties, the fees and expenses of which shall be split equally by the Parties, and the determination of which shall be final and binding on the Parties. Each Party shall file Tax Returns consistently with the final Allocation (as finally determined pursuant to this Section 2.3(c)) and shall not take any position that is inconsistent with such final Allocation, except as otherwise required by applicable Law; *provided* that nothing in this Section 2.3(c) shall bind the Bankruptcy Court or any party in interest with respect to the allocation of proceeds among the Debtors' estates or creditors, which shall remain subject to the Plan and the Bankruptcy Court. Any adjustments to the Aggregate Consideration (or other relevant items) pursuant to this Agreement shall be allocated in a manner consistent with the Allocation. Sellers and Buyer shall give prompt notice to each other of the commencement of any Tax-related legal proceeding or the assertion of any Tax-related claim against Sellers or Buyer, as applicable, in each case, concerning the Allocation.

2.4 **Closing.**

(a) The closing of the Transactions (the "Closing") shall take place remotely by exchange of documents and signatures via electronic transmission at 10:00 a.m., Central Time, on the second Business Day following the satisfaction (or, to the extent permitted by applicable Law, waiver by the Party or Parties entitled to benefit therefrom) of the conditions set forth in ARTICLE 6 (other than those conditions that by their nature are to be satisfied or waived at the Closing, but subject to the satisfaction or, to the extent permitted by applicable Law, waiver of such conditions by the Party or Parties entitled to benefit therefrom); *provided*, *however*, that the Closing may occur in any manner or at any time, date or venue as may be mutually agreed upon by Buyer and Sellers in writing. Except as otherwise set forth herein, all actions to be taken and all documents to be executed and delivered by all Parties at the Closing will be deemed to have been taken, executed and delivered simultaneously, and no such action, execution or delivery shall be effective until

all such actions, executions and deliveries have been taken, executed and delivered. The date on which the Closing occurs is referred to in this Agreement as the "Closing Date".

(b) At or prior to the Closing, Sellers shall deliver or cause to be delivered the following to Buyer:

(i) the certificate referred to in Section 6.2(c);

(ii) evidence that the Purchased Contracts intended to be assumed and assigned at Closing are covered by the Sale Order;

(iii) each of the Rollover Indebtedness Documents, duly executed by each applicable Seller, if any;

(iv) the New Servicing Agreement, duly executed by each applicable Seller, if any;

(v) the Bill of Sale, duly executed by each Seller;

(vi) the Transition Services Agreement, duly executed by each Seller;

(vii) the Intellectual Property Assignment Agreement, duly executed by each Seller;

(viii) the Benefits Assignment and Assumption Agreement, duly executed by each applicable Seller, together with resolutions and such other documentation reasonably necessary to effectuate such Benefits Assignment and Assumption Agreement;

(ix) special or limited warranty deeds (or the local equivalent) conveying each parcel of the Owned Real Property to Buyer subject only to the Permitted Encumbrances;

(x) all certificates or other evidence of Equity Interests of the Depositor;

(xi) the Escrow Agreement, duly executed by ACM; and

(xii) all other Ancillary Agreements required to be delivered by Sellers, duly executed by the applicable Seller.

(c) At or prior to the Closing, Buyer shall deliver or cause to be delivered the following to Sellers:

(i) the Closing Payment, as contemplated by Section 2.3(a);

(ii) the certificate referred to in Section 6.3(c);

(iii) the Bill of Sale, duly executed by Buyer;

(iv) each of the Rollover Indebtedness Documents, duly executed by Buyer (or its applicable Affiliate);

(v) the New Servicing Agreement, duly executed by Buyer (or its applicable Affiliate);

(vi) the Transition Services Agreement, duly executed by Buyer;

(vii) the Intellectual Property Assignment Agreement, duly executed by Buyer;

(viii) the Benefits Assignment and Assumption Agreement, duly executed by Buyer (or its designated Affiliate), together with resolutions of Buyer (or such Affiliate) and such other documentation reasonably necessary to effectuate such Benefits Assignment and Assumption Agreement;

(ix) the Escrow Agreement, duly executed by Buyer Escrow Party and the Escrow Agent; and

(x) all other Ancillary Agreements required to be delivered by Buyer, duly executed.

2.5 **Deposit Amount**.

(a) Promptly after the date hereof (but in any event no later than three Business Days following the date hereof), Buyer Escrow Party shall deposit the Deposit Amount into escrow with the Escrow Agent by wire transfer of immediately available funds pursuant to the terms of the Escrow Agreement.

(b) The Parties shall instruct the Escrow Agent to release and deliver the Deposit Amount to either (x) Buyer Escrow Party or (y) ACM on behalf of Sellers, as follows:

(i) if the Closing shall occur, the Deposit Amount shall be delivered to ACM at the Closing and applied towards the Purchase Price payable by Buyer;

(ii) if this Agreement is terminated by ACM pursuant to Section 8.1(c) or Section 8.1(i) (each, a "Deposit Retention Termination"), the Deposit Amount shall be delivered to ACM; or

(iii) if this Agreement is terminated other than pursuant to a Deposit Retention Termination, the Deposit Amount shall be returned to Buyer Escrow Party in accordance with Section 8.4 and, if applicable, Section 8.5.

(c) At the Closing or within two Business Days after any termination of this Agreement, Buyer Escrow Party and ACM shall deliver a joint written instruction to the Escrow Agent directing the release of the Deposit Amount in accordance with this Section 2.5. If Buyer Escrow Party fails to deliver such joint written instruction when required

following a Deposit Retention Termination, ACM may deliver to the Escrow Agent and Buyer Escrow Party a certificate signed by an officer of ACM certifying that a Deposit Retention Termination has occurred and identifying the applicable provision of Section 8.1 (a "Release Certificate"). The Escrow Agent shall release the Deposit Amount to ACM on the 10th Business Day after receipt of a Release Certificate unless, prior to such date, Buyer Escrow Party has delivered to the Escrow Agent and ACM a written objection stating in reasonable detail the basis therefor, in which case the Escrow Agent shall continue to hold the Deposit Amount until it receives either a joint written instruction of Buyer Escrow Party and ACM or a Final Order of the Bankruptcy Court directing its release. Either Party may seek a determination of the Parties' respective entitlements to the Deposit Amount from the Bankruptcy Court on an expedited basis.

(d) Buyer, on behalf of itself and its Affiliates, agrees that (i) any Deposit Amount released to ACM pursuant to a Deposit Retention Termination in accordance with this Section 2.5 shall, upon such release, be property of Sellers' estates free and clear of all Encumbrances and claims of Buyer and its Affiliates, and (ii) neither Buyer nor any of its Affiliates shall assert any right of set-off, recoupment or turnover with respect to any Deposit Amount so released.

(e) Deposit Not Property of the Estates; Automatic Stay. The Parties acknowledge and agree that (i) the Deposit Amount shall be held in escrow by the Escrow Agent for the benefit of Buyer and shall not constitute property of any Seller's estate within the meaning of section 541 of the Bankruptcy Code unless and until released to ACM following a Deposit Retention Termination in accordance with this Section 2.5; and (ii) the automatic stay under section 362 of the Bankruptcy Code shall not apply to, and shall not restrict or delay, the release of the Deposit Amount to Buyer Escrow Party in accordance with this Agreement, and to the extent the automatic stay is deemed to apply, Sellers and Buyer shall agree and stipulate to relief therefrom without the need for any court order, solely in the event Buyer Escrow Party is entitled to a return of the Deposit Amount under this Section 2.5.

## ARTICLE 3
## REPRESENTATIONS AND WARRANTIES

3.1 **Representations and Warranties of Sellers.** Except as disclosed in the ACM SEC Documents filed with, or furnished to, the SEC and publicly available prior to the date hereof (excluding any disclosures set forth in any "risk factors," "forward-looking statements" and similar disclosures to the extent cautionary, predictive or forward-looking in nature, but including any factual information contained within such statements) or as set forth in the Seller Disclosure Schedules, each Seller represents and warrants to Buyer, severally and not jointly and as to itself, as follows:

(a) Organization; Good Standing; Qualification. Such Seller is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization and has the requisite power and authority to own, lease and operate its assets and conduct the Business, subject to the provisions of the Bankruptcy Code and any Order of the Bankruptcy Court. Such Seller is duly qualified to do business in each jurisdiction where

such qualification is required by the nature of the Business or its ownership of the Purchased Assets, except where the failure to qualify would not materially impair such Seller's ability to consummate the Transactions.

(b) Authority and Enforceability.

(i) Such Seller has the requisite power, authority and capacity to enter into this Agreement and the Ancillary Agreements to which it is or will be a party, and, subject to the Bidding Procedures Order and Sale Order, to perform its obligations hereunder and thereunder and consummate the Transactions.

(ii) The execution and delivery of this Agreement and each Ancillary Agreement to which such Seller is or will be a party, the performance of its obligations hereunder and thereunder and the consummation of the Transactions have been or will be duly authorized by all necessary action or proceeding on the part of such Seller, and no other action or proceeding on the part of such Seller is necessary to authorize the execution and delivery of this Agreement and each Ancillary Agreement to which such Seller is or will be a party by such Seller, the performance by such Seller of its obligations hereunder and thereunder or the consummation of the Transactions.

(iii) This Agreement and each Ancillary Agreement to which such Seller is or will be a party have been or will be duly executed and delivered by such Seller and, subject to entry of the Sale Order, constitute legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their terms, except as limited by bankruptcy, insolvency, reorganization, fraudulent transfer, moratorium and similar Laws affecting creditors' rights generally and by general principles of equity (the "Enforceability Exceptions").

(c) Title to Purchased Assets; Sufficiency. Except as set forth in Section 3.1(c) of the Seller Disclosure Schedules:

(i) Sellers own or have valid rights to, and upon delivery to Buyer at the Closing, subject to the Sale Order, will transfer to Buyer, good and valid title to (or, with respect to each lease included in the Purchased Assets, a valid leasehold interest in) the Purchased Assets, free and clear of all Encumbrances, except for Permitted Encumbrances. There is no currently exercisable option to purchase, right of first offer, right of first refusal or other provision granting Sellers, any Sellers' Affiliate or any other Person any right to acquire the Purchased Assets (including the Owned Real Property) and all such previously exercisable rights have been duly waived or terminated. Subject to entry of the Sale Order, the Purchased Assets, together with the services and rights to be provided to Buyer under this Agreement and the Ancillary Agreements, constitute all of the assets, properties and rights that are necessary to carry on the Business (immediately following the Closing) in all material respects as it is currently being conducted; *provided* that the foregoing shall not apply to (A) the Excluded Assets, (B) any Contract designated by Buyer as an Excluded Contract, (C) any asset or Permit the

transfer of which requires a consent that has not been obtained or is not otherwise permitted by applicable Law or (D) cash, working capital or the availability of financing.

(ii) There are no assets, properties or rights (including any Intellectual Property, Contracts, Books and Records, information technology systems or Permits) used in, held for use in, useful in or necessary for the conduct of the Business as currently conducted that (A) are owned, leased or licensed by any Affiliate of Sellers or any other Person (other than a Seller), (B) are shared between the Business and any other business of Sellers or their Affiliates, or (C) constitute Excluded Assets.

(d) No Conflict. Subject to entry of the Sale Order and except as excused by the Bankruptcy Code, the execution and delivery of and performance by such Seller of this Agreement and the Ancillary Agreements to which it is or will be a party (i) do not and will not constitute or result in a violation or breach of, or conflict with, or allow any Person to exercise any rights under, any of the terms or provisions of such Seller's certificate of organization, bylaws or equivalent organizational documents, (ii) do not and will not constitute or result in a breach or violation of, or conflict with or allow any Person to exercise any rights under, any Contract, license, lease or instrument to which it is a party, and (iii) do not result in the violation of any Law applicable to such Seller, except, in the case of clauses (ii) and (iii), as would not reasonably be expected to materially impair such Seller's ability to consummate the Transactions.

(e) Governmental Approvals and Filing. Except (i) as set forth on Section 3.1(e) of the Seller Disclosure Schedules, (ii) with respect to any Antitrust Law and (iii) for the entry of the Sale Order, no consent, authorization, approval or action of, filing with, notice to, or exemption from any Governmental Authority on the part of such Seller is required in connection with the execution, delivery and performance of this Agreement or any Ancillary Agreement to which such Seller is a party or the consummation of the Transactions, except (A) for any such consent, approval, action, filing, notice or exemption which is due to any action of, or circumstances relating to, Buyer or its Affiliates, or (B) where the failure to obtain such consent, approval or action, to make such filing, to give such notice or obtain any such exemption would not be reasonably expected to (x) materially impair Sellers' ability to consummate the Transactions or (y) materially adversely affect the validity or enforceability against such Seller of this Agreement or such Ancillary Agreements or materially adversely affect the ability of such Seller to consummate the Transactions.

(f) Legal Proceedings. Other than the Chapter 11 Cases or on the docket thereof and except as set forth on Section 3.1(f) of the Seller Disclosure Schedules, there is no: (i) pending or, to Sellers' Knowledge, threatened Litigation or Order of any Governmental Authority, in each case, against, relating to or involving such Seller (whether as a plaintiff or a defendant), the Transactions, the Business or any of the Purchased Assets, in each case, that would reasonably be expected to (x) materially impair Sellers' ability to consummate the Transactions, (y) adversely affect the validity or enforceability against such Seller of this Agreement or any Ancillary Agreements or (z) materially impact the

Transactions, Business or Purchased Assets; or (ii) Order outstanding against any Seller, the Business or any of the Purchased Assets that would materially impair Sellers' ability to consummate the Transactions.

(g) Permits. Sellers own or possess all Permits necessary and material to the Business or the ownership, operation and use of the Purchased Assets. Section 3.1(g)(i) of the Seller Disclosure Schedules identifies all material Permits possessed by Sellers that are necessary to the conduct of the Business or the ownership or operation of the Purchased Assets by Sellers as conducted on the date hereof. Except as set forth on Section 3.1(g)(ii) of the Seller Disclosure Schedules, (i) all such Permits possessed by Sellers are valid and in full force and effect, (ii) Sellers are, and since December 31, 2023 have been, in compliance in all material respects with the terms and conditions of such Permits, other than as a result of the Chapter 11 Cases, (iii) Sellers have not received written notice of violation or proposed revocation, suspension, modification or termination of any such Permit from any issuing Person or Governmental Authority, and (iv) to Sellers' Knowledge, no event has occurred that, with or without notice or lapse of time, would reasonably be expected to result in the revocation, suspension, adverse modification or termination of any such Permit.

(h) No Broker. Except as set forth on Section 3.1(h) of the Seller Disclosure Schedules, such Seller has not used any broker, finder or investment banker in connection with the Transactions, other than any financial advisor whose fees are payable solely by Sellers, and no other broker, finder or investment banker is entitled to any fee or commission from such Seller in connection with the Transactions.

(i) Intellectual Property and Data. Except as set forth on Section 3.1(i) of the Seller Disclosure Schedules: (i) Section 3.1(i)(i) of the Seller Disclosure Schedules sets forth a true, correct and complete list of all (A) patents, patent applications, registered and applied-for trademarks and copyrights, and domain names included in the Purchased Intellectual Property (the "Registered IP"), including the applicable filing or registration number, title, jurisdiction and registered applicant(s) or owner(s), as applicable, and (B) material software included in the Purchased Intellectual Property; (ii) to Sellers' Knowledge, all Registered IP is subsisting, valid and enforceable, and all registration, issuance, renewal, maintenance and other payments that are or have become due with respect thereto have been timely paid by or on behalf of Sellers; (iii) Sellers exclusively own all Purchased Intellectual Property owned or purported to be owned by Sellers and have valid rights to assign, transfer and convey all right, title and interest therein pursuant to this Agreement; (iv) Sellers own, or have a valid and enforceable right to use, all Intellectual Property used in the operation of the Business as currently conducted, and upon the consummation of the Transactions, Buyer will own, or, subject to any required consents, have a valid and enforceable right to use, all such Intellectual Property (other than non-exclusive licenses to commercially available off-the-shelf software or Intellectual Property and non-exclusive licenses to Intellectual Property incidental to any Contract) on materially the same terms as owned or used by Sellers as of the date hereof; (v) there is no pending or, to Sellers' Knowledge, threatened claim against any Seller alleging that the conduct of the Business infringes the Intellectual Property of any third party or challenging Sellers' ownership of any Purchased Intellectual Property; (vi) Sellers have taken

commercially reasonable measures to protect the confidentiality of material Trade Secrets and proprietary source code included in the Purchased Intellectual Property owned by Sellers and, to Sellers' Knowledge, each current and former employee and contractor who developed material proprietary software included in the Purchased Intellectual Property owned by Sellers for the Business has assigned his or her rights therein to a Seller or such rights have vested in a Seller by operation of law; and (vii) to Sellers' Knowledge, in the past three years there has been no security breach of Sellers' information technology systems or customer data that required notice to individuals or Governmental Authorities under applicable Law, and Sellers are in compliance in all material respects with their published privacy policies and applicable privacy Laws regarding customer data.

(j) Labor & Employment.

(i) Section 3.1(j) of the Seller Disclosure Schedules sets forth a complete and accurate list of all Business Employees, with the following information: name; job title; date of hire; base annual salary or hourly rate; total 2025 incentive compensation paid; location of employment (city, state); Fair Labor Standards Act classification; full-time/part-time status; accrued, unused paid time off balances; and active/inactive status (and if inactive, start date of leave and expected return to work date).

(ii) Sellers are not, and have not been within the past three years, party to or bound by a collective bargaining agreement or other union agreement with a labor union or labor organization.

(iii) Sellers are not delinquent in any material respects in payments due and owing to any Business Employee for any earned wages, salaries, commissions, bonuses, or other compensation. Sellers are, and for the past three years have been, in compliance in all material respects with all applicable Laws related to employment, including those related to wages, hours, worker classification, equal employment opportunity, disability rights and benefits, immigration, plant closures and layoffs, health and safety, leaves of absence, and collective bargaining. There are no claims or proceedings against Sellers pending, or to Sellers' Knowledge, threatened to be brought or filed by or before any Governmental Authority, in connection with the employment of any current or former applicant, employee, consultant, volunteer, intern or independent contractor of Sellers, or related to Sellers' labor or employment practices.

(k) Employee Benefit Matters.

(i) Section 3.1(k) of the Seller Disclosure Schedules sets forth a true and complete list of all Benefit Plans. Each Benefit Plan is maintained in the United States and is subject only to the Laws of the United States or a political subdivision thereof.

(ii) For each Assumed Benefit Plan, Sellers have made available to Buyer a true and complete copy of (to the extent applicable): (A) the current plan

document for each such Assumed Benefit Plan and all amendments thereto, including all related trust documents, insurance policies and funding vehicles and administrative services agreements (and, for unwritten plans, a written summary of all material plan terms); (B) the most recent summary plan description and all material modifications thereto and summaries of benefits and coverage; (C) the three most recently filed IRS Form 5500s, along with all exhibits and attachments; (D) in the case of any Assumed Benefit Plan that is intended to be qualified under Section 401(a) of the Code, the most recent IRS determination, opinion or advisory letter; (E) the most recently prepared actuarial report and financial statement, if any, in connection with each such Assumed Benefit Plan; (F) the three most recent years of nondiscrimination and top-heavy tests performed under the Code; (G) all material notices, letters or other correspondence to or from any Governmental Authority sent or received during the past six years with respect to any Assumed Benefit Plan; (H) copies of pending IRS or Department of Labor audits or inquiries and any such audits or inquiries concluded within the past six years; (I) any filings under any amnesty, voluntary compliance, self-correction, or similar program sponsored by any Governmental Authority, including the Employee Plans Compliance Resolution System, Voluntary Fiduciary Correction Program, or Delinquent Filer Voluntary Correction Program, in each case within the past six years; and (J) the IRS Forms 1094-C filed with the IRS and copies of the form of Forms 1095-C filed with the IRS and provided to employees for the three most recently completed plan years.

(iii) Neither Sellers nor any ERISA Affiliate has now or at any time established, sponsored, maintained, participated in, contributed to or been required to contribute to, or has now or at any time within the past six years had any obligation or Liability with respect to any plan (within the meaning of ERISA) that is: (A) a "multiemployer plan" within the meaning of Section 3(37) of ERISA or Section 413 of the Code, (B) subject to Title IV or Section 302 of ERISA or Section 412 of the Code, (C) a "multiple employer plan" within the meaning of Sections 4063, 4064 or 4066 of ERISA or Section 413(c) of the Code, or (D) a "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA.

(iv) Each Assumed Benefit Plan intended to be qualified under Section 401(a) of the Code has received a favorable determination letter from the IRS regarding its qualification thereunder or may rely on an opinion letter issued by the IRS with respect to a prototype plan adopted in accordance with the requirements for such reliance and each such Assumed Benefit Plan is so qualified, and each such Assumed Benefit Plan and related trust are exempt from federal income taxes under Sections 401(a) and 501(a) of the Code. To Sellers' Knowledge, there are no facts or circumstances, and nothing has occurred that, would reasonably be expected to result in the loss of the qualified status of any such Assumed Benefit Plan or the tax-exempt status of any related trust.

(v) Each Assumed Benefit Plan that is a "group health plan" as defined in Section 733(a)(1) of ERISA is and has been, for the past six years, in compliance, in all material respects, with each of the applicable requirements of ERISA and the

Code, including Section 4980B of the Code and Part 6 of Subtitle B of Title I of ERISA and with the Patient Protection and Affordable Care Act of 2010 ("PPACA"), and to Sellers' Knowledge, no event has occurred, and no condition or circumstance exists, that would reasonably be expected to result in a material Liability for penalties or excise Taxes under Code Section 4980D or 4980H or any other provision of PPACA (including the requirement to timely file PPACA information returns with the IRS or to provide applicable statements to employees under Code Sections 6055 and 6056, as applicable). Each Assumed Benefit Plan that is a group health plan is in compliance with the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and the privacy and security laws governing protected health information under HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act, and any applicable state health care privacy and security laws or comparable laws, to the extent applicable.

(vi) Each Assumed Benefit Plan is now and has been established, maintained, operated and administered in all material respects in accordance with its terms and the requirements of all applicable Law, including ERISA and the Code. Sellers have not incurred, and no facts exist which would reasonably be expected to result in, any material Liability with respect to any Benefit Plan, including any Liability, tax, penalty or fee under ERISA, the Code or any other applicable Laws (other than to pay premiums, contributions or benefits in the Ordinary Course consistent with the terms of such plans). Other than the Chapter 11 Cases docket, no material Litigation or Order is pending or, to Sellers' Knowledge, threatened with respect to, involving or otherwise relating to any Assumed Benefit Plan or any fiduciary thereof (in such Person's capacity as a fiduciary), other than claims for benefits in the Ordinary Course. All contributions, premiums or other remittances required to be made under the terms of each Assumed Benefit Plan or by applicable Law have been timely made in accordance with applicable Law and the terms of the Assumed Benefit Plan, and all such contributions, premiums and other remittances for any period ending on or before the Closing Date which are not yet due have been properly accrued and will be paid on or before the Closing Date.

(vii) There are no Assumed Benefit Plans under which welfare benefits are provided to any current or former employees of Sellers or their Affiliates beyond their retirement or other termination of service, other than coverage mandated by Code Section 4980B, Subtitle B of Title I of ERISA or similar state group health plan continuation Laws, the cost of which is fully paid by the eligible participants or their dependents. Sellers and each of their ERISA Affiliates have complied in all material respects with the notice and continuation coverage requirements of Section 4980B of the Code and the regulations thereunder and any similar state Laws.

(viii) Except as set forth in Section 3.1(k)(viii) of the Seller Disclosure Schedules, neither the execution nor the delivery of this Agreement nor the consummation of the Transactions will, either alone or in conjunction with any

other event, including termination of employment or other service, (A) result in any compensation, payment or benefit becoming due or payable, or required to be provided, to any current or former employee, director, officer, consultant, independent contractor or agent of any Seller or any of its Affiliates or Subsidiaries (or any dependent or beneficiary thereof), (B) increase the amount or value of any benefit or compensation otherwise payable or required to be provided to any such Person, (C) result in the acceleration of the time of payment, vesting or funding of any such benefit or compensation, or (D) limit the right to merge, amend or terminate any Assumed Benefit Plan.

(ix) Except as set forth in Section 3.1(k)(ix) of the Seller Disclosure Schedules, neither the execution nor the delivery of this Agreement, nor the consummation of the Transactions will, either alone or in conjunction with any other event, including termination of employment or other service, result in the payment of any amount to a “disqualified individual” (as defined in Section 280G of the Code) that constitutes an “excess parachute payment” as defined in Section 280G(b)(1) of the Code. Sellers will provide to Buyer, no more than 30 days following the date hereof, true and complete copies of any Section 280G calculations and other analysis prepared (whether or not final and including the amount of potential “excess parachute payments” (as defined in Section 280G of the Code)) with respect to any disqualified individual in connection with the Transactions.

(x) None of Sellers, any ERISA Affiliate or any employee, officer or agent thereof, or any trustee, administrator, fiduciary or other “party in interest” or “disqualified person” that is not Sellers, any ERISA Affiliate or an employee, officer or agent thereof, has engaged in any non-exempt prohibited transaction (within the meaning of Section 406 of ERISA or Section 4975 of the Code) with respect to any Assumed Benefit Plan that has subjected Sellers or any ERISA Affiliate, or could reasonably be expected to subject Buyer or any of its Affiliates, to any Liability, Tax or penalty (civil or otherwise) imposed by ERISA, the Code or other applicable Law. To Sellers’ Knowledge, there have not been any fiduciary violations under ERISA that could reasonably be expected to subject Buyer or its Affiliates to any material penalty, tax or other Liability under Section 502 of ERISA or Code Section 4975.

(xi) Each Assumed Benefit Plan that constitutes, in whole or in part, a “non-qualified deferred compensation plan” within the meaning of Section 409A of the Code, and is not otherwise exempt from Section 409A of the Code, has been maintained and operated in all material respects in compliance with Section 409A of the Code.

(xii) Neither Sellers nor any of their Affiliates have any obligation under any Assumed Benefit Plan or otherwise to indemnify, “gross up” or otherwise reimburse any Person for Taxes, interest, penalties or other amounts payable pursuant to Section 409A or Section 4999 of the Code.

(xiii) For purposes of each Assumed Benefit Plan, Sellers and their Affiliates have, in all material respects, correctly classified all individuals performing services to or for the benefit of Sellers and their Affiliates as common law employees, leased employees, independent contractors or agents, as applicable.

(l) Taxes. All material Tax Returns required to be filed by Sellers with respect to the Business and the Purchased Assets have been filed in accordance with all applicable Laws. Sellers have paid all material Taxes owed by them with respect to the Business and the Purchased Assets. There are no liens for any Tax on the Purchased Assets, except for Permitted Encumbrances. There is no action, suit, proceeding, investigation, audit or claim now pending with respect to any Tax with respect to the Business. There are no outstanding agreements extending the statutory period of limitation applicable to any claim for, or the period for the collection or assessment of, Taxes with respect to the Business.

(m) Insurance Policies. Section 3.1(m) of the Seller Disclosure Schedules sets forth an accurate and complete list of all material insurance policies or binders of fire, liability, product liability, umbrella liability, real and personal property, workers' compensation, vehicular, fiduciary liability and other casualty and property insurance issued to any Seller or any of its Affiliates for which the policy period has not yet ended, solely to the extent such policies provide coverage for the Business, the Purchased Assets or the Assumed Liabilities, including any self-funded insurance policies or arrangements (collectively, the "Insurance Policies"). The Insurance Policies are in full force and effect, and all premiums due with respect to the Insurance Policies have been timely paid or, if not yet due, accrued. As of the date hereof, Sellers have not received written notice of cancellation, termination or non-renewal with respect to any of the Insurance Policies. Section 3.1(m) of the Seller Disclosure Schedules sets forth, as of the date hereof, a list of all material claims currently pending under any of the Insurance Policies which are related to the Business, any Purchased Asset or any Assumed Liability. As of the date of this Agreement, to Sellers' Knowledge, all claims and circumstances likely to give rise to a material claim in respect of any Purchased Asset covered by any of the Insurance Policies have been properly reported to the applicable insurers. All such Insurance Policies shall remain in effect through the Closing.

(n) Validity of Contracts.

(i) Section 3.1(n)(i) of the Seller Disclosure Schedules sets forth an accurate list, as of the date hereof, of all material Contracts (including amendments, supplements or modifications thereto) to which a Seller is a party with respect to the Business, the Transactions, the Purchased Assets or the Assumed Liabilities as of the date hereof (each such Contract, a "Material Contract"), and Sellers have made available to Buyer true and complete copies of all such Material Contracts.

(ii) As of the date of this Agreement, each Material Contract is in full force and effect and is a valid and binding obligation of Sellers and, to Sellers' Knowledge, the other parties thereto in accordance with such Material Contract's terms and conditions, except as such validity and enforceability may be limited by (A) the Enforceability Exceptions and (B) the obligation to pay Cure Costs under

Section 5.6(k). As of the date of this Agreement, except, in each case, where the occurrence of such event, breach, default or failure to perform would not be material to the Business, taken as a whole, (1) none of Sellers has received written notice of termination with respect to any Material Contract and (2) to Sellers' Knowledge, no event has occurred which, with the passage of time or the giving of notice or both, would constitute a default under or a violation of, or give rise to a right of indemnity under, any such Material Contract or would cause the acceleration of any obligation of Sellers or the creation of an Encumbrance (other than a Permitted Encumbrance) upon any Purchased Asset, other than those defaults that will be cured in accordance with the Sale Order or any other Order of the Bankruptcy Court required to effect the assignment of any such Material Contract to Buyer, waived in accordance with section 365 of the Bankruptcy Code or that need not be cured under the Bankruptcy Code to permit the assumption and assignment of any such Material Contract that is included in the Purchased Assets.

(o) Partners. Section 3.1(o) of the Seller Disclosure Schedules sets forth an accurate and complete list of the 20 largest locations (each, a "Material Partner"), based on revenue generated by locations for the year ended April 30, 2026 and the six-month period ended October 31, 2026, showing the aggregate sales to each such Material Partner during each such period. For the past three years, except as set forth on Section 3.1(o) of the Seller Disclosure Schedules, none of Sellers or the Business have been, or are currently, engaged in any material dispute with any Material Partner. Except with respect to Contracts that are expiring in the ordinary course of business in accordance with their terms, no Seller has received any written communication from any Material Partner of any intention or threat to terminate or materially reduce purchases from, or otherwise change in any material respect its relationship with, any Seller or the Business, and, to Sellers' Knowledge, no such action is being considered.

(p) Inventory. Except as set forth on Section 3.1(p) of the Seller Disclosure Schedules, each item of Inventory and revenue-earning property used in or relating to the Business is (i) owned by one or more Sellers, and no Inventory or revenue-earning property is held on a consignment basis, and (ii) properly stated on the balance sheet of the Business (to the extent existing on the date thereof) and on the Books and Records in accordance with GAAP.

(q) Real Property.

(i) Section 3.1(q)(i) of the Seller Disclosure Schedules sets forth a true, complete and accurate list of the Owned Real Property.

(ii) Except for the Real Property Leases and as set forth in Section 3.1(q)(ii) of the Seller Disclosure Schedules: (A) there are no leases, licenses, and tenancies affecting the Owned Real Property other than such leases, licenses, and tenancies under which any Seller is a tenant or licensee; (B) Sellers have not granted to any Person any option to purchase, right of first offer, right of first refusal or other provision granting any right to acquire the Owned Real Property; (C) Sellers neither owe nor will owe in the future, any brokerage

commissions or finder's fees with respect to the Owned Real Property; and (D) Sellers have not collaterally assigned or granted any other security interest in the Owned Real Property, nor leased, licensed or otherwise granted any Person the right to use or occupy such Owned Real Property or any portion thereof.

(iii) To Sellers' Knowledge, no public improvements are contemplated to be made and/or which have not heretofore been completed, assessed and paid for with respect to the Owned Real Property.

(iv) To Sellers' Knowledge, all permanent certificates of occupancy and all other material permits, consents and certificates required by all Governmental Authorities having jurisdiction and the requisite certificates of the local board of fire underwriters (or other body exercising similar functions) have been issued for, and in connection with the operation of, the Owned Real Property, have been paid for, and are in full force and effect. To Sellers' Knowledge, there are no agreements, consent orders, decrees, judgments, licenses, permits, conditions or other directives, issued by a Governmental Authority or court which require any change in the present use or operations of the Owned Real Property.

(v) To Sellers' Knowledge, the operation, maintenance and use of the buildings and other improvements constituting the Owned Real Property do not violate any zoning, subdivision, building or other applicable Law, recorded plat, any certificate of occupancy issued with respect to the Owned Real Property or any requirements of departments of housing, building, fire, labor, health, or other municipal departments or other Governmental Authorities having jurisdiction against or affecting the Owned Real Property, nor have Sellers received any written notice of any existing or threatened condemnation or other legal action of any kind involving the Owned Real Property, except for violations that would not have a Material Adverse Effect with respect to any individual Owned Real Property.

(vi) The mechanical, electrical, plumbing, HVAC and other systems servicing the Owned Real Property are in good working order and repair, ordinary wear and tear excepted.

(vii) Section 3.1(q)(vii) of the Seller Disclosure Schedules sets forth a true, complete and accurate list of all real property leased, subleased, licensed or otherwise used or occupied by Sellers pursuant to a Real Property Lease that is a Purchased Asset (collectively, the "Leased Real Property"), including the address of each parcel of Leased Real Property and the Real Property Lease applicable thereto. Sellers have made available to Buyer true and complete copies of each Real Property Lease applicable to the Leased Real Property, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto.

(viii) With respect to each Real Property Lease applicable to the Leased Real Property, subject to entry of the Sale Order and except as excused by the Bankruptcy Code: (A) such Real Property Lease is legal, valid, binding, enforceable and in full force and effect; (B) a Seller holds a valid leasehold (or

subleasehold or license) interest in the applicable Leased Real Property, free and clear of all Encumbrances other than Permitted Encumbrances; (C) other than Cure Costs set forth on Section 3.1(q)(viii) of the Seller Disclosure Schedules, all rent and other amounts due and payable thereunder have been paid; (D) neither such Seller nor, to Sellers' Knowledge, any other party thereto is in material breach or default thereunder, and, to Sellers' Knowledge, no event has occurred that, with notice or lapse of time or both, would constitute a material breach or default thereunder or permit the termination, modification or acceleration of rent thereunder; (E) no Seller has received or delivered any written notice of termination, default or non-renewal thereunder; (F) no Seller has subleased, licensed or otherwise granted any Person the right to use or occupy such Leased Real Property or any portion thereof; and (G) no Seller has collaterally assigned or granted any other security interest in such Real Property Lease or any interest therein.

(ix) The Leased Real Property and the Owned Real Property constitute all of the real property used or held for use in the conduct of the Business. Except as set forth in Section 3.1(q)(ix) of the Seller Disclosure Schedules, to Sellers' Knowledge, (A) the buildings, improvements and systems located on the Leased Real Property are in good operating condition and repair, ordinary wear and tear excepted, and are adequate for the uses to which they are being put, (B) the current use and operation of the Leased Real Property in the conduct of the Business does not violate in any material respect any zoning, building or other applicable Law or any instrument of record, and (C) no Seller has received written notice of any pending or, to Sellers' Knowledge, threatened condemnation, eminent domain or similar proceeding affecting any Leased Real Property.

(r) Environmental Matters. Except as set forth in Section 3.1(r) of the Seller Disclosure Schedules:

(i) such Seller's operation of the Business and the Purchased Assets is and has been in compliance in all material respects with applicable Environmental Laws;

(ii) Sellers own, hold, possess and maintain all Permits required by Environmental Laws for the occupancy or operation of the Purchased Assets and the conduct and operation of the Business, and are in compliance in all material respects with such Permits. All such Permits are in full force and effect, all filings and registrations necessary for renewal or reissuance have been timely submitted, and, to Sellers' Knowledge, no fact, condition or violation exists that would reasonably be expected to cause any such Permit not to be renewed, or to be renewed on materially different terms, by the appropriate Governmental Authority in the Ordinary Course.

(iii) there has been no release or disposal of Hazardous Materials in material violation of, or in a manner that could result in material liability under, any Environmental Laws on, under, in or at any real property currently or formerly

owned or operated by such Seller in connection with the Business or the Purchased Assets;

(iv) no Seller has transported, arranged for the transport of, or arranged for the treatment, storage or disposal of, Hazardous Materials at any off-site location in a manner that could reasonably be expected to result in material liability to any Seller under Environmental Laws in connection with the Business or the Purchased Assets;

(v) such Seller has not received notice of any pending or threatened Litigation or Order or any written notice or demand from any Governmental Authority or other Person alleging violation or liability involving any Seller, the Business, or the Purchased Assets arising under Environmental Laws or relating to Hazardous Materials; and

(vi) such Seller has not entered into any agreement whereby it has assumed, retained, undertaken, or provided an indemnity, whether by contract or operation of Law, to any Person for any material liability arising under Environmental Law in connection with the Business or the Purchased Assets.

(s) SEC Filings. ACM has timely filed with or furnished to the SEC all ACM SEC Documents, except where the failure to so file or furnish would not have a Material Adverse Effect. As of its filing date (or, if amended or superseded by a subsequent filing prior to the date hereof, as of the date of such amendment or superseding filing), each ACM SEC Document complied in all respects with the applicable requirements of the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, and the rules and regulations of the SEC promulgated thereunder, as applicable, except where the failure to comply would not have a Material Adverse Effect, and none of the ACM SEC Documents, at the time it was filed or furnished (or, if amended or superseded, as of the date of such amendment or superseding filing), contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The consolidated financial statements of ACM included in the ACM SEC Documents (i) were prepared in accordance with GAAP applied on a consistent basis during the periods involved (except as may be indicated in the notes thereto and, in the case of unaudited interim financial statements, subject to normal year-end adjustments and the absence of footnotes) and (ii) fairly present in all material respects the consolidated financial position of ACM and its consolidated Subsidiaries as of the dates thereof and the consolidated results of operations and cash flows for the periods then ended. As of the date hereof, there are no outstanding or unresolved comments received from the SEC staff with respect to any of the ACM SEC Documents.

(t) Disclaimer. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS SECTION 3.1 AND THE EXPRESS REPRESENTATIONS AND WARRANTIES CONTAINED IN ANY OF THE ANCILLARY AGREEMENTS TO WHICH ANY SELLER OR ANY OF ITS AFFILIATES IS A PARTY, NONE OF SELLERS NOR ANY OF THEIR RESPECTIVE

ASSOCIATED PERSONS MAKES ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, INCLUDING REPRESENTATIONS AND WARRANTIES AS TO (i) MERCHANTABILITY AND (ii) FITNESS FOR A PARTICULAR PURPOSE, AND HEREBY EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN CONNECTION WITH ANY REPRESENTATION, WARRANTY, STATEMENT, OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO BUYER OR ITS RESPECTIVE AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR FORECAST REGARDING FUTURE RESULTS OR ACTIVITIES OR THE PROBABILITY OF SUCCESS OR PROFITABILITY OF THE PURCHASED ASSETS, OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO BUYER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES BY ANY EQUITYHOLDER, DIRECTOR, MANAGER, OFFICER, EMPLOYEE, AGENT, CONSULTANT, OR REPRESENTATIVE OF ANY SELLER, OR ITS RESPECTIVE AFFILIATES OR REPRESENTATIVES).

3.2 **Representations and Warranties of Buyer.** Buyer represents and warrants to Sellers as follows:

(a) Organization; Good Standing; Qualification. Buyer is duly organized, validly existing and in good standing under the Laws of its jurisdiction of organization and has the requisite power and authority to own, lease and operate its assets and conduct its businesses. Buyer is duly qualified to do business in each jurisdiction where such qualification is required by the nature of its businesses, except where the failure to qualify would not materially impair Buyer's ability to consummate the Transactions.

(b) Authority and Enforceability.

(i) Buyer has the requisite power, authority and capacity to enter into this Agreement and the Ancillary Agreements to which it is or will be a party, and, subject to the Bidding Procedures Order and Sale Order, to perform its obligations hereunder and thereunder and consummate the Transactions.

(ii) The execution and delivery of this Agreement and each Ancillary Agreement to which Buyer is or will be a party, the performance of its obligations hereunder and thereunder and the consummation of the Transactions have been or will be duly authorized by all necessary action or proceeding on the part of Buyer, and no other action or proceeding on the part of Buyer is necessary to authorize the execution and delivery of this Agreement and each Ancillary Agreement to which Buyer is or will be a party by Buyer, the performance by Buyer of its obligations hereunder and thereunder or the consummation of the Transactions.

(iii) This Agreement and each Ancillary Agreement to which Buyer is or will be a party have been or will be duly executed and delivered by Buyer and, subject to entry of the Sale Order, constitute legal, valid and binding obligations of

Buyer, enforceable against Buyer in accordance with their terms, except as limited by the Enforceability Exceptions.

(c) No Conflict. Subject to entry of the Sale Order and except as excused by the Bankruptcy Code, the execution and delivery of and performance by Buyer of this Agreement and the Ancillary Agreements to which it is or will be a party (i) do not and will not constitute or result in a violation or breach of, or conflict with, or allow any Person to exercise any rights under, any of the terms or provisions of Buyer's certificate of organization, bylaws or equivalent organizational documents, (ii) do not and will not constitute or result in a breach or violation of, or conflict with or allow any Person to exercise any rights under, any Contract, license, lease or instrument to which it is a party, and (iii) do not result in the violation of any Law applicable to Buyer, except, in the case of clauses (ii) and (iii), as would not reasonably be expected to materially impair Buyer's ability to consummate the Transactions.

(d) Governmental Approvals and Filing. Except for (i) filings to be made under the HSR Act and (ii) the entry of the Sale Order, no consent, authorization, approval or action of, filing with, notice to, or exemption from any Governmental Authority on the part of Buyer is required in connection with the execution, delivery and performance of this Agreement or any Ancillary Agreement to which Buyer is a party or the consummation of the Transactions, except where the failure to obtain such consent, approval or action, to make such filing, to give such notice or obtain any such exemption would not be reasonably expected to (A) materially impair Buyer's ability to consummate the Transactions or (B) materially adversely affect the validity or enforceability against Buyer of this Agreement or such Ancillary Agreements or materially adversely affect the ability of Buyer to consummate the Transactions.

(e) Financial Capacity. Buyer has, and at Closing will have, sufficient cash to make all necessary payments contemplated by this Agreement or any of the Ancillary Agreements to be made at or after Closing (including fees and expenses in connection with the consummation of the Transactions, all Cure Costs and all Transfer Taxes), and to pay, perform and discharge all of its obligations contemplated by this Agreement and the Ancillary Agreements to be performed at Closing. Buyer acknowledges that the obligations of Buyer to consummate the Transactions are not and will not be subject to the receipt by Buyer of any financing or the consummation of any other transaction (other than the Rollover Indebtedness pursuant to the Rollover Indebtedness Documents).

(f) Legal Proceedings. As of the date hereof, there is no: (i) pending or, to Buyer's Knowledge, threatened Litigation or Order of any Governmental Authority, in each case, against, relating to or involving Buyer (whether as a plaintiff or a defendant), the Transactions or its businesses, in each case, that would reasonably be expected to (x) materially impair Buyer's ability to consummate the Transactions or (y) adversely affect the validity or enforceability against Buyer of this Agreement or any Ancillary Agreements; or (ii) Order outstanding against Buyer that would materially impair Buyer's ability to consummate the Transactions.

(g) No Broker. Except for Stephens Inc., no broker, agent or other intermediary is entitled to any fee, commission or other remuneration in connection with the Transactions based upon arrangements made by or on behalf of Buyer.

(h) Solvency. Immediately after giving effect to the consummation of the Transactions (including any financings being entered into in connection therewith) and taking into account all obligations of Buyer pursuant to this Agreement and the Ancillary Agreements to which it is a party: (i) the fair saleable value of the assets of Buyer will be greater than the total amount of its respective Liabilities; (ii) Buyer will be solvent and able to pay its debts and obligations in the Ordinary Course as they become due; (iii) no transfer of property is being made and no obligation is being incurred in connection with the Transactions with the intent to hinder, delay or defraud either present or future creditors of Buyer in connection with the Transactions; and (iv) Buyer will have adequate capital to carry on its business and all businesses in which Buyer is about to engage.

(i) Bankruptcy Qualification. (i) Buyer is not an insider of any Debtor and neither Buyer nor any of its Affiliates has engaged in any collusion, agreement or other conduct prohibited by section 363(n) of the Bankruptcy Code; (ii) to Buyer's Knowledge, no facts or circumstances exist that would cause Buyer not to qualify as a good-faith purchaser under section 363(m) of the Bankruptcy Code; (iii) as of the Closing, Buyer will be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code with respect to the Purchased Contracts; and (iv) Buyer and its Affiliates have not taken, and will not take, any action intended to impair the Bankruptcy Court's ability to enter or enforce the Sale Order.

(j) Deposit Amount. Upon execution and delivery of the Escrow Agreement by Buyer Escrow Party in accordance with Section 5.13, the Escrow Agreement will have been duly executed by Buyer Escrow Party and, assuming due and valid authorization, execution and delivery by ACM and the Escrow Agent, will be the valid, legal, binding and enforceable obligation of Buyer Escrow Party in accordance with its terms. Buyer Escrow Party has, and as of the date the Deposit Amount is required to be deposited pursuant to Section 5.13 will have, sufficient immediately available funds to deposit the Deposit Amount with the Escrow Agent.

(k) Disclaimer. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS SECTION 3.2 AND THE EXPRESS REPRESENTATIONS AND WARRANTIES CONTAINED IN ANY OF THE ANCILLARY AGREEMENTS TO WHICH BUYER OR ANY OF ITS AFFILIATES IS A PARTY, NONE OF BUYER OR ITS ASSOCIATED PERSONS MAKES ANY REPRESENTATION OR WARRANTY, EXPRESS, STATUTORY OR IMPLIED, INCLUDING REPRESENTATIONS AND WARRANTIES AS TO (i) MERCHANTABILITY AND (ii) FITNESS FOR A PARTICULAR PURPOSE, AND HEREBY EXPRESSLY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN CONNECTION WITH ANY REPRESENTATION, WARRANTY, STATEMENT, OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO ANY SELLER OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY

OPINION, INFORMATION, PROJECTION OR FORECAST REGARDING FUTURE RESULTS OR ACTIVITIES OR THE PROBABILITY OF SUCCESS OR PROFITABILITY OF BUYER, OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO ANY SELLER OR ANY OF ITS AFFILIATES OR REPRESENTATIVES BY ANY EQUITYHOLDER, DIRECTOR, MANAGER, OFFICER, EMPLOYEE, AGENT, CONSULTANT, OR REPRESENTATIVE OF BUYER OR ITS RESPECTIVE AFFILIATES OR REPRESENTATIVES).

(l) No Relationship with Lender. Neither Buyer nor any of its Affiliates (i) is a lender, agent or other party under the DIP Facility or the Prepetition Credit Facility, or (ii) has entered into any agreement, arrangement or understanding with any Lender or any of its Affiliates relating to the Transactions, the Chapter 11 Cases or any Alternative Transaction, other than as disclosed to Sellers in writing prior to the date hereof.

(m) Non-Reliance; Independent Investigation. Buyer has conducted its own independent investigation of the Purchased Assets, the Assumed Liabilities, the Business and the Transactions, and relies solely on the express representations and warranties set forth in Section 3.1 and the Ancillary Agreements. Buyer acknowledges that neither Sellers nor any of their Representatives or Associated Persons have made, and Buyer has not relied upon, any representation or warranty other than those expressly set forth in Section 3.1 and the Ancillary Agreements, including any representation or warranty regarding projections, forecasts, estimates, budgets, data room information or other information furnished to Buyer or its Representatives.

## ARTICLE 4
## PRE-CLOSING COVENANTS

4.1 **Access and Information.** During the Interim Period, subject to the Confidentiality Agreement and applicable Law, upon reasonable advance notice and to the extent such requests are related to any of the Transactions, Sellers shall provide to Buyer and its Representatives reasonable access during normal business hours (in each case, without any material disruption to the conduct of the Business) to the premises, properties, books and records, Contracts, management, personnel and facilities of Sellers related to the Business, the Purchased Assets or the Assumed Liabilities (and shall use commercially reasonable efforts to provide reasonable access to Sellers' agents, advisors, accountants or any other professionals with knowledge of matters relevant to the Transactions), and shall furnish to Buyer such financial, operating and other data and information related to the Business, the Purchased Assets or the Assumed Liabilities as Buyer may reasonably request, in each case, solely for the purpose of assisting Buyer to satisfy the conditions to the Closing set forth in Section 6.1 and Section 6.2, consummating the Transactions and bona fide planning for the transition of the Business to Buyer following the Closing; *provided*, *however*, that (a) the auditors and accountants of Sellers shall not be obligated to make any work papers available to any Person except in accordance with such auditors' and accountants' normal disclosure procedures and then only after such Person has signed a customary agreement relating to such access in form and substance reasonably acceptable to such auditors or accountants, (b) Buyer shall not sample or analyze any soil, groundwater, other environmental media, or building material at any facility of Sellers without Sellers' prior written consent (in their sole and absolute discretion) and (c) Buyer shall comply, and shall cause its Representatives and Associated Persons

to comply, with all of Sellers' policies and safety, health and security rules applicable to any offices or facilities being visited that have been provided to Buyer in advance; *provided*, *further*, that nothing herein shall require any Seller to provide access or to disclose any information to Buyer if such access or disclosure (i) would, in the reasonable judgment of Sellers, be in violation of Law applicable to any Seller or any Subsidiary of any Seller or the terms of any Contract to which any Seller or any Subsidiary of any Seller is party, (ii) is, in the reasonable judgment of Sellers, subject to an attorney-client or an attorney work-product privilege or would result in the waiver of any applicable attorney-client privilege, (iii) is, in the reasonable judgment of Sellers, requested in furtherance of, or preparation for, any Claim by Buyer or any of its Affiliates or Associated Persons against any Seller or any of its Affiliates, (iv) is related to any consent, approval, authorization, clearance from, or filing, notification or registration with, any Governmental Authority set forth in Section 4.5 (which shall be governed by such Section 4.5) or (v) relates to the sales process leading up to the Transactions, including any correspondence, discussions and considerations of the Transactions or any similar transaction between any Seller and any other Person (including any presentations or other materials prepared by or for Sellers or their Representatives, whether in connection with a specific meeting, or otherwise relating to such subject matter); *provided*, that in the case of clauses (i) and (ii), Sellers shall notify Buyer of the general nature of any information so withheld and shall use commercially reasonable efforts to provide such access or information in a manner that does not result in such violation or loss of privilege (including through redaction, clean-team or common-interest arrangements). Other than (x) in the ordinary course of business of Buyer or its Affiliates unrelated to the Transactions, or (y) as expressly provided in the preceding sentence or with the prior written consent of Sellers, Buyer is not authorized to and shall not, and shall cause its Representatives and Associated Persons not to, directly or indirectly contact any director, officer, employee, customer, vendor, supplier, distributor, lender or any Person with a material business relationship with any Seller. Prior to the Closing, Buyer shall not, and shall cause its Affiliates and Associated Persons not to, directly or indirectly, (i) acquire, or enter into any agreement to acquire, any Claim against or interest in any Debtor or (ii) object to, or support any objection to, the DIP Order, the DIP Facility, the Plan, the Bidding Procedures Order or the Sale Order, other than (A) to enforce Buyer's rights under this Agreement, (B) with respect to any such Order, pleading or plan (or any proposed form thereof, or any amendment or modification thereto) that is inconsistent with this Agreement, that would adversely affect Buyer's rights or obligations hereunder, or that is not in form and substance reasonably acceptable to Buyer to the extent so required by this Agreement, or (C) as permitted by Section 7.4. Buyer shall be responsible for any breach of this Section 4.1 by its Representatives or Associated Persons.

4.2 **Ordinary Course of Business.**

(a) Except as required by applicable Law (including the Bankruptcy Code), any Order of the Bankruptcy Court (including the DIP Order), the Plan, this Agreement or actions taken in connection with the Chapter 11 Cases, and subject to any limitations on operations imposed by the Bankruptcy Court, the Bankruptcy Code, the DIP Order or the DIP Facility or as consented to in writing by Buyer (such consent not to be unreasonably withheld, conditioned or delayed), during the Interim Period Sellers shall use commercially reasonable efforts to (i) conduct the Business in the Ordinary Course, (ii) maintain, preserve and protect the Purchased Assets in the condition in which they exist on the date hereof, ordinary wear and tear excepted, (iii) preserve the existing business organization and keep management of the Business intact, keep available the services of the Business

Employees, and maintain existing relations with customers, dealers, retail partners, suppliers, creditors and others having business dealings with the Business, (iv) make all undisputed post-petition payments related to the Purchased Assets, including under the Purchased Contracts (other than Cure Costs), as and when due, to the extent provided in the budget under the DIP Order, and (v) comply in all material respects with all Laws applicable to the Business and the Purchased Assets, in each case taking into account the resources (financial and otherwise) and personnel available to Sellers.

(b) Without limiting the foregoing, except as set forth on Section 4.2(b) of the Seller Disclosure Schedules or as required by applicable Law (including the Bankruptcy Code), any Order of the Bankruptcy Court (including the DIP Order), the Plan, this Agreement, or actions taken by any Seller as required by this Agreement or in connection with the Chapter 11 Cases, or for any limitations on operations or requirements imposed by the Bankruptcy Court, the Bankruptcy Code, the DIP Order, the DIP Facility or any budget under the DIP Order, or as required under any ABS Transaction Document, and without limiting Section 5.6, during the Interim Period Sellers will not, without the prior written consent of Buyer (such consent not to be unreasonably withheld, conditioned or delayed), directly or indirectly:

(i) other than as expressly authorized by the Bankruptcy Court or required by the Plan, (A) increase or agree to increase in any manner cash compensation, bonus or commission opportunity, severance or termination pay or any other remuneration of any kind of any Business Employee, (B) become a party to, establish, enter into, adopt, amend, commence participation in or terminate any Benefit Plan, except for renewals in the Ordinary Course, at no more than prevailing market rates, of Benefit Plans that constitute "employee welfare benefit plans" within the meaning of Section 3(1) of ERISA, (C) enter into any severance, retention, change in control, transaction bonus or similar arrangement with any Business Employee, other than the Transaction Bonuses and the Supplemental Bonuses (unless all Liabilities in respect of such arrangement are Excluded Liabilities), (D) accelerate the vesting or payment of, or otherwise fund or secure the payment of, any compensation payable to a Business Employee under a Benefit Plan, other than as contemplated by Section 5.9(e), or (E) terminate (other than for cause), hire or promote any Business Employee (other than in the Ordinary Course with respect to any Business Employee with annual base compensation of less than $100,000);

(ii) except in the Ordinary Course, grant, impose or suffer to be imposed any Encumbrance upon any of the Purchased Assets other than Encumbrances arising under the DIP Facility, Permitted Encumbrances or Encumbrances that will be cured prior to the Closing;

(iii) sell, lease, encumber, or otherwise dispose of all or any portion of any assets that would constitute "Purchased Assets" as of the Closing Date, or cancel, compromise, waive or release any material right or claim with respect to any Purchased Asset, in each case, other than sales of Inventory in the Ordinary Course;

(iv) materially modify, materially breach, repudiate, reject, cancel or terminate any Purchased Contract (including any Dealer Loan Document), or waive, release or assign any material rights or claims under any Purchased Contract (including with respect to any Dealer Loan Collateral) other than in the Ordinary Course, or file any motion or other pleading seeking to reject, amend or assign to any Person other than Buyer (other than in connection with an Alternative Transaction) any Purchased Contract or any Contract that remains subject to designation by Buyer under Section 5.6(k);

(v) amend, supplement or modify in any material respect any ABS Transaction Document;

(vi) transfer, abandon, allow to lapse, fail to prosecute or maintain, exclusively license, or otherwise dispose of any material Purchased Intellectual Property, other than upon the expiration of the statutory term of any such Purchased Intellectual Property;

(vii) dismiss, compromise or settle any Litigation relating to the Purchased Assets in excess of $100,000;

(viii) except in the Ordinary Course and in accordance with the Plan and as permitted by any Order entered by the Bankruptcy Court in the Chapter 11 Cases, (A) write off, cancel, commit or become obligated to cancel or write off any of the Receivables (or any portion thereof) or any Dealer Loans; (B) dispose of or transfer any of the Receivables (or any portion thereof or rights with respect thereto) or any Dealer Loans; or (C) encumber, transfer, abandon, or otherwise dispose of or release any collateral securing the payment of any of the Receivables (or any portion thereof) or any Dealer Loans (including any Dealer Loan Collateral), or any right, title or interest therein;

(ix) terminate, cancel or make any material change to the structure, limits or terms and conditions of any Insurance Policy, allow any Insurance Policy to expire without renewal or comparable replacement coverage, or fail to timely pay premiums or report known claims to the applicable insurer, except as would not reasonably be expected to be material to Sellers or the Business;

(x) permit any material Permit relating to the Business or the Purchased Assets to terminate, expire or lapse, other than in the Ordinary Course;

(xi) to the extent relating to the Business, the Purchased Assets or the Assumed Liabilities or to the extent such action would reasonably be expected to adversely impact Buyer, (A) make (other than if consistent with past practice), revoke, amend or change any material Tax election, (B) change any annual Tax accounting period or adopt or change any method of Tax accounting, (C) file any material amended Tax Return, (D) enter into any closing agreement with respect to, or settle, any material Tax claim or assessment, other than in the Ordinary Course, (E) extend or waive any statute of limitations regarding the assessment or

collection of any material Tax or (F) knowingly surrender any right to claim a refund of material Taxes;

(xii) take, agree to or commit to assist any other Person in taking, any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to prohibit Sellers or Buyer from consummating the Closing in accordance with the terms hereof or to materially delay such consummation;

(xiii) issue any Equity Interests in Depositor, or enter into any agreements to issue any such Equity Interests (including any put, call, or other option rights, etc. with respect to such Equity Interests); or

(xiv) authorize, agree or otherwise commit, whether or not in writing, to do any of the foregoing.

(c) During the Interim Period, Buyer will not, without the prior written consent of ACM (such consent not to be unreasonably withheld, conditioned or delayed), directly or indirectly, take, agree to or commit to assist any other Person in taking, any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to prohibit Sellers or Buyer from consummating the Closing in accordance with the terms hereof or to materially delay such consummation.

4.3 **Notification of Certain Matters.**

(a) From the date hereof through the Closing, each Party shall promptly notify the other Party of any Assignable Contract, any Contract that such Party proposes to reject or terminate in connection with the Chapter 11 Cases, and any event that would reasonably be expected to cause any condition to Closing not to be satisfied, and shall provide the other Party with reasonably available copies and material information concerning any such Contract or event.

(b) Buyer's receipt of information under this Section 4.3 shall not operate as a waiver or otherwise affect any representation, warranty or agreement given or made by Sellers in this Agreement. Sellers may, at any time before Closing, supplement or amend the Seller Disclosure Schedules to reflect any matter first arising after the date hereof; *provided* that no such supplement or amendment shall be deemed to cure any inaccuracy in or breach of any representation or warranty, or otherwise be taken into account, for purposes of Section 6.2(a) or Section 8.1(b).

4.4 **Obligation to Consummate the Transactions.**

(a) Subject to the terms and conditions set forth in this Agreement, each Party shall use reasonable best efforts to consummate the Transactions as promptly as practicable (which reasonable best efforts shall include, in the case of Buyer, establishing, or causing to be established, a trust with a national bank, to the extent necessary for Buyer to receive, acquire and hold any retail installment Contracts that, as of the Closing, would constitute

Purchased Assets), and in any case prior to the Outside Date, including using reasonable best efforts to satisfy the conditions to the Closing set forth in ARTICLE 6; *provided*, *however*, that (i) in the case of obtaining any consent, approval, authorization, clearance from, or filing, notification or registration with, any Governmental Authority, the Parties' obligations to take actions shall be exclusively governed by Section 4.5 and (ii) in the case of facilitating the sale of the ABS Platform, the Parties' obligations to take actions shall exclusively be governed by Section 4.5(e); *provided*, *further*, that nothing in this Section 4.4(a) shall require any Party to waive any of its conditions to the Closing. The "reasonable best efforts" of Sellers shall not require Sellers or their Affiliates or their respective Representatives to expend any amount of money or provide any other consideration to (A) remedy any breach of any representation or warranty hereunder; or (B) obtain any consent required for consummation of the Transactions; *provided*, *however*, that if Sellers or their Representatives elect to remedy any such breach, Sellers shall, to the extent such breach is actually remedied, not be deemed to be in breach of such representation or warranty, or in violation of any covenant, for purposes of determining Buyer's obligations to consummate the Transactions.

(b) Prior to the Closing, the Parties shall use their respective reasonable best efforts to obtain any consents of Third Parties in respect of any Purchased Contracts required in connection with the Transactions; *provided*, *however*, that such "reasonable best efforts" shall not require any Seller, on its own behalf or on behalf of any other Person, to expend any money (other than de minimis amounts), incur any Liability or provide any other consideration or commence, defend or participate in any Litigation or offer or grant any accommodation (financial or otherwise) to any Person.

4.5 **Filings; Other Actions; Notification and Cooperation.**

(a) Buyer shall take, or cause to be taken, all actions, and do, or cause to be done, all things necessary, proper and advisable under any applicable Laws or Permits to consummate and make effective in the most expeditious manner possible the Transactions, including (i) preparing and making all filings, registrations, forms and notices required to be filed to consummate the Closing; (ii) taking all actions necessary, proper and advisable to obtain, and cooperating with Sellers in obtaining, any consent, Permit, ruling, registration, waiver, exemption, authorization, order or approval issued, granted or otherwise made available by or under the authority of any Governmental Authority required to be obtained by Buyer or any of its Affiliates in connection with the Transactions or to own and operate the Business and the Purchased Assets from and after the Closing, including approvals relating to consumer finance, dealer licensing, collection and insurance, and (iii) executing and delivering any additional instruments necessary to consummate the Closing and to carry out the purposes of this Agreement and the Ancillary Agreements. Buyer shall prepare, file and pay all filing fees and other costs associated with filings and approvals for which it is responsible under this Section 4.5. Additionally, the Parties shall not knowingly take any action after the date of this Agreement that would reasonably be expected to materially delay the obtaining of, or result in not obtaining, any permission, approval or consent from any such Governmental Authority necessary to be obtained prior to the Closing unless otherwise mutually agreed to in writing by the other Party.

(b) Prior to the Closing, each Party (i) shall work cooperatively in connection with obtaining all consents, authorizations, orders or approvals of, or any exemptions by, any Governmental Authority in connection with the Transactions and (ii) subject to the appropriate confidentiality protections, each Party shall promptly consult with the other Party to provide any reasonably necessary information with respect to (and, in the case of correspondence, provide the other Party (or its counsel) copies of) all filings made by such Party with any Governmental Authority or any other information supplied by such Party to, or correspondence with, a Governmental Authority in connection with this Agreement and the Ancillary Agreements. Subject to appropriate confidentiality protections, each Party shall promptly inform the other Party, and if in writing, furnish the other Party with copies of (or, in the case of substantive oral communications, advise the other Party orally of) any substantive communication from any Governmental Authority regarding the transactions contemplated by this Agreement or the Ancillary Agreements, and permit the other Party to review and discuss in advance, and reasonably consider in good faith the views of the other Party in connection with, any substantive proposed written (or any substantive proposed oral) communication with any such Governmental Authority. If any Party or any representative of such Party receives a request for additional information or documentary material from any Governmental Authority with respect to transactions contemplated by this Agreement and the Ancillary Agreements, then such Party will use its reasonable best efforts to make, or cause to be made, promptly and after consultation with the other Party, an appropriate response to such request. No Party shall participate in any substantive meeting with any Governmental Authority in connection with this Agreement or the Ancillary Agreements (or make substantive oral submissions at meetings or in telephone or other conversations) unless it consults with the other Party in advance and, to the extent reasonably practicable and not prohibited by such Governmental Authority, gives the other Party the opportunity to attend and participate in such meeting or other conversation; *provided*, *however*, that, for the avoidance of doubt, meetings between Sellers or any of their Affiliates and any customer of Sellers or their Affiliates shall not be deemed to be meetings in connection with this Agreement or any Ancillary Agreement. Subject to appropriate confidentiality protections, each Party shall furnish the other Party with copies of all correspondence, filings and substantive written communications between it and any such Governmental Authority with respect to this Agreement and the Ancillary Agreements, and furnish the other Party with such necessary information and reasonable assistance as the other Party may reasonably request in connection with its preparation of necessary filings or submissions of information to any such Governmental Authority. Each Party may, as such Party deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other Party under this Section 4.5 as "outside counsel only" or "outside counsel/regulatory in-house counsel only." Such materials and the information contained therein shall be given only to the outside legal counsel or regulatory in-house counsel (as appropriate) of the recipient and will not be disclosed by such outside legal counsel or regulatory in-house counsel to employees (other than regulatory in-house counsel), officers, or directors of the recipient unless express permission is obtained in advance from the source of the materials (Sellers or Buyer, as the case may be) or its legal counsel; *provided*, *however*, that materials provided pursuant to this Section 4.5 may be redacted (i) to remove references concerning

the valuation of the Purchased Assets; (ii) as necessary to comply with contractual arrangements and (iii) as necessary to address reasonable legal privilege concerns.

(c) Each Party agrees to make and cause its "ultimate parent entity" (as defined under the HSR Act) to make any required filing of a Notification and Report Form pursuant to the HSR Act with respect to the transactions contemplated hereby as promptly as practicable (and in any event within 10 Business Days of the date hereof), to respond as promptly as practicable to any request for additional information and documentary material pursuant to the HSR Act and to take all other actions necessary, proper and advisable to cause the expiration or termination of any applicable waiting periods under the HSR Act as soon as practicable. Each Party also agrees to make, as promptly as practicable, any additional filings as may be required of that Party by any other applicable Antitrust Laws and to take all other actions necessary, proper and advisable to cause the expiration of any waiting or suspension periods and obtain the approvals therefor, if any, as soon as practicable. Buyer shall pay and be responsible for all filing fees under the HSR Act and any other Antitrust Laws, but shall not pay or be responsible for Sellers' legal, consultant or advisory fees in connection with a second request issued by any Governmental Authority or any Litigation initiated under the Antitrust Laws with respect to the Transactions.

(d) To the extent required under applicable Laws, other than Antitrust Laws, each Party agrees to make as promptly as practicable any filings required of that Party and to take all other actions reasonably necessary, proper and advisable to obtain the consent, Permit, authorization, order or approval of, or any exemption by, any Governmental Authority, including in connection with the consumer-finance, dealer-licensing, collection and insurance approvals, as soon as practicable after the date hereof (without prejudice to Sections 4.5(a) and 4.5(b)). Buyer shall pay and be responsible for all filing fees in connection with making any such filings and obtaining any such consent, Permit, authorization, order or approval of, or any exemption by, any Governmental Authority.

(e) The Parties shall use commercially reasonable efforts to facilitate the sale and transfer of the ABS Platform, maintain the ratings of the outstanding asset-backed notes issued by the Issuers notwithstanding the Transactions and obtain consents, agreements and opinions required under the ABS Transaction Documents. Buyer shall bear all costs and expenses of presentations, ratings, trustee communications, consents, opinions and other cooperation requested in connection with the ABS Platform. Notwithstanding anything herein to the contrary, Sellers shall not be required to maintain or obtain any rating or to guarantee any rating or other performance of the ABS Platform.

(f) In furtherance and not in limitation of the covenants of the Parties contained in Section 4.4 and this Section 4.5, if any objections are asserted with respect to the transactions contemplated hereby under any applicable Laws or by any Governmental Authority (including under any Antitrust Laws), or if any Litigation is instituted (or threatened to be instituted) by the FTC, the DOJ, any other applicable Governmental Authority, any Person or any Third Party whose consent is required in connection with the transfer of the ABS Platform, the Equity Interests of the Depositor, or any other transaction contemplated hereby or by the Ancillary Agreements, challenging any of the transactions contemplated hereby or by the Ancillary Agreements as violative of any applicable Laws

(including any Antitrust Laws), as requiring any consent, approval, Permit, authorization or other action by any Governmental Authority or Third Party that has not been obtained, or that would otherwise prevent, materially impede or materially delay the consummation of the transactions contemplated hereby or thereby, Buyer shall take, and cause to be taken, all such actions as may be necessary to resolve such objections or Litigation so as to permit consummation of the transactions contemplated by this Agreement and the Ancillary Agreements in a timely manner and in any event prior to the Outside Date. Notwithstanding anything in this Agreement and the Ancillary Agreements to the contrary, the obligations of Buyer under this Section 4.5 shall include Buyer taking any and all actions, without regard to the impact of such actions on Buyer, its Affiliates, the Purchased Assets or the Business, including: (i) selling, divesting, or otherwise conveying particular assets, categories, portions or parts of assets or businesses of Buyer contemporaneously with or subsequent to the Closing; (ii) agreeing to sell, divest, or otherwise convey any particular asset, category, portion or part of the Purchased Assets or Business contemporaneously with or subsequent to the Closing; (iii) licensing, holding separate or entering into similar arrangements with respect to Buyer's assets or the Purchased Assets or conduct of business arrangements or terminating any and all joint venture, strategic partnership and other similar agreements of Buyer; (iv) taking or committing to take any action that limits its freedom of action with respect to any of the assets, properties, products, product lines, services, or businesses of Buyer; (v) obtaining all consents, Permits, approvals, authorizations, waivers, exemptions, orders or other actions from any Governmental Authority or Third Party required in connection with the transfer of the ABS Platform, the Equity Interests of the Depositor, or any other Purchased Asset; (vi) agreeing to obtain "prior approval" or other affirmative approval from a Governmental Authority to carry out any future transaction, or agreeing to make any notification or provide prior notice to any Governmental Authority regarding any proposed transaction; and (vii) as a condition to obtaining any and all expirations of waiting periods under the HSR Act and any other applicable Law or consents from any Governmental Authority or Third Party necessary to consummate the transactions contemplated hereby or thereby or to avoid the entry of, or to effect the dissolution of, any Order, or any impediment under any applicable Laws (including Antitrust Laws), which would otherwise have the effect of preventing the consummation of the transactions contemplated hereby, in each case, to the extent such action is necessary to avoid, prevent, eliminate or remove the actual or threatened (A) commencement of any investigation or proceeding in any forum or (B) issuance or enactment of any Order or applicable Law that would delay, restrain, prevent, enjoin or otherwise prohibit consummation of the Closing and the other transactions contemplated hereby by any Governmental Authority. Without limiting the generality of the foregoing, if, despite the taking of any of the actions required by the first sentence of this Section 4.5(f), any Litigation is threatened or instituted by any Governmental Authority or any other Person challenging the validity or legality of or seeking to restrain the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements, or any Third Party challenges or refuses to grant any consent required in connection with the transfer of the ABS Platform or the Equity Interests of the Depositor, Buyer shall take all actions necessary to avoid, resist, resolve or, if necessary, defend against such Litigation or to obtain such consent, and shall afford Sellers the opportunity to participate therein. Further, in the event of issuance by the FTC or DOJ of a "warning letter" in which the

agency states that, despite expiration or termination of the HSR Act waiting period its investigation of any of the transactions contemplated by this Agreement and the Ancillary Agreements remains open and/or ongoing, such letter shall not, by itself, be grounds for finding that any closing condition under this Agreement and the Ancillary Agreements has not been satisfied.

(g) Buyer shall not, and shall cause its controlled Affiliates not to, acquire or agree to acquire by merging or consolidating with, or by purchasing a portion of the assets of or equity in, or by any other manner, any Person or portion thereof, or otherwise acquire or agree to acquire any assets, if entering into a definitive agreement relating to, or the consummation of, such acquisition, merger, consolidation or other transaction would reasonably be expected to (i) impose any material delay in obtaining, or materially increase the risk of not obtaining, any Permits, authorizations, consents, orders, declarations or approvals of any Governmental Authority necessary to consummate the transactions contemplated hereby or the expiration or termination of any applicable waiting period, including under applicable Antitrust Laws or (ii) materially increase the risk of any Governmental Authority entering an Order prohibiting the consummation of the Transactions or (iii) materially delay the consummation of the Transactions.

4.6 **Acquisition of New Inventory.**

(a) During the Interim Period, Sellers shall, in consultation with Buyer, use commercially reasonable efforts to acquire New Inventory such that the New Inventory Amount shall not be less than Five Million Dollars ($5,000,000) nor exceed Ten Million Dollars ($10,000,000), unless otherwise agreed in writing by Buyer; *provided* that Sellers' obligations under this Section 4.6(a) shall be subject to the availability of proceeds under the DIP Facility, the DIP Order (including any budget thereunder) and any other Order of the Bankruptcy Court, and the selection, timing and terms of any such acquisition shall be determined by Sellers in their reasonable discretion after considering in good faith any input from Buyer. The Statement shall also set forth. the following in respect of New Inventory: (i) a schedule of each Vehicle comprising the New Inventory, including its VIN, year, make, model, mileage, acquisition date, source, title status and acquisition cost; (ii) Sellers' good faith calculation of the New Inventory Amount; and (iii) reasonable supporting documentation, including bills of sale, auction receipts and proof of payment. Sellers shall give Buyer and its Representatives reasonable access to the Vehicles comprising the New Inventory and related records so that Buyer can verify the statement.

(b) At the Closing, Buyer shall reimburse Seller for the New Inventory Amount. The New Inventory Amount shall be included in, and paid as part of, the Purchase Price and the Closing Payment under Section 2.3 of this Agreement.

(c) If this Agreement is terminated before the Closing in accordance with its terms, Buyer shall have no obligation to reimburse Sellers for any portion of the New Inventory Amount and all Vehicles comprising the New Inventory acquired under this Section 4.6 shall then remain the sole property and responsibility of Sellers.

## ARTICLE 5
## ADDITIONAL COVENANTS

5.1 **Further Assurances**.

(a) Sellers and Buyer shall, at any time or from time to time following the Closing, at Buyer's cost and expense, execute and deliver to the other Party all such instruments and documents or further assurances as the other Party may reasonably request to confirm or carry out the provisions and intent of this Agreement and the Ancillary Agreements, including all of the same as is reasonably necessary to: (i) vest in Buyer all of Sellers' right, title and interest in and to the Purchased Assets (including the Purchased Contracts, Owned Real Property and Purchased Intellectual Property) as contemplated in connection with the Transactions; (ii) effectuate Buyer's assumption of the Assumed Liabilities; and (iii) grant to each Party all rights contemplated to be granted to such Party under this Agreement and the Ancillary Agreements.

(b) Seller Support Obligations. Buyer agrees to use its reasonable best efforts to obtain the release of Sellers or their Affiliates that are a party to or otherwise have Liability with respect to (and to cause Buyer to be substituted for Sellers and their Affiliates with respect to) any guarantees, performance bonds, bid bonds, credit support agreements, reimbursement agreements, letters of credit, remaining obligations or liabilities under any Contract or other agreement by Sellers or their Affiliates and other similar agreements or commitments, in each case, relating to the ABS Platform, including those set forth in Section 5.1(b) of the Seller Disclosure Schedules (the "Seller Support Obligations"), in each case as of or as soon as reasonably practicable following the Closing. In the event any of the Seller Support Obligations are not released prior to or at the Closing, Buyer will indemnify and hold Sellers and their Affiliates that are a party to or otherwise have Liability with respect to each such Seller Support Obligation harmless for any and all payments required to be made under such Seller Support Obligation until such Seller Support Obligation is released. The foregoing indemnity will survive the Closing indefinitely and will not be subject to the limitations set forth in Section 7.1. Sellers agree to, and to cause their Affiliates to, cooperate with Buyer and use reasonable best efforts to assist Buyer in connection with the foregoing. Notwithstanding anything to the contrary contained in this Section 5.1(b) or elsewhere, (i) none of Sellers nor any of their Affiliates shall have any obligation to keep any Seller Support Obligations in place for any renewal, extension, modification, supplement, amendment or rearrangement of the terms of any or all of the obligations or liabilities relating to the Seller Support Obligations and (ii) neither Buyer nor any of its Affiliates will renew, extend, modify, supplement, amend or rearrange (or take any action that has the effect of renewing, extending, modifying, supplementing, amending or rearranging) the terms of any or all of the obligations or liabilities relating to any Seller Support Obligations that remain in effect following the Closing without the prior written consent of Sellers, which may be granted or withheld in their sole discretion. Notwithstanding anything herein to the contrary, Buyer shall obtain replacements for Seller Support Obligations under any customer warranty, guaranty or similar agreement on behalf of any Issuer to the extent that any such Issuer is required to comply with the terms thereof.

5.2 **Publicity**. Concurrently with the execution and delivery of this Agreement, the Parties shall make a press release in form and substance reasonably satisfactory to Buyer and Sellers regarding the Transactions contemplated herein, including a joint statement to employees of Sellers. Subsequently and prior to the Closing, unless otherwise required by applicable Law, the Bankruptcy Court, the Bidding Procedures Order or by obligations of Buyer or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Buyer, on the one hand, and Sellers, on the other hand, shall consult with each other before issuing any press release, communication to employees or otherwise making any public statement with respect to this Agreement or the Transactions and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld, conditioned or delayed). From and after the Closing, the Parties may make public statements with respect to this Agreement or the Transactions so long as such announcements do not disclose the specific terms and conditions of this Agreement, except where such terms and conditions have already been disclosed as required by Law or by obligations of Buyer or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange or the Bankruptcy Court; *provided*, *however*, that the issuing Party shall use its reasonable best efforts to consult with the other Party with respect to the text thereof to the extent practicable.

5.3 **Certain Tax Matters.**

(a) Withholding Taxes.

(i) Buyer shall not deduct or withhold from amounts payable to Sellers hereunder any Taxes, except as required by applicable Law. To the extent amounts are deducted or withheld pursuant to applicable Law by Buyer and remitted to the proper Taxing Authority in accordance with applicable Law, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person to whom such amounts would otherwise have been paid. Prior to withholding or deducting Taxes from any amounts payable to Sellers hereunder, Buyer shall (A) provide Sellers with at least five Business Days' advance written notice of Buyer's intention to withhold, along with the legal basis therefor, (B) allow Sellers a reasonable opportunity to furnish forms, certificates or other items that would reduce or eliminate such withholding Taxes, and (C) reasonably cooperate with Sellers to obtain any available reduction, exemption or refund of such withholding. If, in accordance with the foregoing, Buyer withholds any amount, it shall make payment to the proper Taxing Authority of the withheld amount in accordance with applicable Law, and send to Sellers proof of such payment as soon as reasonably practicable.

(ii) Each Seller shall deliver to Buyer a properly completed IRS Form W-9.

(b) Transfer Taxes and Apportioned Obligations.

(i) All amounts payable hereunder or under any Ancillary Agreement are exclusive of all recordation, transfer, documentary, stamp, conveyance, sales,

use, value added or other similar Taxes imposed or levied by reason of, in connection with or attributable to this Agreement and the Ancillary Agreements or the Transactions (collectively, "Transfer Taxes"). Buyer shall prepare and timely file, at its own expense, all necessary documents (including, but not limited to, all Tax Returns) with respect to such Transfer Taxes, and Sellers shall cooperate with respect thereto. Buyer shall be responsible for the payment of all Transfer Taxes, and shall pay all amounts due and owing in respect of any Transfer Taxes, which amounts shall be in addition to the sums otherwise payable, at the rate in force at the due time for payment or such other time as is stipulated under applicable Law. Buyer shall deliver copies of all such Tax Returns and other documentation and proof of payment with respect to such Transfer Taxes to Sellers.

(ii) For all purposes under this Agreement, in the case of any taxable period that includes but does not end on the Closing Date (a "Straddle Period"), the portion of Taxes relating to the Purchased Assets attributable to the Pre-Closing Tax Period shall be determined as follows: (A) in the case of real property, personal property and similar ad valorem Taxes, such portion shall equal the amount of such Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days in such Straddle Period through and including the Closing Date and the denominator of which is the total number of days in such Straddle Period; and (B) in the case of all other Taxes, including sales Taxes, such portion shall equal the amount that would be payable if such Straddle Period ended at the end of the Closing Date; *provided* that exemptions, allowances and deductions calculated on an annual basis (including depreciation and amortization deductions) shall be allocated between the Pre-Closing Tax Period and the Post-Closing Tax Period in proportion to the number of days in each such portion of the Straddle Period. Sellers shall be liable for the proportionate amount of such Taxes that is attributable to the Pre-Closing Tax Period, and Buyer shall be liable for the proportionate amount of such Taxes that is attributable to the Post-Closing Tax Period; *provided*, *however*, that, notwithstanding the foregoing, all payroll, employment, withholding, social security, unemployment and similar Taxes relating to any Assumed Employee Liability, whether attributable to a Pre-Closing Tax Period or a Post-Closing Tax Period, shall be Assumed Liabilities.

(iii) Real property Taxes with respect to the Owned Real Property shall be prorated as of the Closing Date in accordance with Section 5.3(b)(ii)(A), and Sellers' portion thereof that is unpaid as of the Closing shall be paid out of the proceeds payable to Sellers at the Closing. Following the Closing, Buyer shall be responsible for all such Taxes, and Sellers shall have no further Liability therefor.

(c) Cooperation. Each of Sellers and Buyer shall provide the other with reasonable assistance and relevant records in connection with Tax Returns, audits and proceedings relating to the Business or Purchased Assets.

(d) Tax Refunds. Buyer shall pay, or cause its Affiliates (including the Depositor) to pay, to Sellers (or their designated successors or liquidating trust) any Tax Refunds received in cash by Buyer or any of its Affiliates after the Closing, within ten

Business Days after receipt. Any Tax credit, in lieu of such cash refund, constituting a Tax Refund that is applied to reduce Taxes otherwise payable by Buyer or any of its Affiliates shall be treated as received by Buyer or its applicable Affiliate upon the reduction of such Taxes. Any amounts paid to Sellers shall be net of reasonable Tax costs and expenses of Buyer or its Affiliates related to or arising in respect of such Tax Refund. Sellers agree to repay to Buyer the amount paid to them pursuant to this Section 5.3(d) (plus any interest, penalties or other charges imposed by the relevant Taxing Authority) in the event that Buyer or its Affiliates are required to repay such Tax Refund to such Taxing Authority. Payments under this Section 5.3(d) shall be treated as adjustments to the Aggregate Consideration.

5.4 **Wrong Pockets.** From and after the Closing Date, if any Party or any of its Affiliates receives payment from any Person in respect of an account receivable or other payment owed to another Party or any Affiliate of such other Party, or is in possession of any assets (including, in the case of any Seller or any of its Affiliates, any Purchased Asset or, in the case of Buyer or any of its Affiliates, any Excluded Asset) as to which another Party or any Affiliate of such other Party is entitled or to which such other Party or any Affiliate of such other Party is entitled to the benefit thereof, such Party shall cause the Person receiving such payment or having possession of such asset to promptly remit such payment to the designated bank account of the owner of such receivable or payment or otherwise cause the transfer, assignment, conveyance, and delivery of such asset to such other Party or its designated Affiliate, in each case, without the payment of any additional consideration. The obligations in this Section 5.4 shall be binding upon any successor to any Seller and any liquidating trust or similar entity established under the Plan. This Section 5.4 shall terminate upon dissolution of Sellers and their Affiliates or effectiveness of the Plan.

5.5 **Purchased Intellectual Property**. For a period of twelve months after the Closing, at Buyer's sole cost and expense, Sellers shall take such further reasonable actions and execute such further documents as may be necessary or reasonably requested by Buyer to effectuate, evidence and perfect the assignment and transfer of all Purchased Intellectual Property included in the Purchased Assets to Buyer, including making such filings with any Governmental Authorities as may be required to transfer such Purchased Intellectual Property to Buyer and to correct any defects or inconsistencies in the record owner of such Purchased Intellectual Property. The obligations in this Section 5.5 shall be binding upon any successor to any Seller and any liquidating trust or similar entity established under the Plan. Subject to the preceding sentence, this Section 5.5 shall terminate upon the later of the expiration of the period set forth in the first sentence of this Section 5.5 and the dissolution of Sellers and their Affiliates or effectiveness of the Plan.

5.6 **Bankruptcy Court Matters.**

(a) Competing Transactions; Fiduciary Out. This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids in respect of the Purchased Assets in accordance with the terms and conditions of the Bidding Procedures Order. Notwithstanding anything to the contrary in this Agreement but consistent in all respects with the Bidding Procedures Order, at any time before entry of the Sale Order, Sellers, their Affiliates and their respective Representatives may solicit, initiate, encourage and facilitate Acquisition Proposals,

furnish information and afford access to any Person, and enter into and participate in discussions and negotiations concerning any Acquisition Proposal, in each case without obtaining Buyer's consent; *provided* that Sellers shall provide Buyer with all information concerning any Qualified Bid and otherwise comply with all provisions in the Bidding Procedures Order. The Seller Board may, in its good faith determination (after considering the recommendation of the Special Committee) that any action or inaction is or would reasonably be expected to be consistent with its fiduciary duties under applicable Law to the estate and its stakeholders or the Bankruptcy Code, change, withdraw, qualify or modify any recommendation, enter into or participate in an Alternative Transaction or Superior Proposal, or terminate this Agreement to enter into an Alternative Transaction pursuant to Section 8.1(d) or accept a Superior Proposal pursuant to Section 8.1(g), subject to payment to Buyer of the Break-up Fee and Expense Reimbursement and any other conditions of the Bidding Procedures Order. Notwithstanding anything to the contrary contained herein, nothing in this Agreement shall limit the Seller Board's or the Special Committee's ability to comply with fiduciary duties under applicable Law or the Bankruptcy Code, and no provision shall be construed to require the Seller Board or the Special Committee to take or refrain from any action inconsistent with such duties.

(b) Bankruptcy Court Filings.

(i) Sellers shall file a motion contemporaneously with the commencement of the Chapter 11 Cases seeking the Bankruptcy Court's entry of the Bidding Procedures Order, on or before the Bidding Procedures Order Deadline and substantially in the form of Exhibit B hereto, among other things, (A) establishing bidding procedures governing the sale of the Purchased Assets, as amended, modified or supplemented in accordance with the Bidding Procedures Order (the "Bidding Procedures"), (B) approving payment of the Break-up Fee and the Expense Reimbursement, to the extent payable by the terms of this Agreement or the Bidding Procedures Order, (C) providing that the Break-up Fee and the Expense Reimbursement shall constitute administrative expenses of Sellers with priority over any and all pre-petition creditors and administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code until paid, (D) designating Buyer as the stalking horse and authorizing and approving Sellers' entry into this Agreement, and (E) containing such other terms that are otherwise acceptable to Sellers and Buyer, in their reasonable discretion. Following the date hereof, after the conclusion of the Auction and if Buyer is or is deemed the Successful Bidder, Sellers shall file a motion with the Bankruptcy Court scheduling entry of the Sale Order, on or before the Sale Order Deadline following a Sale Hearing, in form and substance reasonably acceptable to Sellers and Buyer, authorizing and approving, inter alia, (1) the sale of the Purchased Assets to Buyer on the terms and conditions set forth herein, free and clear of all Encumbrances and Liabilities (to the extent set forth therein), and (2) the assignment and assumption by Buyer of each Purchased Contract.

(ii) If the Bidding Procedures Order, Sale Order, Plan, Confirmation Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition

for certiorari or motion for reconsideration, amendment, clarification, modification, vacatur, stay, rehearing or reargument shall be filed with respect to the Sale Order, Bidding Procedures Order or other such order), and this Agreement has not otherwise been terminated pursuant to ARTICLE 8, Sellers shall use their commercially reasonable efforts to diligently defend such appeal, petition or motion and shall use their commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.

(iii) Sellers shall provide Buyer with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers relating to the transactions contemplated by this Agreement prepared by Sellers or any Affiliates (including forms of orders and notices to interested parties) prior to the filing thereof in the Chapter 11 Cases. All motions, applications, and supporting papers prepared by Sellers and relating to the transactions contemplated by this Agreement to be filed on behalf of Sellers after the date hereof must be reasonably satisfactory in form and substance to Buyer. No Seller shall seek any modification to the Bidding Procedures, Bidding Procedures Order or Sale Order by the Bankruptcy Court or any other court without the prior written consent of Buyer, such consent not to be unreasonably withheld, conditioned or delayed.

(iv) Each Seller shall promptly provide Buyer and its counsel with copies of all notices, filings and orders of the Bankruptcy Court that such Seller has in its possession (or receives) pertaining to the Transactions, the Sale Order, Plan, Confirmation Order, or any other order related to any of the transactions contemplated by this Agreement, but only to the extent such papers are not publicly available on the docket of the Bankruptcy Court or otherwise made available to Buyer and its counsel.

(c) Each of Buyer and Sellers shall continue to act in good faith and without any improper conduct, including collusion or fraud of any kind.

(d) Each of Buyer and Sellers will promptly take such actions as are reasonably requested by the other Party to assist in obtaining entry of the Sale Order and the Bidding Procedures Order and otherwise assist in consummating the Transactions, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of establishing adequate assurances of future performance (within the meaning of section 365 of the Bankruptcy Code) by Buyer of its obligations under this Agreement and demonstrating that Buyer is a good faith buyer under section 363(m) of the Bankruptcy Code.

(e) Pursuant to the terms of the proposed Bidding Procedures Order, Buyer shall provide information to Sellers to be disseminated to counterparties to Purchased Contracts who request such information, sufficient to satisfy a finding of adequate assurance of future performance as required in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Purchased Contracts.

(f) Sellers shall use commercially reasonable efforts to provide appropriate notice of the hearings on motions relating to the Chapter 11 Cases to all Persons entitled to notice, including all known creditors of Sellers, all Persons that have asserted Encumbrances on the Purchased Assets, all parties to the Purchased Contracts and all Taxing Authorities in jurisdictions applicable to Sellers and as otherwise required by the Bankruptcy Code and Bankruptcy Rules.

(g) Sellers shall file with the Bankruptcy Court and serve the Cure Notice as required by the Bidding Procedures Order and provide a copy of the same to Buyer.

(h) If an Auction is conducted, and Buyer is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Successful Bidder") but is the next highest bidder, as determined by Sellers, at the Auction, Buyer shall be required to serve as a back-up bidder (the "Back-up Bidder") and keep Buyer's bid to consummate the Transactions on the terms and conditions set forth in this Agreement (as the same may be revised in the Auction with the consent of Buyer) open and irrevocable in accordance with the Bidding Procedures Order until the earlier of (A) the first Business Day after the closing of an Alternative Transaction with the Successful Bidder for the Purchased Assets and (B) the Outside Date (such date, the "Back-up Bid Expiration Date"). In accordance with and subject to the Bidding Procedures Order, if the Alternative Transaction with the applicable Successful Bidder is terminated prior to the Back-up Bid Expiration Date, the Back-up Bidder will be deemed the new Successful Bidder for the Purchased Assets and shall be obligated to consummate the sale as if it were the Successful Bidder at the Auction.

(i) Buyer acknowledges that Lenders may be entitled to credit bid all or any portion of their claims under the DIP Facility or the Prepetition Credit Facility pursuant to section 363(k) of the Bankruptcy Code, subject to the DIP Order and the Bidding Procedures Order, and that the submission or acceptance of any such credit bid shall not constitute a breach of this Agreement by Sellers; *provided* that any such credit bid shall constitute an Alternative Transaction for all purposes of this Agreement (including Section 8.5) and the Bidding Procedures Order shall require that any such credit bid include cash sufficient to pay the Break-up Fee and the Expense Reimbursement in full at the closing thereof.

(j) Sellers shall provide Buyer with a reasonable opportunity to review and comment upon all motions, applications, and supporting papers relating to the Transactions prepared by Sellers and to be filed in the Chapter 11 Cases. Sellers shall consider Buyer's comments on such motions and supporting papers in good faith, and all such motions, applications and supporting papers shall be in form and substance reasonably acceptable to Buyer.

(k) Assumption and Assignment of Contracts.

(i) Within 10 days of the date hereof, Sellers shall deliver to Buyer Section 5.6(k)(i) of the Seller Disclosure Schedules that lists all Contracts of Sellers that are potentially capable of assumption and assignment pursuant to section 365 of the Bankruptcy Code (the "Assignable Contracts"). At the Sale Hearing (notice

of which shall be properly and timely served on all non-Seller counterparties to Assignable Contracts by Sellers), Sellers shall seek authority to assume and assign to Buyer those Assignable Contracts that become Purchased Contracts pursuant to the terms of this Section 5.6(k).

(ii) No later than the end of the applicable Contract Designation Period, Buyer shall deliver a schedule (a "Buyer Purchased Contract Schedule") to Sellers of those Assignable Contracts that shall be assumed by Sellers and assigned to Buyer pursuant to an order of the Bankruptcy Court pursuant to section 365 of the Bankruptcy Code (the "Purchased Contracts"). Any Contract not set forth on a Buyer Purchased Contract Schedule shall be an Excluded Contract. Upon receipt of notice of the Buyer Purchased Contract Schedule, Sellers shall promptly provide notice to the applicable non-Seller counterparty of such designation as a Purchased Contract. Notwithstanding anything herein to the contrary, any and all expenses to be incurred by Sellers with respect to maintaining any Real Property Lease after the Closing to the extent it has not been identified as either a Purchased Contract or an Excluded Contract prior to the Closing shall be at Buyer's sole cost and expense, and Buyer shall pay and be solely responsible for all amounts that accrue and become due and owing under any such Real Property Leases from and after the Closing Date including any rejection damages to the extent that any of the Real Property Leases do not become a Purchased Contract. For the avoidance of doubt, in no event shall any Excluded Location Lease be considered or deemed a Purchased Contract hereunder.

(iii) Notwithstanding the foregoing, a Contract shall not be a Purchased Contract hereunder and shall not be assigned to, or assumed by, Buyer to the extent that such Contract (i) is rejected by a Seller or terminated by a Seller in accordance with the terms hereof or by the other party thereto, or terminates or expires by its terms, on or prior to the Closing and is not continued or otherwise extended upon assumption, or (ii) is a Disputed Amount Contract (unless and until such Disputed Amount Contract is designated as a Purchased Contract in accordance with this Section 5.6(k)). In addition, a Permit shall not be assigned to, or assumed by, Buyer to the extent that such Permit requires a consent of any Governmental Authority or other third party (other than, and in addition to, that of the Bankruptcy Court) in order to permit the sale or transfer to Buyer of such Seller's rights under such Permit, and no such consent has been obtained prior to the Closing. If any such consent shall not be obtained, or if any attempted assignment of such Contract or Permit would be ineffective or would impair Buyer's rights under such Contract or Permit in question so that Buyer would not in effect acquire the benefit of such rights, such Seller, to the maximum extent permitted by Law (and subject to any approval of the Bankruptcy Court that may be required), at Buyer's sole cost and expense, and for a period not to exceed the Contract Designation Period, shall act as Buyer's agent in order to obtain for Buyer the benefits thereunder and shall cooperate, to the maximum extent permitted by Law, with Buyer in any other reasonable arrangement designed to provide such benefits to Buyer; *provided*, *however*, that (i) Sellers shall not incur any costs associated with the obligations hereunder (including with respect to the Cure Costs) and (ii) Sellers' obligations

hereunder shall only continue until the Chapter 11 Cases are closed or dismissed. Buyer shall reasonably cooperate with Sellers in order to enable Sellers to provide to Buyer the benefits contemplated by this Section 5.6(k).

(iv) From the date hereof until the expiration of the Contract Designation Period, Sellers shall not seek Bankruptcy Court approval to amend, reject, or assign to a Person other than Buyer any Assignable Contract unless and until such Assignable Contract becomes an Excluded Contract under the terms of this Section 5.6(k) or unless otherwise agreed to in writing by Buyer. Additionally, Sellers shall file with the Bankruptcy Court such motions or pleadings as may be appropriate or otherwise as may be reasonably requested by Buyer to preserve Sellers' right or ability to assume and assign any of the Assignable Contracts (including pursuant to section 365(d)(4) of the Bankruptcy Code) until the expiration of the Contract Designation Period.

(v) If any Purchased Contract requires the payment of Cure Costs in order to be assumed pursuant to section 365 of the Bankruptcy Code, and such Cure Costs are undetermined on the Closing Date because a non-Seller counterparty to such Contract asserts a Cure Cost in an amount that is different than the amount of Cure Costs proposed by Sellers and such difference will not be resolved prior to the Closing Date (each such Contract, a "Disputed Amount Contract"), then Sellers shall provide Buyer, not less than ten Business Days prior to the Closing Date, or as soon as reasonably practicable thereafter (but in any event prior to Closing), with a schedule that lists each such Disputed Amount Contract and the Cure Cost that has been asserted by each such non-Seller counterparty. If Sellers, with the consent of Buyer, and the non-Seller counterparty with respect to any Disputed Amount Contract, are unable to agree on Cure Costs for such Disputed Amount Contract within 10 Business Days following the Closing Date, then Buyer may (i) elect to have such Disputed Amount Contract designated as an Excluded Contract, or (ii) solely upon Buyer's written request, Sellers shall, at the expense of Buyer, seek to have the amount of Cure Costs related to such Disputed Amount Contract determined by the Bankruptcy Court by the date that is no later than 30 days following the Closing Date. Upon final determination of such Cure Costs, or if no agreement is reached between the parties, Buyer may elect to designate such Disputed Amount Contract as an Excluded Contract or a Purchased Contract. If such Disputed Amount Contract is designated as a Purchased Contract, Buyer shall pay the Cure Costs with respect to such Purchased Contract either (A) concurrently with Sellers' assumption and assignment thereof to Buyer or (B) as agreed in writing by Buyer and the applicable counterparty to such Purchased Contract, and execute and deliver to the applicable Sellers an assignment and assumption agreement with respect to such Purchased Contract unless otherwise agreed to by the parties. If the Cure Cost related to a Disputed Amount Contract is not resolved (either by agreement of the parties or by determination of the Bankruptcy Court) by the date that is 30 days following the Closing Date, then such Disputed Amount Contract shall automatically be designated an Excluded Contract unless Buyer provides Sellers with written notice to the contrary. Notwithstanding the foregoing, if, following the Closing, it is discovered that a Contract that should

have been listed on Section 5.6(k)(i) of the Seller Disclosure Schedules was not so listed, Sellers shall, to the extent Sellers are still debtors-in-possession in the Chapter 11 Cases, promptly following the discovery thereof, notify Buyer in writing of any such Contract and Sellers' good faith estimate of the amount of Cure Costs applicable to each such Contract (and if no Cure Cost is estimated to be applicable with respect to any such Contract, the amount of such Cure Cost shall be designated for such Contract as "$0.00"), and upon Buyer's request, take all actions reasonably required to assume and assign to Buyer such Contract, *provided* that Buyer pay the applicable Cure Cost.

(vi) Notwithstanding anything herein to the contrary, the Parties agree and acknowledge that the covenants set forth in this Section 5.6(k) shall survive the Closing.

(l) Transfer Tax Exemption. Sellers and Buyer shall cooperate in good faith to minimize Transfer Taxes. Sellers shall seek an exemption under section 1146(a) of the Bankruptcy Code in the Sale Order and the Confirmation Order. The inclusion or availability of an exemption is not a condition to Closing and failure to obtain it is not a breach. Transfer Taxes shall be borne as provided in Section 5.3(b)(i).

(m) Consumer Privacy. To the extent the Transactions involve the sale or lease of personally identifiable information, Buyer shall bear all costs and expenses of any notice, hearing or appointment of a Consumer Privacy Ombudsman required under sections 332 and 363(b)(1)(B) of the Bankruptcy Code, comply with Sellers' privacy policies and all applicable privacy and data-protection Laws, and use the information only for lawful purposes related to the Business and Purchased Assets. The Parties acknowledge that compliance with this Section 5.6(m) shall not constitute an additional condition to Closing, except to the extent expressly required by the Sale Order or applicable Law.

(n) Debtors-in-Possession. From the Petition Date through the Closing, Sellers shall continue to operate the Business as debtors-in-possession pursuant to the Bankruptcy Code and any Order of the Bankruptcy Court.

(o) Plan. Sellers may, but shall not be required to, seek entry of the Sale Order pursuant to sections 105(a), 363, 365, 1123 and 1129 of the Bankruptcy Code in connection with confirmation of the Plan, and, if so, the Sale Order Deadline shall apply to the confirmation of the Plan.

5.7 **Risk Retention Matters.** Buyer hereby agrees that, at the Closing, Buyer (or its designated Subsidiary) shall, consistent with the terms and conditions herein and as set forth in the Sale Order (a) assume the duties and obligations of ACM Arkansas as "servicer", "sponsor" and "administrator" (each, as defined in the U.S. Risk Retention Rules), and act as "servicer", "sponsor" and "administrator", with respect to the ABS Platform as contemplated by the applicable ABS Transaction Documents, and (b) assume the duties and obligations of Colonial as the "seller", and act as "seller", with respect to the ABS Platform as contemplated by the applicable ABS Transaction Documents.

5.8 **Books and Records**. Until the later of seven years after the Closing Date and the closing of the Chapter 11 Cases, Buyer shall retain and preserve all Books and Records relating to the Purchased Assets, the Assumed Liabilities and the Business. Buyer shall not destroy or dispose of any such Books and Records without at least 30 days' prior written Notice to Sellers and any of their successors or liquidating trusts and a reasonable opportunity for Sellers, their successors, any liquidating trust and their Representatives to take possession of them. Upon reasonable Notice and during normal business hours, Buyer shall provide Sellers, their successors, any liquidating trust and their Representatives reasonable access to and copies of such Books and Records, and reasonable access to post-Closing personnel and locations, in each case, as needed for Tax Returns, Litigation (*provided* that no such access shall be required in connection with any adversarial proceeding between Buyer or any of its Affiliates, on the one hand, and any Seller or any of its Affiliates, on the other hand, it being understood that the production of any information in connection with any such proceeding shall be governed by the applicable rules of discovery), retained Claims, claims reconciliation, regulatory matters, insurance claims, SEC reporting or the administration and wind-down of the Chapter 11 Cases. Notwithstanding the foregoing, nothing herein will require Buyer to provide access to, or to disclose any information to, Sellers if Buyer reasonably believes such access or disclosure would (a) result in the loss of attorney-client privilege, (b) result in a breach of a Contract to which Buyer is a party, or (c) violate any applicable Law or Order; *provided* that in the case of clauses (a) through (c), Buyer shall notify Sellers of the general nature of any information so withheld and shall use commercially reasonable efforts to provide such access or information in a manner that does not result in such violation or loss of privilege (including through redaction, clean-team or common-interest arrangements).

5.9 **Employee Matters.**

(a) Offers of Employment. Prior to the Closing, Buyer may, but is not obligated to, offer (or cause a designee of Buyer to offer), by written offer letter outlining the terms and conditions of the offer of employment, to employ certain Business Employees (as determined solely by Buyer in its sole discretion prior to Closing), copies of which offers Buyer will deliver to Sellers and Sellers will deliver to the intended Business Employees, in each case prior to Closing. No later than five Business Days prior to the Closing, Buyer shall notify Sellers in writing of each Business Employee to whom Buyer intends to offer employment. All such offers shall be on an "at will" basis and, subject to the remainder of this Section 5.9(a), on such other terms and conditions as Buyer or its designee in its discretion shall offer. For purposes of this Agreement, each Business Employee who receives and accepts such offer of employment on or prior to the Closing and who actually commences work with Buyer immediately after the Closing Date shall be referred to herein as a "Transferred Employee". Buyer shall use its commercially reasonable efforts to assume all Transferred Employees' leave balances for any accrued vacation, paid time off, sick leave or other leave provided to such Transferred Employees by any Seller or any of its Affiliates on an accrual basis, to the extent permitted by applicable Law, and, to the extent any such balance is not so assumed, Buyer shall pay such balance to the applicable Transferred Employee as and when required by applicable Law. Sellers shall pay, or cause to be paid, to each Business Employee who does not become a Transferred Employee his or her accrued but unused vacation and/or paid time off as of the Closing, solely to the extent required to be paid under applicable Law or the applicable Benefit Plan. Buyer shall pay, or cause to be paid, to each Transferred Employee any annual bonus or commissions

for the performance period in which the Closing occurs, in an amount no less than the amount accrued in respect thereof as of the Closing (taking into account service and performance prior to the Closing), at the time such amount would otherwise have been paid under the applicable Benefit Plan. For 12 months following the Closing, Buyer shall provide, or shall cause its Affiliates to provide, each Transferred Employee who remains employed with Buyer or its Affiliates during such period, while employed, with (i) annual base salary, hourly wages, and target annual cash bonus (including commission) opportunities that are no less favorable than those provided by Sellers or their Affiliates to such individual immediately prior to the Closing, and (ii) employee benefits (excluding, for the avoidance of doubt, equity and equity-based compensation, deferred compensation, unusual and/or extraordinary bonus, and defined benefit pension plans, programs, agreements and arrangements) that are no less favorable, in the aggregate, than those provided by Sellers or their Affiliates immediately prior to the Closing, in each case subject to applicable Law.

(b) Buyer Benefit Plans. In respect of the employee benefit plans, programs, policies, contracts or other arrangements (whether written or unwritten) established or maintained by Buyer or its Affiliates in which Transferred Employees may participate following the Closing, Buyer shall use commercially reasonable efforts to (i) waive pre-existing condition exclusions and waiting periods to the extent such requirements were waived or satisfied under the comparable Benefit Plan immediately prior to the Closing, (ii) provide, without duplication, credit for co-payments and deductibles paid by a Transferred Employee in respect of eligible expenses before Closing during the calendar year in which Closing occurs, and (iii) recognize service with Sellers for eligibility, vesting and benefit-level purposes (but not, for the avoidance of doubt, benefit accruals under any defined benefit plans) to the same extent recognized under the corresponding Benefit Plans, in each case subject to applicable Law and without duplicating benefits.

(c) Assumed Benefit Plans. Buyer (or its designated Affiliate) shall assume the Assumed Benefit Plans. Buyer, on the one hand, and Sellers, on the other, shall take such actions as are necessary and reasonably requested by the other Party to cause Buyer (or its designated Affiliate) to assume sponsorship of the Assumed Benefit Plans as of the Closing and to effect the transfer of all assets and benefit Liabilities of the Assumed Benefit Plans together with all related trust, insurance policies and administrative services agreements, effective as soon as practicable following the Closing, subject to the terms of the Benefits Assignment and Assumption Agreement. The Parties agree and acknowledge that neither Buyer nor any of its Affiliates will (i) become a participating company in any of the Benefit Plans provided by Sellers or any of their Affiliates or ERISA Affiliates by virtue of purchasing the Purchased Assets and operating the Business, (ii) have any Liability in respect of, arising out of, or otherwise relating to any of the Benefit Plans or any Liabilities relating to any Business Employee, other than the Assumed Benefit Plans and the Assumed Employee Liabilities or as may be required by applicable Law (including any obligation attaching to Buyer to the extent Buyer is a "successor employer" as required under COBRA relating to any period of time on or after the Closing), or (iii) assume or have any Liability in respect of any Controlled Group Liabilities.

(d) Seller Arrangements. Sellers shall:

(i) Allow Buyer and its Representatives reasonable access upon reasonable advance notice to meet with and interview during normal business hours, any Business Employees that Buyer may select, and Sellers shall not (and shall instruct their officers and management not to) (A) willfully interfere with Buyer's or its Representatives' rights under Section 5.9(a) to make offers of employment or (B) intentionally encourage any Business Employee not to accept, or to reject, such offer of employment; *provided* that nothing herein shall restrict Sellers from (x) making general communications to Business Employees that are not specifically directed at Buyer's offers of employment and do not intentionally encourage any Business Employee not to accept or to reject such offer of employment, or (y) taking any action required by applicable Law or any Order of the Bankruptcy Court;

(ii) Provide reasonable cooperation and information to Buyer and its Representatives, to the extent reasonably available to Sellers and permitted by applicable Law (including any Law relating to privacy or data protection), with respect to: (A) the current terms and conditions of employment for any Business Employee, to the extent different from those reflected on Section 3.1(j) of the Seller Disclosure Schedules; (B) a list of all qualified beneficiaries receiving or eligible to elect COBRA continuation coverage under any Benefit Plan whose last employment was associated with the Purchased Assets; and (C) all information reasonably requested by Buyer to determine the status as full-time employees under PPACA of any Business Employee offered employment with Buyer or its Affiliates;

(iii) Timely process the payroll for and pay, or cause to be paid, the base wages, base salary, bonuses and other compensation and benefits that are due and payable with respect to current or former Business Employees in connection with their employment with Sellers, including under any Benefit Plans, in each case to the extent due and payable prior to the Closing;

(iv) Withhold and remit all applicable payroll taxes as required by applicable Law, and pay the related employer portion of any such taxes, with respect to all current and former Business Employees with respect to such payments, and remit, at or prior to the Closing, all employee deferrals, employer contributions and premiums due under any Benefit Plan with respect to periods ending at or prior to the Closing, in each case to the extent due prior to the Closing;

(v) To the extent requested by Buyer in writing no later than 10 Business Days prior to the Closing Date, adopt resolutions terminating any Benefit Plan intended to be qualified under Section 401(a) of the Code that is not an Assumed Benefit Plan, effective no later than the day prior to the Closing Date; and

(vi) Reject, effective no later than the Closing, each employment, change in control, retention and severance agreement with any Business Employee that Buyer has not designated in writing as a Purchased Contract, excluding the retention award agreements entered into by Sellers and certain Business Employees

in June 2026, which shall be paid pursuant to their terms by Sellers or their Affiliates as of the Closing (the "Retention Award Agreements").

(e) Section 409A; No Severance Trigger. The Parties shall treat the Transactions as resulting in a "separation from service" for purposes of Section 409A of the Code with respect to any Transferred Employee in accordance with Treasury Regulation Section 1.409A-1(h)(4), and this Section 5.9(e) shall constitute the Parties' written specification for such purpose, which shall apply consistently to all Transferred Employees. The transfer of employment of any Transferred Employee to Buyer or its Affiliates shall not constitute a termination of employment under any Benefit Plan, excluding the Retention Award Agreements; *provided* that any severance or other Liability (excluding with respect to the Retention Award Agreements) that nonetheless becomes payable in connection therewith shall be an Assumed Employee Liability.

(f) Transaction Incentive Program. Buyer has negotiated and agreed that a portion of the proceeds of the Purchase Price shall be used to pay retention bonus payments for certain employees of Sellers and their Affiliates as an inducement to retain and incentivize such employees to remain employed through, and assist in, the Closing. Section 5.9(f) of the Seller Disclosure Schedules sets forth (i) the name of each individual who is to receive a transaction bonus (each, a "Transaction Bonus Recipient"), and (ii) the amount of the transaction bonus and other amounts payable to each Transaction Bonus Recipient (collectively, the "Transaction Bonuses"), subject to an aggregate cap for all Transaction Bonuses of $5,600,000. On or prior to the date hereof, ACM shall have entered into agreements with each Transaction Bonus Recipient on the form agreed by the Parties (each, a "Transaction Bonus Agreement") in order to facilitate the payment of such amounts to such employees on behalf of Buyer. Sellers, or one of their Affiliates, shall pay, on Buyer's behalf, each Transaction Bonus as set forth on Section 5.9(f) of the Seller Disclosure Schedules together with any other payments required under the Transaction Bonus Agreements in a single lump sum on the Closing Date, subject to all applicable withholding. For the avoidance of doubt, the Transaction Bonuses and all other payments required under the Transaction Bonus Agreements shall be funded exclusively from the proceeds of the Purchase Price which would otherwise be payable to Sellers at the Closing. The Parties acknowledge and agree that the arrangements set forth in this Section 5.9(f), including the Transaction Bonuses, are a material inducement to Buyer's willingness to enter into this Agreement and consummate the Transactions and were effectuated for the purpose of preserving the Business and the Purchased Assets during the Interim Period, and that Buyer would not have entered into this Agreement but for such arrangements.

(g) Supplemental Bonus Pool. In addition to the Transaction Bonuses, Buyer shall assume all Liabilities in respect of an additional bonus pool in the amount of $1,300,000 (the "Supplemental Bonus Amount"). No later than five Business Days prior to Closing, Sellers shall deliver to Buyer a written Schedule 5.9(g) setting forth (i) the name of each employee of Sellers or their Affiliates who is to receive a supplemental bonus (each, a "Supplemental Bonus Recipient"), and (ii) the amount allocated to each Supplemental Bonus Recipient from the Supplemental Bonus Amount (each, a "Supplemental Bonus"). Sellers, or one of their Affiliates, shall pay, on Buyer's behalf, each Supplemental Bonus in a single lump sum on the Closing Date, subject to all

applicable withholding. For the avoidance of doubt, the Supplemental Bonuses shall be funded exclusively from the proceeds of the Purchase Price which would otherwise be payable to Sellers at the Closing.

(h) Third Party Beneficiaries. This Section 5.9 shall be binding upon and inure solely to the benefit of each of the Parties, and nothing in this Section 5.9, express or implied, shall confer upon any other Person any rights or remedies of any nature whatsoever under or by reason of this Section 5.9. Nothing contained herein, express or implied, shall be construed to establish, amend or modify any Benefit Plan or any Assumed Benefit Plan. The Parties acknowledge and agree that the terms set forth in this Section 5.9 shall not create any right in any Business Employee or any other Person to any continued employment with any of Sellers or Buyer or any of their Affiliates or compensation or benefits of any nature or kind whatsoever, nor shall anything in this Agreement interfere with the right of Buyer or its Affiliates to relocate or terminate the employment of any of the Transferred Employees at any time after the Closing Date.

5.10 **Corporate Existence**. The Parties acknowledge and agree that nothing in this Agreement or any Ancillary Agreement shall require any Seller to maintain its corporate (or similar) existence, or prevent any Seller or any of its Subsidiaries from winding down their operations following the Closing in accordance with the Plan. Within 30 days after the Closing (or, if later, the effectiveness of the Plan), each Seller shall, and shall cause its Subsidiaries (other than any Subsidiary whose Equity Interests are Purchased Assets) to, file such documents as are necessary to change its corporate (or similar) name to a name that does not include "Car-Mart", "Car Mart", "Colonial", "ACM" or any term confusingly similar thereto; *provided* that, following the Closing, Sellers may use their legal names (and former names) in a non-trademark manner solely as required to identify themselves in filings with the Bankruptcy Court or any Governmental Authority and in other wind-down communications, consistent with any limited license granted to Sellers under the Intellectual Property Assignment Agreement.

5.11 **Term Sheets.** Subject to the terms of this Section 5.11, during the period beginning on the date hereof and ending on the earlier to occur of the Closing Date and the termination of this Agreement in accordance with its terms, each Party shall negotiate in good faith the Rollover Indebtedness Documents and the New Servicing Agreement, consistent with the terms and conditions of the Rollover Indebtedness Term Sheet, until the Rollover Indebtedness Documents and the New Servicing Agreement are in Agreed Form. Sellers will use their reasonable best efforts to deliver or cause to be delivered to Buyer initial drafts of the Rollover Indebtedness Documents and the New Servicing Agreement promptly following the date hereof, and Buyer shall use its reasonable best efforts to deliver any comments thereto within five (5) Business Days after receipt of each draft. Each of Sellers and Buyer shall use their reasonable best efforts to finalize the Rollover Indebtedness Documents and the New Servicing Agreement as promptly as practicable following the date hereof. Notwithstanding anything to the contrary in this Agreement or the Rollover Indebtedness Term Sheet, (a) the Rollover Indebtedness Term Sheet does not constitute a binding agreement to enter into the Rollover Indebtedness Documents or the New Servicing Agreement, and (b) if, after negotiating in good faith as required by this Section 5.11, the Parties cannot agree on an Agreed Form, no Party will be required to execute or deliver the Rollover Indebtedness Documents or the New Servicing Agreement. No Party will be in breach of this Agreement or liable to any other Party solely because the Parties did not agree on, execute or

deliver the Rollover Indebtedness Documents or the New Servicing Agreement, as long as that Party has complied with its obligations under this Section 5.11.

5.12 **Transition Services Agreement**. During the Interim Period, the Parties shall cooperate in good faith to identify each License (as defined in the Transition Services Agreement) required for the operation of the Business that is not transferable or assignable to Buyer, or is transferable or assignable only with the approval of a Governmental Authority, and finalize the Transition Services Agreement in the form set forth on Exhibit F accordingly. Each of Sellers and Buyer shall use their reasonable best efforts to finalize the Transition Services Agreement and cause it to be in Agreed Form as promptly as practicable following the date hereof, and in any event no later than 21 days after the date hereof. Buyer shall use commercially reasonable efforts to apply for and obtain, prior to the Closing, the New Licenses (as defined in the Transition Services Agreement), and Sellers shall, at Buyer's cost, reasonably cooperate with Buyer in connection therewith, including by executing applications, consents, notices and other documents reasonably requested by Buyer.

5.13 **Escrow Agreement; Deposit Amount**. Promptly after the date hereof, Buyer shall use its best efforts to deliver to the Escrow Agent any information requested by the Escrow Agent in connection with, and take all actions necessary or advisable to cause the Escrow Agent to complete, the Escrow Agent's "know-your-customer" review process with respect to the Escrow Agreement. Sellers shall provide all cooperation reasonably requested by Buyer in connection with the matters contemplated by the immediately foregoing sentence. Promptly following the date hereof (but in any event no later than three Business Days following the date hereof), Buyer Escrow Party shall (a) execute and deliver to ACM and the Escrow Agent the Escrow Agreement, in substantially the form set forth on Exhibit G, and (b) deposit the Deposit Amount with the Escrow Agent by wire transfer of immediately available funds, in accordance with the terms of the Escrow Agreement. ACM shall execute and deliver the Escrow Agreement substantially concurrently with Buyer Escrow Party's execution and delivery thereof pursuant to the immediately foregoing sentence.

## ARTICLE 6
## CONDITIONS TO OBLIGATIONS OF THE PARTIES

6.1 **Conditions to Obligations of Buyer and Sellers**. The obligations of Buyer and Sellers to effect the Closing are subject to the satisfaction or waiver (if permitted by applicable Law) of the following conditions:

(a) No Illegality. There shall not be in effect any applicable Law that enjoins, prohibits or makes illegal the Transactions.

(b) Bankruptcy Orders. The Bankruptcy Court shall have entered the Sale Order or, if the Transactions are effectuated through the Plan, the Confirmation Order, and such Order shall be in full force and effect and shall not have been reversed, modified, amended, vacated or stayed.

(c) Regulatory Approvals. Any applicable statutory waiting period (and any extension thereof) applicable to the Transactions under the HSR Act, or any other

applicable competition, merger control, antitrust or similar Law, shall have been terminated or shall have expired. For the avoidance of doubt, the issuance by the FTC or the DOJ of a "warning letter" in which the relevant agency states that, despite expiration or termination of the HSR Act waiting period, its investigation remains open or ongoing, shall not be grounds for finding that any condition to the Closing set forth in this ARTICLE 6 has not been satisfied.

(d) No Governmental Order. No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Order (whether temporary, preliminary or permanent) that is in effect and has the effect of making the Transactions illegal or otherwise restraining or prohibiting consummation of such Transactions.

(e) No Trustee, Conversion or Dismissal. The Bankruptcy Court shall not have entered any order (i) appointing a trustee or examiner with respect to the Chapter 11 Cases, (ii) converting the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or (iii) dismissing the Chapter 11 Cases.

6.2 **Conditions to Obligations of Buyer**. The obligation of Buyer to effect the Closing is subject to the satisfaction, or waiver (if permitted by applicable Law) by Buyer of the following additional conditions:

(a) As of the date hereof and as of the Closing Date (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date) (i) each representation or warranty contained in Sections 3.1(a), 3.1(b) and 3.1(c) shall be true and correct in all material respects, and (ii) each other representation or warranty set forth in Section 3.1 (disregarding all qualifications and exceptions contained therein relating to materiality, including references to "Material Adverse Effect") shall be true and correct, except where the failure of any such representations and warranties referred to in this clause (ii) to be so true and correct would not reasonably be expected to have a Material Adverse Effect;

(b) Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed or complied with prior to the Closing in all material respects, and Sellers shall have caused the documents and instruments required by Section 2.4(b) to be delivered to Buyer (or tendered subject only to Closing);

(c) Sellers shall have delivered a certificate from an authorized officer of each Seller to the effect that each of the conditions specified in Section 6.2(a) and Section 6.2(b) has been satisfied; and

(d) From the date of this Agreement until the Closing, there shall not have occurred and be continuing any Material Adverse Effect.

6.3 **Conditions to Obligations of Sellers.** Sellers' obligation to consummate the Transactions in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a) As of the date hereof and as of the Closing Date (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date) (i) each representation or warranty contained in Sections 3.2(a), 3.2(b) and 3.2(c) (without regard to any reference or qualifications to materiality contained in such representations and warranties) shall be true and correct in all material respects, and (ii) each other representation and warranty (disregarding all qualifications and exceptions contained therein relating to materiality) set forth in Section 3.2 shall be true and correct in all respects, except where the failure of such representations and warranties to be so true and correct has not and would not reasonably be expected to, individually or in the aggregate, materially prevent, restrict or delay the consummation of the Transactions or the transactions contemplated by any Ancillary Agreement;

(b) Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed or complied with prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by Section 2.4(c) to be delivered to Sellers (or tendered subject only to Closing); and

(c) Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 6.3(a) and Section 6.3(b) has been satisfied.

6.4 **Frustration of Closing Conditions.** No Party may rely, whether as a basis for not consummating the Transactions or terminating this Agreement or otherwise, on the failure of any condition set forth in this ARTICLE 6 to be satisfied if such failure was caused by such Party's breach of this Agreement.

## ARTICLE 7
## NO SURVIVAL OF REPRESENTATIONS, WARRANTIES AND PRE-CLOSING COVENANTS

7.1 **No Survival**. Notwithstanding anything to the contrary in this Agreement, all of the representations and warranties contained in this Agreement (including the Seller Disclosure Schedules, schedules and exhibits attached hereto and the certificates delivered pursuant hereto) and each of the covenants and agreements contained in ARTICLE 4 shall terminate automatically at and will not survive the Closing.

7.2 **Release.** Except to the extent otherwise expressly provided in Section 9.9:

(a) Effective as of the Closing, Buyer, on behalf of itself and its Affiliates, heirs, legal representatives, successors and assigns (each, a "Buyer Releasor"), hereby fully, knowingly, voluntarily, irrevocably and unconditionally waives, releases, acquits and forever discharges, to the fullest extent permitted by Law, each Seller, and each of its respective Associated Persons (which shall be deemed to include its Subsidiaries and their respective Associated Persons with respect to any period prior to the Closing) (each, a "Seller Releasee") of, from and against any and all rights, claims, assertions, demands, disputes, controversies, covenants, damages, complaints, allegations, causes of action,

Litigation, Losses and/or Liabilities whatsoever (in each case, whether existing in the past, now or in the future, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, in law or at equity or based on contract, statute, tort or otherwise) arising out of, relating to or resulting from: (i) the ownership, organization, management or operation of the Purchased Assets and/or the Business on or prior to the Closing; (ii) the negotiation, execution, performance and consummation of this Agreement and the Transactions; and (iii) any information, documents or materials furnished by or on behalf of any Seller or its Affiliates (clauses (i) through (iii), each, a "Buyer Released Matter"), which such Buyer Releasor or any of its Affiliates, heirs, legal representatives, successors or assigns ever had, now has or may have on or by reason of any matter, cause or thing whatsoever from the beginning of time; *provided*, *however*, that notwithstanding the foregoing, each Buyer Releasor does not in any event release Sellers (x) from their obligations under this Agreement, (y) from any claim for Fraud, gross negligence or willful misconduct, or (z) with respect to any rights of Buyer under this Agreement, the DIP Order, the Sale Order, the Plan and any other agreement between the Parties entered after the date hereof.

(b) Each Buyer Releasor irrevocably covenants and agrees not to, directly or indirectly, and covenants and agrees to cause its respective Affiliates, heirs, legal representatives, successors and assigns not to, assert, maintain or pursue any claim, demand, allegation, complaint, cause of action or assertion and/or bring or maintain any Litigation with respect to, arising out of, or relating to any Buyer Released Matter against the Seller Releasees or any of them. Notwithstanding the foregoing, each Buyer Releasor retains and maintains, and does not release or waive, (i) its rights to enforce the obligations of the Parties under, but in any case, subject to the terms of, this Agreement and each Ancillary Agreement, (ii) any claim for Fraud, gross negligence, or willful misconduct, subject to the terms of this Agreement, and (iii) its rights under the Bidding Procedures Order and the Sale Order, including with respect to the Deposit Amount, the Break-up Fee, the Expense Reimbursement and the Excluded Liabilities. Each Buyer Releasor acknowledges and agrees, on behalf of itself and its Affiliates, heirs, legal representatives, successors and assigns, that no Seller Releasee shall have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions, omissions or Fraud of any other Person. Notwithstanding any provision of this Agreement or any Ancillary Agreement to the contrary, the Seller Releasees not party to this Agreement are express, intended third-party beneficiaries of this Section 7.2 with full rights of enforcement of this Section 7.2 as if a party hereto.

(c) Except as otherwise described in this Section 7.2, Buyer acknowledges and agrees that Buyer is acquiring the Purchased Assets on an "AS IS, WHERE IS, WITH ALL FAULTS" basis, without any representation or warranty, express, implied, statutory or otherwise, as to title, condition, quality, quantity, collectability, enforceability, compliance with Law, value, merchantability, fitness for a particular purpose or any other matter, except only for the express representations and warranties expressly set forth in Section 3.1 and the Ancillary Agreements. Buyer assumes all risks relating to the Purchased Assets, including unknown and undiscovered risks, and shall not seek rescission or other relief based on any such matter.

(d) Effective as of the Closing, each Seller, on behalf of itself and its controlled Affiliates (each, a "Seller Releasor"), successors and assigns, hereby fully, knowingly, voluntarily, irrevocably and unconditionally waives, releases, acquits and forever discharges, to the fullest extent permitted by Law, Buyer and each of its Affiliates and Representatives (each, a "Buyer Released Party") of, from and against any and all rights, claims, assertions, demands, disputes, controversies, covenants, damages, complaints, allegations, causes of action, Litigation, Losses and/or Liabilities whatsoever (in each case, whether existing in the past, now or in the future, known or unknown, actual or potential, suspected or unsuspected, fixed or contingent, in law or at equity or based on contract, statute, tort or otherwise) arising out of, relating to or resulting from: (i) the ownership, organization, management or operation of the Purchased Assets and/or the Business on or prior to the Closing; and (ii) the negotiation, execution, performance and consummation of this Agreement and the Transactions (each, a "Seller Released Matter"); *provided, however*, that notwithstanding the foregoing, each Seller Releasor does not in any event release Buyer (x) from its obligations under this Agreement, (y) from any claim for Fraud, gross negligence or willful misconduct, or (z) with respect to any rights of Sellers under this Agreement, the DIP Order, the Sale Order, the Plan and any other agreement between the Parties entered after the date hereof.

(e) Each Seller Releasor irrevocably covenants and agrees not to, directly or indirectly, and covenants and agrees to cause its respective Affiliates, heirs, legal representatives, successors and assigns not to, assert, maintain or pursue any claim, demand, allegation, complaint, cause of action or assertion and/or bring or maintain any Litigation with respect to, arising out of, or relating to any Seller Released Matters against the Buyer Released Parties or any of them. Notwithstanding the foregoing, each Seller Releasor retains and maintains, and does not release or waive, (i) its rights to enforce the obligations of the Parties under, but in any case, subject to the terms of, this Agreement and each Ancillary Agreement, (ii) any claim for Fraud, gross negligence, or willful misconduct, subject to the terms of this Agreement, and (iii) its rights under the Bidding Procedures Order and the Sale Order, including with respect to the Deposit Amount, the Break-up Fee, the Expense Reimbursement and the Excluded Liabilities. Each Seller Releasor acknowledges and agrees, on behalf of itself and its Affiliates, heirs, legal representatives, successors and assigns, that no Buyer Released Party shall have any shared or vicarious liability, or otherwise be the subject of legal or equitable claims, for the actions, omissions or Fraud of any other Person. Notwithstanding any provision of this Agreement or any Ancillary Agreement to the contrary, the Buyer Released Parties not party to this Agreement are express, intended third-party beneficiaries of this Section 7.2 with full rights of enforcement of this Section 7.2 as if a party hereto.

7.3 **No Right of Set-Off.** Buyer, for itself and its successors and permitted assigns, hereby unconditionally and irrevocably waives any rights of set-off, netting, offset, recoupment, or similar rights that Buyer or any of its successors and permitted assigns has or may have with respect to the payment of the Purchase Price or any other payments to be made by Buyer pursuant to this Agreement or any other document or instrument delivered by Buyer in connection herewith, including, for the avoidance of doubt, any rights of set-off, netting, offset, recoupment, or similar rights against the Deposit Amount.

7.4 **No Rescission.** Notwithstanding anything to the contrary contained in this Agreement or in any Ancillary Agreement, no Person shall be entitled to (a) rescind this Agreement or any Ancillary Agreement, other than in connection with or in respect of Fraud, or (b) recover any rescissory damages arising out of or relating to this Agreement or any Ancillary Agreement, other than in connection with or in respect of Fraud. Buyer shall not seek, and shall cause its Affiliates not to seek, any stay pending appeal of the Sale Order or the Bidding Procedures Order and shall not appeal or support any appeal of either such Order; *provided*, *however*, that the foregoing shall not restrict Buyer or its Affiliates from objecting to, appealing or seeking a stay pending appeal of, or seeking reconsideration of, any such Order (or any amendment or modification thereof) that is inconsistent with this Agreement, that does not satisfy the requirements of Section 5.6, as applicable, or that was entered, amended or modified without Buyer's prior written consent where such consent is required hereunder.

## ARTICLE 8
## TERMINATION

8.1 **Termination.** This Agreement may be terminated at any time prior to the Closing, as follows:

(a) upon the mutual written agreement of Buyer and ACM;

(b) by Buyer, if any Seller shall have breached any of its representations, warranties, covenants or agreements set forth in this Agreement, which breach (i) would give rise to the failure of any condition set forth in Section 6.2(a) or Section 6.2(b) and (ii) is incapable of being cured or, if capable of being cured, has not been cured by the earlier of (x) the Outside Date and (y) the date that is 20 days following receipt by ACM of written notice from Buyer identifying such breach or failure to perform or comply and stating Buyer's intention to terminate this Agreement pursuant to this Section 8.1(b); *provided*, *however*, that Buyer shall not have the right to terminate this Agreement pursuant to this Section 8.1(b) if Buyer is then in breach of any of its representations, warranties, covenants or agreements hereunder and such breach would give rise to the failure of any condition set forth in Section 6.3(a) or Section 6.3(b);

(c) by ACM, if Buyer shall have breached any of its representations, warranties, covenants or agreements set forth in this Agreement, which breach (i) would give rise to the failure of any condition set forth in Section 6.3(a) or Section 6.3(b) and (ii) is incapable of being cured or, if capable of being cured, has not been cured by the earlier of (x) the Outside Date and (y) the date that is 20 days following receipt by Buyer of written notice from ACM identifying such breach or failure to perform or comply and stating ACM's intention to terminate this Agreement pursuant to this Section 8.1(c); *provided*, *however*, that ACM shall not have the right to terminate this Agreement pursuant to this Section 8.1(c) if any Seller is then in breach of any of its representations, warranties, covenants or agreements hereunder and such breach would give rise to the failure of any condition set forth in Section 6.2(a) or Section 6.2(b);

(d) by Buyer or ACM, (i) if an Alternative Transaction is entered into other than in connection with an Auction, or (ii) if there is an Auction, Buyer is not declared the

Successful Bidder or the Back-up Bidder at the Auction; *provided*, *however*, that Buyer may not terminate this Agreement pursuant to clause (ii) of this Section 8.1(d) while serving as Back-up Bidder prior to the Back-up Bid Expiration Date;

(e) by Buyer, if (i) the Bankruptcy Court has not entered the Bidding Procedures Order prior to 11:59 p.m. (Central Time) on the Bidding Procedures Order Deadline, (ii) the Bankruptcy Court has not approved and entered the Sale Order, or, if effectuated through the Plan, the Confirmation Order, prior to 11:59 p.m. (Central Time) on the Sale Order Deadline, or (iii) following entry of the Sale Order or the Bidding Procedures Order, such Order is stayed, reversed, modified, vacated or amended in any material respect without the prior written consent of Buyer (which consent may not be unreasonably withheld, conditioned or delayed) and such stay, reversal, modification, vacation or amendment is not eliminated within 21 days; *provided*, *however*, that this Section 8.1(e) shall not permit termination while an appeal, stay motion or other challenge is pending if the Order remains capable of becoming effective before the Outside Date; *provided*, *further*, that the right of Buyer to terminate this Agreement under (A) this Section 8.1(e) shall not be available if the failure of the entry of the Bidding Procedures Order or the Sale Order, or any such stay, reversal, modification, vacation or amendment, was primarily caused by Buyer's breach of this Agreement, (B) clause (i) of this Section 8.1(e) following the earlier to occur of (x) the entry of the Bidding Procedures Order and (y) five Business Days following the Bidding Procedures Order Deadline, and (C) clause (ii) of this Section 8.1(e) following the earlier to occur of (x) the entry of the Sale Order and (y) five Business Days following the Sale Order Deadline;

(f) by Buyer or ACM, if the Closing shall not have occurred on or before the Outside Date; *provided*, *however*, that (i) if, as of the Outside Date, all conditions set forth in ARTICLE 6 other than the conditions set forth in Section 6.1(b) or Section 6.1(c) or Section 6.1(d) (to the extent related to Section 6.1(c)) shall have been satisfied or shall be capable of being satisfied on the Closing Date were the Closing to happen on such date, then the Outside Date shall automatically be extended by an additional 90 days, and (ii) the right to terminate this Agreement under this Section 8.1(f) shall not be available to (A) any Party if such failure of the Closing to occur on or before such date (as extended if applicable) was caused by such Party's failure to comply with the terms of this Agreement, including Section 4.5 and Section 5.6 and (B) Buyer, if any Seller is pursuing an action that seeks to specifically enforce the performance of Buyer's obligations under this Agreement to consummate the Closing or other similar equitable relief or if any appeal, stay motion or other challenge to the Bidding Procedures Order or Sale Order is pending;

(g) by ACM, if the Seller Board (after considering the recommendation of the Special Committee) determines in good faith that proceeding with the Transactions would violate applicable Law or would be inconsistent with its fiduciary duties or fiduciary obligations to the estate and its stakeholders under the Bankruptcy Code, including if Sellers elect to terminate this Agreement to accept a Superior Proposal under Section 5.6(a);

(h) by Buyer or ACM, if any Order having the effect set forth in Section 6.1(d) shall be in effect and shall have become final and nonappealable; *provided*, *however*, that

the right to terminate this Agreement under this Section 8.1(h) shall not be available to any Party if the failure of such condition, or the fact that such Order has become final and nonappealable, was caused by such Party's failure to comply with Section 4.5 or Section 5.6;

(i) by ACM, if (A) (1) all of the conditions set forth in Section 6.1 and Section 6.2 have been satisfied or waived in writing (to the extent such waiver is permitted by applicable Law) (other than those conditions that by their nature are to be satisfied at the Closing so long as such conditions would be satisfied at the Closing), (2) the Closing is required to be consummated pursuant to Section 2.4, (3) ACM has confirmed in writing to Buyer that Sellers are ready, willing and able to consummate the Closing, and (4) the Closing shall not have been consummated within two Business Days after the delivery of such written confirmation to Buyer, (B) Buyer, having been designated the Back-up Bidder, fails to keep its bid open and irrevocable through the Back-up Bid Expiration Date, or (C) Buyer or any of its Affiliates seeks a stay pending appeal of, appeals or supports an appeal of the Bidding Procedures Order or the Sale Order;

(j) by Buyer or ACM, if any of the Chapter 11 Cases is dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(k) by Buyer, if Sellers withdraw the motion with respect to the Sale Order;

(l) by Buyer or ACM, if the Rollover Indebtedness Documents are not in Agreed Form by December 3, 2026; *provided*, *however*, that the right to terminate this Agreement under this Section 8.1(l) shall not be available to any Party if the failure of the Rollover Indebtedness Documents to be in Agreed Form by such date was caused by such Party's failure to comply with Section 5.11; and

(m) by ACM, if Buyer Escrow Party shall have failed to deposit the Deposit Amount with the Escrow Agent as contemplated by Section 2.5 and Section 5.13 by November 27, 2026.

8.2 **Procedure and Effect of Termination.**

(a) Termination of this Agreement by either Buyer or ACM shall be by delivery of a Notice to the other Party. Such Notice shall state the termination provision in this Agreement that such terminating Party is claiming provides a basis for termination of this Agreement. Termination of this Agreement pursuant to the provisions of Section 8.1 shall be effective upon and as of the date of delivery of such Notice as determined pursuant to Section 9.2.

(b) If a Party waives compliance with any of the conditions, obligations or covenants contained in this Agreement, the waiver will be without prejudice to any of its rights of termination in the event of non-fulfillment, non-observance or non-performance of any other condition, obligation or covenant in whole or in part.

(c) If this Agreement is terminated, the Parties are released from all of their respective obligations under this Agreement, except that each Party's obligations under

Section 2.5, Section 5.2, this Section 8.2, Section 8.3, Section 8.4, Section 8.5, Sections 9.1 through 9.5, Sections 9.8 through 9.11, Sections 9.15 and 9.16 shall survive in accordance with their terms; *provided*, *however*, that, subject to Section 8.3(b), nothing herein shall relieve any Party from liability for any Willful Breach.

(d) As soon as practicable following a termination of this Agreement for any reason, but in no event more than 30 days after such termination, Buyer and Sellers shall, to the extent practicable, withdraw all filings, applications and other submissions relating to the Transactions filed or submitted by or on behalf of such Party to any Governmental Authority or other Person. No withdrawal obligation shall apply to any pleading, filing, notice or other submission made in the Chapter 11 Cases or required to be maintained by applicable Law.

8.3 **Retention of Deposit Amount; Exclusive Remedy**.

(a) In the event of a Deposit Retention Termination, in consideration for Sellers having expended considerable time and expense in connection with this Agreement, and without the requirement of any notice or demand from Sellers or any other application to or order of the Bankruptcy Court, the Deposit Amount shall be non-refundable and shall be released to ACM in accordance with Section 2.5(b)(ii). Prior to any termination of this Agreement, Sellers may, at their election, seek specific performance of Buyer's obligation to consummate the Closing pursuant to Section 9.9 in lieu of terminating this Agreement, and nothing in this Section 8.3 shall limit Buyer's liability for Willful Breach pursuant to Section 8.2(c).

(b) Subject to Section 8.2(c), if this Agreement is terminated, (i) the receipt by ACM or Buyer, as applicable, of the Deposit Amount in accordance with Section 2.5 and (ii) Buyer's receipt of the Break-up Fee and the Expense Reimbursement (in each case, if and when payable) in accordance with Section 8.5, in each case, shall be the sole and exclusive remedies of such Party against the other Parties and their respective Affiliates for any Liability, damage or other loss suffered as a result of any breach of any representation, warranty, covenant or agreement in this Agreement or the failure of the Transactions to be consummated. Notwithstanding Section 9.9, (A) Buyer may not both seek specific performance of this Agreement pursuant to Section 9.9 and receive the Break-up Fee, and Buyer's acceptance of the Break-up Fee shall constitute an irrevocable waiver of any right to specific performance or other equitable relief, (B) in no event shall the aggregate Liability of Sellers and their estates under or in connection with this Agreement or its termination exceed the sum of the Break-up Fee and the Expense Reimbursement (plus return of the Deposit Amount, if applicable), and (C) each of the Break-up Fee and the Expense Reimbursement shall be payable no more than once.

(c) The Parties acknowledge that the agreements contained in this Section 8.3 and Section 2.5 are an integral part of the Transactions, that the damages resulting from a Deposit Retention Termination are uncertain and incapable of accurate calculation, and that the Deposit Amount is not a penalty but rather constitutes liquidated damages in a reasonable amount that will compensate Sellers for the efforts and resources expended and opportunities forgone while negotiating this Agreement and in reliance on this Agreement

and on the expectation of the consummation of the Transactions, and that, without these agreements, Sellers would not have entered into this Agreement.

8.4 **Return of Deposit Amount.** In the event that this Agreement is terminated other than pursuant to a Deposit Retention Termination, the Deposit Amount shall be returned to Buyer Escrow Party in accordance with Section 2.5(b)(iii) within two Business Days after such termination, without any requirement of any further notice, application to or Order of the Bankruptcy Court and notwithstanding the automatic stay, and such return (together with the payment of the Break-up Fee and the Expense Reimbursement, if and when payable pursuant to Section 8.5) shall be in full satisfaction of any claim of Buyer arising out of such termination, except in the case of Fraud.

8.5 **Break-up Fee; Expense Reimbursement.**

(a) In the event that (i) this Agreement is terminated pursuant to Section 8.1(d) or Section 8.1(g), (ii) an Alternative Transaction is consummated within six months after the date of such termination, (iii) the Bidding Procedures Order approving the Break-up Fee has been entered and is in effect, and (iv) at the time of such termination, (A) Buyer is not in breach of this Agreement such that ACM could terminate this Agreement pursuant to Section 8.1(c), (B) no Deposit Retention Termination has occurred, and (C) Buyer has complied with its obligations as Back-up Bidder under Section 5.6(h), if applicable, ACM shall pay (or cause to be paid) to Buyer a break-up fee equal to $9,000,000 (the "Break-up Fee"), by wire transfer of immediately available funds to an account designated by Buyer in writing, solely from, and contemporaneously with the receipt by Sellers of, the cash proceeds of the consummation of such Alternative Transaction. In no event shall the Break-up Fee be payable from any other property of the Debtors' estates, including any proceeds of the DIP Facility, any cash collateral or any professional fee escrow.

(b) If this Agreement is terminated prior to the Closing for any reason other than pursuant to a Deposit Retention Termination, Section 8.1(l) or Section 8.1(m), Sellers shall pay Buyer, in accordance with Section 8.5(c), the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) associated with diligence of Sellers in connection with Buyer becoming the stalking horse bidder, negotiation and documentation of this Agreement and term sheets and pleadings and papers related thereto, hearings, contested matters and any auction related to the Purchased Assets, and any other matters related to this Agreement (the "Expense Reimbursement"); *provided*, *however*, that in no event shall the Expense Reimbursement exceed an amount equal to $1,500,000.

(c) The Parties acknowledge that the agreements contained in this Section 8.5 are an integral part of the Transactions, that the damages resulting from a termination giving rise to the Break-up Fee or the Expense Reimbursement are uncertain and incapable of accurate calculation, and that the Break-up Fee and the Expense Reimbursement are not penalties but rather constitute liquidated damages in a reasonable amount that will compensate Buyer for the efforts and resources expended and opportunities forgone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Transactions, that the Break-up Fee and the Expense Reimbursement

are actual and necessary costs of preserving Sellers' estates within the meaning of section 503(b) of the Bankruptcy Code, and that, without these agreements, Buyer would not have entered into this Agreement. In the event Sellers become obligated to pay the Break-up Fee and Expense Reimbursement, such amounts shall be payable from the proceeds of a closing with the third-party buyer; *provided*, *however*, that if the Break-up Fee and Expense Reimbursement are not fully paid from such closing for any reason, such unpaid amounts shall be allowed and paid as administrative expenses in the Chapter 11 Cases pursuant to sections 503(b)(3) and 507(a)(2) of the Bankruptcy Code. For the avoidance of doubt, (y) the Break-up Fee and Expense Reimbursement shall be free of any Encumbrances and, notwithstanding anything herein to the contrary, shall be payable or credited to Buyer only upon closing of such Alternative Transaction, the Parties acknowledge and agree that the Break-up Fee and Expense Reimbursement, on the terms and subject to the conditions to the payment thereof, shall be Buyer's sole recourse in connection with this Agreement and the Transactions in the event this Agreement is terminated prior to the Closing, and (z) notwithstanding anything contained herein to the contrary, (i) Buyer shall have the right, but not the obligation, to increase its bid for the Purchased Assets at the Auction, and (ii) the amount of the Break-up Fee and Expense Reimbursement, once triggered pursuant to the terms of this Agreement, shall act as a credit toward any Closing by Buyer as the high bidder or as the Back-up Bidder.

## ARTICLE 9
## MISCELLANEOUS

9.1 **Governing Law, Jurisdiction, Venue and Service.** Except to the extent governed by the Bankruptcy Code, this Agreement will be governed by and be construed in accordance with the Laws of the State of Delaware, without regard however to the conflicts of laws principles thereof. Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, including, the assumption and assignment of the Purchased Contracts, and (b) any and all legal proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court; *provided* that solely in the event that the Bankruptcy Court abstains, declines or lacks jurisdiction, or the Chapter 11 Cases have been closed or dismissed, the state and federal courts located in the State of Delaware shall have exclusive jurisdiction and the foregoing clauses (a) and (b) shall instead be read to apply to the state and federal courts located in the State of Delaware. The Parties hereby consent to and submit to the jurisdiction and venue of such courts and shall receive notices at such locations pursuant to Section 9.2(b). To the extent not prohibited by applicable Law or Bankruptcy Court rule, each Party hereby waives and agrees not to assert, by way of motion, as a defense or otherwise in any such proceeding, any Claim (i) that it is not subject to the jurisdiction of such courts, (ii) that the proceeding is brought in an inconvenient forum, (iii) that it is immune from any legal process with respect to itself or its property, (iv) that the venue of the proceeding is improper, or (v) that this Agreement or the subject matter hereof or thereof may not be enforced in or by such court. Each of the Parties hereby (x) irrevocably submits with regard to any such legal proceeding to the exclusive personal jurisdiction of such courts in the event any dispute arises out of this Agreement or any Transactions, including the assumption and assignment of the Purchased Contracts, (y) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other

request for leave from such courts or that such Litigation is brought in an inconvenient forum, and (z) agrees that it shall not bring any Litigation relating to this Agreement or any of the Transactions in any court other than such courts in accordance with this Section 9.1; *provided*, *however*, that, a Party may commence any Litigation in a court other than such courts solely for the purpose of enforcing an Order issued by such courts or the terms of this Section 9.1. The Parties waive personal service of any and all process on each of them and consent that all such service of process shall be made in the manner, to the Party and at the address set forth in Section 9.2(b), and service so made shall be complete as stated in Section 9.2(b). EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY.

9.2 **Notices.**

(a) Notice Requirements. Any notice, request, demand, waiver, consent, approval or other communication permitted or required under this Agreement (each, a "Notice") shall be in writing, shall refer specifically to this Agreement and shall be deemed given only if delivered by hand or sent by email of a PDF attachment (with transmission confirmed) or by internationally recognized overnight delivery service that maintains records of delivery, addressed to the Parties at their respective addresses specified in Section 9.2(b) or to such other address as the Party to whom Notice is to be given may have provided to the other Party at least five days prior to such address taking effect in accordance with this Section 9.2. Such Notice shall be deemed to have been given as of the date delivered by hand or internationally recognized overnight delivery service or confirmed that it was received by email. If a Notice deemed given upon receipt is given after 5:00 p.m. in the place of receipt (the Parties understand and agree that the foregoing applies only to Notice and not to copies), such Notice will be deemed given on the next succeeding Business Day.

(b) Address for Notice.

If to Sellers, to:

America's Car-Mart, Inc.
1805 North 2nd, Suite 401
Rogers, Arkansas 72756
Attention: Douglas Campbell
Brett Papasan
Email: douglas.campbell@car-mart.com
brett.papasan@car-mart.com

with a copy (which shall not constitute effective notice) to:

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606
Attention: Ryan H. Ferris
Brian Kent

Louis Chiappetta
Jamie Netznik

Email: rferris@mayerbrown.com
bkent@mayerbrown.com
lchiappetta@mayerbrown.com
jnetznik@mayerbrown.com

and

Mayer Brown LLP
1221 Avenue of the Americas
New York, New York 10020
Attention: Richard Stieglitz
Email: rstieglitz@mayerbrown.com

If to Buyer, to:

c/o Claypool Holdings, LLC
1380 W Paces Ferry Rd NW
Atlanta, GA 30327
Attention: Peter Hennessy
Steve Hennessy
Mark Hennessy
Robert Hennessy
Email: Peter@HennessyATL.com
Steve@HennessyATL.com
Mark@HennessyATL.com
Robert@HennessyATL.com

with a copy (which shall not constitute effective notice) to:

Troutman Pepper Locke LLP
875 Third Avenue
New York, New York 10022
Attention: Matthew Brooks; Michael Sabino
Email: matthew.brooks@troutman.com
michael.sabino@troutman.com

and

Troutman Pepper Locke LLP
Two California Plaza
350 South Grand Avenue
Suite 3400
Los Angeles, California 90071
Attention: David Kupetz

Email: david.kupetz@troutman.com

9.3 **No Benefit to Third Parties.** Sellers and Buyer intend that this Agreement will not benefit or create any right or cause of action in favor of any Person, other than the Seller Releasees, the Buyer Released Parties, each of the Persons referenced in Section 9.10 and the rights of the Parties' respective successors, permitted assigns and any liquidating trust established under the Plan, each of whom is an intended third-party beneficiary of this Agreement that shall be entitled to enforce the applicable terms hereof as though party hereto. No Person, other than the Parties and such third-party beneficiaries, is entitled to rely on the provisions of this Agreement in any action, suit, proceeding, hearing or other forum.

9.4 **Waiver.** No waiver of any of the provisions of this Agreement will constitute a waiver of any other provision (whether or not similar). No waiver will be binding unless executed in writing by the Party to be bound by the waiver. A Party's failure or delay in exercising any right under this Agreement will not operate as a waiver of that right. A single or partial exercise of any right will not preclude a Party from any other or further exercise of that right or the exercise of any other right.

9.5 **Expenses.** Except as otherwise expressly provided in this Agreement, whether or not the transactions contemplated by this Agreement are consummated, each Party shall bear its own costs and expenses (including the fees and expenses of its counsel, advisors, accountants and other professionals) incurred in connection with the negotiation, execution and Closing of this Agreement and the Transactions.

9.6 **Assignment.**

(a) This Agreement becomes effective only when executed by Sellers and Buyer. After that time, it will be binding upon and inure to the benefit of Sellers, Buyer and their respective legal representatives, successors and permitted assigns. Any transferee of any Purchased Asset or any interest therein shall be a creditworthy entity and shall agree to assume all obligations under this Agreement and the Ancillary Agreements.

(b) Neither this Agreement nor any of the rights or obligations under this Agreement may be assigned or transferred, in whole or in part, by any Party without the prior written consent of the other Party; *provided*, *however*, that (i) any Seller may transfer or assign such rights and obligations under this Agreement to a liquidating trust or similar vehicle established under the Plan or under any other chapter 11 plan confirmed in the Chapter 11 Cases, and such liquidating trust or similar vehicle may transfer, assign and sell its right to receive proceeds of the Purchase Price, and (ii) Buyer may, without the consent of Sellers, assign this Agreement, in whole or in part, to (a) one or more of its Affiliates or (b) any financing source or lender to Buyer or any of its Affiliates for collateral security purposes in connection with such financing; *provided*, *further*, that in no event will any such assignment limit or release Buyer from the performance of any of its obligations or any liability hereunder.

9.7 **Amendment.** This Agreement may only be amended, supplemented or otherwise modified by written agreement signed by Buyer and Sellers. Sellers and the Seller Board may not

take or authorize any such actions contemplated by this Section 9.7 without the prior approval of the Special Committee.

9.8 **Severability.** Wherever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law. Any term or provision of this Agreement that is invalid or unenforceable in any situation will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation. In the event that any clause, term, or condition of this Agreement is held to be invalid or contrary to Law: (a) this Agreement will remain in full force and effect as to all other clauses, terms, and conditions; (b) the subject clause, term, or condition will be revised to the minimum extent necessary to render the modified provision valid, legal and enforceable; and (c) the remaining provisions of this Agreement will be amended to the minimum extent necessary so as to render this Agreement as a whole most nearly consistent with the intentions of the Parties in light of the modification or removal of the invalid or illegal provision.

9.9 **Equitable Relief.**

(a) The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, including, but not limited to, any breach of Section 4.4. It is accordingly agreed that a Party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement. Each Party hereby waives: (i) any requirement that the other Party post a bond or other security as a condition for obtaining any such relief, and (ii) any defenses in any action for specific performance, including the defense that a remedy at law would be adequate.

(b) Each Party hereby agrees not to raise any objections to the availability of equitable remedies to the extent provided for herein, and the Parties further agree that nothing set forth in this Section 9.9 shall require any Party hereto to institute any proceeding for (or limit any Party's right to institute any proceeding for) specific performance under this Section 9.9 prior to or as a condition to exercising any termination right under this Agreement, nor shall the commencement of any legal action or legal proceeding pursuant to this Section 9.9 or anything set forth in this Section 9.9 restrict or limit any Party's right to terminate this Agreement in accordance with the terms hereof.

9.10 **No Liability.** No past, present or future director, officer, manager, employee, incorporator, member, partner or equityholder or other Affiliate of (a) any Seller (other than such Seller in its capacity as such) or (b) Buyer (other than Buyer in its capacity as such), in each case, shall have any Liability for any obligations or Liabilities of Sellers or Buyer, as applicable, under this Agreement or any Ancillary Agreement or other agreement, document or instrument entered into in connection with this Agreement, or for any Claim based on, in respect of, or by reason of, the Transactions. Any Claim or cause of action based upon, arising out of, or related to this Agreement or any Ancillary Agreement or other agreement, document or instrument contemplated hereby may only be brought against Persons that are expressly named as parties hereto or thereto, and then only with respect to the specific obligations set forth herein or therein. Other than the

Parties, no other Person shall have any Liability or obligation for any of the representations, warranties, covenants, agreements, obligations or Liabilities of any Party under this Agreement or the Ancillary Agreements or other agreements, documents or instruments contemplated hereby, or of or for any Litigation based on, in respect of, or by reason of, the Transactions (including the breach, termination or failure to consummate the Transactions), in each case whether based on contract, tort, fraud, strict liability, other Law or otherwise and whether by piercing the corporate veil, by a Claim by or on behalf of a Party or another Person or otherwise. For the avoidance of doubt, this Section 9.10 does not release or otherwise waive any Claims, demands or causes of action against any Seller or any Affiliate of any Seller, or against Buyer or any Affiliate of Buyer, except as expressly set forth in this Section 9.10.

9.11 **English Language.** This Agreement shall be written and executed in, and all other communications under or in connection with this Agreement shall be in, the English language. Any translation into any other language shall not be an official version thereof, and in the event of any conflict in interpretation between the English version and such translation, the English version shall control.

9.12 **Bulk Sales Statutes.** Buyer hereby waives compliance by Sellers with the requirements and provisions of any applicable bulk sales or bulk transfer Laws or similar Laws (including any Laws requiring notice to, or a Tax clearance certificate from, any Taxing Authority in connection with the sale of assets) in any jurisdiction that may otherwise apply in connection with the Transactions, and Buyer acknowledges that the Purchased Assets are transferred free and clear of any bulk-transfer claims pursuant to the Sale Order. Any Liabilities (including Taxes) arising out of any failure to comply with any such Laws shall be Assumed Liabilities.

9.13 **Counterparts.** This Agreement may be executed in any number of counterparts, each of which is deemed to be an original, and such counterparts together constitute one and the same instrument. Transmission of an executed signature page by email or other electronic means is as effective as a manually executed counterpart of this Agreement.

9.14 **Entire Agreement.** This Agreement, together with the Schedules, Exhibits and Annexes expressly contemplated hereby and attached hereto, the Seller Disclosure Schedules, the Ancillary Agreements and the other agreements, certificates and documents delivered in connection herewith or therewith or otherwise in connection with the Transactions, contains the entire agreement among the Parties with respect to the Transactions and supersedes all prior agreements, understandings, promises and representations, whether written or oral, among the Parties with respect to the subject matter hereof and thereof.

9.15 **Conflicts; Privileges.**

(a) Acknowledgement of Representation. It is acknowledged by each Party that Sellers have retained Mayer Brown LLP ("Mayer Brown") to act as their counsel in connection with this Agreement, the Ancillary Agreements, the Chapter 11 Cases, the DIP Facility, the Prepetition Credit Facility and the Transactions (the "Current Representation"), and that no other Party has the status of a client of Mayer Brown for conflict-of-interest or other purposes as a result thereof.

(b) Affirmation of Representation. Buyer agrees that before and following the Closing, Mayer Brown may represent any Seller or any successor or liquidating trust of any Seller (any such Person, a "Designated Person") in any matter involving or arising from the Current Representation, including interpretation or application of this Agreement or the Ancillary Agreements, even if the interests of the Designated Person are directly adverse to Buyer, its Affiliates or any of their financing sources.

(c) Waiver of Conflict. Buyer hereby waives and agrees not to assert (i) any claim that Mayer Brown has a conflict of interest in any representation described in Section 9.15(b), (ii) any confidentiality obligation with respect to any communication between Mayer Brown and any Designated Person occurring during or after the Current Representation, or (iii) any disqualification, privilege or conflict objection based on Mayer Brown's representation of any Designated Person in any dispute with Buyer or its Affiliates.

(d) Retention of Privilege. Except with regard to any privilege associated with a Seller Claim relating exclusively to Purchased Assets, all attorney-client privilege and other evidentiary privilege relating to communications between Mayer Brown and any Designated Person or their Representatives concerning the Current Representation belongs exclusively to Sellers, their successors or any liquidating trust and shall not pass to or be claimed by Buyer, its Affiliates, Representatives or financing sources. Buyer shall not review, use or seek to compel disclosure of those communications without Sellers' prior written consent.

(e) Third-Party Beneficiary. Mayer Brown and its partners and employees are intended third-party beneficiaries of this Section 9.15, which shall survive the Closing, termination of this Agreement, the closing and dissolution of the Chapter 11 Cases and any assignment to a liquidating trust.

9.16 **Non-Business Day.** If the final date of any period provided in this Agreement or any of the Ancillary Agreements for the performance of an obligation or for the taking of any action falls on a day that is not a Business Day, then the end of such period will be automatically deemed extended to the next Business Day.

[*Remainder of page left intentionally blank. Signature page follows.*]

IN WITNESS WHEREOF, and intending to be legally bound, the undersigned have caused this ASSET PURCHASE AGREEMENT to be executed as of the date hereof.

**ACM**:

AMERICA'S CAR-MART, INC.

DocuSigned by:

By: Douglas Campbell

D5419610F4D64E8...

Name: Douglas Campbell

Title: Chief Executive Officer and President

**ADDITIONAL SELLERS**:

AMERICA'S CAR MART, INC.

DocuSigned by:
By: Douglas Campbell
D5419610F4D64E8...
Name: Douglas Campbell
Title: President and Assistant Secretary

COLONIAL AUTO FINANCE, INC.

DocuSigned by:
By: Douglas Campbell
D5419610F4D64E8...
Name: Douglas Campbell
Title: President and Assistant Secretary

TEXAS CAR-MART, INC.

DocuSigned by:
By: Douglas Campbell
D5419610F4D64E8...
Name: Douglas Campbell
Title: Authorized Signatory

AUTO FINANCE INVESTORS, INC.

DocuSigned by:
By: Douglas Campbell
D5419610F4D64E8...
Name: Douglas Campbell
Title: Authorized Signatory

COLONIAL UNDERWRITING, INC.

DocuSigned by:
By: Douglas Campbell
D5419610F4D64E8...
Name: Douglas Campbell
Title: President and Assistant Secretary

**BUYER**:

CARDINAL FINANCE LLC

By: Peter R. Hennessy
Name: Peter Hennessy
Title: Principal

ACM-AR INC.

By: Peter R. Hennessy
Name: Peter Hennessy
Title: Principal

ACM FINANCE INC.

By: Peter R. Hennessy
Name: Peter Hennessy
Title: Principal

CARDINAL ASSET HOLDINGS LLC

By: Peter R. Hennessy
Name: Peter Hennessy
Title: Principal

CLAYPOOL HOLDINGS, LLC

By: Peter R. Hennessy
Name: Peter Hennessy
Title: Principal

**EXHIBIT A**

FORM OF BENEFITS ASSIGNMENT AND ASSUMPTION AGREEMENT

**AGREED FORM**

# BENEFITS ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BENEFITS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made as of [●], 202[●] by and among AMERICA'S CAR-MART, INC., a Texas corporation ("ACM"), the Additional Sellers (as defined in the Purchase Agreement (as defined below)) (together with ACM, collectively, "Sellers" and each, a "Seller"), Cardinal Finance LLC, an Arkansas limited liability company, ACM-AR Inc., an Arkansas corporation, ACM Finance Inc., an Arkansas corporation, Claypool Holdings, LLC, a Georgia limited liability company (the "Buyer Escrow Party"), and Cardinal Asset Holdings LLC, a [●] limited liability company (all of the Persons set forth in this clause (iii), collectively, and together with their respective permitted successors, designees and assigns, "Buyer") . Each Seller and Buyer may be referred to herein individually as a "Party" and collectively as the "Parties." All capitalized terms used herein will have the respective meanings given to such terms in that certain Asset Purchase Agreement, dated as of November 23, 2026, by and among Sellers and Buyer (as amended or restated from time to time in accordance with its terms, the "Purchase Agreement"), unless otherwise expressly defined herein.

## RECITALS

WHEREAS, Sellers or one or more of their Affiliates sponsor, maintain, contribute to or participate in the Assumed Benefit Plans (as defined in the Purchase Agreement), which Assumed Benefit Plans are set forth on Schedule A (each, an "Assumed Benefit Plan" and collectively, the "Assumed Benefit Plans");

WHEREAS, pursuant to the Purchase Agreement and the Sale Order, and subject to the terms and conditions set forth therein, Buyer has agreed to purchase and accept the Assumed Benefit Plans and the rights and assets under or relating to the Assumed Benefit Plans, including all trusts, insurance contracts, administrative services, recordkeeping and similar Contracts, and all assets held in any trust or funding vehicle relating thereto, and to assume and agree to pay, perform and discharge when due all Liabilities arising under the Assumed Benefit Plans, in each case as provided in Sections 2.1(a)(xiii) and 2.2(a)(vi) of the Purchase Agreement;

WHEREAS, in connection with the Transactions, Buyer (in such capacity, the "Plan Sponsor") has agreed to assume sponsorship of each Assumed Benefit Plan, and Sellers have consented to such assumption, to the substitution of the Plan Sponsor for the applicable Seller under each Assumed Benefit Plan and to the continuation of each Assumed Benefit Plan by the Plan Sponsor following the Closing; and

WHEREAS, pursuant to the Purchase Agreement, the Parties are entering into this Agreement to evidence the assignment of the Assumed Benefit Plans to, and the assumption of the Assumed Benefit Plans by, the Plan Sponsor.

NOW, THEREFORE, in consideration of the mutual benefits to be derived from this Agreement, the representations, warranties, conditions, agreements and promises contained in the Purchase Agreement and herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows, in each case effective as of, and conditioned upon, the Closing:

1. Assignment; Seller Consent. Effective as of the Closing and subject to any requisite consents and approvals (including, without limitation, third-party consents described in Section 7 (Third-Party Consents) below and Bankruptcy Court approvals), each Seller hereby assigns, transfers, conveys and delivers to the Plan Sponsor all of its right, title and interest in, to and under each Assumed Benefit Plan, together with all trust agreements, insurance policies and contracts, administrative services agreements, recordkeeping agreements, investment management agreements and all other Contracts relating thereto (collectively, the "Related Contracts"), and all assets held in any trust or other funding vehicle relating thereto, in each case, subject only to the terms and conditions set forth in the Purchase Agreement and the Sale Order. To the extent necessary, each Seller hereby consents to (a) the Plan Sponsor's adoption, sponsorship and continuation of each Assumed Benefit Plan, (b) the Plan Sponsor's assumption of all rights, powers, duties, obligations, responsibilities and Liabilities of such Seller under and with respect to each Assumed Benefit Plan and the Related Contracts, and (c) the substitution of the Plan Sponsor for such Seller under each Assumed Benefit Plan and the Related Contracts, including as employer, plan sponsor, plan administrator and named fiduciary, as applicable.

2. Assumption. Effective as of the Closing and subject to any requisite consents and approvals (including, without limitation, third-party consents described in Section 7 (Third-Party Consents) below and Bankruptcy Court approvals), the Plan Sponsor hereby adopts and assumes sponsorship of each Assumed Benefit Plan, assumes all rights, powers, duties, obligations, Liabilities and responsibilities of Sellers and their Affiliates under and with respect to each Assumed Benefit Plan and the Related Contracts, and is hereby substituted for the applicable Seller under each Assumed Benefit Plan and the Related Contracts, including as employer, plan sponsor, plan administrator and named fiduciary, as applicable. Without limiting the foregoing, the Plan Sponsor hereby assumes and agrees to pay, perform and discharge when due all Assumed Employee Liabilities.

3. Participating Employers. Effective as of the Closing and subject to any requisite consents and approvals (including, without limitation, third-party consents described in Section 7 (Third-Party Consents) below and Bankruptcy Court approvals), each Seller and each Affiliate of a Seller that is a participating employer in any Assumed Benefit Plan shall cease to be a participating employer therein, and Buyer and each Affiliate of Buyer that employs Transferred Employees shall be substituted as a participating employer in such Assumed Benefit Plan, in each case without any termination or discontinuance of such Assumed Benefit Plan.

4. No Termination; Continued Participation. None of the assignment, adoption, assumption or continuation of any Assumed Benefit Plan by the Plan Sponsor, or the substitution of the Plan Sponsor for any Seller thereunder, shall constitute a termination or discontinuance of such Assumed Benefit Plan. Each individual who is a participant in, or a beneficiary or alternate payee under, any Assumed Benefit Plan immediately prior to the Closing (including any former employee, any Business Employee who does not become a Transferred Employee and any individual receiving or eligible to elect continuation coverage under COBRA) shall continue as a participant, beneficiary or alternate payee therein, subject to the terms and conditions of such Assumed Benefit Plan, and no break or interruption in employment, service or plan participation shall be deemed to have occurred solely by reason of the transactions contemplated by this Agreement.

5. Elections Remain in Effect. To the extent applicable, all elections, beneficiary designations, deferral and contribution elections, investment directions, participant loans, qualified domestic relations orders and qualified medical child support orders in effect under any Assumed Benefit Plan as of the Closing shall remain in effect until modified, revoked or satisfied in accordance with the terms of such Assumed Benefit Plan and applicable Law.

6. Third-Party Consents. To the extent that the assignment of any Related Contract requires the consent of any insurer, trustee, service provider or other Third Party that has not been obtained as of the Closing, Sellers shall use commercially reasonable efforts to take the actions Buyer reasonably determines necessary or appropriate, at Seller's cost and expense, to provide (or cause to be provided) for the provision of benefits under the Assumed Benefit Plans in a manner substantially similar to that which would have applied had the consent been obtained as of the Closing (which may include entering into a transition services agreement on terms mutually acceptable to Buyer and Sellers) and to obtain such consent as promptly as reasonably practicable following the Closing. The Sellers will indemnify and hold harmless the Buyer and its Affiliates from any and all losses, penalties, damages and other Liabilities incurred by or otherwise assessed or levied on Buyer or any of its Affiliates as a result of the foregoing (including, without limitation, the failure to obtain such consent on or prior to the Closing).

7. Amendment of Assumed Benefit Plans. To the extent necessary and subject to any requisite consents and approvals (including, without limitation, third-party consents described in Section 7 (Third-Party Consents) below and Bankruptcy Court approvals), each Assumed Benefit Plan and Related Contract is hereby amended to conform to the provisions of this Agreement, and the Plan Sponsor shall adopt such amendments and take such other actions as may be necessary to reflect its sponsorship of each Assumed Benefit Plan. Except as expressly set forth in this Section 8, this Agreement shall not constitute an amendment, modification or waiver of any provision of the Assumed Benefit Plans and the Related Contracts. Except as expressly modified by this Agreement, each Assumed Benefit Plan and Related Contract shall continue in full force and effect. Upon the effectiveness of the assignment of an Assumed Benefit Plan and each Related Contract associated therewith pursuant to this Agreement, (a) each reference in such Assumed Benefit Plan and each Related Contract to "this Agreement" or the words "hereunder," "hereof," "herein" or words of similar effect referring to such Assumed Benefit Plan or such Related Contract shall mean and be a reference to such Assumed Benefit Plan or such Related Contract as amended by this Agreement and (b) a reference to each Assumed Benefit Plan and each Related Contract in any other instrument or document shall be deemed a reference to such Assumed Benefit Plan or such Related Contract as amended by this Agreement.

8. Further Assurances. At any time and from time to time following the Closing, each Party shall execute and deliver such further instruments and take such other actions as any other Party may reasonably request to evidence and effectuate the transactions contemplated by this Agreement, including any filings with or notices to any Governmental Authority, insurer, trustee or service provider.

9. Purchase Agreement. This Agreement is executed and delivered in connection with the Purchase Agreement, and is subject to every agreement, representation, warranty, indemnity, covenant and provision contained in the Purchase Agreement. In the event of any ambiguity, conflict or inconsistency between the terms of this Agreement and the terms of the Purchase Agreement, the terms of the Purchase Agreement will govern and control. The Parties

acknowledge and agree that all agreements, representations, warranties, indemnities, covenants and provisions contained in the Purchase Agreement are not superseded hereby but will remain in full force and effect to the extent provided therein.

10. Other Provisions Incorporated by Reference. Sections 1.2 (Construction), 9.1 (Governing Law, Jurisdiction, Venue and Service), 9.2 (Notices), 9.3 (No Benefit to Third Parties), 9.4 (Waiver), 9.6 (Assignment), 9.7 (Amendment), 9.8 (Severability), 9.10 (No Liability), 9.11 (English Language), 9.13 (Counterparts), 9.14 (Entire Agreement) and 9.16 (Non-Business Day) of the Purchase Agreement are incorporated by reference into this Agreement, in each case mutatis mutandis, and each such Section so incorporated shall be fully enforceable against Sellers and Buyer as if fully restated in this Agreement. Without limiting Section 9.3 of the Purchase Agreement, nothing in this Agreement shall confer upon any participant or beneficiary in any Assumed Benefit Plan any rights other than those provided under the terms of such Assumed Benefit Plan.

*[Remainder of page left intentionally blank. Signature page follows.]*

IN WITNESS WHEREOF, and intending to be legally bound, the undersigned have caused this BENEFITS ASSIGNMENT AND ASSUMPTION AGREEMENT to be executed as of the date hereof.

**ACM**:

AMERICA'S CAR-MART, INC.

By:__________________________________
Name:
Title:

**ADDITIONAL SELLERS**:

AMERICA'S CAR MART, INC.

By:___________________________________
Name:
Title:

COLONIAL AUTO FINANCE, INC.

By:___________________________________
Name:
Title:

TEXAS CAR-MART, INC.

By:___________________________________
Name:
Title:

AUTO FINANCE INVESTORS, INC.

By:___________________________________
Name:
Title:

COLONIAL UNDERWRITING, INC.

By:___________________________________
Name:
Title:

**BUYER:**

CARDINAL FINANCE LLC

By:________________________________
Name: Peter Hennessy
Title: Principal

ACM-AR INC.

By:________________________________
Name: Peter Hennessy
Title: Principal

ACM FINANCE INC.

By:________________________________
Name: Peter Hennessy
Title: Principal

CARDINAL ASSET HOLDINGS LLC

By:________________________________
Name: Peter Hennessy
Title: Principal

CLAYPOOL HOLDINGS, LLC

By:________________________________
Name:
Title:

# SCHEDULE A

## Assumed Benefit Plans

1. America's Car-Mart, Inc. 401(k) Plan, effective October 1, 2024.
2. Colonial Auto Finance, Inc. 401(k) Plan, effective October 1, 2024.
3. America's Car Mart, Inc. Welfare Benefit Plan maintained by the operating subsidiary.
   a. America's Car Mart, Inc. Voluntary Life Plan.
   b. America's Car Mart, Inc. Accidental Death & Dismemberment Plan.
   c. America's Car Mart, Inc. Short Term Disability Plan.
   d. America's Car Mart, Inc. Long Term Disability Plan.
   e. America's Car Mart, Inc. Critical Illness Plan.
   f. America's Car Mart, Inc. Hospital Indemnity Plan.
   g. America's Car Mart, Inc. Medical Plan.
   h. America's Car Mart, Inc. Group Life Plan.
   i. America's Car Mart, Inc. Employee Assistance Program Plan.
   j. America's Car Mart, Inc. Dental Plan.
   k. America's Car Mart, Inc. Vision Plan.
   l. America's Car Mart, Inc. Accident Plan.
   m. Basic Life AD&D.
   n. Teladoc Health and Chronic Condition Management.
   o. ExecSelect executive health and wellness program.
   p. Samaritan Fund.
4. Health Savings Account.

**EXHIBIT B**

FORM OF BIDDING PROCEDURES ORDER

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| America's Car-Mart, Inc., *et al.*,[1] | ) | Case No. [XX-XXXXX] (___) |
| Debtors. | ) | Joint Administration Requested |

**ORDER (I) APPROVING CERTAIN BIDDING PROCEDURES AND FORM AND MANNER OF NOTICE THEREOF, (II) APPROVING DESIGNATION OF STALKING HORSE BIDDER AND DESIGNATED BACKUP BIDDER AND RELATED BID PROTECTIONS, (III) SCHEDULING AUCTION AND HEARING ON APPROVAL OF SALE OF ALL OR SUBSTANTIALLY ALL OF DEBTORS' ASSETS, (IV) ESTABLISHING CERTAIN ASSUMPTION AND ASSIGNMENT PROCEDURES AND APPROVING FORM AND MANNER OF NOTICE THEREOF, AND (V) GRANTING RELATED RELIEF**

Upon the emergency motion (the "Motion")[2] of the above-captioned debtors and debtors-in-possession (the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), seeking, pursuant to sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, 6004, 6006, 9007, 9008, and 9014, Bankruptcy Local Rules 2002-1 and 9013-1, and section G of the Procedures for Complex Cases in the Southern District of Texas (the "Complex Case Procedures"), entry of an order (this "Order") (a) approving the bidding procedures attached hereto as **Annex 1** (the "Bidding Procedures"), by which the Debtors will

---

1 The Debtors in these Chapter 11 Cases, along with the last four digits of each of the Debtors' tax identification numbers, are: America's Car-Mart, Inc. (1141); Colonial Auto Finance, Inc. (3258); Texas Car-Mart, Inc. (3909); America's Car Mart, Inc. (1606); Colonial Underwriting, Inc. (3159); and Auto Finance Investors, Inc. (1385). The location of Debtor America's Car-Mart, Inc.'s corporate headquarters and the Debtors' service address in these Chapter 11 Cases is 1805 North 2nd Street, Suite 401, Rogers, Arkansas 72756.

2 Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Bidding Procedures, as applicable.

solicit and select the highest or otherwise best offer for one or more sales (each, a "Transaction" and, collectively, the "Sale") of all, substantially all, or any portion of the Debtors' assets (the "Assets"); (b) approving the designation of Claypool Holdings, LLC, Cardinal Finance LLC, ACM-AR Inc., ACM Finance Inc., and Cardinal Asset Holdings LLC (collectively with any affiliates or designees thereof, "Buyer" or the "Stalking Horse Bidder"), as the stalking horse bidder for the Assets under the Asset Purchase Agreement, dated as of November 24, 2026, by and among America's Car-Mart, Inc. ("ACM"), the other Sellers (as defined therein), and the Stalking Horse Bidder (together with all exhibits and schedules thereto, and as the same may be amended, supplemented, or otherwise modified from time to time, the "Stalking Horse APA"), attached to the Motion as **Exhibit A**, subject to higher or otherwise better Qualified Bids in accordance with the Bidding Procedures, and authorizing the Debtors to enter into and perform under the Stalking Horse APA; (c) approving the designation of New ACM HoldCo, LLC, a Delaware limited liability company formed by or on behalf of Silver Point Finance, LLC, in its capacities as the DIP Agent and the Prepetition Agent (collectively with any affiliates or designees thereof, the "Designated Backup Bidder"), on the terms set forth in the Asset Purchase Agreement by and among ACM, the other Sellers, and the Designated Backup Bidder, substantially in the form attached to the Motion as **Exhibit B** (the "Credit Bid APA"), pursuant to which, unless a different Backup Bidder is selected at an Auction, the Designated Backup Bidder is deemed the Backup Bidder and the Designated Backup Bid the Backup Bid, including if no Auction is held, subject to the Credit Bid APA being executed in substantially such form, and authorizing the Debtors to enter into and perform under the Credit Bid APA if the Designated Backup Bidder becomes the Successful Bidder; (d) approving the Break-Up Fee and the Expense Reimbursement (together, the "Bid Protections") payable to the Stalking Horse Bidder on the terms and subject to the

conditions set forth in the Stalking Horse APA and the Bidding Procedures; (e) approving procedures for the assumption and assignment of executory contracts and unexpired leases and the form and manner of notice of proposed Cure Costs (as defined below) (the "Assumption and Assignment Procedures"); (f) scheduling (i) an auction (the "Auction"), if any, in the event that the Debtors receive two or more timely Qualified Bids (including the Stalking Horse Bid) with respect to the same Assets, and (ii) a final hearing (the "Sale Hearing") to approve one or more Transactions; (g) approving the form and manner of notice of (i) the Auction and Sale Hearing, substantially in the form attached hereto as **Annex 2** (the "Sale Notice"), (ii) the Assumption and Assignment Procedures, substantially in the form attached hereto as **Annex 3** (the "Assumption Notice"), and (iii) the identification of the Successful Bidder(s), substantially in the form attached hereto as **Annex 4** (the "Post-Auction Notice" and, together with the Sale Notice and the Assumption Notice, the "Sale Process Notices"); (h) approving the escrow arrangements for the Stalking Horse Deposit, including finding that the Stalking Horse Deposit is not property of the Debtors' estates unless and until released to ACM following a Deposit Retention Termination and that it, when applicable, may be returned to the Stalking Horse Bidder in accordance with the Stalking Horse APA without further order of this Court; and (i) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration and the Sale Declaration; and this Court having reviewed the Motion and conducted a hearing to consider the relief requested therein regarding the Bidding Procedures and related matters (the "Bidding Procedures Hearing"); and this Court having considered the statements of counsel, and the evidence presented at the Bidding Procedures Hearing and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT:**[3]

A. This Court has jurisdiction over this matter and over the property of the Debtors and their bankruptcy estates pursuant to 28 U.S.C. §§ 157(a) and 1334 and the Order of Reference to Bankruptcy Judges from the United States District Court for the Southern District of Texas, General Order 2012-6, entered May 24, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), (N), and (O), and this Court may enter a final order consistent with Article III of the United States Constitution. The statutory predicates for the relief sought herein are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, 6004, 6006, 9007, 9008, and 9014, and Bankruptcy Local Rules 2002-1 and 9013-1. Venue of the Chapter 11 Cases and the Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B. The Debtors have demonstrated a compelling and sound business justification for, and the best interests of their estates will be served by, this Court granting the Motion to the extent provided in this Order, including (a) approving the Bidding Procedures, attached hereto as **Annex 1**; (b) approving the designation of Buyer as the Stalking Horse Bidder and the Debtors' entry into and performance under the Stalking Horse APA; (c) approving the designation of the Designated Backup Bidder; (d) approving the Bid Protections; (e) establishing the Assumption and Assignment Procedures; (f) scheduling the Auction (if any) and the Sale Hearing; and (g) approving the form and manner of the Sale Process Notices, attached hereto respectively as **Annex 2**, **Annex 3**, and **Annex 4**.

---

3 The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. All findings of fact and conclusions of law announced by this Court at the Bidding Procedures Hearing are hereby incorporated herein to the extent not inconsistent herewith.

C. Good and sufficient notice of the relief sought in the Motion has been given, and no further notice is required except as set forth herein with respect to the Auction and the Sale Hearing. Subject to the immediately preceding sentence, a reasonable opportunity to object or to be heard regarding the relief requested in the Motion was afforded to all interested persons and entities.

D. In accordance with Bankruptcy Rule 6004, the Debtors have properly filed and noticed the Motion. The issuance of this Order as of the date hereof, including approval of the Bidding Procedures, is supported by evidence of compelling business justifications and other circumstances demonstrating that the relief granted by this Order is necessary to maximize value for the Debtors and their estates. It is necessary to consider the relief granted herein on an emergency basis to avoid immediate and irreparable harm to the Debtors and their estates.

E. The Sale Notice, the Assumption Notice, and the Post-Auction Notice, substantially in the forms attached hereto as Annex 2, Annex 3, and Annex 4, respectively, are appropriate, sufficient, and reasonably calculated to provide all interested parties with timely and proper notice of the Sale (including the sale of the Assets free and clear of all Encumbrances), any Transaction, the Bidding Procedures, the Auction, the Sale Hearing, the potential assumption and assignment of the Assigned Contracts and related Cure Costs, and the identity of the Successful Bidder(s) and Backup Bidder(s), and no other or further notice shall be required.

F. Good and sufficient business reasons exist for this Court to authorize the Debtors to designate Buyer as the Stalking Horse Bidder and to enter into and perform under the Stalking Horse APA, which reflects a sound exercise of the Debtors' business judgment. The Stalking Horse APA was negotiated at arm's length and in good faith. The Bid Protections (a) are fair and reasonable and supported by a sound business justification, (b) were a material inducement for,

and a condition of, the Stalking Horse Bidder's entry into the Stalking Horse APA, (c) are actual and necessary costs and expenses of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, and (d) are reasonably designed to establish a floor for further bidding and to promote higher or otherwise better bids for the Assets. The escrow arrangements for the Stalking Horse Deposit are fair and reasonable.

G. Good and sufficient business reasons exist for this Court to approve the designation of the Designated Backup Bidder on the terms set forth in the Credit Bid APA, which reflects a sound exercise of the Debtors' business judgment. The Designated Backup Bid provides closing certainty and protects the Debtors' estates against the risk of a default by the Stalking Horse Bidder, comes at no cost to the Debtors' estates because the Designated Backup Bidder is not entitled to any break-up fee, expense reimbursement, or other bid protection, and will not chill bidding.

H. The Bidding Procedures are fair, reasonable, and appropriate under the circumstances and are reasonably designed to maximize the value to be achieved for the Assets.

I. The Assumption and Assignment Procedures provided for herein and the Assumption Notice are reasonable and appropriate and consistent with the provisions of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006. The Assumption and Assignment Procedures and the Assumption Notice have been tailored to provide an adequate opportunity for all Counterparties (as defined below) to assert any objections to the assumption and assignment of the Assigned Contracts and related Cure Costs.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. The Motion is GRANTED as set forth herein.

2. Any objections to the entry of this Order or to the relief provided herein, to the extent not withdrawn, waived, resolved, or settled are overruled.

**I. Important Dates and Deadlines.**

3. The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

| ***Transaction Milestones*** | |
|---|---|
| **Date and Time**<br><br>(all in prevailing Central Time), unless otherwise noted | **Event or Deadline** |
| Three (3) business days after the Petition Date, at 11:59 p.m. (or, with respect to any executory contract or unexpired lease designated for assumption and assignment after the Petition Date, three (3) business days after such designation) | Assumption Notice Deadline |
| December 14, 2026, at 5:00 p.m. | Sale Objection Deadline |
| 5:00 p.m. on the date that is 14 days after service of the Assumption Notice (with objections to any Supplemental Assumption Notice due 10 business days after the filing thereof) | Contract Objection Deadline |
| The day that is one (1) business day prior to the Sale Hearing, at 11:59 p.m. | Supplemental Assumption Notice Deadline |
| December 17, 2026, at 5:00 p.m. | Bid Deadline |
| December 22, 2026, at 10:00 a.m. (prevailing Eastern Time) / 9:00 a.m. (prevailing Central Time) | Auction (if applicable) |
| 24 hours after the conclusion of the Auction | Post-Auction Notice Deadline |
| 24 hours after the conclusion of the Auction | Successful Bidder Selection Deadline |
| The earlier of (a) 48 hours after the Post-Auction Notice is filed with this Court and (b) the Sale Hearing | Post-Auction Objection Deadline |
| No later than 35 days after the Petition Date, at a time to be announced, which may be held together with the Confirmation Hearing | Sale Hearing |
| The earlier of (a) two (2) business days prior to the closing of the Transaction and (b) two (2) business days prior to the date on which the Bankruptcy Code or this Court would otherwise require a determination to assume or reject the applicable executory contract or unexpired lease, at 11:59 p.m. (subject to the Designation Deadlines with respect to the Stalking Horse Bid and Real Property Leases set forth herein) | Final Assumption Notice Deadline |
| 5:00 p.m. on the date that is 14 days after service of the applicable Final Assumption Notice | Final Contract Objection Deadline |

4. ***The failure timely to file an objection in accordance with this Order shall forever bar, as applicable, the assertion of any objection to the Motion, entry of any Sale Order(s), and/or consummation of any Transaction, including the assumption and assignment of Assigned Contracts to the Stalking Horse Bidder, the Designated Backup Bidder, or any other Successful Bidder or Backup Bidder pursuant to the Stalking Horse APA, the Credit Bid APA, or any Purchase Agreement, and shall be deemed to constitute any such party's consent to entry of the applicable order and consummation of the Transaction(s) and all other transactions related thereto.***

5. The Debtors reserve the right, and are authorized to, modify the above timeline and the Bidding Procedures in accordance with the Bidding Procedures, including by filing a notice on the docket of the Chapter 11 Cases; *provided* that no such modification shall impair the Stalking Horse Bidder's rights to the Bid Protections or otherwise modify the Bidding Procedures in a manner inconsistent with the Stalking Horse APA without the Stalking Horse Bidder's consent (not to be unreasonably withheld, conditioned, or delayed).

**II. Bidding Procedures.**

6. The Bidding Procedures, attached as **Annex 1** to this Order, are hereby approved in their entirety, incorporated by reference as if fully set forth herein, and shall govern all Bids and bidding procedures relating to the Assets. The Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance therewith. The failure specifically to include or reference a particular provision of the Bidding Procedures in this Order shall not diminish or impair the effectiveness of such provision.

7. The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate, and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties-in-interest.

8. Any and all objections to the Sale of the Assets (each, a "Sale Objection"), including with respect to the identity of the Stalking Horse Bidder and adequate assurance of future performance by the Stalking Horse Bidder, must be filed and served on the Objection Recipients (as defined below) by **December 14, 2026, at 5:00 p.m. (prevailing Central Time)** (the "Sale Objection Deadline"); *provided* that objections solely related to the identity of, and adequate assurance of future performance by (a) the Successful Bidder (other than the Stalking Horse Bidder) shall be filed by the Post-Auction Objection Deadline and (b) the Designated Backup Bidder, solely if and when the Designated Backup Bidder becomes the Successful Bidder, shall be filed by the Backup Bidder Objection Deadline (as defined below).

9. The Bid Deadline shall be **December 17, 2026, at 5:00 p.m. (prevailing Central Time)**, unless extended by the Debtors pursuant to the Bidding Procedures. Any disputes or objections, if any, to the selection of Qualified Bid(s), Successful Bid(s), or Backup Bid(s) shall be resolved by this Court at the Sale Hearing.

10. The Debtors are authorized to conduct an Auction in accordance with the Bidding Procedures. If two or more Qualified Bids are received by the Bid Deadline and the Debtors, in their business judgment and after consultation with the Consultation Parties, elect to conduct the Auction, the Auction shall take place on **December 22, 2026, at 10:00 a.m. (prevailing Eastern Time) / 9:00 a.m. (prevailing Central Time),** at the offices of proposed counsel to the Debtors, Mayer Brown LLP, 1221 Avenue of the Americas, New York, New York 10020, or virtually, or at such other place and time as the Debtors shall notify all Qualified Bidders, the Consultation Parties, and all other parties entitled to attend the Auction. If no Qualified Bid other than the Stalking Horse Bid and the Designated Backup Bid is received by the Bid Deadline with respect to the Assets subject to the Stalking Horse APA, the Auction shall not occur with respect to such

Assets, the Stalking Horse Bidder shall be deemed the Successful Bidder, the Designated Backup Bid shall remain the Backup Bid, and the Debtors shall seek approval of the Stalking Horse APA and the Transactions contemplated thereby (and of the Designated Backup Bid as the Backup Bid) at the Sale Hearing.

11. No later than 24 hours after the conclusion of the Auction, if any, (the "Post-Auction Notice Deadline"), the Debtors shall file the Post-Auction Notice, substantially in the form attached hereto as **Annex 4**, identifying the Successful Bidder(s) and Backup Bidder(s), post it on the Case Website, and serve it on the Counterparties to the Assigned Contracts by email, if available, or otherwise by overnight delivery. The Post-Auction Notice is approved. Promptly following the conclusion of the Auction, if any, and in any event no later than 24 hours after the conclusion of the Auction (the "Successful Bidder Selection Deadline"), the Debtors shall announce the Successful Bid(s) and Successful Bidder(s) and file with this Court notice thereof.

12. Objections related to the identity of the Successful Bidder (other than the Stalking Horse Bidder and the Designated Backup Bidder) and adequate assurance of future performance by the Successful Bidder (other than the Stalking Horse Bidder and the Designated Backup Bidder), including Post-Auction Contract Objections, must be filed and served on the Objection Recipients and counsel to the Successful Bidder(s), if known, no later than the earlier of (a) 48 hours after the filing of the Post-Auction Notice and (b) the Sale Hearing (the "Post-Auction Objection Deadline"). If the Designated Backup Bidder becomes the Successful Bidder, whether at the Auction or because a Successful Bidder fails to consummate the relevant Transaction, the Debtors shall promptly file with this Court, post on the Case Website, and serve on the Counterparties to the Assigned Contracts a notice thereof (a "Backup Bidder Notice"), and objections solely related to the identity of, and adequate assurance of future performance by, the

Designated Backup Bidder must be filed and served on the Objection Recipients no later than (x) the earlier of 48 hours after the filing of the Backup Bidder Notice and the Sale Hearing or (y) if the Backup Bidder Notice is filed after the Sale Hearing, 7 days after the filing of the Backup Bidder Notice (the "Backup Bidder Objection Deadline"). Any objection to a Successful Bidder's proposed adequate assurance of future performance will be resolved at the Sale Hearing or at such other date and time as may be fixed by this Court.

13. The Sale Hearing shall be held at a time to be announced, before this Court, or as soon thereafter as counsel and interested parties may be heard, at which time this Court will consider approval of the Sale to the Successful Bid(s) and the Backup Bid(s) (including, as applicable, the Designated Backup Bid) and the entry of the Sale Order(s). The Debtors may adjourn the Sale Hearing from time to time without further notice to creditors or other parties-in-interest other than by announcement of the adjournment at the Sale Hearing or in a notice or agenda filed with this Court. If a Successful Bidder fails to consummate the relevant Transaction because of a breach or failure on its part, the Debtors may, in accordance with the Bidding Procedures, designate the applicable Backup Bid as the new Successful Bid and consummate the Transaction with the Backup Bidder.

## III. Stalking Horse Bidder, Designated Backup Bidder, and Bid Protections.

14. Buyer is hereby designated as the Stalking Horse Bidder for the Purchased Assets (as defined in the Stalking Horse APA), subject to higher or otherwise better Qualified Bids in accordance with the Bidding Procedures. The Debtors are authorized to enter into and perform under the Stalking Horse APA, subject to entry of the Sale Order with respect to consummation of the Transactions contemplated thereby. The Stalking Horse Bidder shall be deemed a Qualified Bidder, and the Stalking Horse Bid shall be deemed a Qualified Bid, at all times and for all purposes under the Bidding Procedures (including with respect to submission of any Overbid) with

respect to the Assets subject to the Stalking Horse APA. The Stalking Horse Bidder shall be entitled, but not obligated, to submit Overbids at the Auction, and, the Stalking Horse Deposit shall be governed solely by the Stalking Horse APA and the Escrow Agreement. The Transactions contemplated by the Stalking Horse APA shall be approved by the Sale Order, which may, at the Debtors' election, be entered as part of an order confirming the Plan, and the Sale Hearing may be held together with the hearing to consider confirmation of the Plan (the "Confirmation Hearing").

15. New ACM HoldCo, LLC is hereby designated as the Designated Backup Bidder on the terms set forth in the Credit Bid APA in substantially the form attached to the Motion as **Exhibit B**, and the Debtors are authorized to enter into and perform under the Credit Bid APA if the Designated Backup Bidder becomes the Successful Bidder, in which case the Credit Bid APA shall serve as the operative purchase agreement for such Transaction. The Designated Backup Bidder may not amend, supplement, or otherwise modify the Credit Bid APA in any manner that is adverse to the Debtors or their estates, or that alters the consideration, conditions to closing, or the Outside Date (as defined in the Credit Bid APA), without the Debtors' prior written consent. The Designated Backup Bidder shall be deemed a Qualified Bidder, and the Designated Backup Bid shall be deemed a Qualified Bid, at all times and for all purposes and, because the Designated Backup Bid is a credit bid, the Designated Backup Bidder shall not be required to submit a Deposit. Unless a different Backup Bidder is selected at the Auction in accordance with the Bidding Procedures, the Designated Backup Bidder shall be deemed the Backup Bidder, and the Designated Backup Bid the Backup Bid, in each case on the terms set forth in the Credit Bid APA, including if no Auction is held. The Designated Backup Bid shall remain open and irrevocable until the earlier of (a) the closing of the Transaction with the Successful Bidder and (b) the Outside Date (as defined in the Credit Bid APA). The Designated Backup Bidder shall not be entitled to any

break-up fee, expense reimbursement, or other bid protection. Consummation of the Designated Backup Bid shall constitute an Alternative Transaction (as defined in the Stalking Horse APA), and to the extent the Bid Protections are payable upon the closing of the Designated Backup Bid, the Designated Backup Bidder shall fund the Bid Protections in cash at such closing.

16. The Bid Protections, consisting of (a) a break-up fee in the amount of $9,000,000 (the "Break-Up Fee") and (b) reimbursement of the Stalking Horse Bidder's reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) incurred in connection with the Stalking Horse APA and the Transactions contemplated thereby, in an amount not to exceed $1,500,000 (the "Expense Reimbursement"), are approved on the terms and subject to the conditions set forth in the Stalking Horse APA and the Bidding Procedures. The Break-Up Fee shall be payable solely if the Stalking Horse APA is terminated under the circumstances described in the Stalking Horse APA (including upon the Debtors' entry into an Alternative Transaction other than in connection with an Auction, if the Stalking Horse Bidder is not selected as the Successful Bidder or the Backup Bidder at the Auction, or upon termination by the Debtors in the exercise of their fiduciary duties) and an Alternative Transaction is consummated within six (6) months after such termination, and the Break-Up Fee shall be paid solely from, and contemporaneously with the Debtors' receipt of, the cash proceeds of such Alternative Transaction. The Expense Reimbursement shall be payable as and when provided in the Stalking Horse APA. The Bid Protections shall not be payable if the Stalking Horse Bidder is in breach of the Stalking Horse APA such that ACM could terminate the Stalking Horse APA, a Deposit Retention Termination has occurred, or the Stalking Horse Bidder has failed to perform its obligations as back-up bidder.

17. The Bid Protections, to the extent payable, shall constitute allowed administrative expense claims against the Debtors' estates under sections 503(b) and 507(a)(2) of the Bankruptcy Code, with priority over any and all other administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code until paid, and shall be payable in accordance with the Stalking Horse APA without further order of this Court. In no event shall the Bid Protections be payable from any proceeds of the DIP Facility, any cash collateral, or any professional fee escrow, and each of the Break-Up Fee and the Expense Reimbursement shall be payable no more than once. The receipt of the Bid Protections (if and when payable) shall be the Stalking Horse Bidder's sole and exclusive remedy against the Debtors in the event the Stalking Horse APA is terminated, and in no event shall the aggregate liability of the Debtors and their estates under or in connection with the Stalking Horse APA or its termination exceed the sum of the Bid Protections (plus return of the Stalking Horse Deposit, if applicable). The Stalking Horse Bidder shall be entitled, in submitting any Overbid at the Auction, to credit the full amount of the Bid Protections against the consideration payable under such Overbid. Any Bid (other than the Stalking Horse Bid) for all or substantially all of the Assets subject to the Stalking Horse APA must satisfy the Initial Minimum Overbid and include cash sufficient to pay the Bid Protections in full at closing.

18. The escrow arrangements for the Stalking Horse Deposit are approved. The Stalking Horse Deposit of $25,000,000 will be held in escrow by the Escrow Agent for the benefit of the Stalking Horse Bidder and shall not constitute property of the Debtors' estates unless and until released to ACM following a Deposit Retention Termination. The Stalking Horse Deposit shall be applied toward the Purchase Price (as defined in the Stalking Horse APA) at closing, released to ACM following a Deposit Retention Termination, or otherwise returned to the Stalking Horse Bidder, in each case in accordance with the Stalking Horse APA and the Escrow Agreement

and without further order of this Court. The Stalking Horse Deposit shall be deposited with the Escrow Agent no later than three (3) business days after the execution of the Stalking Horse APA.

19. Silver Point Finance, LLC, in its capacities as the DIP Agent and the Prepetition Agent, is authorized, pursuant to section 363(k) of the Bankruptcy Code and subject in all respects to the Bankruptcy Code, other applicable law, and the DIP Order, to credit bid, for all or any portion of the Assets, up to the full amount of the DIP Claims and the Prepetition Claims, in each case with respect to the Assets on which the DIP Agent or the Prepetition Agent, as applicable, holds a valid, perfected, and unavoidable lien securing such claims, together in a single Bid, in any combination, and together with cash or other consideration, without making a Deposit, and to submit Overbids (including credit bids of the DIP Claims and the Prepetition Claims) at the Auction; *provided* that (a) any credit bid of the Prepetition Claims shall be subject to any "challenge" rights set forth in the DIP Order; (b) any credit bid for Assets subject to the Stalking Horse APA (other than the Designated Backup Bid in its capacity as a backup bid) must satisfy the Initial Minimum Overbid and include cash consideration sufficient to pay the Bid Protections in full in cash at the closing thereof; (c) no portion of the Bid Protections may be credit bid, offset, or subordinated by the DIP Agent or the Prepetition Agent; and (d) any such credit bid for Assets subject to the Stalking Horse APA shall constitute an Alternative Transaction for all purposes of the Stalking Horse APA.

## IV. Notice Procedures.

20. The Sale Notice, substantially in the form attached hereto as **<u>Annex 2</u>**, is approved.

21. Within five business days after the entry of this Order, the Debtors shall serve the Sale Notice and this Order, including the Bidding Procedures, by email, if available, or otherwise by first-class mail, postage prepaid, upon, to the best knowledge of the Debtors' management: (a) all parties that have (within the six-month period prior to the Petition Date) expressed written

interest in purchasing any of the Assets; (b) all entities known to have asserted any Encumbrance on the Assets; (c) counsel to any Committee; (d) counsel to the DIP Agent and the Designated Backup Bidder; (e) counsel to the Stalking Horse Bidder; and (f) the United States Trustee.

22. In addition, within five business days after the entry of this Order or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice (without this Order or the Bidding Procedures) by email, if available, or otherwise by first-class mail, postage prepaid or, for those parties who have consented to receive notice by the ECF system, by ECF upon (a) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief granted herein; (b) the Office of the United States Attorney for the Southern District of Texas; (c) the Internal Revenue Service; (d) Deutsche Bank National Trust Company, as indenture trustee and paying agent (in such capacities, the "Indenture Trustee"); (e) BNY Mellon Trust of Delaware, as owner trustee (the "Owner Trustee"); (f) all parties entitled to notice pursuant to Bankruptcy Local Rule 2002-1(b); and (g) all known creditors of the Debtors, including their contract and lease counterparties. The Debtors shall publish the Sale Notice, as modified for publication, in a national publication on one occasion substantially contemporaneous with such service or as soon as practicable thereafter and in any additional publications as the Debtors deem appropriate and shall cause the Sale Notice to be posted on the Case Website.

23. Service of the Sale Notice as described above shall be good and sufficient notice of any Transaction with respect to known interested parties, and publication of the Sale Notice as described above shall be good and sufficient notice of any Transaction with respect to all unknown parties.

## V. Assumption and Assignment Procedures.

24. The Assumption and Assignment Procedures, as detailed in the Motion and incorporated herein by reference as if fully set forth in this Order, are approved.

25. The Assumption Notice, substantially in the form attached hereto as **Annex 3**, is approved.

26. On or before the date that is three (3) business days after the Petition Date**, at 11:59 p.m. (prevailing Central Time**) (or, with respect to any executory contract or unexpired lease that is designated for assumption and assignment after the Petition Date, the date that is three (3) business days after such designation**)** (the "Assumption Notice Deadline"), the Debtors shall file with this Court, post on the Case Website, and serve on each counterparty (each, a "Counterparty") to an Assigned Contract the Assumption Notice, which shall include a list of potential Assigned Contracts to be assumed and assigned (the "Assigned Contracts List") and the proposed cure amount, if any, that the Debtors believe is required to be paid to the applicable Counterparty under sections 365(b)(1)(A) and (B) of the Bankruptcy Code for each Assigned Contract (each, a "Cure Cost"). If no Cure Cost is listed for a particular Assigned Contract, the Debtors' asserted Cure Cost for such Assigned Contract shall be deemed to be $0.00. The Assigned Contracts List shall include the Existing Servicing Agreements and the other ABS Transaction Documents (each as defined in the Stalking Horse APA) proposed to be assumed and assigned to the Stalking Horse Bidder, and the Debtors shall serve the Assumption Notice on the Indenture Trustee, the Owner Trustee, and the other transaction parties thereunder. Service of the Assumption Notice as set forth herein shall be good and sufficient notice of the proposed assumption and assignment of the Assigned Contracts, the applicable Cure Costs, and the procedures for objecting thereto.

27. Any objection to a Cure Cost or to the assumption and assignment of an Assigned Contract (other than an objection as to the identity of the Successful Bidder or adequate

assurance of future performance by the Successful Bidder (in each case, other than the Stalking Horse Bidder and the Designated Backup Bidder), which shall be due by the Post-Auction Objection Deadline, or an objection as to the identity of, or adequate assurance of future performance by, the Designated Backup Bidder, which shall be due by the Backup Bidder Objection Deadline) (each, a "Contract Objection") shall: (a) be in writing; (b) comply with the Bankruptcy Rules and Bankruptcy Local Rules; (c) be filed with this Court, together with proof of service, by no later than 5:00 p.m. (prevailing Central Time) on the date that is 14 days after service of the Assumption Notice (the "Contract Objection Deadline"); (d) be served so as to be actually received on or before the Contract Objection Deadline upon the Objection Recipients; and (e) state with specificity the grounds for such objection, including the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the Counterparty believes is required to be paid under sections 365(b)(1)(A) and (B) of the Bankruptcy Code, along with the specific nature and dates of any alleged defaults and the pecuniary losses, if any, resulting therefrom. For the avoidance of doubt, the Backup Bidder Objection Deadline shall not extend the Contract Objection Deadline with respect to Cure Costs or any other objection to the assumption and assignment of an Assigned Contract.

28. Any time after the Assumption Notice Deadline and before the Supplemental Assumption Notice Deadline, the Debtors are authorized, but not directed, to (a) add previously omitted Assigned Contracts (including, without limitation, any Previously Omitted Contract (as defined in the Stalking Horse APA)), (b) remove an Assigned Contract that a Successful Bidder does not propose to assume, or (c) amend or modify the previously stated Cure Cost; *provided* that no later than one (1) business day prior to the Sale Hearing, by 11:59 p.m. (prevailing Central Time) (the "Supplemental Assumption Notice Deadline"), the Debtors shall file with this Court

and serve on the applicable Counterparties a supplemental assumption notice containing the same information as an Assumption Notice (each, a "Supplemental Assumption Notice"), and such Counterparties shall have until the date that is 10 business days after the filing of the applicable Supplemental Assumption Notice to file an objection, which shall comply with the requirements for Contract Objections (a "Supplemental Contract Objection").

29. Counterparties shall file any objection solely as to the identity of the Successful Bidder or adequate assurance of future performance by the Successful Bidder (in each case, if the Successful Bidder is not the Stalking Horse Bidder or the Designated Backup Bidder) (a "Post-Auction Contract Objection") by the Post-Auction Objection Deadline, and any objection solely as to the identity of, or adequate assurance of future performance by, the Designated Backup Bidder (a "Backup Bidder Contract Objection") by the Backup Bidder Objection Deadline. The Successful Bidder (including the Designated Backup Bidder, if it becomes the Successful Bidder) shall provide adequate assurance information to the Debtors consistent with the Bidding Procedures, and the Debtors shall provide such information to Counterparties who request it in writing.

30. ***If no Contract Objection, Supplemental Contract Objection, Post-Auction Contract Objection, Backup Bidder Contract Objection, or Final Contract Objection is timely filed with respect to an Assigned Contract: (a) the Counterparty shall be deemed to have consented to the assumption and assignment of such Assigned Contract and be forever barred from asserting any objection thereto (including, without limitation, with respect to adequate assurance of future performance), notwithstanding any anti-alienation provision or other restriction on assignment or transfer; (b) all breaches, violations, defaults, and pecuniary losses under such Assigned Contract shall be deemed cured and compensated pursuant to section***

***365(b)(1)(A) and (B) of the Bankruptcy Code upon payment of the Cure Cost set forth in the applicable notice; and (c) such Cure Cost shall be controlling, notwithstanding anything to the contrary in such Assigned Contract, and the Counterparty shall be forever barred from asserting any other rights, claims, or causes of action related to such Assigned Contract against the Debtors, their estates, the Successful Bidder, or their respective property.***

31. To the extent the parties are unable to resolve consensually any Contract Objection, Supplemental Contract Objection, or Post-Auction Contract Objection or Backup Bidder Contract Objection, including any dispute regarding a Cure Cost, such objection will be adjudicated at the Sale Hearing or at such other date and time as may be fixed by this Court; *provided* that the Debtors shall not settle any such Cure Cost dispute relating to a Purchased Contract (as defined in the Stalking Horse APA) without the Stalking Horse Bidder's consent, and, with respect to any Disputed Amount Contract (as defined in the Stalking Horse APA), the Stalking Horse Bidder may elect to designate such contract as a Purchased Contract or an Excluded Contract in accordance with the Stalking Horse APA.

32. The inclusion of an Assigned Contract on the Assumption Notice will not (a) obligate the Debtors to assume any Contract listed thereon nor the Successful Bidder to take assignment of such Assigned Contract, or (b) constitute any admission or agreement of the Debtors that such Assigned Contract is an executory contract.

33. At the Sale Hearing, the Debtors will seek this Court's approval of the assumption and assignment to the Successful Bidder(s) of only those Assigned Contracts that the Debtors and the Successful Bidder(s) have agreed shall be assumed and assigned (the "Selected Assigned Contracts"). The Debtors and their estates reserve any and all rights with respect to any Assigned Contracts that are not ultimately designated as Selected Assigned Contracts.

34. Any time after the Sale Hearing and before the applicable Designation Deadline (as defined below), the Debtors may add, remove, or modify Assigned Contracts and Cure Costs on the same terms as set forth above; *provided* that no later than the earlier of (a) two (2) business days prior to the closing of the Transaction and (b) two (2) business days prior to the date on which the Bankruptcy Code or this Court would otherwise require a determination to assume or reject the applicable executory contract or unexpired lease (the "Designation Deadline"), by 11:59 p.m. (prevailing Central Time) (the "Final Assumption Notice Deadline"), the Debtors shall file with this Court, post on the Case Website, and serve on the applicable Counterparties a final assumption notice containing the same information as an Assumption Notice (each, a "Final Assumption Notice"), and such Counterparties shall have until 5:00 p.m. (prevailing Central Time) on the date that is 14 days after service of the applicable Final Assumption Notice to file an objection, which shall comply with the requirements for Contract Objections (a "Final Contract Objection"); *provided*, *further*, that, consistent with the Stalking Horse APA and the Bidding Procedures, (w) with respect to the Stalking Horse Bid, the Designation Deadline for any executory contract or unexpired lease (other than a Real Property Lease (as defined in the Stalking Horse APA), shall be the date that is five (5) business days prior to the closing of the Transaction, (x) with respect to Real Property Leases (other than Excluded Location Leases (as defined in the Stalking Horse APA)), the Designation Deadline shall be the later of (i) entry of an order dismissing or converting the Chapter 11 Cases, confirming the Plan, or entering the Sale Order and (ii) 60 days after the closing of the Transaction, and (y) the Stalking Horse Bidder may designate any executory contract or unexpired lease as a Purchased Contract or an Excluded Contract (each as defined in the Stalking Horse APA) at any time prior to the applicable Designation Deadline, and the Debtors shall file and serve a Final Assumption Notice (or supplemental Final Assumption Notice) within three (3)

business days after any such designation. Any unresolved Final Contract Objection will be adjudicated at such date and time as may be fixed by this Court.

**VI. Additional Provisions.**

35. ***Any substantial contribution claims by any Bidder are deemed waived, to the extent based solely on such Bidder's submission of a Bid in accordance with the Bidding Procedures.***

36. Except as otherwise provided herein, any objection provided hereunder must (a) be in writing, (b) comply with the Bankruptcy Rules and Bankruptcy Local Rules, (c) state with particularity the legal and factual basis therefor, and (d) be filed with this Court and served so as to be actually received no later than the applicable objection deadline by the following parties (the "Objection Recipients"): (i) proposed counsel to the Debtors, Mayer Brown LLP, 700 Louisiana Street, Suite 3400 Houston, Texas 77002 (Attn.: Charles S. Kelley (ckelley@mayerbrown.com), and 71 South Wacker Drive, Chicago, Illinois 60606 (Attn: Louis S. Chiappetta (lchiappetta@mayerbrown.com)), and 1221 Avenue of the Americas, New York, New York 10020 (Attn: Richard A. Stieglitz (rstieglitz@mayerbrown.com); (ii) counsel to the Stalking Horse Bidder, Troutman Pepper Locke LLP, 875 Third Avenue, New York, New York 10022, Attn: Matthew Brooks (matthew.brooks@troutman.com), David Kupetz (david.kupetz@troutman.com), Michael Sabino (Michael.sabino@troutman.com); (iii) counsel to the DIP Agent and the Designated Backup Bidder, Milbank LLP, 55 Hudson Yards, New York, New York 10001, Attn: John Britton (jbritton@milbank.com), Matt Brod (mbrod@milbank.com), and Jason T. Anderson (jtanderson@milbank.com); (iv) the U.S. Trustee, 515 Rusk Street, Suite 3516, Houston, Texas 77002; and (v) proposed counsel to any Committee.

37. Notwithstanding anything to the contrary herein or in the Bidding Procedures, any payment made or to be made by the Debtors pursuant to the authority granted herein, including

payment of any Bid Protections, shall be subject to and in compliance with the DIP Order, including compliance with any budget or cash flow forecast in connection therewith and any other terms and conditions thereof, and the DIP Documents (as defined in the DIP Order). Nothing in this Order shall amend, modify, alter, waive, or impair, in any way, any terms, provisions, requirements, or restrictions of the DIP Order or the DIP Documents.

38. To the extent there is any inconsistency between the terms of the DIP Order or the DIP Documents and the terms of this Order or any action taken or proposed to be taken hereunder, the terms of the DIP Order or the DIP Documents, as applicable, shall control.

39. Notice of the Motion as provided therein shall be deemed good and sufficient notice of the Motion, and the requirements of Bankruptcy Rule 6004(a) and the Complex Case Procedures are satisfied by such notice. The contents of the Motion satisfy the requirements of Bankruptcy Rule 6003(b) and Bankruptcy Local Rule 9013-1. Notwithstanding Bankruptcy Rules 6004(h), 6006(d), or otherwise, this Order shall be immediately effective and enforceable upon its entry.

40. In the event there is any conflict between this Order and the Bidding Procedures, the terms and conditions of this Order shall control and govern in all respects.

41. The Debtors are authorized to take all such actions as are necessary or appropriate to implement the terms of this Order.

42. This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: [●], 2026
Houston, Texas

________________________________________

UNITED STATES BANKRUPTCY JUDGE

# Annex 1

## Bidding Procedures

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| America's Car-Mart, Inc., *et al.*,[1] | ) | Case No. [XX-XXXXX] (___) |
| Debtors. | ) | |
| | ) | Joint Administration Requested |

**BIDDING PROCEDURES FOR**
**SALE OF DEBTORS' ASSETS**

On November 24, 2026, the United States Bankruptcy Court for the Southern District of Texas (the "Court") entered the *Order (I) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (II) Approving the Designation of the Stalking Horse Bidder and the Designated Backup Bidder and the Related Bid Protections, (III) Scheduling an Auction and a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets, (IV) Establishing Certain Assumption and Assignment Procedures and Approving Form and Manner of Notice Thereof, and (V) Granting Related Relief* [Docket No. ●] (the "Bidding Procedures Order"),[2] by which the Court approved the following procedures ("Bidding Procedures") with respect to a sale or disposition by the above-captioned debtors and debtors in possession (collectively, the "Debtors," and with their non-debtor subsidiaries, the "Company") of the Company's assets in the Debtors' chapter 11 cases (the "Chapter 11 Cases").

The Bidding Procedures set forth the process by which the Debtors are authorized to solicit and evaluate proposals for the acquisition of the Debtors' assets and operations (the "Assets" and each such transaction, a "Transaction"), which may culminate in an auction (the "Auction") if competing Qualified Bids (as defined below) are received for the same Assets, as further described herein. Subject to the terms of the Bidding Procedures, interested parties: (1) may bid on the Assets (a) in individual lots, (b) as a collective whole, or (c) in any combination; and (2) may structure such bid to provide for the consummation of the related Transaction through a sale under section 363 of the Bankruptcy Code.

The Debtors negotiated an Asset Purchase Agreement, dated as of November 24, 2026 (together with all exhibits and schedules thereto, and as the same may be amended, supplemented,

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each of the Debtors' tax identification numbers, are: America's Car-Mart, Inc. (1141); Colonial Auto Finance, Inc. (3258); Texas Car-Mart, Inc. (3909); America's Car Mart, Inc. (1606); Colonial Underwriting, Inc. (3159); and Auto Finance Investors, Inc. (1385). The location of Debtor America's Car-Mart, Inc.'s corporate headquarters and the Debtors' service address in these Chapter 11 Cases is 1805 North 2nd Street, Suite 401, Rogers, Arkansas 72756.

[2] Capitalized terms used but not defined herein have the meanings specified in the Bidding Procedures Order or, if not defined therein, in the Stalking Horse APA.

or otherwise modified from time to time, the "Stalking Horse APA"), by and among Debtor America's Car-Mart, Inc. ("ACM"), the other Sellers, and Claypool Holdings, LLC, Cardinal Finance LLC, ACM-AR Inc., ACM Finance Inc., and Cardinal Asset Holdings LLC (collectively with any affiliates or designees thereof, the "Stalking Horse Bidder"), pursuant to which the Stalking Horse Bidder has agreed to acquire the Purchased Assets for aggregate consideration consisting of (a) cash in an amount equal to the Purchase Price under the Stalking Horse APA, being the sum of (i) $10,000,000, plus (ii) the Real Property Amount of $13,662,985, plus (iii) the Closing Retail Inventory Amount, plus (iv) the New Inventory Amount (being the aggregate cash amounts actually paid by Sellers to acquire New Inventory during the Interim Period, including auction, buyer and documentation fees, transportation costs and title and registration costs, which Sellers shall use commercially reasonable efforts to cause to be not less than $5,000,000 nor more than $10,000,000, subject to the DIP Order; (b) the Rollover Indebtedness, consisting of a senior secured term loan facility in an aggregate principal amount of approximately $328 million to be issued in favor of the lenders under the Prepetition Credit Facility on the terms set forth in the Rollover Indebtedness Term Sheet; and (c) the assumption of the Assumed Liabilities under the Stalking Horse APA (collectively, the "Stalking Horse Bid"), subject to higher or otherwise better Qualified Bids in accordance with these Bidding Procedures. Pursuant to the Stalking Horse APA, the Stalking Horse Bidder will deposit $25,000,000 (the "Stalking Horse Deposit") with Citibank, N.A., as escrow agent (the "Escrow Agent"), no later than three (3) business days after the execution of the Stalking Horse APA, which Stalking Horse Deposit shall be held and released in accordance with the Stalking Horse APA and the Escrow Agreement. The Transactions contemplated by the Stalking Horse APA shall be approved by the Sale Order, which may, at the Debtors' election, be entered as part of an order confirming the proposed *Joint Prepackaged Chapter 11 Plan of America's Car-Mart, Inc. and Certain of its Affiliates* [Docket No. ●] (together with all exhibits and schedules thereto, and as amended, supplemented, or otherwise modified from time to time pursuant to the terms thereof, the "Plan").

The Debtors have also negotiated the form of an Asset Purchase Agreement by and among ACM, the other Sellers, and New ACM HoldCo, LLC, a Delaware limited liability company formed by or on behalf of Silver Point Finance, LLC, in its capacities as the DIP Agent and the Prepetition Agent (each as defined below) (collectively with any affiliates or designees thereof, the "Designated Backup Bidder"), substantially in the form attached as Exhibit B to the Motion (the "Credit Bid APA"), pursuant to which the Designated Backup Bidder has agreed to serve as a backup bidder (such bid, the "Designated Backup Bid") in accordance herewith in the event it is selected to be the Backup Bidder. The Credit Bid APA attached to the Motion is in substantially complete form. The Designated Backup Bidder shall not amend, supplement, or otherwise modify the Credit Bid APA in any manner that is adverse to the Debtors or their estates, or that alters the consideration, conditions to closing, or the Outside Date (as defined in the Credit Bid APA), without the prior written consent of the Debtors.

Pursuant to the Bidding Procedures Order, the Court approved (1) the designation of the Stalking Horse Bidder and the Debtors' entry into the Stalking Horse APA, (2) the designation of the Designated Backup Bidder on the terms set forth in the Credit Bid APA and the Debtors' authority to enter into and perform under the Credit Bid APA in the event the Designated Backup Bidder becomes the Successful Bidder, (3) the Bid Protections, and (4) the schedule of dates and events set forth herein for the marketing and sale of the Assets subject to the Stalking Horse Bid.

The Successful Bidder(s) (as defined below) shall acquire the applicable Assets free and clear of any and all pledges, liens, security interests, encumbrances, claims, charges, options, and other interests thereon (collectively, the "Encumbrances") to the maximum extent permitted by section 363 of the Bankruptcy Code and subject to all conditions and limitations set forth in the relevant Sale Order and Final Purchase Agreement (each as defined below), with such Encumbrances to attach to the net sale proceeds generated by each Transaction with the same validity and priority as such Encumbrances had against the Assets.

Following the Debtors' receipt of a Qualified Bid (as defined below) that the Debtors have determined in their reasonable business judgment, following consultation with the Consultation Parties (as defined below), is the highest or otherwise best bid in accordance with the Bidding Procedures, and subject to Court approval of such Qualified Bid as a Successful Bid (as defined below), the Debtors shall implement each such Transaction pursuant to the terms of an applicable Final Purchase Agreement.

The Bidding Procedures do not prohibit the combining of Bids (as defined below) by multiple bidders; *provided*, that any communications among multiple Potential Bidders (as defined below) regarding the combining of such Bids shall only be conducted with the prior written consent of the Debtors' advisors following consultation with the Consultation Parties and shall be facilitated by the Debtors' advisors (as described below). Interested parties are encouraged to submit Bids for a sale of all or a portion of the Assets or for one or more alternative value-maximizing Transactions.

Copies of the Motion, the Bidding Procedures Order, the Stalking Horse APA, the Credit Bid APA, and any other documents filed in the Chapter 11 Cases can be obtained free of charge (1) on the case website maintained by the Debtors' claims and noticing agent, Omni Agent Solutions, Inc., https://omniagentsolutions.com/ACM (the "Case Website"), or (2) upon written request to Mayer Brown LLP, proposed counsel to the Debtors.

## KEY DATES

The key dates for the sale process are as follows. Such dates may be extended or otherwise modified by (1) the Debtors by filing a notice on the docket of the Chapter 11 Cases or (2) an order of the Court:

| Deadline/Event | Timing |
|---|---|
| Assumption Notice Deadline | The date that is three (3) business days after the Petition Date, at 11:59 p.m. (prevailing Central Time) (or, with respect to any executory contract or unexpired lease that is designated for assumption and assignment after the Petition Date, the date that is three (3) business days after such designation) |
| Sale Objection Deadline | December 14, 2026, at 5:00 p.m. (prevailing Central Time) |

| **Deadline/Event** | **Timing** |
|---|---|
| Contract Objection Deadline | 5:00 p.m. (prevailing Central Time) on the date that is 14 days after service of the Assumption Notice (with objections to any Supplemental Assumption Notice due 10 business days after the filing thereof) |
| Supplemental Assumption Notice Deadline | 1 business day prior to the Sale Hearing, at 11:59 p.m. (prevailing Central Time) |
| Bid Deadline | December 17, 2026, at 5:00 p.m. (prevailing Central Time) |
| Auction (if applicable) | December 22, 2026, at 10:00 a.m. (prevailing Eastern Time) / 9:00 a.m. (prevailing Central Time) |
| Deadline for (i) Filing of Post-Auction Notice and (ii) Service of Post-Auction Notice on Relevant Counterparties | 24 hours after the conclusion of the Auction |
| Successful Bidder Selection Deadline | 24 hours after the conclusion of the Auction |
| Post-Auction Objection Deadline[3] | The earlier of 48 hours after the Post-Auction Notice is filed with the Court or the Sale Hearing |
| Sale Hearing | no later than 35 days after the Petition Date, at a time to be announced (prevailing Central Time), which may be held together with the hearing on confirmation of the Plan |
| Final Assumption Notice Deadline | The earlier of (a) two (2) business days prior to the closing of the Transaction and (b) two (2) business days prior to the date on which the Bankruptcy Code or the Court would otherwise require a determination to assume or reject the applicable executory contract or unexpired lease (the "Designation Deadline"), at 11:59 p.m. (prevailing Central Time); *provided* that, with respect to the Stalking Horse Bid, the Designation Deadline for any executory contract or unexpired lease (other than a Real Property Lease) shall be the date that is five (5) business days prior to the closing of the Transaction; *provided further that with respect to Real Property Leases (other than Excluded Location Leases), the Designation Deadline shall be the later of (x) entry of an order dismissing or converting the Chapter* Cases, confirming the Plan, or entering the Sale Order and (y) 60 days after the closing of the Transaction; *provided*, *further*, that the Debtors shall file and serve a Final Assumption Notice (or supplemental Final Assumption Notice) within three (3) business days after any designation by the Stalking Horse Bidder of an executory |

3 The Post-Auction Objection Deadline only applies to objections related to the identity of the Successful Bidder(s) or adequate assurance of future performance provided by the Successful Bidder(s) (in each case, other than the Stalking Horse Bidder).

| Deadline/Event | Timing |
|---|---|
| | contract or unexpired lease for assumption and assignment or for exclusion |
| Final Contract Objection Deadline | 5:00 p.m. (prevailing Central Time) on the date that is 14 days after service of the applicable Final Assumption Notice |

## ACCESS TO DEBTORS' DILIGENCE MATERIALS

To receive access to due diligence materials and to participate in the bidding process, any party that desires (individually or as part of a consortium of interested parties that is contemplating a joint bid) to bid for the Assets (each, a "Potential Bidder") must submit to Houlihan Lokey Capital, Inc. ("Houlihan"), an executed confidentiality agreement in form and substance satisfactory to the Debtors (a "Confidentiality Agreement").

A Potential Bidder that delivers an executed Confidentiality Agreement to Houlihan shall be a "Diligence Party." As promptly as practicable after the Debtors determine that a party is a Diligence Party, the Debtors will deliver to the Diligence Party access to the Debtors' confidential electronic data room (the "Data Room"). The Debtors will afford any Diligence Party access to reasonable due diligence before the Bid Deadline (as defined below). Notwithstanding the foregoing, the Debtors reserve the right to withhold any diligence materials that the Debtors determine (in their reasonable business judgment and after consultation with the Consultation Parties) are sensitive or otherwise not appropriate for disclosure to a Diligence Party that the Debtors determine (in their reasonable business judgment and after consultation with the Consultation Parties) is a competitor of the Debtors or is affiliated with any competitor of the Debtors. The Debtors also reserve the right to decline to enter into a Confidentiality Agreement with, and grant access to the Data Room to, a Potential Bidder that, in the reasonable judgment of the Debtors and their advisors, will not be able to submit a Qualified Bid (as defined below), including if such Potential Bidder does not appear to have the financial or operational capacity to consummate a Transaction. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Diligence Party.

All due diligence requests must be directed to Houlihan. Each Diligence Party and Bidder (as defined below) shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Diligence Party and/or Bidder and its contemplated Transaction. Failure by a Diligence Party or Potential Bidder to comply with requests for additional information and due diligence access may be a basis for the Debtors to determine, in their reasonable business judgment and after consultation with the Consultation Parties, that such Diligence Party or Potential Bidder is not a Qualified Bidder (as defined below). The Debtors reserve the right, in their discretion (after consultation with the Consultation Parties), to permit a Diligence Party or Potential Bidder to remedy any such failure to comply.

**All due diligence requests must be directed to: Daniel Martin (Dmartin@HL.com), Ibreez Esmail (Ibreez.Esmail@HL.com), Drew Heinig (Drew.Heinig@HL.com), and Sam Fischer (Sam.Fischer@HL.com).**

## NO COMMUNICATION AMONG BIDDERS

There shall be no communication regarding the Debtors' sale process among Diligence Parties or Potential Bidders (including, for the avoidance of doubt, the Stalking Horse Bidder and the DIP Agent (as defined below), and the Designated Backup Bidder) unless the Debtors, after consultation with the Consultation Parties, have previously authorized such communication in writing, including the terms on which such communication shall be permitted; *provided* that, to the extent any consideration offered or to be offered by any Potential Bidder consists of "roll-over" or other indebtedness to be issued to the DIP Agent and/or any related parties in their capacities as lenders under the DIP Facility or holders of claims under the Prepetition Credit Facility, such Potential Bidder and the DIP Agent shall be deemed to have the Debtors' consent to discuss the terms applicable to such indebtedness so long as the Potential Bidder has submitted a proposal or transaction overview to the Debtors and the Debtors' advisors have been given the option to attend or be copied on any such communication(s). Should any Diligence Party or Potential Bidder desire to communicate directly with another Diligence Party or Potential Bidder, such Diligence Party or Potential Bidder shall provide written notice of the proposed communication(s) to the Debtors' advisors; the Debtors' advisors shall have the option to attend or be copied on any such communication(s) between Diligence Parties or Potential Bidders. The Debtors reserve the right, in their reasonable business judgment, after consultation with the Consultation Parties, to disqualify any Diligence Parties or Potential Bidders that communicate among themselves without the Debtors' written consent.

## BID REQUIREMENTS

1) **Bid Requirements**. Other than the Stalking Horse Bid and the Designated Backup Bid, each of which shall be considered Qualified Bids for all purposes under the Bidding Procedures, any proposal, solicitation, or offer (each, a "Bid") by a party (each, a "Bidder") to acquire some or all of the Company's assets must be submitted in writing and determined by the Debtors in good faith, after consultation with the Consultation Parties, to have satisfied the following requirements (collectively, the "Bid Requirements").

   a) Acquired Assets; Assumed Liabilities. Each Bid must clearly identify, in writing and as applicable (i) the particular assets, if any, the Bidder seeks to acquire from the Company, and (ii) the particular liabilities, if any, the Bidder seeks to assume (the "Assumed Liabilities"). For the avoidance of doubt, a Qualified Bid (as defined below) may include a bid for less than all or substantially all of the Company's assets.

   b) Identity. Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Bidder if such Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by such Bid) and the complete terms of any such participation.

   c) Purchase Price; Form of Consideration. Each Bid must: (i) clearly set forth, as applicable, the purchase price to be paid, including all cash and non-cash

components assuming a purchase of the applicable Assets and any assumption of liabilities (the "Purchase Price"); (ii) identify separately the cash and any non-cash components of the Purchase Price; and (iii) indicate the allocation of the Purchase Price among the applicable Assets. The Purchase Price should be a single value in U.S. dollars for the applicable Assets on a cash-free, debt-free basis. Any Bid for all or substantially all of the Assets must also include a statement as to whether the Bid is conditioned on purchasing all Assets or whether the Bid should be viewed as a separate Bid for one or more sets of Assets.

d) Definitive Documentation. Each Bid must be in writing and include definitive documentation executed by the Bidder with respect to such Bid including: (i) an asset purchase agreement and/or any other applicable purchase agreement (individually or collectively, the "Purchase Agreement"); and (ii) to the extent applicable, all other material transaction documents contemplated by such Bid, including any financing or investment commitments contemplated or required by such Bid (collectively, the "Bid Documents"). For the avoidance of doubt, a Bidder may, but shall not be required to, propose a Transaction to be implemented through a modified version of the Plan. Each Purchase Agreement must be executed by an authorized representative of the Bidder and marked to show any modifications to the Stalking Horse APA.

e) Deposit. On or before the Bid Deadline, each Bid must be accompanied by a cash deposit equal to 10% of the Purchase Price (including both cash and non-cash value) contemplated by such Bid (the "Deposit"), to be held in an interest-bearing escrow account to be identified and established by the Debtors after consultation with the Consultation Parties. The Deposit for a Bid on account of a Transaction that is ultimately consummated by the Company shall be applied to the respective Purchase Price of such Transaction at closing. Except for a Deposit applied at closing or forfeited in accordance with these Bidding Procedures or the applicable Final Purchase Agreement, each Deposit shall be returned on the applicable date set forth below (the "Bid Termination Date"):

i) with respect to a Bid that is not designated as a Qualified Bid, within five (5) business days after the Bid Deadline;

ii) with respect to a Qualified Bid that is not designated as the Successful Bid or Backup Bid, within five (5) business days after the entry of the Sale Order; and

iii) with respect to a Successful Bid or Backup Bid for which a Transaction is not consummated, within five (5) business days after the earlier of (x) 90 days after the entry of the Sale Order and (y) the closing of a Transaction.

The Debtors shall not be obligated to return a Deposit during the pendency of a good-faith dispute concerning the forfeiture of such Deposit.

f) Proof of Financial Ability to Perform. A Bid must include written evidence that the Debtors reasonably conclude, after consultation with the Consultation Parties, demonstrates that the Bidder has the necessary financial ability to (i) close the relevant Transaction in a timely manner and (ii) provide adequate assurance of future performance under all contracts to be assumed and assigned in such Transaction. The Bid must also be accompanied by committed financing or evidence of other financial ability to pay for the costs of continuing the Chapter 11 Cases: (x) while any required regulatory approvals (including, but not limited to, approvals under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and consumer finance, dealer licensing, collection, and insurance regulatory approvals, including with respect to any change of control of ACM Insurance Company) regarding the proposed Transaction are pending; and (y) through the closing of the proposed Transaction.

g) Contingencies; No Financing or Diligence Outs. A Bid shall not be conditioned on obtaining financing, the sufficiency of financing, any internal financing approval, or the outcome or review of due diligence.

h) Regulatory and Third-Party Approvals. A Bid must set forth each required regulatory and third-party approval, expected timing of receipt, and those actions the Bidder will take to obtain each approval as promptly as possible.

i) Conditions to Closing. Each Bid must identify with particularity each condition to closing of the relevant Transaction (the "Closing") and the timeline to achieve the relevant closing conditions.

j) Bid Irrevocable. A Bid shall be irrevocable until the Bid Termination Date, subject to extension upon mutual agreement. Each Bid must expressly provide that the Bidder is prepared to consummate the Transaction set forth in the Purchase Agreement or the Stalking Horse APA, as applicable, and the Bidding Procedures, promptly following Court approval of the proposed Transaction set forth in an entered order (any such order, a "Sale Order") (which may be the Plan confirmation order) and satisfaction of the closing conditions set forth in the Purchase Agreement or the Stalking Horse APA, as applicable.

k) Expenses. Each Bidder presenting a Bid or Bids shall bear its own costs and expenses (including legal fees) in connection with the Bid. Other than the Bid Protections payable to the Stalking Horse Bidder in accordance with the Stalking Horse APA, the Bidding Procedures Order, and these Bidding Procedures, no party submitting a Bid (including, for the avoidance of doubt, the Designated Backup Bidder with respect to the Designated Backup Bid) shall be entitled to a break-up fee, expense reimbursement, or similar payment. Any substantial contribution claims by any Bidder are deemed waived, to the extent based solely on such Bidder's submission of a Bid hereunder.

l) Authorization. Each Bid must contain a written certification by an authorized officer that the Bidder has obtained authorization or approval from its board of

directors (or comparable governing body) with respect to the submission of such Bid and the consummation of the transactions contemplated by such Bid; *provided*, that if the Bidder is an entity formed to consummate the proposed Transaction, the Debtors must also be provided evidence of the approval of the Bid by the Bidder's equity holders.

m) As-Is, Where-Is. Each Bid must include a written acknowledgement and representation that the Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Transaction prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, by the Debtors or their advisors or other representatives regarding the Transaction or the completeness of any information provided in connection therewith or the Auction, except as expressly provided in the applicable Final Purchase Agreement.

2) **Bid Deadline**. Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received** on or before **December 17, 2026 at 5:00 p.m. (prevailing Central Time)** (the "Bid Deadline") to each of the following:

Debtors' proposed investment banker:

Houlihan Lokey Capital, Inc.
Attn: Daniel Martin (DMartin@HL.com)
Ryan Sandahl (RSandahl@HL.com)
Ibreez Esmail (Ibreez.Esmail@HL.com)

Debtors' proposed counsel:

Mayer Brown LLP
Attn: Charles S. Kelley (ckelley@mayerbrown.com)
Louis S. Chiappetta (lchiappetta@mayerbrown.com)
Ryan Ferris (rferris@mayerbrown.com)
Richard A. Stieglitz (rstieglitz@mayerbrown.com)

3) **Qualified Bids**. A Bid that the Debtors determine satisfies each of the Bid Requirements, including the timely submission of a Bid by the Bid Deadline, shall constitute a "Qualified Bid" and such Bidder shall be a "Qualified Bidder." The Debtors, after consultation with the Consultation Parties, may consider multiple Bids for different lots of Assets for the purposes of determining whether such Bids, in the aggregate, constitute a Qualified Bid, and may introduce Potential Bidders to each other at or prior to the Auction, if any, at the Debtors' sole discretion. For the avoidance of doubt, the Debtors, after consultation with the Consultation Parties, will consider all Bids, regardless of the amount of such Bid or the proposed form of consideration thereunder (including indebtedness to be issued pursuant to section 1129(b)(2)(A) of the Bankruptcy Code).

4) **Determination as to Qualified Bid**. No later than the start of the Auction, the Debtors, after consultation with the Consultation Parties, shall provide notice to each Bidder that the Debtors have: (a) determined its Bid to be a Qualified Bid; or (b) rejected its Bid as not a Qualified Bid (in which case the Deposit shall be returned to such Bidder in accordance herewith). The Debtors shall also notify each Bidder of the timing and procedures of any Auction, or their selection, after consultation with the Consultation Parties, to proceed with an alternative transaction (including seeking Court approval of a Qualified Bid).

## STALKING HORSE BID

The Stalking Horse Bidder shall be deemed to be a Qualified Bidder, and the Stalking Horse Bid shall be deemed to be a Qualified Bid, at all times and for all purposes (including with respect to submission of any Overbid) with respect to the Assets subject to the Stalking Horse APA. If the Stalking Horse Bid is chosen as the Successful Bid, the rights and obligations of the Stalking Horse Bidder shall be as set forth in the Stalking Horse APA. The Stalking Horse Bidder shall be entitled, but not obligated, to submit Overbids at the Auction, and the Stalking Horse Deposit shall be governed solely by the Stalking Horse APA and the Escrow Agreement.

***Bid Protections***. In recognition of the Stalking Horse Bidder's expenditure of time, energy, and resources and the benefit to the Debtors' estates of establishing a floor for further bidding, and pursuant to the Bidding Procedures Order and the Stalking Horse APA, the Debtors are authorized to pay to the Stalking Horse Bidder, on the terms and subject to the conditions set forth in the Stalking Horse APA: (1) a break-up fee in the amount of $9,000,000 (the "Break-Up Fee"); and (2) the reasonable and documented out-of-pocket costs and expenses (including fees and expenses of counsel) incurred by the Stalking Horse Bidder in connection with the Stalking Horse APA and the Transactions contemplated thereby, in an amount not to exceed $1,500,000 (the "Expense Reimbursement" and, together with the Break-Up Fee, the "Bid Protections"). The Bid Protections shall not be payable if the Stalking Horse Bidder is in breach of the Stalking Horse APA such that ACM could terminate the Stalking Horse APA, a Deposit Retention Termination (as defined in the Stalking Horse APA) has occurred, or the Stalking Horse Bidder has failed to perform its obligations as back-up bidder.

The Break-Up Fee shall be payable solely if the Stalking Horse APA is terminated under the circumstances described in the Stalking Horse APA (including upon the Debtors' entry into an Alternative Transaction (as defined in the Stalking Horse APA) other than in connection with an Auction, if the Stalking Horse Bidder is not selected as the Successful Bidder or the Backup Bidder at the Auction, or upon termination by the Debtors in the exercise of their fiduciary duties) and an Alternative Transaction is consummated within six (6) months after such termination, and shall be paid solely from, and contemporaneously with the Debtors' receipt of, the cash proceeds of such Alternative Transaction. The Expense Reimbursement shall be payable as and when provided in the Stalking Horse APA. Pursuant to the Bidding Procedures Order, the Bid Protections (to the extent payable) shall constitute allowed administrative expense claims against the Debtors' estates under sections 503(b) and 507(a)(2) of the Bankruptcy Code, with priority over any and all other administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code until paid, and shall be payable without further order of the Court. In no event shall the Bid Protections be payable from any proceeds of the DIP Facility, any cash collateral, or any professional fee escrow, and each of the Break-Up Fee and the Expense Reimbursement shall be payable no more than

once. Any payment of the Bid Protections shall be subject to and in compliance with the DIP Order. The receipt of the Bid Protections (if and when payable) shall be the Stalking Horse Bidder's sole and exclusive remedy against the Debtors in the event the Stalking Horse APA is terminated, and in no event shall the aggregate liability of the Debtors and their estates under or in connection with the Stalking Horse APA or its termination exceed the sum of the Bid Protections (plus return of the Stalking Horse Deposit, if applicable).

The Stalking Horse Bidder shall be entitled, in submitting any Overbid at the Auction, to credit the full amount of the Bid Protections against the consideration payable under such Overbid, such that the value of each Overbid submitted by the Stalking Horse Bidder shall be deemed to include the amount of the Bid Protections. Once triggered pursuant to the terms of the Stalking Horse APA, the Bid Protections shall also be credited toward the consideration payable at any Closing by the Stalking Horse Bidder as Successful Bidder or Backup Bidder. Any credit bid by the DIP Agent or the Prepetition Agent (each as defined below) for Assets subject to the Stalking Horse APA shall constitute an Alternative Transaction for all purposes of the Stalking Horse APA and must include cash consideration sufficient to pay the Bid Protections in full in cash at the closing thereof.

If no Qualified Bid other than the Stalking Horse Bid is received by the Bid Deadline with respect to the Assets subject to the Stalking Horse APA, then the Auction will not occur with respect to such Assets, the Stalking Horse Bidder shall be deemed the Successful Bidder with respect to such Assets, and the Debtors shall seek approval of the Stalking Horse APA and the Transactions contemplated thereby at the Sale Hearing, which may be held together with the hearing on confirmation of the Plan.

Any Bid (other than the Stalking Horse Bid) for all or substantially all of the Assets subject to the Stalking Horse APA must provide for aggregate consideration, as determined by the Debtors after consultation with the Consultation Parties, with a value equal to or greater than the sum of (1) the value of the Stalking Horse Bid, plus (2) the amount of the Bid Protections, plus (3) $1,000,000 (the "Initial Minimum Overbid") and must include cash sufficient to pay the Bid Protections in full at closing.

## DESIGNATED BACKUP BID

The Designated Backup Bidder shall be deemed to be a Qualified Bidder, and the Designated Backup Bid shall be deemed to be a Qualified Bid, at all times and for all purposes, and, because the Designated Backup Bid is a credit bid, the Designated Backup Bidder shall not be required to submit any Deposit.

Unless a different Backup Bidder is selected at an Auction in accordance with the section entitled "Backup Bidder" below, the Designated Backup Bidder shall be deemed to be the Backup Bidder, and the Designated Backup Bid shall be deemed to be the Backup Bid in each case on the terms set forth in the Credit Bid APA, including if no Auction is held. The Designated Backup Bid shall remain open and irrevocable until the earlier of (x) the closing of the Transaction with the Successful Bidder and (y) the Outside Date (as defined in Credit Bid APA).

If the Stalking Horse APA (or other Successful Bid) is terminated or the Successful Bidder fails to consummate its Transaction, the Debtors may designate the Designated Backup Bidder as the Successful Bidder and consummate the Transaction contemplated by the Credit Bid APA as approved in the Sale Order, which shall, if applicable, also approve the Designated Backup Bid as the Backup Bid, and the Credit Bid APA shall serve as the operative purchase agreement for such Transaction.

If the Designated Backup Bidder submits an Overbid at the Auction, such Overbid shall be subject to the conditions applicable to credit bids set forth in the section entitled "Right to Credit Bid" below, including satisfaction of the Initial Minimum Overbid and inclusion of cash consideration sufficient to pay the Bid Protections in full in cash at the closing thereof.

Consummation of the Designated Backup Bid shall constitute an Alternative Transaction under the Stalking Horse APA. Any Bid Protections payable to the Stalking Horse Bidder shall be payable solely as provided in the Stalking Horse APA and subject to the limitations set forth in the section entitled "Bid Protections" above. To the extent the Bid Protections are payable upon the closing of the Designated Backup Bid, the Designated Backup Bidder shall fund the Bid Protections in cash at such closing.

## RIGHT TO CREDIT BID

Silver Point Finance, LLC, in its capacities as (i) agent and lender under the DIP Facility and (ii) administrative agent and collateral agent under the Prepetition Credit Facility (in such capacities, and collectively with the lenders under the DIP Facility and the Prepetition Credit Facility, the "DIP Agent" and the "Prepetition Agent," respectively), shall be entitled, pursuant to section 363(k) of the Bankruptcy Code and subject in all respects to the Bankruptcy Code, other applicable law, and the interim and final orders authorizing the DIP Facility (the "DIP Order"), to submit a credit bid for all or any portion of the Assets, up to the full amount of (a) the obligations outstanding under the DIP Facility (the "DIP Claims") and (b) the obligations outstanding under the Prepetition Credit Facility (the "Prepetition Claims"), in each case with respect to the Assets on which the DIP Agent or the Prepetition Agent, as applicable, holds a valid, perfected, and unavoidable lien securing such claims; *provided* that any credit bid of the Prepetition Claims shall be subject to any "challenge" rights set forth in the DIP Order. The Designated Backup Bid is a credit bid made pursuant and subject to this section. The DIP Agent and the Prepetition Agent may credit bid the DIP Claims and the Prepetition Claims together, in a single Bid, in any combination, together with cash or other consideration. Any such credit bid shall be deemed a Qualified Bid and shall not be required to be accompanied by a Deposit; *provided* that (1) any credit bid for Assets subject to the Stalking Horse APA (other than the Designated Backup Bid in its capacity as a backup bid) must satisfy the Initial Minimum Overbid and include cash consideration sufficient to pay the Bid Protections in full in cash at the closing thereof, (2) no portion of the Bid Protections may be credit bid, offset, or subordinated by the DIP Agent or the Prepetition Agent, and (3) any such credit bid for Assets subject to the Stalking Horse APA shall constitute an Alternative Transaction for all purposes of the Stalking Horse APA. The DIP Agent and the Prepetition Agent shall be entitled to submit Overbids (including credit bids of the DIP Claims and the Prepetition Claims) at the Auction.

## HIGHEST OR OTHERWISE BEST BID

Whenever the Bidding Procedures refer to the highest or otherwise best Qualified Bid, such determination shall take into account any factors the Debtors, after consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid and may include, but are not limited to, the following: (1) the amount and nature of the consideration, including any Assumed Liabilities; (2) the executory contracts and unexpired leases of the Debtors, if any, for which assumption and assignment or rejection is required, and the costs and delay associated with any litigation concerning executory contracts and unexpired leases necessitated by such Qualified Bid; (3) the number, type, and nature of any changes to the applicable Purchase Agreement requested by each Qualified Bidder; (4) the extent to which such modifications are likely to delay the Closing and the cost to the Debtors of such modifications or delay; (5) the likelihood of the Qualified Bidder being able to close the proposed Transaction (including obtaining surety bonding and any required regulatory approvals) and the timing thereof; (6) the net benefit or cost to the Debtors' estates (including, without limitation, any tax implications of the proposed Transaction); (7) preservation of operations and employment and honoring of employee compensation and retention commitments to the extent relevant to the value of the Bid to the Debtors' estates; and (8) any other factors that the Debtors, after consultation with the Consultation Parties, may deem relevant (collectively, the "Bid Assessment Criteria"). Notwithstanding anything to the contrary herein, with respect to any Bid for any Assets, the Bid Assessment Criteria and any other consideration of such Bid shall be evaluated solely with respect to the value thereof to, and the effect of such Bid on, the Debtors' bankruptcy estates.

## AUCTION

If two or more Qualified Bids are received by the Bid Deadline, the Debtors may, in their business judgment and after consultation with the Consultation Parties, conduct an Auction to determine the highest or otherwise best Qualified Bid. If fewer than two Qualified Bids are received by the Bid Deadline, the Debtors shall not conduct the Auction. Only Qualified Bidders may participate in the Auction.

## PROCEDURES FOR AUCTION

The Auction (if any) shall take place on December 22, 2026 at 10:00 a.m. (prevailing Eastern Time) / 9:00 a.m. (prevailing Central Time) at the offices of proposed counsel for the Debtors, Mayer Brown LLP, 1221 Avenue of the Americas, New York, New York 10020, or virtually, or at such other place and time as the Debtors shall notify all Qualified Bidders, the Consultation Parties, and all other parties entitled to attend the Auction. The Auction shall be conducted according to the following procedures:

Only the Debtors, the Consultation Parties, the Stalking Horse Bidder, any other Qualified Bidders, and/or other parties as the Debtors may determine to include in their discretion (after consultation with the Consultation Parties), in each case along with their representatives and advisors, shall be entitled to attend the Auction, and only Qualified Bidders will be entitled to make any Overbids (as defined below) at the Auction. The Qualified Bidders and any other authorized attendees shall appear in person or through duly authorized representatives at the Auction.

The Debtors (after consultation with the Consultation Parties) reserve the right to modify the date(s) of the Auction, including to accommodate multiple Auctions in the event Qualified Bids reflect interest in separate and distinct Assets, in which case, there may be multiple Successful Bidders and/or Backup Bidders hereunder.

***The Debtors May Conduct the Auction***

The Debtors and their advisors shall direct and preside over the Auction, which shall be transcribed. Other than as expressly set forth herein, the Debtors will conduct the Auction in the manner they determine (after consultation with the Consultation Parties) will result in the highest or otherwise best offer for any of the Assets or otherwise maximize the value of the Assets. The Debtors shall, prior to the commencement of the Auction, provide the Consultation Parties, each Qualified Bidder participating in the Auction, and any other parties entitled to attend the Auction with a copy of the Purchase Agreement or Stalking Horse APA associated with the highest or otherwise best Qualified Bid with respect to the Assets for which such Qualified Bidder is bidding, as determined by the Debtors (after consultation with the Consultation Parties) (such highest or otherwise best Qualified Bid, the "Starting Bid"). At the start of the Auction, the Debtors shall describe the material terms of the Starting Bid, and each Qualified Bidder participating in the Auction must confirm that: (1) it has not engaged in any collusion with respect to the bidding or sale of any of the Assets described herein; (2) it has reviewed, understands, and accepts the Bidding Procedures; (3) it has consented to the core jurisdiction of the Court (as described more fully below); and (4) its Qualified Bid is a good-faith bona fide offer that it intends to consummate if selected as the Successful Bidder.

***Terms of Overbid***

An "Overbid" is any Bid made at the Auction, in accordance with the requirements set forth herein (as determined by the Debtors after consultation with the Consultation Parties), subsequent to the Debtors' announcement of the Starting Bid for such Assets. To submit an Overbid for purposes of the Auction, a Bidder must comply with the following conditions:

a) Minimum Overbid. If the Starting Bid for the Assets subject to the Stalking Horse APA is the Stalking Horse Bid, the first Overbid for such Assets by any Qualified Bidder other than the Stalking Horse Bidder shall have a value not less than the Initial Minimum Overbid and shall include cash sufficient to pay the Bid Protections in full at closing. The Debtors will announce the minimum bidding increment for all subsequent Overbids (the "Bid Increment") and other Auction rules at the outset of the Auction with respect to the Assets and may change such rules at any time during the Auction after consultation with the Consultation Parties. For the purpose of evaluating the value of the consideration provided by any Overbid, the Debtors will take into account the Bid Protections payable to the Stalking Horse Bidder and, with respect to any Overbid by the Stalking Horse Bidder, shall credit the full amount of the Bid Protections. The Debtors reserve the right, after consultation with the Consultation Parties, to announce reductions or increases in the Bid Increment at any time during the Auction. Additional consideration in excess of the amount set forth in the respective Starting Bid may include cash and/or non-cash consideration; *provided*, *however*, that the value for

such non-cash consideration shall be determined by the Debtors in their reasonable business judgment after consultation with the Consultation Parties.

b) Remaining Terms Are the Same as for Qualified Bids. Except as modified in the Bidding Procedures, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above; *provided*, *however*, that the Bid Deadline shall not apply. Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Purchase Agreement or Stalking Horse APA, as the case may be, in connection therewith. For the avoidance of doubt, any Overbid shall be irrevocable and shall remain open and binding on the Bidder in accordance with the Bidding Procedures and the conditions for a Qualified Bid.

c) Evidence of Financial Wherewithal. To the extent not previously provided, a Bidder submitting an Overbid at the Auction (other than the Stalking Horse Bidder, unless its Overbid includes cash consideration) must provide written evidence of its ability to consummate the proposed Transaction as the Debtors may reasonably request after consultation with the Consultation Parties. Such evidence must be in the form of financial disclosure, credit-quality support information, or credit enhancement reasonably acceptable to the Debtors.

***Announcement and Consideration of Overbids***

a) Announcement of Overbids. A Bidder submitting an Overbid at the Auction shall announce at the Auction the material terms of such Overbid, including, without limitation, the total amount and type of consideration offered in such Overbid.

b) Consideration of Overbids. The Debtors reserve the right, in their reasonable business judgment and after consultation with the Consultation Parties, to make one or more continuances of the Auction to, among other things: (i) facilitate discussions between the Debtors and individual Qualified Bidders; (ii) allow individual Qualified Bidders to consider how they wish to proceed; and (iii) give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment and after consultation with the Consultation Parties, may require that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Transaction at the prevailing Overbid amount.

***Consent to Jurisdiction as Condition of Bidding***

All Qualified Bidders shall (1) be deemed to have consented to the core jurisdiction of the Court to enter any final order or orders, which shall be binding in all respects, to adjudicate all disputes related to the Bids, the Auction, and a Transaction, and (2) waive any right to a jury trial in connection with any such dispute.

***As-Is, Where-Is Sale***

The sale of the Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Debtors or their estates except to the extent set forth in the Final Purchase Agreement, as approved by the Court. Except as otherwise provided in the Final Purchase Agreement, all of the Debtors' rights, title, and interest in and to the Assets subject thereto shall be sold free and clear of all Encumbrances in accordance with sections 363 and 365 of the Bankruptcy Code, with such Encumbrances to attach to the net proceeds of each Transaction.

Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct all desired due diligence regarding the Assets prior to making its Qualified Bid, that it has relied solely upon its own independent review, investigation, and inspection of any documents and/or the Assets in making its Qualified Bid, and that it did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidding Procedures or, as to any Successful Bidder or Backup Bidder (as defined below), the terms of each Transaction as set forth in the final form of the applicable Purchase Agreement or Stalking Horse APA (the "Final Purchase Agreement"), which shall be on terms mutually acceptable to the Successful Bidder or Backup Bidder, on the one hand, and the Debtors, on the other hand.

***Closing the Auction; Successful Bidder***

The Auction shall continue until there is only one Qualified Bid or combination of Qualified Bids for each portion of the Assets that the Debtors determine, in their reasonable business judgment and in a manner consistent with their fiduciary duties, after consultation with the Consultation Parties, is the highest or otherwise best Qualified Bid at the Auction for such portion of the Assets and that further bidding is unlikely to result in higher or otherwise better Qualified Bid(s) that would be acceptable to the Debtors. Thereafter, the Debtors shall select such Qualified Bid(s), after consultation with the Consultation Parties, as the overall highest or otherwise best Qualified Bid(s) (such Bid(s), the "Successful Bid(s)," and the Bidder(s) submitting such Successful Bid(s), the "Successful Bidder(s)"). In making this decision, the Debtors shall consider the Bid Assessment Criteria.

If an Auction is held, the Debtors shall be deemed to have accepted a Qualified Bid only when (1) such Bid is declared a Successful Bid at the Auction; and (2) definitive documentation has been executed in respect thereof. Such acceptance is conditioned upon approval by the Court of the Successful Bid(s) and the entry of an order approving such Successful Bid(s).

Promptly following the Debtors' selection of the Successful Bid(s) and the conclusion of the Auction, and in any event no later 24 hours after the conclusion of the Auction, the Debtors shall announce the Successful Bid(s) and Successful Bidder(s) and shall file with the Court notice of the Successful Bid(s) and Successful Bidder(s). No further Bids will be accepted after the Auction is closed.

***Backup Bidder***

If an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid as compared to the Successful Bid at the Auction for the Assets, as determined by the Debtors in the exercise of their reasonable business judgment (after consultation with the Consultation Parties) (the "Backup Bid"), shall be required to serve as a backup bidder (the "Backup Bidder"), and each Qualified Bidder (including the Stalking Horse Bidder) shall agree and be deemed to agree to be the Backup Bidder if so designated; *provided* that if an Auction is held and the Designated Backup Bid is not the next-highest or otherwise second-best Qualified Bid, the Debtors may designate another Qualified Bidder as the Backup Bidder, in which case the Designated Backup Bidder shall not be the Backup Bidder; otherwise, the Designated Backup Bidder shall remain the Backup Bidder; *provided*, *further*, that if the Stalking Horse Bidder is selected as the Backup Bidder, its Backup Bid shall remain open and irrevocable in accordance with the Stalking Horse APA until the earlier of (x) the first business day after the closing of a Transaction with the Successful Bidder for the applicable Assets and (y) the Outside Date (as defined in the Stalking Horse APA).

The identity of the Backup Bidder and the amount and material terms of the Qualified Bid of the Backup Bidder shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.

The Backup Bid shall remain binding on the Backup Bidder until the earlier of (1) the closing of a Transaction for the applicable Assets pursuant to the Successful Bid; and (2) 90 days after the entry of the Sale Order, unless otherwise agreed in writing by the Debtors and the Backup Bidder or otherwise ordered by the Court; *provided* that the Backup Bid of the Stalking Horse Bidder (if designated as the Backup Bidder) and the Designated Backup Bid shall remain open and irrevocable for the periods set forth above with respect thereto. If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes.

Subject to the terms of the Sale Order, the Debtors will be authorized, but not required, to consummate (after consultation with the Consultation Parties) all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.

Following entry of the relevant Sale Order, if the Successful Bidder fails to consummate the Transaction contemplated by the Successful Bid, the Debtors may, after consultation with the Consultation Parties, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors will be authorized, but not required, to agree, after consultation with the Consultation Parties, to consummate the Transaction with the Backup Bidder without further order of the Court. In such case of a breach or failure to perform on the part of the Successful Bidder and in such other circumstances as may be specified in the definitive documentation governing the Successful Bid, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors. The Debtors specifically reserve the right to seek all available remedies, including damages and specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures.

***True Up of Deposit***

If an Auction is held, then within one (1) business day following the conclusion of the Auction, the Successful Bidder(s) (other than with respect to any credit bid) shall submit by transfer of immediately available funds to an account identified by the Debtors the amount required to increase the Successful Bidder(s)' Deposit(s) to 10% of the Purchase Price contained in the Successful Bid(s), as applicable, or such other amount as the Debtors determine, after consultation with the Consultation Parties.

## SALE HEARING

A hearing to consider approval of one or more Transactions and the transfer of all of the applicable Assets and Assumed Liabilities to the Successful Bidder(s) (the "Sale Hearing"), which may be held together with the hearing on confirmation of the Plan, is presently scheduled to take place on [●], 2026, at [●] (prevailing Central Time), or as soon thereafter as counsel may be heard, before the Honorable [●], United States Bankruptcy Judge at the United States Bankruptcy Court for the Southern District of Texas, 515 Rusk Street, Courtroom [●], Houston, Texas 77002.

The Sale Hearing may be continued to a later date by the Debtors by sending notice prior to, or making an announcement at, the Sale Hearing, or as may be ordered by the Court.

At the Sale Hearing, the Debtors shall seek Court approval of the Successful Bid(s) and the Backup Bid(s). Any prior designation or conditional acceptance of a Successful Bid remains subject to (i) Court approval and (ii) the applicable Debtors' execution of definitive agreements.

## CONSULTATION PARTIES

The "Consultation Parties" are (i) the advisors to any official statutory committee duly appointed in the Chapter 11 Cases and (ii) the advisors to the DIP Agent; *provided* that, for so long as the Designated Backup Bid remains open, the advisors to the DIP Agent shall not be Consultation Parties with respect to the Assets subject to the Designated Backup Bid or any decision to designate a Successful Bidder or Backup Bidder, without the consent of the Debtors. The Debtors shall consult with the Consultation Parties regarding all Bids. If a Consultation Party submits a Bid (including a credit bid) or has a Bid submitted on its behalf for so long as such Bid remains open (and, after the Bid Deadline, is deemed to be a Qualified Bid), then such party shall not be deemed a Consultation Party for the portion of the Assets subject to the Bid to the extent the Debtors reasonably determine that consultation with such Consultation Party would impair the sale process or would otherwise be inconsistent with the *Procedures for Complex Cases in the Southern District of Texas* (effective January 1, 2023).

To the extent any insider (as such term is defined in the Bankruptcy Code) of the Debtors or any of their affiliates, or any person or entity controlled by such insider of the Debtors or any of their affiliates, chooses to submit a Bid, and such Bid is deemed a Qualified Bid, such insider and any person associated with such insider shall be expressly prohibited from participating in any manner in the evaluation of Qualified Bids and the Auction (other than in such insider's capacity as a Qualified Bidder).

Each reference in these Bidding Procedures to "consultation" (or similar phrase) with the Consultation Parties shall mean reasonable consultation in good faith.

**ADDITIONAL PROCEDURES**

The Debtors, in the exercise of their fiduciary duties for the purpose of maximizing value for their estates from the sale process, may modify the Bidding Procedures and implement additional procedural rules for conducting the Auction after consultation with the Consultation Parties. Specifically, among other things, the Debtors may determine, after consultation with the Consultation Parties, to select more than one Successful Bid and more than one Successful Bidder (and/or more than one Backup Bid) and more than one Backup Bidder, in which event such Backup Bids may provide for groupings of Assets that are different from the groupings of Assets reflected in the Successful Bid(s) for separate portions of the Assets.

**RESERVATION OF RIGHTS AND MODIFICATIONS**

Except as otherwise provided in the Stalking Horse APA or the Bidding Procedures Order, the Debtors reserve the right, in their reasonable business judgment after consultation with the Consultation Parties, to: (1) determine which Bidders are Qualified Bidders; (2) determine which Bids are Qualified Bids; (3) determine which Qualified Bid is the highest or otherwise best proposal and which is the next-highest or otherwise best proposal; (4) reject, at any time prior to the closing of the Auction or, if no Auction is held, at any time prior to entry of the Sale Order(s), any Bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (c) contrary to the best interests of the Debtors and their estates; (5) waive terms and conditions set forth herein with respect to all Potential Bidders; (6) impose additional terms and conditions with respect to all Potential Bidders; (7) extend the deadlines set forth herein; (8) schedule one or more additional Auctions; (9) continue or cancel the Auction and/or Sale Hearing in open court or by filing a notice on the docket of the Chapter 11 Cases, without further notice; (10) include any other party as an attendee at the Auction; and (11) modify the Bidding Procedures and implement additional procedural rules for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bankruptcy Code, the Bidding Procedures Order, or any other order of the Court, *provided* that all such modifications shall be disclosed to all Potential Bidders (if applicable) or Qualified Bidders (if applicable) prior to or during the Auction; *provided, further*, that no such modification shall impair the Stalking Horse Bidder's rights to the Bid Protections or otherwise modify the Bidding Procedures in a manner inconsistent with the Stalking Horse APA without the Stalking Horse Bidder's consent (not to be unreasonably withheld, conditioned, or delayed).

Unless expressly addressed by separate order of the Court, the Debtors shall retain all rights to any of their assets that are (a) not Assets, or (b) otherwise not subject to a Transaction that is approved by the Court at the Sale Hearing. Any allocation of a Qualified Bidder's purchase price among the Assets for which it is bidding is not a binding determination of, nor an admission by the Debtors of, the value of such Assets, and all rights are reserved with respect thereto.

**FIDUCIARY OUT**

Notwithstanding anything to the contrary in the Bidding Procedures or the Bidding Procedures Order, nothing in the Bidding Procedures or the Bidding Procedures Order shall require any Debtor, its officers, or the board of directors, board of managers, or similar governing body of

any Debtor to take any action or to refrain from taking any action with respect to the Bidding Procedures or any Transaction to the extent such officers, or the board of directors, board of managers, or similar governing body of such Debtor reasonably determine in good faith, after consultation with counsel, that taking or failing to take such action would be inconsistent with applicable law or its fiduciary obligations under applicable law.

Further, notwithstanding anything to the contrary in the Bidding Procedures or the Bidding Procedures Order, through the date of the Auction (if held), nothing in the Bidding Procedures or the Bidding Procedures Order shall diminish the right of any of the Debtors and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives to: (1) consider, respond to, and facilitate alternate proposals for sales or other restructuring transactions involving any or all of the Assets (each, an "Alternate Proposal"); (2) provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity; (3) maintain or continue discussions or negotiations with respect to Alternate Proposals; (4) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiation of Alternate Proposals; and (5) enter into or continue discussions or negotiations with holders of claims against or equity interests in any Debtor or any other party in interest in the Chapter 11 Cases (including the United States Trustee), or any other entity regarding Alternate Proposals.

# Annex 2

## Sale Notice

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| America's Car-Mart, Inc., *et al.*,[1] | ) | Case No. [XX-XXXXX] (___) |
| Debtors. | ) | |
| | ) | Joint Administration Requested |

**NOTICE OF AUCTION AND SALE HEARING**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1. On [●], 2026 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Court"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. On [●], 2026, the Debtors filed a motion [Docket No. [●]] (the "Bidding Procedures Motion"), pursuant to sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Rules 2002, 6003, 6004, 6006, 9007, 9008, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rules 2002-1 and 9013-1 of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules"), seeking an order (the "Bidding Procedures Order") approving, among other things, procedures (the "Bidding Procedures")[2] for submitting competing bids for the Assets.

3. Pursuant to the Bidding Procedures Order, the Court approved, among other things, (a) the designation of Claypool Holdings, LLC, Cardinal Finance LLC, ACM-AR Inc., ACM Finance Inc., and Cardinal Asset Holdings LLC (collectively with any affiliates or designees thereof, the "Stalking Horse Bidder"), as the stalking horse bidder for the Assets pursuant to that certain Asset Purchase Agreement, dated as of [●], 2026 (the "Stalking Horse APA"), subject to higher or otherwise better Qualified Bids, and the Bid Protections payable to the Stalking Horse

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each of the Debtors' tax identification numbers, are: America's Car-Mart, Inc. (1141); Colonial Auto Finance, Inc. (3258); Texas Car-Mart, Inc. (3909); America's Car Mart, Inc. (1606); Colonial Underwriting, Inc. (3159); and Auto Finance Investors, Inc. (1385). The location of Debtor America's Car-Mart, Inc.'s corporate headquarters and the Debtors' service address in these Chapter 11 Cases is 1805 North 2nd Street, Suite 401, Rogers, Arkansas 72756.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures.

Bidder thereunder, and (b) the designation of New ACM HoldCo, LLC (collectively with any affiliates or designees thereof, the "Designated Backup Bidder") as the Backup Bidder on the terms set forth in the Credit Bid APA, unless a different Backup Bidder is selected at the Auction.

4. On [●], 2026, the Court entered the Bidding Procedures Order [Docket No. [●]]. Pursuant to the Bidding Procedures Order, if at least two Qualified Bids with regard to any Assets are received by the Bid Deadline of **December 17, 2026, at 5:00 p.m. (prevailing Central Time)** (each as defined in the Bidding Procedures Order or the Bidding Procedures, as applicable), the Debtors may conduct an Auction, which shall start on **December 22, 2026, at 10:00 a.m. (prevailing Eastern Time) / 9:00 a.m. (prevailing Central Time)** at the offices of proposed counsel to the Debtors, Mayer Brown LLP, 1221 Avenue of the Americas, New York, New York 10020, virtually, or at another place and time as the Debtors shall notify all Qualified Bidders, the Consultation Parties, and all other parties entitled to attend the Auction. Only the Debtors, the Consultation Parties, the Stalking Horse Bidder, any other Qualified Bidders, and such other parties as the Debtors may determine (after consultation with the Consultation Parties), in each case along with their representatives and advisors, shall be permitted to attend the Auction. Only Qualified Bidders may submit Overbids at the Auction. Any party that wishes to submit a Bid (as defined in the Bidding Procedures) for all or any portion of the Assets must submit a Bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

5. The Sale Hearing to consider the sale of the Assets to the Successful Bidder(s), free and clear of all Encumbrances, and approval of the Backup Bid(s) (including, as applicable, the Designated Backup Bid), will be held before the Honorable [●], United States Bankruptcy Judge, on **[December 28], 2026, at [●] [a.m./p.m.] (prevailing Central Time)**, in Courtroom [●], 515 Rusk Avenue, Houston, Texas 77002, together with the hearing to consider confirmation of the Plan, or as soon thereafter as counsel may be heard. The Sale Order(s) may be included as part of the order confirming the Plan. The Sale Hearing may be adjourned by the Debtors from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment at the Sale Hearing or in a notice or agenda filed with the Court.

6. Objections to the Sale, including with respect to the identity of the Stalking Horse Bidder and adequate assurance of future performance by the Stalking Horse Bidder, must (a) be in writing, (b) comply with the Bankruptcy Rules and the Bankruptcy Local Rules, (c) state with particularity their legal and factual bases, and (d) be filed with the Court and served so as to be actually received on or before **December 14, 2026, at 5:00 p.m. (prevailing Central Time)** (the "Sale Objection Deadline"); *provided* that (i) objections solely related to the identity of the Successful Bidder and adequate assurance of future performance by the Successful Bidder (in each case, other than the Stalking Horse Bidder and the Designated Backup Bidder) must be filed and served by the earlier of (x) 48 hours after the Post-Auction Notice is filed and (y) commencement of the Sale Hearing (the "Post-Auction Objection Deadline"), and (ii) objections solely related to the identity of, and adequate assurance of future performance by, the Designated Backup Bidder, solely if and when the Designated Backup Bidder becomes the Successful Bidder, must be filed and served no later than (x) the earlier of 48 hours after the filing of a notice thereof by the Debtors (a "Backup Bidder Notice") and the Sale Hearing or (y) if the Backup Bidder Notice is filed after the Sale Hearing, 7 days after the filing of the Backup Bidder Notice (the "Backup Bidder Objection Deadline"). Objections must be served on the following parties (collectively, the

"Objection Recipients") and, in the case of objections due by the Post-Auction Objection Deadline, counsel to the Successful Bidder(s), if known:

(a) proposed counsel to the Debtors, Mayer Brown LLP, 700 Louisiana Street, Suite 3400, Houston, Texas 77002 (Attn.: Charles S. Kelley (ckelley@mayerbrown.com)); 71 South Wacker Drive, Chicago, Illinois 60606 (Attn.: Louis S. Chiappetta (lchiappetta@mayerbrown.com)); and 1221 Avenue of the Americas, New York, New York 10020 (Attn.: Richard A. Stieglitz (rstieglitz@mayerbrown.com));

(b) counsel to the Stalking Horse Bidder, Troutman Pepper Locke LLP, 875 Third Avenue, New York, New York 10022 (Attn.: Matthew Brooks (matthew.brooks@troutman.com), David Kupetz (david.kupetz@troutman.com), and Michael Sabino (michael.sabino@troutman.com));

(c) counsel to the DIP Agent and the Designated Backup Bidder, Milbank LLP, 55 Hudson Yards, New York, New York 10001 (Attn.: John Britton (jbritton@milbank.com), Matt Brod (mbrod@milbank.com), and Jason T. Anderson (jtanderson@milbank.com));

(d) the Office of the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), 515 Rusk Street, Suite 3516, Houston, Texas 77002; and

(e) proposed counsel to any Committee.

**UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER HEARING AND NOTICE.**

7. This Sale Notice is subject to the Bidding Procedures and the Bidding Procedures Order, and the Bidding Procedures Order controls in the event of a conflict. The Debtors encourage all parties in interest to review such documents in their entirety. Parties seeking information about the sale of the Assets and/or copies of any related document, including the Bidding Procedures Motion, the Bidding Procedures Order, the Stalking Horse APA, or the Credit Bid APA, may make a written request to proposed counsel to the Debtors, Mayer Brown LLP, at the addresses set forth above. In addition, copies of the Bidding Procedures Motion, the Bidding Procedures Order, the Stalking Horse APA, the Credit Bid APA, and this Sale Notice are on file with the Clerk of the Court and are available free of charge on the Debtors' case website maintained by Omni Agent Solutions, Inc. at https://omniagentsolutions.com/ACM.

# ANNEX 3

## Assumption and Assignment Notice

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| America's Car-Mart, Inc., *et al.*,[1] | ) | Case No. [XX-XXXXX] (___) |
| Debtors. | ) | Joint Administration Requested |

**NOTICE OF (I) POTENTIAL ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (II) CURE AMOUNTS**

You are receiving this notice because you may be a counterparty to a contract or lease with America's Car-Mart, Inc. or one of its affiliates or subsidiaries. Please read this notice carefully as your rights may be affected by the transactions described herein.

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1. On [●], 2026 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Court"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. On [●], 2026, the Debtors filed a motion [Docket No. [●]] seeking approval of procedures for the sale of some or all of the Debtors' assets (the "Bidding Procedures").[2] On [●], 2026, the Court entered an order approving the Bidding Procedures [Docket No. [●]] (the "Bidding Procedures Order").

3. Pursuant to the Bidding Procedures and the Bidding Procedures Order, the Debtors may assume and assign to the Stalking Horse Bidder, the Designated Backup Bidder, or any other Successful Bidder(s) or Backup Bidder(s) (as applicable) one or more of those executory contracts

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each of the Debtors' tax identification numbers, are: America's Car-Mart, Inc. (1141); Colonial Auto Finance, Inc. (3258); Texas Car-Mart, Inc. (3909); America's Car Mart, Inc. (1606); Colonial Underwriting, Inc. (3159); and Auto Finance Investors, Inc. (1385). The location of Debtor America's Car-Mart, Inc.'s corporate headquarters and the Debtors' service address in these Chapter 11 Cases is 1805 North 2nd Street, Suite 401, Rogers, Arkansas 72756.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures.

and unexpired leases listed on **Schedule A** annexed hereto (collectively, the "Potentially Assigned Agreements" and each, a "Potentially Assigned Agreement"), pursuant to section 365 of the Bankruptcy Code. The Potentially Assigned Agreements include the Servicing Agreements and the other ABS Transaction Documents (each as defined in the Stalking Horse APA) proposed to be assumed and assigned to the Stalking Horse Bidder.

4. The Debtors have indicated on **Schedule A** annexed hereto the cure amounts, if any, that they believe must be paid under sections 365(b)(1)(A) and (B) of the Bankruptcy Code to cure any defaults and compensate any pecuniary losses under the Potentially Assigned Agreements (each a "Cure Amount"). If no Cure Amount is listed for a particular Potentially Assigned Agreement, the Debtors' asserted Cure Amount for such Potentially Assigned Agreement shall be deemed to be $0.00.

5. Any party objecting to the Debtors' proposed Cure Amount or to the assumption and assignment of a Potentially Assigned Agreement, or asserting that any other amounts, defaults, conditions, or pecuniary losses must be cured or satisfied under any of the Potentially Assigned Agreements in order for such contract or lease to be assumed and assigned (other than an objection as to the identity of the Successful Bidder or adequate assurance of future performance by the Successful Bidder (in each case, other than the Stalking Horse Bidder and the Designated Backup Bidder), which shall be due by the Post-Auction Objection Deadline, or an objection as to the identity of, or adequate assurance of future performance by, the Designated Backup Bidder, which shall be due by the Backup Bidder Objection Deadline (as defined below)), must file an objection (a "Contract Objection") that (a) is in writing, (b) complies with the Bankruptcy Rules and the Bankruptcy Local Rules, (c) specifies the grounds for the objection, including the fully liquidated cure amount and the legal and factual bases for any unliquidated cure amount that the objector asserts is required to be paid under sections 365(b)(1)(A) and (B) of the Bankruptcy Code, along with the specific nature and dates of any alleged defaults and the pecuniary losses, if any, resulting therefrom, (d) is filed with the Court, together with proof of service, and (e) is served so as to be actually received on (i) proposed counsel to the Debtors, Mayer Brown LLP, 700 Louisiana Street, Suite 3400, Houston, Texas 77002 (Attn.: Charles S. Kelley (ckelley@mayerbrown.com)); 71 South Wacker Drive, Chicago, Illinois 60606 (Attn.: Louis S. Chiappetta (lchiappetta@mayerbrown.com)); and 1221 Avenue of the Americas, New York, New York 10020 (Attn.: Richard A. Stieglitz (rstieglitz@mayerbrown.com)); (ii) counsel to the Stalking Horse Bidder, Troutman Pepper Locke LLP, 875 Third Avenue, New York, New York 10022 (Attn.: Matthew Brooks (matthew.brooks@troutman.com), David Kupetz (david.kupetz@troutman.com), and Michael Sabino (michael.sabino@troutman.com)); (iii) counsel to the DIP Agent and the Designated Backup Bidder, Milbank LLP, 55 Hudson Yards, New York, New York 10001 (Attn.: John Britton (jbritton@milbank.com), Matt Brod (mbrod@milbank.com), and Jason T. Anderson (jtanderson@milbank.com)); (iv) the Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, Texas 77002; and (v) proposed counsel to any Committee (collectively, the "Notice Parties"), in each case by no later than **5:00 p.m. (prevailing Central Time) on the date that is 14 days after the service of this Assumption and Assignment Notice** (the "Contract Objection Deadline"). Any objection to adequate assurance of future performance by the Stalking Horse Bidder must be filed by the Sale Objection Deadline (as defined below). The Backup Bidder Objection Deadline shall not extend the Contract Objection Deadline with respect to Cure Amounts or any other objection to the assumption and assignment of a Potentially Assigned Agreement.

6. Within 24 hours after the Auction concludes, the Debtors shall file with the Court, post on the Case Website, and serve on the Counterparties to the Potentially Assigned Agreements a notice identifying the Successful Bidder(s) and Backup Bidder(s) (the "Post-Auction Notice"). The deadline for objecting solely to the Successful Bidder's identity or adequate assurance of its future performance (in each case, if the Successful Bidder is not the Stalking Horse Bidder or the Designated Backup Bidder) (an "Adequate Assurance Objection") shall be the earlier of (a) 48 hours after the filing of the Post-Auction Notice and (b) the Sale Hearing (the "Post-Auction Objection Deadline" or the "Adequate Assurance Objection Deadline"). If the Designated Backup Bidder becomes the Successful Bidder, whether at the Auction or because a Successful Bidder fails to consummate the relevant Transaction, the Debtors shall promptly file with the Court, post on the Case Website, and serve on the Counterparties a notice thereof (a "Backup Bidder Notice"), and any objection solely as to the identity of, or adequate assurance of future performance by, the Designated Backup Bidder (a "Backup Bidder Contract Objection") must be filed and served on the Notice Parties no later than (x) the earlier of 48 hours after the filing of the Backup Bidder Notice and the Sale Hearing or (y) if the Backup Bidder Notice is filed after the Sale Hearing, 7 days after the filing of the Backup Bidder Notice (the "Backup Bidder Objection Deadline"). The Successful Bidder (including the Designated Backup Bidder, if it becomes the Successful Bidder) shall provide adequate assurance information to the Debtors, and the Debtors shall provide such information to Counterparties who request it in writing from proposed counsel to the Debtors.

**UNLESS A CONTRACT OBJECTION IS TIMELY AND PROPERLY FILED AND SERVED BEFORE THE CONTRACT OBJECTION DEADLINE, AN ADEQUATE ASSURANCE OBJECTION IS TIMELY RAISED BEFORE THE ADEQUATE ASSURANCE OBJECTION DEADLINE, OR A BACKUP BIDDER CONTRACT OBJECTION IS TIMELY RAISED BEFORE THE BACKUP BIDDER OBJECTION DEADLINE, THE NON-DEBTOR PARTY TO A POTENTIALLY ASSIGNED AGREEMENT SHALL (A) BE FOREVER BARRED FROM OBJECTING TO THE CURE AMOUNT AND FROM ASSERTING ANY ADDITIONAL CURE OR OTHER AMOUNTS WITH RESPECT TO SUCH POTENTIALLY ASSIGNED AGREEMENT, AND THE DEBTORS AND THE SUCCESSFUL BIDDER(S) SHALL BE ENTITLED TO RELY SOLELY UPON THE CURE AMOUNT; (B) BE DEEMED TO HAVE CONSENTED TO ANY ASSUMPTION AND ASSIGNMENT OF SUCH POTENTIALLY ASSIGNED AGREEMENT; AND (C) BE FOREVER BARRED AND ESTOPPED FROM ASSERTING OR CLAIMING AGAINST THE DEBTORS OR THE SUCCESSFUL BIDDER(S) THAT ANY ADDITIONAL AMOUNTS ARE DUE OR OTHER DEFAULTS EXIST, THAT CONDITIONS TO ASSIGNMENT MUST BE SATISFIED UNDER SUCH POTENTIALLY ASSIGNED AGREEMENT OR THAT THERE IS ANY OBJECTION OR DEFENSE TO THE ASSUMPTION AND ASSIGNMENT OF SUCH POTENTIALLY ASSIGNED AGREEMENT.**

**IN ADDITION, THE PROPOSED CURE AMOUNT SET FORTH IN SCHEDULE A HERETO SHALL BE BINDING UPON THE NON-DEBTOR PARTIES TO THE POTENTIALLY ASSIGNED AGREEMENTS FOR ALL PURPOSES IN THESE CHAPTER 11 CASES AND WILL CONSTITUTE A FINAL DETERMINATION OF THE CURE AMOUNTS REQUIRED TO BE PAID IN CONNECTION WITH ANY ASSUMPTION AND ASSIGNMENT OF THE POTENTIALLY ASSIGNED AGREEMENTS.**

7. If a non-Debtor counterparty timely and properly objects to the proposed Cure Amounts for a Potentially Assigned Agreement (the "Disputed Cure Amount"), then (a) the cure amount shall be as agreed between the parties (*provided* that the Debtors shall not settle any such dispute relating to a Purchased Contract (as defined in the Stalking Horse APA) without the Stalking Horse Bidder's consent) or (b) if the parties cannot resolve the dispute, then such objection will be adjudicated at the Sale Hearing or at such other date and time as may be fixed by the Court. All other objections to the proposed assumption and assignment of a Potentially Assigned Agreement will likewise be heard at the Sale Hearing or at such other date and time as may be fixed by the Court.

8. A Contract Objection does not constitute an objection to the relief generally requested in the motion to approve the Bidding Procedures or in the Sale. Parties wishing to otherwise object to the relief requested in the motion to approve the Bidding Procedures or the Sale must file and serve a separate objection, stating with particularity such party's grounds for objection, on each of the Notice Parties listed above no later than **December 14, 2026, at 5:00 p.m. (prevailing Central Time)** (the "Sale Objection Deadline").

9. If you agree with the Cure Amount indicated on **Schedule A**, and otherwise do not object to the Debtors' assignment of your lease or contract, you need not take any further action.

10. The Debtors' decision to assume and assign the Potentially Assigned Agreements is subject to Bankruptcy Court approval and consummation of the sale of the Assets. The Debtors may add, remove, or modify Potentially Assigned Agreements and Cure Amounts by filing and serving a Supplemental Assumption Notice or a Final Assumption Notice in accordance with the Bidding Procedures Order, and affected Counterparties will have the opportunity to object as set forth therein.

**Inclusion of any document on the list of Potentially Assigned Agreements does not constitute a determination or admission by the Debtors or the Successful Bidder(s) that such document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and all related rights are reserved.**

# Schedule A

## LEASES

| Landlord Name / Address | Address of Subject Property | Cure Amount |
| --- | --- | --- |

## EXECUTORY CONTRACTS

| Counterparty Name / Address | Description of Contract | Cure Amount |
| --- | --- | --- |

**Annex 4**
**Post-Auction Notice**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| America's Car-Mart, Inc., *et al.*,[5] | ) | Case No. [XX-XXXXX] (___) |
| | ) | |
| Debtors. | ) | |
| | ) | Joint Administration Requested |
| | ) | |

**NOTICE OF SUCCESSFUL BIDDER(S) AND BACKUP BIDDER(S)**
**[Relates to Docket Nos. [●] and [●]]**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1. On [●], 2026 (the "Petition Date"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Southern District of Texas (the "Court"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

1. On [●], 2026, the Court entered the *Order (I) Approving Certain Bidding Procedures and the Form and Manner of Notice Thereof, (II) Approving the Designation of the Stalking Horse Bidder and the Designated Backup Bidder and the Related Bid Protections, (III) Scheduling an Auction and a Hearing on the Approval of the Sale of All or Substantially All of the Debtors' Assets, (IV) Establishing Certain Assumption and Assignment Procedures and Approving the Manner of Notice Thereof, and (V) Granting Related Relief* [Docket No. [●]] (the "Bidding Procedures Order"), which, among other things, approved the bidding procedures attached to the Bidding Procedures Order as Annex 1 (the "Bidding Procedures")[6] and authorized the Debtors to conduct an auction (the "Auction") for the Assets in accordance with the Bidding Procedures.

2. Pursuant to the Bidding Procedures Order, the Court approved, among other things, (a) the designation of Claypool Holdings, LLC, Cardinal Finance LLC, ACM-AR Inc., ACM Finance Inc., and Cardinal Asset Holdings LLC (collectively with any affiliates or designees thereof, the "Stalking Horse Bidder"), as the stalking horse bidder for the Assets pursuant to that certain Asset Purchase Agreement, dated as of [●], 2026 (the "Stalking Horse APA"), and (b) the

---

[5] The Debtors in these Chapter 11 Cases, along with the last four digits of each of the Debtors' tax identification numbers, are: America's Car-Mart, Inc. (1141); Colonial Auto Finance, Inc. (3258); Texas Car-Mart, Inc. (3909); America's Car Mart, Inc. (1606); Colonial Underwriting, Inc. (3159); and Auto Finance Investors, Inc. (1385). The location of Debtor America's Car-Mart, Inc.'s corporate headquarters and the Debtors' service address in these Chapter 11 Cases is 1805 North 2nd Street, Suite 401, Rogers, Arkansas 72756.

[6] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order or the Bidding Procedures, as applicable.

designation of New ACM HoldCo, LLC (collectively with any affiliates or designees thereof, the "Designated Backup Bidder") as the backup bidder on the terms set forth in the Credit Bid APA, unless a different Backup Bidder is selected at the Auction.

3. On **December 22, 2026**, beginning at 10:00 a.m. (prevailing Eastern Time) / 9:00 a.m. (prevailing Central Time), the Debtors conducted the Auction in accordance with the Bidding Procedures. The Auction concluded on [●], 2026, at [●] [a.m./p.m.] (prevailing Central Time).

4. At the conclusion of the Auction, the Debtors, in the exercise of their reasonable business judgment and after consultation with the Consultation Parties, selected **[NAME OF SUCCESSFUL BIDDER]** (the "Successful Bidder") as the Successful Bidder for [all or substantially all of the Assets] [the following Assets: [●]]. The Successful Bid provides for aggregate consideration consisting of [(a) cash in the amount of $[●]; (b) [●]; and (c) the assumption of the Assumed Liabilities set forth in the Successful Bidder's Purchase Agreement] (the "Successful Bid"). A copy of the [Purchase Agreement] [Stalking Horse APA, as modified at the Auction] executed by the Successful Bidder (the "Successful Bidder APA") is attached hereto as Exhibit A.

5. The Debtors, after consultation with the Consultation Parties, further selected **[NAME OF BACKUP BIDDER] [the Stalking Horse Bidder] [the Designated Backup Bidder]** (the "Backup Bidder") as the Backup Bidder for [all or substantially all of the Assets] [the following Assets: [●]]. The Backup Bid provides for aggregate consideration consisting of [●] (the "Backup Bid"). [A copy of the Purchase Agreement executed by the Backup Bidder is attached hereto as **Exhibit B**.] [The Credit Bid APA was attached to the Motion as Exhibit C [Docket No. [●]].] The Backup Bid shall remain open and irrevocable in accordance with the Bidding Procedures [until the earlier of (a) the closing of a Transaction for the applicable Assets pursuant to the Successful Bid and (b) 90 days after entry of the Sale Order] [, or, with respect to the Stalking Horse Bidder or the Designated Backup Bidder, for the period set forth in the Stalking Horse APA or the Credit Bid APA, as applicable].

6. The Successful Bid and the Backup Bid remain subject to Court approvals. The hearing to consider approval of the Transaction(s) contemplated by the Successful Bid and the Backup Bid (the "Sale Hearing") will be held before the Honorable [●], United States Bankruptcy Judge, on **[December 28], 2026, at [●] [a.m./p.m.] (prevailing Central Time)**, in Courtroom [●], 515 Rusk Avenue, Houston, Texas 77002[, together with the hearing to consider confirmation of the Plan]. [Participation at the Sale Hearing will be permitted [in person or] by an audio and video connection. Audio communication will be by use of the Court's dial-in facility, which may be accessed at 832-917-1510; Judge [●]'s conference room number is [●]. Video communication will be by use of the GoTo platform; the meeting code is "Judge [●]".] The Debtors may adjourn the Sale Hearing without further notice other than an announcement at the Sale Hearing or a notice or agenda filed with the Court. At the Sale Hearing, the Debtors will seek entry of the Sale Order(s) approving the Sale to the Successful Bidder on the terms of the Successful Bid and approving the Backup Bid.

7. Objections relating solely to (a) the Successful Bidder's identity and (b) adequate assurance of its future performance, in each case other than the Stalking Horse Bidder and the Designated Backup Bidder, including any Post-Auction Contract Objection, must (i) be in writing,

(ii) comply with the Bankruptcy Rules and the Bankruptcy Local Rules, (iii) state with particularity their legal and factual bases, and (iv) be filed with the Court and served on the Objection Recipients and counsel to the Successful Bidder so as to be actually received no later than the earlier of (x) 48 hours after the filing of this Post-Auction Notice and (y) the Sale Hearing, **i.e.**, by **[●], 2026, at [●] [a.m./p.m.] (prevailing Central Time)** (the "Post-Auction Objection Deadline"). [Because the Designated Backup Bidder has been selected as the Successful Bidder, objections solely related to the identity of, and adequate assurance of future performance by, the Designated Backup Bidder, including any Backup Bidder Contract Objection, must be filed and served on the Objection Recipients no later than the earlier of 48 hours after the filing of this notice and the Sale Hearing (the "Backup Bidder Objection Deadline").] Any objection to the Successful Bidder's proposed adequate assurance of future performance will be resolved at the Sale Hearing.

8. The "Objection Recipients" are:

(a) proposed counsel to the Debtors, Mayer Brown LLP, 700 Louisiana Street, Suite 3400, Houston, Texas 77002 (Attn.: Charles S. Kelley (ckelley@mayerbrown.com)); 71 South Wacker Drive, Chicago, Illinois 60606 (Attn.: Louis S. Chiappetta (lchiappetta@mayerbrown.com)); and 1221 Avenue of the Americas, New York, New York 10020 (Attn.: Richard A. Stieglitz (rstieglitz@mayerbrown.com));

(b) counsel to the Stalking Horse Bidder, Troutman Pepper Locke LLP, 875 Third Avenue, New York, New York 10022 (Attn.: Matthew Brooks (matthew.brooks@troutman.com), David Kupetz (david.kupetz@troutman.com), and Michael Sabino (michael.sabino@troutman.com));

(c) counsel to the DIP Agent and the Designated Backup Bidder, Milbank LLP, 55 Hudson Yards, New York, New York 10001 (Attn.: John Britton (jbritton@milbank.com), Matt Brod (mbrod@milbank.com), and Jason T. Anderson (jtanderson@milbank.com));

(d) the Office of the United States Trustee for the Southern District of Texas, 515 Rusk Street, Suite 3516, Houston, Texas 77002;

(e) proposed counsel to any Committee; and

(f) [counsel to the Successful Bidder, [●] (Attn.: [●] ([●]))].

9. Objections to the Sale on any other grounds, including any objection to the identity of, or adequate assurance of future performance by, the Stalking Horse Bidder, were required to be filed by the Sale Objection Deadline of December 14, 2026, at 5:00 p.m. (prevailing Central Time), and this Post-Auction Notice does not extend or reopen such deadline. Objections solely related to the identity of, or adequate assurance of future performance by, the Designated Backup Bidder are governed by the Backup Bidder Objection Deadline set forth in the Bidding Procedures Order.

10. The Successful Bidder has provided adequate assurance information to the Debtors in accordance with the Bidding Procedures. A Counterparty to an Assigned Contract may request that information in writing to proposed counsel to the Debtors at the addresses set forth above. At the Sale Hearing, the Debtors will seek approval of the assumption and assignment to the Successful Bidder of only those Assigned Contracts that the Debtors and the Successful Bidder have agreed shall be assumed and assigned (the "Selected Assigned Contracts"). [A list of the Selected Assigned Contracts identified as of the date hereof is attached hereto as **Exhibit C**.] Listing any contract or lease does not obligate the Debtors to assume, or the Successful Bidder to take assignment of, such contract or lease, or constitute an admission that it is an executory contract or unexpired lease, and all rights are reserved.

***IF NO POST-AUCTION OBJECTION IS TIMELY FILED AND SERVED IN ACCORDANCE WITH THIS NOTICE AND THE BIDDING PROCEDURES ORDER, THE OBJECTING PARTY SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE IDENTITY OF THE SUCCESSFUL BIDDER OR ADEQUATE ASSURANCE OF FUTURE PERFORMANCE BY THE SUCCESSFUL BIDDER, SHALL BE DEEMED TO HAVE CONSENTED TO THE ASSUMPTION AND ASSIGNMENT OF THE APPLICABLE ASSIGNED CONTRACT(S) TO THE SUCCESSFUL BIDDER, AND THE COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER NOTICE OR HEARING.***

11. If the Successful Bidder fails to consummate the contemplated Transaction, the Debtors may, in accordance with the Bidding Procedures and the Sale Order, designate the Backup Bid as the new Successful Bid and the Backup Bidder as the new Successful Bidder and consummate the Transaction with the Backup Bidder without further order of the Court or notice to any party.

12. This Post-Auction Notice is subject to the terms and conditions of the Bidding Procedures and the Bidding Procedures Order, and the Bidding Procedures Order controls in the event of a conflict. Copies of the Bidding Procedures Order, the Bidding Procedures, the Stalking Horse APA, the Credit Bid APA, the Successful Bidder APA, and all other documents filed in the Chapter 11 Cases may be obtained free of charge on the Debtors' case website maintained by Omni Agent Solutions, Inc. at https://omniagentsolutions.com/ACM, or upon written request to proposed counsel to the Debtors.

# EXHIBIT C

FORM OF BILL OF SALE

**AGREED FORM**

# BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is made as of [●], 2026 by and among AMERICA'S CAR-MART, INC., a Texas corporation ("ACM"), the Additional Sellers (as defined in the Purchase Agreement (as defined below)) (together with ACM, collectively, "Sellers" and each, a "Seller"), and Cardinal Finance LLC, an Arkansas limited liability company, ACM-AR Inc., an Arkansas corporation, ACM Finance Inc., an Arkansas corporation, Claypool Holdings, LLC, a Georgia limited liability company, and Cardinal Asset Holdings LLC, an Indiana limited liability company (collectively, and together with their respective permitted successors, designees and assigns, "Buyer"). Each Seller and Buyer may be referred to herein individually as a "Party" and collectively as the "Parties." All capitalized terms used but not defined herein will have the respective meanings given to such terms in the Purchase Agreement (as defined below) or the Plan (as defined below), as applicable.

## RECITALS

WHEREAS, on November 23, 2026, Sellers and Buyer entered into that certain Asset Purchase Agreement, dated as of November 23, 2026 (as amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, the "Purchase Agreement");

WHEREAS, on November 24, 2026, Sellers commenced cases under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"), jointly administered under Case No. [●];

WHEREAS, on November 24, 2026, the Bankruptcy Court entered [the Sale Order as part of] the order (the "Confirmation Order") confirming the Joint Prepackaged Chapter 11 Plan of America's Car-Mart, Inc. and Certain of its Affiliates (as amended, supplemented or otherwise modified from time to time, the "Plan") [Docket No. [●]];

WHEREAS, pursuant to the Purchase Agreement and the Sale Order, and subject to the terms and conditions set forth therein, Buyer has agreed to purchase and accept from each Seller, and each Seller has agreed to sell, transfer, convey, assign and deliver to Buyer all of such Seller's right, title and interest in and to the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances) and all Liabilities (other than Assumed Liabilities) except as otherwise expressly provided in the Sale Order;

WHEREAS, pursuant to the Purchase Agreement, Buyer has agreed to assume and pay, perform and discharge when due, all of the Assumed Liabilities; and

WHEREAS, pursuant to the Purchase Agreement, Sellers and Buyer (a) are entering into this Agreement as evidence of such sale, transfer, conveyance, assignment and delivery of the Purchased Assets to Buyer and such assumption by Buyer of the Assumed Liabilities and (b) are concurrently entering into the Intellectual Property Assignment Agreement and the Benefits Assignment and Assumption Agreement.

NOW, THEREFORE, in consideration of the mutual benefits to be derived from this Agreement, the representations, warranties, conditions, agreements and promises contained in the

Purchase Agreement and herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

1. Bill of Sale, Assignment and Assumption of Purchased Assets. Effective as of the Closing, each Seller hereby sells, transfers, conveys, assigns and delivers to Buyer all of its right, title and interest in and to the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances) and all Liabilities (other than Assumed Liabilities), subject only to the terms and conditions set forth in the Purchase Agreement and the Sale Order, and Buyer does hereby purchase and accept the Purchased Assets.

2. Assignment and Assumption of Assumed Liabilities. Effective as of the Closing, each Seller hereby assigns to Buyer all of the Assumed Liabilities, subject only to the terms and conditions set forth in the Purchase Agreement and the Sale Order, and Buyer hereby accepts such assignment and assumes, and agrees that it shall be solely responsible for, and shall pay, discharge, and perform when due, each of the Assumed Liabilities.

3. Intellectual Property Assignment Agreement. Simultaneously with the execution and delivery of this Agreement, each Party shall execute and deliver to the other Parties the Intellectual Property Assignment Agreement consistent with Sections 2.4(b)(vii) and 2.4(c)(vii) of the Purchase Agreement.

4. Benefits Assignment and Assumption Agreement. Simultaneously with the execution and delivery of this Agreement, each Party shall execute and deliver to the other Parties the Benefits Assignment and Assumption Agreement consistent with Sections 2.4(b)(viii) and 2.4(c)(viii) of the Purchase Agreement.

5. Purchase Agreement. This Agreement is executed and delivered in connection with the Purchase Agreement, and is subject to every agreement, representation, warranty, indemnity, covenant and provision contained in the Purchase Agreement. In the event of any ambiguity, conflict or inconsistency between the terms of this Agreement and the terms of the Purchase Agreement, the terms of the Purchase Agreement will govern and control. The Parties acknowledge and agree that all agreements, representations, warranties, indemnities, covenants and provisions contained in the Purchase Agreement are not superseded hereby but will remain in full force and effect to the extent provided therein. This Agreement is not intended to, and does not, create any more expansive obligations of the Parties than those contemplated by the Purchase Agreement.

6. Other Provisions Incorporated by Reference. Sections 1.2 (Construction), 9.1 (Governing Law, Jurisdiction, Venue and Service), 9.2 (Notices), 9.3 (No Benefit to Third Parties), 9.4 (Waiver), 9.6 (Assignment), 9.7 (Amendment), 9.8 (Severability), 9.10 (No Liability), 9.11 (English Language), 9.13 (Counterparts), 9.14 (Entire Agreement) and 9.16 (Non-Business Day) of the Purchase Agreement are incorporated by reference into this Agreement, in each case *mutatis mutandis*, and each such Section so incorporated shall be fully enforceable against Sellers and Buyer and their respective successors and permitted assigns, and the rights of Sellers hereunder may be enforced by the Wind Down Estate and the Wind Down Administrator without the consent of Buyer, as if fully restated in this Agreement.

[*Remainder of page left intentionally blank. Signature page follows.*]

IN WITNESS WHEREOF, and intending to be legally bound, the undersigned have caused this BILL OF SALE AND ASSIGNMENT AND ASSUMPTION AGREEMENT to be executed as of the date hereof.

**ACM**:

AMERICA'S CAR-MART, INC.

By:__________________________________
Name:
Title:

**ADDITIONAL SELLERS**:

[●]

By:__________________________________
Name:
Title:

**BUYER**:

[CARDINAL FINANCE LLC]

By:__________________________________
Name:
Title:

[ACM-AR INC.]

By:__________________________________
Name:
Title:

[ACM FINANCE INC.]

By:__________________________________
Name:
Title:

[CLAYPOOL HOLDINGS, LLC]

By:__________________________________
Name:
Title:

[CARDINAL ASSET HOLDINGS LLC]

By:__________________________________
Name:
Title:

**EXHIBIT D**

FORM OF INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT

**AGREED FORM**

**EXHIBIT D**
**FORM OF INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

**INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT**

This INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT (this "**Assignment**") is made and entered into as of [●], 2026 (the "**Effective Date**"), by and among AMERICA'S CAR-MART, INC., a Texas corporation ("**ACM**"), AMERICA'S CAR MART, INC., an Arkansas corporation ("**ACM Arkansas**"), COLONIAL AUTO FINANCE, INC., an Arkansas corporation ("**CAF**"), TEXAS CAR-MART, INC., a Texas corporation, COLONIAL UNDERWRITING, INC., an Arkansas corporation and AUTO FINANCE INVESTORS, INC., a Texas corporation (each of the foregoing, an "**Assignor**" and, collectively, "**Assignors**"), and, Cardinal Finance LLC, an Arkansas limited liability company, ACM-AR Inc., an Arkansas corporation, ACM Finance Inc., an Arkansas corporation, Claypool Holdings, LLC, a Georgia limited liability company, and Cardinal Asset Holdings LLC, an Indiana limited liability company (all of the Persons set forth in this clause (iii), collectively, and together with their respective permitted successors, designees and assigns, "Buyer") ("**Assignee**"). Each Assignor and Assignee may be referred to herein individually as a "**Party**" and collectively as the "**Parties**."

**RECITALS**

(A) WHEREAS, Assignors and Assignee are parties to that certain Asset Purchase Agreement, dated as of November 23, 2026 (the "**Purchase Agreement**"), pursuant to which, among other things, and subject to the terms and conditions thereof and of the Sale Order, Assignors have agreed to sell, transfer, convey, assign and deliver to Assignee, and Assignee has agreed to purchase and accept from Assignors, all of Assignors' right, title and interest in, to and under the Purchased Assets, including the Purchased Intellectual Property;

(B) WHEREAS, on November 24, 2026, Assignors and certain of their Affiliates commenced the Chapter 11 Cases in the Bankruptcy Court, and on November 24, 2026, the Bankruptcy Court entered the Sale Order [Docket No. [●]] approving the Purchase Agreement and the Transactions, including the sale of the Purchased Assets to Assignee free and clear of all Encumbrances (other than Permitted Encumbrances) and all Liabilities (other than Assumed Liabilities) pursuant to sections 105, 363 and 365 of the Bankruptcy Code; and

(C) WHEREAS, the Purchase Agreement requires that, at the Closing, Assignors execute and deliver this Assignment to Assignee, and Assignee execute and deliver this Assignment to Assignors.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in the Purchase Agreement and herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, hereby agree as follows:

**1. Definitions**

1.1 Capitalized terms used but not defined in this Assignment have the meanings given to them in the Purchase Agreement. For purposes of this Assignment, "**Assigned IP**" means all Purchased Intellectual Property, including, without limitation, (a) the patents, if any, set forth on Schedule A, (b) the trademarks set forth on Schedule B, together with all goodwill associated therewith, (c) the copyrights set forth on Schedule C, and (d) the domain names and social media accounts set forth on Schedule D.

**2. Assignment**

2.1 Assignment. Upon the terms and subject to the conditions of the Purchase Agreement and the Sale Order, effective as of the Closing, each Assignor hereby irrevocably sells, transfers, conveys, assigns and delivers to Assignee, and Assignee hereby purchases, accepts and acquires from each such Assignor, all of such Assignor's right, title and interest in, to and under the Assigned IP, free and clear of all Encumbrances (other than Permitted Encumbrances) and all Liabilities (other than Assumed Liabilities), to the extent provided in the Sale Order, together with:

(a) all registrations, applications, renewals, extensions, reissues, divisionals, continuations, continuations-in-part and reexaminations of or relating to any of the foregoing, and all rights to apply for any of the foregoing in any jurisdiction;

(b) all goodwill associated with or symbolized by any of the Trademarks included in the Assigned IP;

(c) all income, royalties, damages and payments now or hereafter due or payable with respect to any of the foregoing, including damages and payments for past, present and future infringement, misappropriation, dilution or other violation thereof;

(d) all rights to sue and recover for past, present and future infringement, misappropriation, dilution or other violation of any of the foregoing, and all rights of priority and protection of interests therein under the Laws of any jurisdiction; and

(e) all tangible embodiments of any of the foregoing, including software (in source code and object code form), works of authorship, technology, databases and documentation, in each case to the extent in the possession or control of Assignors and not constituting Excluded Books and Records.

2.2 Intent-to-Use Applications. Notwithstanding Section 2.1, to the extent any Trademark application included in the Assigned IP is an application filed under Section 1(b) of the Lanham Act (15 U.S.C. § 1051(b)) for which an amendment to allege use or statement of use has not been filed and accepted, such application is assigned together with that portion of the Business to which the mark pertains, which Business is ongoing and existing and is being transferred to Assignee pursuant to the Purchase Agreement, in accordance with 15 U.S.C. § 1060(a)(1).

2.3 Licensed IP and Consents. Notwithstanding anything to the contrary herein, this Assignment shall not constitute an assignment of any Intellectual Property licensed to any Assignor, or of any rights under any Contract, except that this Assignment does include, and each Assignor hereby assigns to Assignee, all of such Assignor's rights in, to and under any license or other Contract relating to Intellectual Property that is a Purchased Contract assumed and assigned to Assignee pursuant to the Purchase Agreement, the Sale Order and section 365 of the Bankruptcy Code, effective as of the Closing (or, if later, the effective date of such assumption and assignment).

2.4 Excluded Assets. Notwithstanding anything to the contrary herein, Assignors are not assigning, and Assignee is not acquiring, any right, title or interest in, to or under any Excluded Asset, all of which is retained by Assignors.

**3. Assumed Liabilities**

3.1 Effective as of the Closing, Assignee hereby assumes and agrees to pay, perform and discharge when due all Assumed Liabilities arising under or relating to the Assigned IP, including all Liabilities arising from the ownership, use, prosecution, maintenance or enforcement of the Assigned IP from and after the Closing. Assignee shall bear all fees, costs and expenses (including filing, recordation, registrar and attorneys' fees) of recording this Assignment and of prosecuting, maintaining and renewing the Assigned IP from and after the Closing.

**4. Recordation; Further Assurances**

4.1 Filing Offices. Each Assignor hereby authorizes and requests the Commissioner for Patents and the Commissioner for Trademarks of the United States Patent and Trademark Office, the Register of Copyrights of the United States Copyright Office, each applicable domain name registrar, and the corresponding officials of any other Governmental Authority in any jurisdiction, to record Assignee as the assignee and owner of the Assigned IP. Assignee may, at its sole cost and expense, record this Assignment (or a short-form assignment substantially consistent herewith, which Assignors shall execute upon Assignee's reasonable request) with any such Governmental Authority or registrar; *provided* that the Schedules hereto may be redacted or separated as reasonably necessary to limit disclosure to the Assigned IP recorded in the applicable office.

4.2 Domain Names and Accounts. Assignors shall, at Assignee's sole cost and expense, take such actions as are reasonably requested by Assignee to transfer to Assignee (or its designee) administrative control of the domain names and social media accounts included in the Assigned IP set forth on Schedule D, including by delivering, at the Closing or promptly thereafter (and in any event within [5] Business Days after the Closing), all authorization codes, account credentials and administrator access within Assignors' possession or control and initiating, within such period, any registrar-to-registrar or account transfer procedures, in each case subject to the terms of service of the applicable registrar or platform.

4.3 Further Assurances. Each Assignor and its successors (including any liquidating trust established under the Plan) shall execute and deliver such additional instruments of transfer as Assignee may reasonably request to vest in Assignee Assignors' right, title and interest in and to the Assigned IP; *provided* that (a) all such actions shall be at Assignee's sole cost and expense, (b) no Assignor shall be required to incur any Liability, pay any consideration, commence or participate in any Litigation, or make any representation or warranty, and (c) no Assignor shall be required to maintain its corporate existence or take any action inconsistent with its wind-down under the Plan and such obligations shall terminate on the later of: (i) twelve (12) months after the Closing, (ii) the dissolution of such Assignor, or (iii) the effectiveness of the Plan.

**5. Wind-Down Use**

5.1 Consistent with Section 5.10 of the Purchase Agreement, effective as of the Closing, Assignee hereby grants to each Assignor, its successors and any liquidating trust established under the Plan, a non-exclusive, royalty-free, fully paid-up, non-transferable (except to such successors or liquidating trust) license to use the Assigned IP solely to the extent reasonably required for the administration and wind-down of the Chapter 11 Cases, retained Claims, Excluded Assets, Tax matters and SEC matters, until the later of: (i) twelve (12) months after the Closing, (ii) the dissolution of such Assignor, or (iii) the effectiveness of the Plan; *provided* that (a) Trademarks, corporate names and trade names included in the Assigned IP may be used only in a non-trademark manner to identify Assignors, and (b) Assignors shall keep confidential any customer data included in the Assigned IP. Within 30 days following the Closing (or, if later, the effectiveness of the Plan), each Assignor shall file such documents as are necessary to change its corporate name to a name that does not include "Car-Mart", "Car Mart", "Colonial", "ACM" or any term confusingly similar thereto.

**6. Relationship to Purchase Agreement**

6.1 This Assignment is executed and delivered pursuant to, and is subject to all of the terms and conditions of, the Purchase Agreement and the Sale Order. Nothing contained in this Assignment shall be deemed to supersede, enlarge, diminish, modify or otherwise affect any of the provisions of the Purchase Agreement or the Sale Order, including the rights and obligations of the Parties thereunder, or create any additional representations, warranties, covenants or obligations of any Party. In the event of any conflict or inconsistency between the terms of this Assignment and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall govern and control; and in the event of any conflict or inconsistency between the terms of this Assignment or the Purchase Agreement and the Sale Order, the Sale Order shall govern and control.

**6.2 No Representations or Warranties. Except for the representations and warranties expressly set forth in Section 3.1 of the Purchase Agreement, Assignee acknowledges and agrees that the Assigned IP is being transferred on an "AS IS, WHERE IS, WITH ALL FAULTS" basis and that, except for such representations and warranties, no Assignor makes, and each Assignor hereby expressly disclaims, any representation or warranty of any kind, express, implied or statutory, with respect to the Assigned IP, including as to title, validity, enforceability, registrability, scope, non-infringement, merchantability or fitness for a particular purpose, or as to the completeness or accuracy of the Schedules hereto. The omission of any item from any Schedule hereto shall not limit the Assigned IP, and the inclusion of any item on any Schedule hereto shall not constitute a representation or warranty of any kind.**

**6.3 No Survival; Release. For the avoidance of doubt, Article 7 of the Purchase Agreement (including the release and "AS IS" provisions thereof) applies to this Assignment and the Assigned IP.**

**7. Other Provisions Incorporated by Reference**

7.1 Sections 1.2 (Construction), 9.1 (Governing Law, Jurisdiction, Venue and Service), 9.2 (Notices), 9.3 (No Benefit to Third Parties), 9.4 (Waiver), 9.6 (Assignment), 9.7 (Amendment), 9.8 (Severability), 9.10 (No Liability), 9.11 (English Language), 9.13 (Counterparts), 9.14 (Entire Agreement) and 9.16 (Non-Business Day) of the Purchase Agreement are incorporated by reference into this Assignment, in each case *mutatis mutandis*, and each such Section so incorporated shall be fully enforceable against Assignors and Assignee as if fully restated in this Assignment.

*[Signature pages follow.]*

IN WITNESS WHEREOF, and intending to be legally bound, the undersigned have caused this INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT to be executed as of the date hereof.

**ASSIGNORS:**

**AMERICA'S CAR-MART, INC.,**
**a Texas corporation**

By: ______________________________
Name:
Title:

**AMERICA'S CAR MART, INC.,**
**an Arkansas corporation**

By: ______________________________
Name:
Title:

**COLONIAL AUTO FINANCE, INC.,**
**an Arkansas corporation**

By: ______________________________
Name:
Title:

**[TEXAS CAR-MART, INC.,**
**a Texas corporation]**

By: ______________________________
Name:
Title:

**[AUTO FINANCE INVESTORS, INC.,**
**a Texas corporation]**

By: ______________________________
Name:
Title:

**[COLONIAL UNDERWRITING, INC.,**
**an Arkansas corporation]**

By: ______________________________
Name:
Title:

**ASSIGNEES:**

**[CARDINAL FINANCE LLC,**
**an Arkansas limited liability company]**

By: ______________________________
Name:
Title:

**[ACM-AR, INC.,**
**an Arkansas corporation]**

By: ______________________________
Name:
Title:

**[ACM FINANCE INC.,**
**an Arkansas corporation]**

By: _______________________________
Name:
Title:

**[CLAYPOOL HOLDINGS, LLC,**
**a Georgia limited liability company]**

By: _______________________________
Name:
Title:

**[CARDINAL ASSET HOLDINGS LLC,**
**an Indiana limited liability company]**

By: _______________________________
Name:
Title:

**SCHEDULE A**

**PATENTS**

None.

**SCHEDULE B**[1]

**TRADEMARKS**

| **Record Owner (Assignor)** | **Mark** | **Jurisdiction** | **Reg. / Serial No.** | **Reg. / Filing Date** | **Basis (1(a)/1(b))** |
|---|---|---|---|---|---|
| America's Car-Mart, Inc. (Arkansas Corporation) (as listed in USPTO records) | AMERICA'S CAR-MART | United States | Reg. No. 2941130 | Apr. 19, 2005 | 1(a) (Class 35) |
| America's Car Mart, Inc. (Arkansas) | AMERICA'S CAR-MART DRIVE EASY | United States | Reg. No. 5400464 | Feb. 13, 2018 | 1(a) (Class 35) |
| America's Car Mart, Inc. (Arkansas) | KEEPING YOU ON THE ROAD | United States | Reg. No. 6837976 | Sep. 6, 2022 | 1(a) (Class 35) |
| America's Car Mart, Inc. (Arkansas) | $ PAY YOUR WAY and Design | United States | Reg. No. 6838261 | Sep. 6, 2022 | 1(a) (Class 35) |
| America's Car Mart, Inc. (Arkansas) | 100% SATISFACTION and Design | United States | Reg. No. 6838256 | Sep. 6, 2022 | 1(a) (Class 35) |
| America's Car Mart, Inc. (Arkansas) | ACCIDENT PROTECTION PLAN and Design | United States | Reg. No. 6838258 | Sep. 6, 2022 | 1(a) (Class 35) |
| America's Car Mart, Inc. (Arkansas) | PEACE OF MIND and Design | United States | Reg. No. 6838262 | Sep. 6, 2022 | 1(a) (Class 35) |
| America's Car Mart, Inc. (Arkansas) | SERVICE CONTRACT PLUS and Design | United States | Reg. No. 6838263 | Sep. 6, 2022 | 1(a) (Class 35) |
| America's Car Mart, Inc. (Arkansas) | A AMERICA'S CAR-MART and Design | United States | Reg. No. 6837978 | Sep. 6, 2022 | 1(a) (Class 35) |
| America's Car Mart, Inc. (Arkansas) | A AMERICA'S CAR-MART and Design | United States | Reg. No. 6837980 | Sep. 6, 2022 | 1(a) (Class 35) |
| America's Car Mart, Inc. (Arkansas) | A AMERICA'S CAR-MART and Design | United States | Reg. No. 6837983 | Sep. 6, 2022 | 1(a) (Class 35) |

[1] Note to Draft: Remaining bracketed items to be finalized prior to Closing.

| **Record Owner (Assignor)** | **Mark** | **Jurisdiction** | **Reg. / Serial No.** | **Reg. / Filing Date** | **Basis (1(a)/1(b))** |
|---|---|---|---|---|---|
| America's Car Mart, Inc. (Arkansas) | A AMERICA'S CAR-MART and Design | United States | Reg. No. 6966844 | Jan. 31, 2023 | 1(a) (Class 35) |
| America's Car Mart, Inc. (Arkansas) | A and Design | United States | Reg. No. 6833605 | Aug. 30, 2022 | 1(a) (Class 35) |
| America's Car Mart, Inc. (Arkansas) | A and Design | United States | Reg. No. 6837977 | Sep. 6, 2022 | 1(a) (Class 35) |
| America's Car Mart, Inc. (Arkansas) | CAR-MART | Arkansas | Reg. No. 500000616 | [Aug. 1, 1997; renewed Aug. 1, 2017] | [status to be confirmed] |
| America's Car Mart, Inc. (Arkansas) | CAR-MART | Indiana | Reg. No. 2023000027392 | [May 11, 2023] | [status to be confirmed] |
| America's Car Mart, Inc. (Arkansas) | CAR-MART | Missouri | Reg. No. 14457 | [Sep. 14, 1998; renewed Sep. 13, 2018] | [status to be confirmed] |
| America's Car-Mart (registrant as listed) | America's Car-Mart | Alabama | Reg. No. 131-361 | [Apr. 25, 2024] | [status to be confirmed] |

**SCHEDULE C[2]**

**COPYRIGHTS**

| Record Owner (Assignor) | Title of Work | Reg. No. | Reg. Date |
|---|---|---|---|
| America's Car-Mart, Inc. [Assignor to be confirmed: Texas parent vs. Arkansas subsidiary] | Automobile loan information system (computer program) | TXu 1-146-243 | June 24, 2002 |

[2] Note to Draft: Remaining bracketed items to be finalized prior to Closing.

## SCHEDULE D

## DOMAIN NAMES

| Registrant / Account Holder | Domain Name / Account | Registrar | Expiration Date |
|---|---|---|---|
| ACM | car-mart.com | GoDaddy.com, LLC | 1/13/2031 |
| ACM | carmart.com | GoDaddy.com, LLC | 3/6/2027 |

## SOCIAL MEDIA ACCOUNTS

| Account Holder | Domain Name / Account | Platform |
|---|---|---|
| America's Car Mart, Inc. (AR) | https://www.facebook.com/americascarmartcorporate | Facebook |
| America's Car Mart, Inc. (AR) | https://www.youtube.com/c/CarMartCorporate | You Tube |
| America's Car Mart, Inc. (AR) | https://www.linkedin.com/company/america's-car-mart-inc./home/ | LinkedIn |
| America's Car Mart, Inc. (AR) | https://www.indeed.com/cmp/America's-Car--mart/jobs | Indeed |
| America's Car Mart, Inc. (AR) | https://x.com/AmericasCarMart | X |
| America's Car Mart, Inc. (AR) | https://www.instagram.com/americascarmart/ | Instagram |

**EXHIBIT E**

ROLLOVER INDEBTEDNESS TERM SHEET

**CONFIDENTIAL**
**SUBJECT TO FRE 408 AND EQUIVALENTS**

## SUMMARY OF TERMS AND CONDITIONS OF ROLLOVER DEBT[1]

*This term sheet summarizes the principal economic terms of the "rollover debt" in connection with the proposed acquisition of the operating assets and business of America's Car-Mart, Inc. ("Car-Mart" or the "Company") by Cardinal Finance LLC, an Arkansas limited liability company, ACM-AR Inc., an Arkansas corporation, and ACM Finance Inc., an Arkansas corporation (collectively, the "Buyers")[2], which are wholly-owned direct and indirect subsidiaries of Cardinal Asset Holdings – TX LLC, a Texas limited liability company (the "Parent") (such acquisition, the "Bankruptcy Acquisition"). This term sheet is non-binding and is intended for discussion purposes only and does not constitute a commitment to lend or an agreement to deliver any such commitment. The transaction contemplated herein is subject to, among other things, credit committee approval, satisfactory completion of due diligence and the negotiation and execution of mutually acceptable definitive documentation.*

| | |
|---|---|
| **Borrower:** | A newly-formed bankruptcy remote special purpose entity (the "Borrower"), which will be a wholly-owned subsidiary of one of the Buyers. The Buyers will assign all of the SPV Collateral (as defined below) to the Borrower on the Closing Date. |
| **Rollover Debt Facility:** | A senior secured term loan facility in an aggregate principal amount of $328.0 million[3] issued to the lenders (the "Existing Lenders") under the Credit and Guaranty Agreement, dated as of October 30, 2025, among America's Car Mart, Inc., Colonial Auto Finance, Inc. and Texas Car-Mart, Inc., the guarantors party thereto, the Existing Lenders and Silver Point Finance, LLC, as Administrative Agent and Collateral Agent. Term loans under the Rollover Debt Facility that are prepaid may not be reborrowed. |
| **Agent:** | Silver Point Finance, LLC. |
| **Guarantors:** | None. |
| **Collateral:** | The Rollover Debt Facility shall be secured by a first priority lien on all of the assets of the Borrower, including the following assets of the Company and its subsidiaries acquired pursuant to the Bankruptcy Acquisition and assigned by the Buyers to the Borrower (collectively, the "SPV Collateral"): |

[1] Capitalized terms used but not defined in this term sheet shall have the meanings ascribed to them in the Asset Purchase Agreement to which this term sheet is attached.
[2] Claypool Holdings, LLC and Cardinal Asset Holdings LLC are "Buyers" under the Asset Purchase Agreement but will not be acquiring any of the assets of the Company and its subsidiaries that constitute SPV Collateral.
[3] Calculated as $360.0mm *less* the amount of cash paid by the Buyers to the Company under the Asset Purchase Agreement related to the base component of the Purchase Price ($10mm), the Real Property Amount ($13.0mm) and the Closing Retail Inventory Amount (expected to be ~$9.0mm). Exact amount of the Rollover Debt Facility (i) to be calculated based on the actual cash amounts paid under the Asset Purchase Agreement related to the foregoing and (ii) to be increased by the amount of any accelerated sales tax required to be paid at closing.

(i) all residual interests in the securitization pools, and all rights with respect to all receivables and restricted cash held in the securitization pools, as of the Closing Date;

(ii) all other receivables owned by the Company (including any that were previously charged-off) as of the Closing Date;

(iii) all vehicles, including all repossessed vehicles and all vehicles designated to be sold at wholesale or auction (but excluding, for the avoidance of doubt, any vehicle inventory purchased with the New Inventory Amount), owned by the Company as of the Closing Date (collectively, the "Vehicle Collateral"); and

(iv) all proceeds, substitutions, replacements and supporting obligations of the foregoing and all books and records and general intangibles related to the foregoing, including all documentation with respect to the existing securitization pools.

The Rollover Debt Facility shall also be secured by a first priority pledge of the equity interests of the Borrower.

**Interest Rate:** 1-month SOFR (1% floor) plus 7.50%, paid in cash (and subject to deferral as described below).

**Amortization:** The Rollover Debt Facility will be subject to "turbo" amortization at all times, with all cash flows from the SPV Collateral (including all cash proceeds from refinancing or otherwise monetizing any receivables and dispositions of any Vehicle Collateral) applied to a waterfall that:

(i) *first*, pays or reimburses any Third-Party Servicing Costs, Internal Servicing Costs, Third-Party Ancillary Costs and Internal Ancillary Costs then due and owing and the base and incentive servicing fees described below for the applicable period;

(ii) *second*, pays or reimburses any Regulatory Costs then due and owing and funds the Reserve Account up to the Regulatory Reserve Amount;

(iii) *third*, pays any amounts then necessary to exercise the clean-up call under any applicable securitizations when eligible;

(iv) *fourth*, pays all accrued and unpaid interest (including any deferred interest from prior periods);

(v) *fifth*, pays all outstanding principal until paid in full;

(vi) *sixth*, pays 15% of any remaining amounts, less the aggregate amount paid under clause *second* above since the Closing Date, to the Company's Chapter 11 bankruptcy estate; and

(vii) *seventh*, pays any further remaining amounts to the Parent or its designee.

"Third-Party Servicing Costs" means reasonable and documented out-of-pocket fees, costs, liabilities, and expenses incurred or paid by or on behalf of the Borrower owing to unaffiliated third parties with respect to (i) state, federal and local taxes, including sales taxes, (ii) customary bank fees for any blocked accounts for the benefit of the Existing Lenders, (iii) customary repossession costs with respect to the Vehicle Collateral and the vehicles owned by the securitization entities, including vehicle transportation, reconditioning, vehicle remarketing, auction fees and all other and related services pertaining to monetizing the Vehicle Collateral and the vehicles owned by the securitization entities, (iv) legal services related to pursuing customer collections and repossessions and (v) without duplication of any other item in this definition or any Regulatory Costs, all fees, costs, and expenses related to and payments made to satisfy any Assumed Liability consisting of an ABS Liability or a Liability or Claim under an Existing Servicing Agreement (as each such term is defined in the Asset Purchase Agreement), and, in each case under this definition, without duplication of amounts paid or reimbursed under the securitizations.

"Internal Servicing Costs" means allocated internal costs and expenses of the Borrower (or the Servicer on its behalf) or the applicable Buyer as servicer of the securitization entities of the type described in clause (iii) of "Third-Party Servicing Costs" that would otherwise be provided by a third party, but only to the extent that (x) such costs and expenses do not exceed the market rate for the related service and (y) such costs and expenses do not exceed (i) $10.0 million in the first year after the Closing Date, (ii) $5.0 million in the second year after the Closing Date and (iii) $1.0 million in each year thereafter, in each case as such caps may be increased in the reasonable discretion of the Agent acting in good faith consultation with the Servicer. All Internal Servicing Costs shall be evidenced by invoices provided to the Agent by the Borrower and subject to reasonable annual audits at the expense of the Agent, unless any such audit establishes overcharging.

"Ancillary Services and Contracts" means warranties, vehicle service contracts, accident protection programs, collateral protection insurance and similar contracts of the Company and its subsidiaries existing as of the Closing Date.

"Third-Party Ancillary Costs" means reasonable and documented out-of-pocket costs owing to unaffiliated third parties associated with honoring the Ancillary Services and Contracts and the obligations thereunder, whether through payment to the vehicle owner, a service provider or otherwise, in each case to the extent not paid through available insurance or other reserves.

"Internal Ancillary Costs" means allocated internal costs and expenses of the Servicer or its designee of the type described in "Third-Party Ancillary Costs" that would otherwise be provided by a third party, but only to the extent that (x) such costs and expenses do not exceed the market rate for the related service and (y) such costs and expenses do not exceed in the aggregate (i) $15.0 million *less* (ii) the aggregate amount of Third-Party Ancillary Costs, as such cap may be increased in the reasonable discretion of the Agent acting in good faith consultation with the Servicer. All Internal Ancillary Costs shall be evidenced by invoices provided to the Agent by the Borrower and subject to reasonable annual audits at the expense of the Agent, unless any such audit establishes overcharging.

**Maturity:** Fifth anniversary of closing of the transactions.

**Call Protection** None.

**Servicing:** One of the Buyers will act as the servicer for the Borrower and the SPV Collateral and one of the Buyers (which may be the same person) will act as the servicer for the Ancillary Services and Contracts (each, in such capacity, the "Servicer"), subject to termination upon certain triggers to be mutually agreed.

The Servicer will service the SPV Collateral and the Ancillary Services and Contracts in a manner in material compliance with all applicable state and federal laws and regulations and consistent with the customary servicing practices of the Servicer as such practices are modified by the Servicer over time, and in any event using the same degree of skill and attention that the Servicer exercises with respect to all comparable receivables that it services for itself or others.

The Servicer will (a) use commercially reasonable efforts to obtain and maintain all necessary licenses, which may require the use of a transition services agreement for an interim period from and after the Bankruptcy Acquisition, (b) monetize the Vehicle Collateral promptly after the Closing Date, (c) service

the existing charged-off receivables promptly after the Closing Date (subject to receipt of all necessary licenses) and (d) service the existing vehicle service contracts (limited to the scope of services required thereunder as of the Closing Date) on terms to be agreed and consistent with past practice; provided that the cost of such servicing shall be paid by the Borrower and not the Buyers or the Parent.

The Servicer will receive the following servicing fees:

(i) a base servicing fee, payable monthly and calculated as one-twelfth of 4.00% of the outstanding principal balance of the receivables included in the SPV Collateral (including any delinquent receivables prior to charge-off in accordance with GAAP but excluding any charged-off receivables and, for the avoidance of doubt, excluding any receivables in the securitization pools) at such time; and

(ii) an incentive servicing fee, payable in connection with the distribution of amounts to the Existing Lenders in respect of interest (including deferred interest) and principal pursuant to the waterfall (collectively, the "Distributed Debt Service") in excess of the following thresholds:

(A) with respect to the initial $100.0 million of Distributed Debt Service, 2.00% of such initial Distributed Debt Service;

(B) with respect to the next $100.0 million of Distributed Debt Service (up to $200.0 million in total), 4.00% of such additional Distributed Debt Service;

(C) with respect to the next $100.0 million of Distributed Debt Service (up to $300.0 million in total), 6.00% of such additional Distributed Debt Service;

(D) with respect to the next $100.0 million of Distributed Debt Service (up to $400.0 million in total), 8.00% of such additional Distributed Debt Service; and

(E) with respect to any Distributed Debt Service in excess of $400.0 million, 10.00% of such additional Distributed Debt Service.

Payment of any incentive servicing fees shall be subject to pro forma compliance with a minimum collateral coverage ratio of

| | |
|---|---|
| | (i) 1.50x for the first 18 full months after the Closing Date and (ii) 1.25x thereafter, calculated as:<br><br>(a) the sum of (1) the outstanding principal balance of receivables that are owned directly by the Borrower (other than any charged-off receivables) *plus* (2) the outstanding principal balance of receivables that are owned directly by the securitization entities in the securitization pools (other than any charged-off receivables) *plus* (3) all restricted cash held in the securitization pools, divided by<br><br>(b) the sum of (1) the aggregate outstanding principal under the Rollover Debt Facility *plus* (2) the aggregate outstanding debt under the securitization pools. |
| **Conditions Precedent:** | Customary for transactions of this type and including (i) consummation of the Bankruptcy Acquisition on terms satisfactory to the Existing Lenders and (ii) cash equity capitalization of the Buyers by the Parent of at least $25 million pursuant to an equity contribution agreement on terms satisfactory to the Existing Lenders (it being understood that such cash equity capitalization may include up to $10 million of the New Inventory Amount). |
| **Credit Facility Documentation**: | The credit agreement for the Rollover Debt Facility shall be based on a warehouse credit facility to be agreed, and the servicing agreement for the Rollover Debt Facility shall be based on the servicing agreements for the existing securitization pools, in each case modified to reflect the structure and terms hereof and other customary provisions for residual financing facilities of this type and shall be satisfactory to the Existing Lenders and the Buyers. The definitive documentation for the Rollover Debt Facility will include a customary back-up servicing agreement. |
| **Covenants; Events of Default:** | The covenants and events of default will be customary for transactions of this type.<br><br>The affirmative covenants shall, without limitation, require the Borrower (i) to exercise the clean-up call under any applicable securitizations when eligible and with available cash, unless otherwise agreed by the Existing Lenders; <u>provided</u> that the cost of such exercise shall be paid by the Borrower and not the Existing Lenders; and (ii) to begin pursuing the First-Out Refinancing within 60 days after the Closing Date and to use commercially reasonable efforts to obtain the First-Out Refinancing.<br><br>The negative covenants shall include, without limitation, the following with respect to the Borrower: limitations on indebtedness (with carve outs for, among others to be agreed, the First-Out Refinancing); limitations on liens; limitations on |

dividends and other payments in respect of equity interests and other restricted payments; limitations on investments (including acquisitions), loans and advances; limitations on fundamental changes, including mergers, acquisitions, consolidations, liquidations and dissolutions; limitations on asset sales; limitations on issuance of capital stock and creation of subsidiaries; limitations on sale and leaseback transactions; limitations on transactions with shareholders and affiliates; limitations on conduct of business; no further negative pledges; changes in fiscal year; anti-terrorism law, anti-money laundering and sanctions; limitations on amendments or waivers to organizational documents and material contracts; limitations with respect to the securitization pools; and special purpose entity limitations. Without limiting the foregoing, the definitive documents will reflect that the Borrower is a bankruptcy-remote special purposes entity with no activity other than receiving collections from the SPV Collateral and making distributions pursuant to the waterfall.

The credit agreement will also require a minimum tangible net worth of the Buyers on a consolidated basis (excluding the equity value of the Borrower) of at least $25.0 million at all times (and the Buyers will be a party to the credit agreement solely for purposes of such covenant).

The deferral of cash interest payments shall not be an event of default to the extent that there is insufficient net cash flow from the SPV Collateral with respect to any payment date, and such deferred interest amounts shall not be capitalized or bear interest.

**First-Out Refinancing:**

After the Closing Date, the Borrower shall use commercially reasonable efforts to refinance a portion of the Rollover Debt Facility with the net cash proceeds of an asset-based credit facility, residual financing facility or other credit facility secured by the SPV Collateral in an aggregate principal amount of up to $200.0 million on terms satisfactory to the Borrower and the Existing Lenders (the "First-Out Refinancing"), and in any event with a weighted average expected yield that is at least 150bps less than the weighted average yield of the Rollover Debt Facility.

In connection with the First-Out Refinancing, the net cash proceeds of the First-Out Refinancing will be applied to repay the Rollover Debt Facility, and the remaining amount of the Rollover Debt Facility will be converted to a second lien facility with the same collateral as the First-Out Refinancing (subject to reasonably satisfactory intercreditor arrangements), providing for cash interest payments of the second lien facility (subject to deferral in the case of insufficient net cash flow) prior to amortization of the First-Out Refinancing and other customary terms.

**Governing Law:** New York law.

**Counsel to Agent:** Milbank LLP.

**Regulatory Costs** "Regulatory Costs" means all Losses arising from Pre-Closing Matters, whether asserted, commenced, or discovered before or after the Closing Date, and for which the Borrower or the Buyers (or their affiliates as contemplated under the documentation for the Bankruptcy Acquisition) is held responsible or otherwise liable, including as servicer of the SPV Collateral or as servicer, originator or administrator under the securitizations, including, but not limited to:

(a) any inquiry, investigation, civil investigative demand, subpoena, examination, audit, request for information, demand, notice, enforcement action, consent order, supervisory directive, or other proceeding by or before any federal, state, municipal, or tribal governmental, regulatory, or self-regulatory authority, attorney general, court-appointed monitor or receiver, or other public official (including, but not limited to, the CFPB, the FTC, state attorneys general, and state financial, consumer-credit, licensing, and motor vehicle agencies) (each, a "Regulator"), and any remediation, look-back, file review, compliance plan, or borrower outreach required or requested by any Regulator or reasonably undertaken by the Buyers in good faith in connection with any Pre-Closing Matter;

(b) any claim, demand, lawsuit, arbitration (including mass arbitration and associated filing and administrative fees), counterclaim, defense, setoff, or recoupment of any kind, whether under a federal, state, or municipal statute, regulation, or common law, asserted by or on behalf of any obligor, co-obligor, guarantor, or class or group of the foregoing, regardless of merit; and

(c) any repurchase, substitution, indemnity, reserve, or other obligation arising under any securitization or financing document to the extent attributable to any Pre-Closing Matter.

"Losses" means all out-of-pocket losses, liabilities, damages, fines, civil money penalties, disgorgement, restitution, refunds, judgments, settlements, interest, costs and expenses (including fees and expenses of attorneys, experts, consultants, forensic accountants and independent reviewers) arising from any Pre-Closing Matters; provided that, in connection with any proposed settlement, the Buyers and the Borrower will consult with the Existing Lenders prior to effecting any settlement (it being understood that such consultation shall not be a right to withhold consent to any reasonable settlement).

**"**Pre-Closing Matter**"** means any act, omission, practice, policy, procedure or condition of the Company and its affiliates and subsidiaries occurring or existing prior to the Closing Date with respect to the marketing, sale, origination, underwriting, pricing, documentation, servicing, collection, repossession, disposition, deficiency collection, credit reporting, or data handling of any SPV Collateral (including the securitized receivables), including any actual or alleged violation of Applicable Consumer Law.

"Applicable Consumer Law**"** means all federal, state, and local laws, regulations, orders, consent orders, supervisory directives, and published regulatory guidance relating to consumer credit or consumer protection, including but not limited to, TILA/Reg Z; ECOA/Reg B; FCRA/Reg V; FDCPA/Reg F; Dodd-Frank §§ 1031/1036 (UDAAP); FTC Act § 5; the FTC Holder Rule, Used Car Rule, Credit Practices Rule, and CARS Rule (to the extent effective); GLBA and the Safeguards Rule; TCPA; SCRA; MLA; E-SIGN; UCC Article 9 (repossession and disposition notices); state retail installment sales and motor vehicle finance acts; state usury, licensing, and UDAP laws; state starter-interrupt and GPS tracking device laws; privacy and data-breach laws; bankruptcy automatic stay and discharge violations; and any Holder Rule or assignee liability arising under 16 C.F.R. Part 433 or 15 U.S.C. § 1641.

"Regulatory Reserve Account" means a deposit account in the name of the Borrower maintained for the benefit of the Servicer established upon the discovery or notice of a potential claim, demand, investigation or other liability, whether private or governmental, that may result in the Borrower or the Servicer incurring material Regulatory Costs relating to any Pre-Closing Matter, into which the Regulatory Reserve Amount will be deposited.

"Regulatory Reserve Amount" means an amount equal to the reasonably estimated Regulatory Costs related to any Pre-Closing Matter, subject to market third-party dispute mechanisms to be agreed upon.

**EXHIBIT F**

FORM OF TRANSITION SERVICES AGREEMENT

**AGREED FORM**
**CONFIDENTIAL**

# TRANSITION SERVICES AGREEMENT

THIS TRANSITION SERVICES AGREEMENT (this "***Agreement***"), dated as of [●], 2026 (the "***Closing Date***"), is entered into by and among (a) [Cardinal Finance LLC, an Arkansas limited liability company, ACM-AR Inc., an Arkansas corporation, ACM Finance Inc., an Arkansas corporation, Claypool Holdings, LLC, a Georgia limited liability company, and Cardinal Asset Holdings LLC, an Indiana limited liability company] ([collectively,] "***Buyer***"), and (b) the Persons listed on the signature pages hereto as "Sellers" (collectively, "***Sellers***", and each, a "***Seller***"). Each Seller and Buyer may be referred to herein individually as a "***Party***" and collectively as the "***Parties***". Capitalized terms used herein and not otherwise defined will have the respective meanings given to them in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, on November 23, 2026, Buyer and Sellers entered into that certain Asset Purchase Agreement (the "***Purchase Agreement***"), pursuant to which, subject to the satisfaction of the conditions set forth in the Purchase Agreement, among other things, Buyer has agreed to purchase from Sellers, and Sellers have agreed to sell to Buyer, the Purchased Assets, in each case, as of the Closing Date;

WHEREAS, Sellers hold the licenses, permits, registrations and approvals listed on Schedule A (collectively, the "***Licenses***"), each of which is required for the operation of the Business and is not transferable or assignable to Buyer, or is transferable or assignable only with the prior approval of the applicable Governmental Authority (each Seller holding a License, a "***Licensee Seller***");

WHEREAS, Buyer has applied for, or after the Closing in accordance with applicable regulatory requirements will apply for, new Licenses, and will seek the transfer or reissuance of those Licenses that are transferable or capable of being reissued (collectively, the "***New Licenses***");

WHEREAS, the Parties' primary objective is for Buyer to obtain all New Licenses required to operate the Business prior to the Closing, and this Agreement is intended to apply solely to those Licenses in respect of which a New License has not been obtained as of the Closing;

WHEREAS, the arrangement herein is intended to be temporary and to avoid disruption to the Business, to Sellers' customers and account obligors and to the communities served by Sellers' dealership locations during the period in which the New Licenses are obtained, and the Parties intend to comply with all applicable Laws during the Term (as defined herein); and

WHEREAS, in order to ensure an orderly transition of the Business to Buyer and as a condition to consummating the transactions contemplated by the Purchase Agreement, Buyer and Sellers have agreed to enter into this Agreement, pursuant to which Buyer and Licensee Sellers will provide, or cause their respective Affiliates to provide, certain services to the other, in each case on a transitional basis and subject to the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and the respective representations, warranties, covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

# ARTICLE 1
# SCOPE OF SERVICES

1.1 **Services Generally**. Upon the terms and subject to the conditions set forth in this Agreement, the Licensee Sellers hereby engage Buyer to provide Management Services (as defined below) to the extent permitted by applicable Law; provided that all such Management Services shall be provided under the Licensee Sellers' direction and control. For the purposes of this Agreement, "***Management Services***" means all (i) administrative services, (ii) human resources services, (iii) bookkeeping, billing, and collection, accounts receivable, and accounts payable services, and (iv) management, back-office and support services as necessary to operate the Business under the Licenses during the Term, in each case excluding any service, function or activity that applicable Law requires to be performed by the holder of a License.

(a) **Powers of Attorney**. The Licensee Sellers will execute any powers of attorney reasonably requested by Buyer to enable Buyer to provide the Management Services promptly upon request, including any powers of attorney, agency designations or signature authorizations necessary to permit Buyer's designated personnel to execute retail installment contracts, certificate of title and lien applications, odometer disclosure statements and other documents in the name of the applicable Licensee Seller, in each case to the extent not prohibited by applicable Law or the terms of the applicable License, provided that nothing in this sentence limits the first sentence of this Section 1.1, Section 1.1(c) or Section 1.1(d).

(b) **Sellers' Operations**. Each Licensee Seller will continue, through its own personnel, to manage and operate the Business conducted under its Licenses in compliance with all applicable Laws during the Term, including the sale and financing of Vehicles, the origination, servicing and collection of Dealer Loans, the operation and maintenance of any applicable licensed locations, and all other activities requiring a License. Each Licensee Seller shall designate one or more individuals who will be engaged by such Licensee Seller during the Term and who will be responsible for supervising personnel at the licensed locations and for regulatory compliance under such Licensee Seller's Licenses (each, a "***Designated Licensee Representative***"). Buyer shall not exercise control over any activity that applicable Law requires to be conducted directly and solely by the holder of a License and not by an agent or designee but may provide input on Business matters and shall have access to operational data, personnel and all other matters necessary or appropriate to prepare for assumption of operations, in each case to the extent permitted by applicable Law (including Laws relating to consumer privacy and data protection) and subject to Section 1.1(c).

(c) **Legal Compliance**. Notwithstanding anything to the contrary in this Section 1.1, the Parties acknowledge that certain legal responsibilities must remain with the Licensee Sellers as the licensed entities, and the Parties agree that the Licensee Sellers will retain such legal responsibilities. Each Licensee Seller (through its Designated Licensee Representatives and existing Licenses) shall continue to oversee and ultimately be responsible for all aspects of the operation of the Business conducted under its Licenses that are subject to regulatory oversight during the Term. For example, without limitation, during the Term, each Licensee Seller shall (i) retain ultimate authority and responsibility for its licensure and for the operation of the Business conducted under its Licenses and for its Designated Licensee Representatives, and (ii) maintain the bonds, net worth, insurance, financial assurances and recordkeeping and safeguarding procedures required as a condition of each of its Licenses, in each case until and upon such time as Buyer obtains the applicable New License. Nothing in this Agreement shall be construed to diminish or interfere with the authority of any Designated Licensee Representative, as required by applicable Law, to manage the operations conducted under the applicable Licenses. In performing the Management Services, Buyer shall follow all lawful and reasonable directions of the Designated Licensee Representatives as necessary to comply with applicable licensing requirements (and any direction that a Designated Licensee Representative determines in good faith is necessary to comply with applicable licensing requirements shall

be deemed reasonable). Buyer's provision of the Management Services shall be subject to the Licensee Sellers' discretion regarding any matter for which a Licensee Seller must retain responsibility as a matter of Law. Buyer shall not direct or influence the exercise of any Designated Licensee Representative's judgment regarding compliance with applicable Law.

(d) **No Transfer of Licenses**. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement is intended to, and nothing in this Agreement shall be construed to, constitute a sale, assignment, transfer, conveyance, lease, loan or other disposition of any License, or the grant to Buyer of any right to use any License, and no fee or other consideration is payable by Buyer to any Seller for the use of any License. Each License shall remain at all times the sole property of the applicable Licensee Seller, and all activities conducted under each License during the Term shall be conducted by, and under the authority, direction and control of, the applicable Licensee Seller.

1.2 **Collections and Remittance; Operating Expenses**.[1] Each Licensee Seller, as the holder of the applicable Licenses, shall bill and collect all amounts due from customers and account obligors in respect of the Business conducted under its Licenses during the Term. The Licensee Sellers shall deposit all such collections into one or more segregated accounts (collectively, the "***Collections Account***"). On or before the first day of the Term (or such later date as Buyer may agree, acting reasonably), the Licensee Sellers shall use commercially reasonable efforts to cause each Collections Account to be subject to a deposit account control agreement, in form and substance reasonably satisfactory to Buyer, among the applicable Licensee Seller, Buyer and the applicable depository bank (each, a "***DACA***"), and no Licensee Seller shall deposit collections into any account that is not subject to a DACA. Any collections received in an account that is not subject to a DACA shall be transferred to a Collections Account within [two (2)] Business Days after identification. The Licensee Sellers shall instruct the depository banks to sweep funds from the Collections Account to Buyer's designated account(s) from time to time, all on a timing basis designated by Buyer and reasonably acceptable to the Licensee Sellers. Buyer acknowledges that the Licensee Sellers retain the right to revoke this sweep instruction if directed to do so by a Governmental Authority or if the applicable Licensee Seller determines in good faith, after consultation with counsel, that such revocation is required by applicable Law. Out of the Collections Account, the Licensee Sellers and Buyer will pay or cause to be paid all normal course operating expenses of the Licensee Sellers during the Term on a timely basis, which includes, without limitation, salaries, property costs, Vehicle inventory and reconditioning costs, supplies, printing, stationery, billing and collection services, and Buyer's reasonable and documented expenses in providing the services required under this Agreement during the Term. No Licensee Seller shall be required to advance or expend its own funds in connection with the operation of the Business during the Term, and to the extent the funds in the Collections Account are insufficient, or are not available under the ABS Transaction Documents or the New Servicing Agreement, to pay any such operating expenses when due, Buyer shall fund such shortfall into the Collections Account within five (5) Business Days after written request by the applicable Licensee Seller. Notwithstanding the foregoing, this Section 1.2 is subject to, and shall be applied in a manner consistent with, the cash collection, allocation, distribution and remittance provisions of the ABS Transaction Documents and the New Servicing Agreement, and in the event of any conflict, the ABS Transaction Documents and the New Servicing Agreement shall control; *provided* that nothing in the ABS Transaction Documents or the New Servicing Agreement shall limit or reduce Buyer's obligations under the immediately preceding sentence or Section 1.6. The Licensee Sellers' obligation to remit cash belonging to Buyer, and to provide Buyer with bank statements or read-only access to the applicable accounts, shall survive the expiration or earlier termination of this Agreement until such time as the Parties mutually agree that all relevant cash has been remitted. For the avoidance of doubt, by entering into this Agreement, the Parties do not intend for any of Sellers'

[1] Note to Draft: The mechanics of this Section 1.2 are to be finalized once the Rollover Indebtedness Documents and Servicing Agreement are in Agreed Form.

respective employees, customers, account obligors, clients and/or vendors to have privity of contract with Buyer.

1.3 **Maintenance of Licenses**. During the Term, each Licensee Seller shall maintain in good standing all of its Licenses, including each License listed on Schedule A attached hereto. No Licensee Seller shall take any action to dissolve its corporate or other legal existence, or to surrender, cancel, allow to lapse or fail to renew any License, during the Term without Buyer's prior written consent, unless Buyer has notified Licensee Sellers in writing that it has obtained an applicable New License, which notice Buyer shall deliver within [two (2)] Business Days after obtaining such New License. Notwithstanding Section 5.10 of the Purchase Agreement or any other provision of the Purchase Agreement or any Ancillary Agreement, each Licensee Seller shall maintain its corporate or other legal existence, and shall not wind down, dissolve or transfer its Licenses to any liquidating trust, until the expiration or earlier termination of the Term as to all of its Licenses.

1.4 **Further Assurances**. During the Term, Buyer and Sellers shall, at Buyer's sole cost, reasonably cooperate in good faith to take such actions necessary to enable the transactions set forth in this Agreement, including but not limited to, executing and delivering all requisite powers of attorney. To the extent necessary for Sellers to fulfill their obligations hereunder, Buyer shall, at no cost or expense to Sellers, make all Purchased Assets reasonably available to Sellers for such purpose; provided that any failure or delay in doing so shall relieve and excuse Sellers of their obligations hereunder, solely to the extent such failure or delay renders Sellers incapable of performing such obligations.

1.5 **Books and Records**. Buyer and Sellers shall maintain complete and accurate books with regard to the operation of the Business under any of the Licenses, including all books and records required to be maintained by the holder of a License under applicable Law and all records necessary to permit Buyer and the applicable Licensee Seller to respond to any examination, audit or information request of a Governmental Authority.

1.6 **Reimbursement Obligations**.[2] Notwithstanding anything to the contrary in this Agreement, Buyer shall be responsible for, and if applicable, shall promptly reimburse Sellers for, all costs and expenses incurred by any of Sellers following the Closing Date in connection with (a) matters relating to the transactions contemplated by this Agreement and the transition services provided hereunder (including, for the avoidance of doubt, any incremental additional cost and expense payable by the estate of Sellers in connection with their wind down as a result of the transactions and services contemplated by this Agreement), (b) any operating expenses described in Section 1.2 to the extent not paid in full from the Collections Account or funded by Buyer when due, and (c) maintenance of the corporate existence, Licenses and assets of Sellers to the extent necessary for Sellers to perform their obligations under this Agreement, including all renewal, bonding, financial-assurance, examination and compliance costs in respect of the Licenses, and the fees, expenses and disbursements of Sellers' Representatives incurred in connection therewith. Sellers may invoice Buyer for such costs and expenses monthly in arrears, and Buyer shall pay each such invoice within ten (10) days after receipt. On the Closing Date, Buyer shall deposit with Sellers an amount equal to $[●] (the "***Expense Deposit***"), which Sellers may apply to any amount due and unpaid under this Agreement and which Buyer shall replenish within five (5) Business Days after written notice of any such application. Any unapplied portion of the Expense Deposit shall be returned to Buyer promptly following the expiration or termination of this Agreement and the payment in full of all amounts owed to Sellers hereunder. For the avoidance of doubt, no fee, margin, mark-up or other consideration is payable by Buyer to any Seller under this Agreement in respect of the Management Services or the use of any License, and Buyer's obligations under this Section 1.6 are limited to the reimbursement of costs and

---

[2] Note to Draft: The mechanics of this Section 1.6 are to be finalized once the Rollover Indebtedness Documents and Servicing Agreement are in Agreed Form.

expenses (without limiting Buyer's payment and funding obligations under Section 1.2 or any other provision of this Agreement).

1.7 **Payment Terms**. Buyer shall pay all[3] costs and expenses of third-party vendors ("***Third-Party Costs***") incurred by Sellers in fulfilling their obligations hereunder during the Term, to the extent such Third-Party Costs are preapproved by Buyer in writing (email to suffice), such approval not to be unreasonably withheld, conditioned or delayed. All Third-Party Costs shall be payable within ten (10) days of receipt by Buyer of Sellers' invoice therefor. If Buyer does not approve any Third-Party Costs, Sellers shall not be deemed to be in breach of this Agreement or any of their obligations hereunder, nor shall Buyer have any cause of Action against any of Sellers, to the extent Sellers' failure or inability to perform such obligation results from Buyer's failure to approve or fund any Third-Party Cost or to provide reasonably necessary information, access, or cooperation.

1.8 **Duty to Inform**. During the Term, in the event that any of the following occurs with respect to any Party or its personnel related to the operation of the Business or the provision of Management Services, the Party with knowledge shall promptly (and in any event within two (2) Business Days after any officer or Designated Licensee Representative of such Party obtains knowledge of such event) inform the other Parties, including providing the underlying facts and circumstances, of any:

(a) criminal or disciplinary inquiries, investigations or proceedings (including by a licensing authority, Governmental Authority, or peer review organization);

(b) inquiries, investigations, examinations or proceedings by any Governmental Authority relating to any License or to the licensure of any Licensee Seller, including any proposed or threatened suspension, revocation, non-renewal, conditioning or other adverse action in respect of any License;

(c) any examination, audit, information request, civil investigative demand or consumer complaint proceeding relating to the sale or financing of Vehicles or to the origination, servicing or collection of Dealer Loans, under any applicable consumer protection, consumer credit, collection, titling, privacy or data-security Law; or

(d) any status change, determination or correspondence in respect of any application for a New License, or any notice or assertion by a Governmental Authority that the arrangements contemplated by this Agreement are not permitted under applicable Law.

1.9 **Indemnification**. Buyer shall indemnify, defend, and hold harmless Sellers and their respective officers, directors, managers, members, employees, and agents from and against any and all claims, liabilities, losses, damages, costs, fines, penalties and expenses (including reasonable attorneys' fees) (collectively, "***Losses***") arising out of or relating to (a) any actions taken or services performed by any Seller in connection with this Agreement or at the express request or consent of Buyer, (b) any breach by Buyer of this Agreement, including but not limited to, any Losses resulting from inaccurate, false, incomplete, or improper information or other data provided by Buyer to any Seller, (c) any claim, assertion, investigation or proceeding by any Governmental Authority that the arrangements contemplated by this Agreement, or the conduct of the Business under the Licenses during the Term, violate applicable Law, or (d) the provision of the Management Services or the operation of the Business during the Term by Buyer, its Affiliates or their respective personnel, including any action taken under any power of attorney, agency designation or signature authorization granted under Section 1.1(a). Notwithstanding the foregoing, in no

[3] Note to Buyer: Third-Party Costs already require Buyer's written pre-approval. Your qualifiers invite an after-the-fact dispute over costs Buyer has already approved.

event shall Buyer indemnify, defend, and hold harmless Sellers and their respective officers, directors, managers, members, employees, and agents from and against any and all Losses to the extent arising out of the gross negligence or willful misconduct of Sellers and their respective officers, directors, managers, members, employees, and agents (excluding, for this purpose, Buyer, its Affiliates and their respective personnel).

1.10 **Provision of Services; Limitation of Liability**. The Parties shall perform their obligations hereunder in good faith, and all obligations to be performed by the Parties hereunder are provided "as is," without representation or warranty of any kind, express or implied. EXCEPT FOR (A) LOSSES RELATED TO GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, (B) BUYER'S INDEMNIFICATION OBLIGATIONS UNDER SECTION 1.9 AND (C) BUYER'S OBLIGATIONS TO PAY, FUND OR REIMBURSE AMOUNTS UNDER SECTIONS 1.2, 1.6, 1.7 AND 1.11(b), IN NO EVENT SHALL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY, OR PUNITIVE DAMAGES, OR FOR ANY LOSS OF PROFITS, REVENUE, BUSINESS, GOODWILL, OR ANTICIPATED SAVINGS, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE SERVICES, REGARDLESS OF THE FORM OF ACTION (WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR OTHERWISE), AND EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. EXCEPT FOR (A) LOSSES RELATED TO GROSS NEGLIGENCE OR WILLFUL MISCONDUCT, (B) BUYER'S INDEMNIFICATION OBLIGATIONS UNDER SECTION 1.9 AND (C) BUYER'S OBLIGATIONS TO PAY, FUND OR REIMBURSE AMOUNTS UNDER SECTIONS 1.2, 1.6, 1.7 AND 1.11(b), EACH PARTY'S TOTAL AGGREGATE LIABILITY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE SERVICES SHALL NOT EXCEED THE TOTAL AGGREGATE AMOUNTS PAID OR PAYABLE BY BUYER TO SELLERS UNDER THIS AGREEMENT.

1.11 **Term and Termination; Effect of Termination**.

(a) This Agreement will become effective on the Closing Date and will automatically terminate on the six (6)-month anniversary of the Closing Date (the "***Initial Term***"). This Agreement may be renewed for two (2) three (3)-month terms (each, a "***Renewal Term***" and together with the Initial Term, the "***Term***") by Buyer, by providing written notice to Sellers at least thirty (30) days prior to the expiration of the Initial Term or the then-current Renewal Term, as applicable; provided that Buyer may not elect a Renewal Term unless, at the time of such election, Buyer is not in breach of its payment obligations hereunder and has submitted all applications for the outstanding New Licenses in accordance with Section 1.12, and in no event shall the Term extend beyond the twelve (12)-month anniversary of the Closing Date without the prior written consent of the Licensee Sellers. Notwithstanding the foregoing, this Agreement shall automatically terminate as to each License, and as to each state in respect of which no License remains outstanding, upon the earlier of (A) the date on which Buyer obtains the applicable New License and (B) the date on which the applicable License is transferred to, or reissued in the name of, Buyer or its designee, and the Management Services and the other obligations of the Parties hereunder shall be reduced accordingly. In addition, (i) Buyer may terminate this Agreement at any time, for any or no reason, upon thirty (30) days' prior written notice to Sellers, (ii) in the event any Party shall breach any of its obligations hereunder, and such breach shall not be cured within thirty (30) days of notice thereof (or, in the case of Buyer's failure to pay any amount when due, ten (10) days of notice thereof), then, in addition to any and all other legal and equitable remedies available to the non-breaching Party at law or in equity, the non-breaching Party shall be entitled to terminate this Agreement upon written notice to the breaching Party, and (iii) any Licensee Seller may suspend performance under, or terminate, this Agreement as to any License or as to any state, immediately upon written notice to Buyer, if such Licensee Seller determines in good faith, after consultation with counsel, that continued performance would violate applicable Law or

would reasonably be expected to result in the suspension, revocation, non-renewal or conditioning of, or other adverse action in respect of, any License.

(b) Upon the expiration of the Term or the earlier termination of this Agreement, the rights and obligations of the Parties (other than (i) as provided in this Section 1.11(b), (ii) the Licensee Sellers' obligation to remit cash under Section 1.2 and their obligations under Section 1.10 and Section 1.12 and (iii) Buyer's obligations under Section 1.2, Section 1.6, Section 1.7 and Section 1.9) will terminate without further action of the Parties. Upon such expiration or termination, Buyer shall pay all amounts accrued or incurred hereunder through the effective date of expiration or termination, together with any reasonable wind-down costs incurred by Sellers as a result thereof, within ten (10) days after receipt of Sellers' invoice therefor. Upon such expiration or termination, each Party shall provide the other Party with reasonable access to books and records owned by it following the expiration or termination of this Agreement to permit such requesting Party to satisfy any reporting and contractual obligations which may be required of it relating to this Agreement. Notwithstanding the foregoing, termination of this Agreement shall not affect, impair, restrict, modify or alter any obligations of any Party arising prior to such termination or any obligations expressly stated to survive termination hereof.

1.12 **Pursuit of New Licenses**. Buyer shall, at its sole cost and expense, use its reasonable best efforts to obtain each New License as promptly as practicable, and in any event prior to the expiration of the Term, including by preparing and submitting all applications, filings, fees, bonds, financial assurances, background-check materials and other information required by each applicable Governmental Authority. Without limiting the foregoing, Buyer shall submit a complete application for each New License not obtained prior to the Closing no later than thirty (30) days after the Closing Date, and shall respond to any request for information from a Governmental Authority as promptly as practicable after receipt thereof (and in any event, not later than the period required by such Governmental Authority). Buyer shall keep the Licensee Sellers reasonably informed of the status of each application for a New License and shall provide a written status report to the Licensee Sellers not less than once each month during the Term. The Licensee Sellers shall, at Buyer's sole cost and expense, reasonably cooperate with Buyer in connection with Buyer's pursuit of the New Licenses, including by executing applications, consents, notices and other documents reasonably requested by Buyer; provided that no Licensee Seller shall be required to take any action that it determines in good faith would violate applicable Law or jeopardize any License.

## ARTICLE 2
## MISCELLANEOUS

2.1 **Compliance with Laws**. Sellers and Buyer shall comply with all applicable Laws during the Term. If necessary for this Agreement to comply with Law or guidance from any Governmental Authority, the Parties agree to use reasonable best efforts to amend this Agreement within ten (10) Business Days of notice from a Governmental Authority that an amendment to this Agreement is required. If the Parties are unable to agree upon such an amendment, or if a Governmental Authority objects to the arrangements contemplated by this Agreement, any affected Licensee Seller may suspend performance under, or terminate, this Agreement as to the affected License or state in accordance with Section 1.11(a).

2.2 **Assignment**. The rights of a Party under this Agreement are not assignable by such Party without the written consent of the other Parties; provided, however, that Buyer may, without the prior written consent of any other Party, (a) assign all or any portion of its rights under this Agreement to one or more of its Affiliates or (b) collaterally assign all or any portion of its rights under this Agreement to its lenders; provided that no such assignment shall relieve Buyer of any of its obligations hereunder. Consistent with Section 9.6 of the Purchase Agreement, any Seller may transfer or assign its rights and obligations under this Agreement to a liquidating trust or similar vehicle established under the Plan or under any other

chapter 11 plan confirmed in the Chapter 11 Cases. This Agreement will be binding upon and inure to the benefit of the Parties and their respective legal representatives, successors and permitted assigns.

2.3 **Integration**. This Agreement and the Schedules hereto, together with the Purchase Agreement, contain the entire agreement among the Parties with respect to the Transactions and supersede all prior agreements, understandings, promises and representations, whether written or oral, among the Parties with respect to the subject matter hereof and thereof. Notwithstanding anything to the contrary contained in this Agreement, nothing herein will operate to subject Buyer to any Excluded Liabilities or otherwise modify or amend the scope of Purchased Assets, Excluded Assets, Assumed Liabilities, or Excluded Liabilities set forth in the Purchase Agreement; provided that the foregoing shall not limit Buyer's payment, funding, reimbursement and indemnification obligations under Sections 1.2, 1.6, 1.7, 1.9 and 1.11(b) with respect to costs, expenses and Losses arising during or as a result of the Term. This Agreement relates solely to the continued operation of the Business under the Licenses pending receipt of the New Licenses, and is not intended to provide for, duplicate or vary any servicing, information technology, back-office or other transition arrangement provided for in any other Ancillary Agreement. In the event of any conflict between this Agreement and the Purchase Agreement, the Purchase Agreement shall control, other than in the case of Section 1.3, which shall control over Section 5.10 of the Purchase Agreement, and other than with respect to Buyer's obligations described in the proviso to the second sentence of this Section 2.3, which shall control.

2.4 **Amendments; Waivers**. No amendment to or modification of this Agreement will be effective unless it is in writing and signed by each of the Parties; provided that, consistent with Section 9.7 of the Purchase Agreement, Sellers and the Seller Board may not take or authorize any such action without the prior approval of the Special Committee. No waiver of any of the provisions of this Agreement will constitute a waiver of any other provision (whether or not similar). Any agreement on the part of any Party to any waiver will be valid only if set forth in an instrument, in writing, signed on behalf of such Party. A Party's failure or delay in exercising any right under this Agreement will not operate as a waiver of that right. A single or partial exercise of any right will not preclude a Party from any other or further exercise of that right or the exercise of any other right.

2.5 **Construction**. The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the Parties and no presumption or burden of proof will arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. The rules of construction set forth in Section 1.2 of the Purchase Agreement shall apply to this Agreement as if set forth herein.

2.6 **Severability**. Wherever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law. Any term or provision of this Agreement that is invalid or unenforceable in any situation will not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation. In the event that any clause, term, or condition of this Agreement is held to be invalid or contrary to Law: (a) this Agreement will remain in full force and effect as to all other clauses, terms, and conditions; (b) the subject clause, term, or condition will be revised to the minimum extent necessary to render the modified provision valid, legal and enforceable; and (c) the remaining provisions of this Agreement will be amended to the minimum extent necessary so as to render this Agreement as a whole most nearly consistent with the intentions of the Parties in light of the modification or removal of the invalid or illegal provision.

2.7 **Counterparts**. This Agreement may be executed in any number of counterparts, each of which is deemed to be an original, and such counterparts together constitute one and the same instrument.

Transmission of an executed signature page by email or other electronic means is as effective as a manually executed counterpart of this Agreement.

2.8 **Third-Party Beneficiaries**. Nothing in this Agreement, expressed or implied, is intended to or will be construed to confer upon any third person, any right, remedy or claim under or by reason of this Agreement, other than the Persons indemnified under Section 1.9, each of the Persons referenced in Section 2.15 and the rights of the Parties' respective successors, permitted assigns and any liquidating trust established under the Plan, each of whom is an intended third-party beneficiary of this Agreement that shall be entitled to enforce the applicable terms hereof as though party hereto. No Person, other than the Parties and such third-party beneficiaries, is entitled to rely on the provisions of this Agreement in any action, suit, proceeding, hearing or other forum.

2.9 **Relationship of Parties**. Nothing in this Agreement will be deemed or construed by the Parties or any third party as creating a partnership or the relationship of principal and agent or joint venturer between the Parties, it being understood and agreed that no provision contained herein, and no act of the Parties, will be deemed to create any relationship between the Parties other than independent contractors; provided that nothing in this Section 2.9 limits, qualifies or impairs any power of attorney, agency designation or signature authorization granted under Section 1.1(a), or the Licensee Sellers' direction and control of the Management Services under Section 1.1, in each case to the extent required by applicable Law or the terms of the applicable License.

2.10 **Force Majeure**. Any failure or omission by any Party in the performance of any obligation under this Agreement will not be deemed a breach of this Agreement or create any liability, if the same arises from any cause or causes beyond the control of such Party, including but not limited to, the following, which, for purposes of this Agreement will be regarded as beyond the control of each of the Parties: acts of God, pandemic, fire, storm, flood, earthquake, governmental regulation or direction, acts of the public enemy, war, rebellion, insurrection, riot, acts of terrorism, invasion, strike, lockout or shortage of labor (a "***Force Majeure Event***"); provided, however, that if any Party is affected by a Force Majeure Event, such Party will promptly notify the other Parties in writing of the cause and will resume performance whenever such Force Majeure Event is removed. Notwithstanding the foregoing, no Force Majeure Event will delay or excuse any payment obligation hereunder.

2.11 **Notices**. Any notice, request, demand, waiver, consent, approval or other communication permitted or required under this Agreement (each, a "***Notice***") shall be in writing, shall refer specifically to this Agreement and shall be deemed given only if delivered by hand or sent by email of a PDF attachment (with transmission confirmed) or by internationally recognized overnight delivery service that maintains records of delivery, addressed to the Parties at their respective addresses specified in Section 9.2(b) of the Purchase Agreement or to such other address as the Party to whom Notice is to be given may have provided to the other Parties at least five (5) days prior to such address taking effect in accordance with this Section 2.11. Such Notice shall be deemed to have been given as of the date delivered by hand or internationally recognized overnight delivery service or confirmed that it was received by email. If a Notice deemed given upon receipt is given after 5:00 p.m. in the place of receipt (the Parties understand and agree that the foregoing applies only to Notice and not to copies), such Notice will be deemed given on the next succeeding Business Day.

2.12 **Governing Law, Jurisdiction, Venue and Service**. This Agreement and any disputes hereunder will be governed by and construed in accordance with the internal laws of the State of [Delaware] without giving effect to any choice or conflict of law provision or rule (whether of the State of [Delaware] or any other jurisdiction) that could cause the application of laws of any jurisdiction other than those of the State of [Delaware], in each case except to the extent governed by the Bankruptcy Code. Without limiting any Party's right to appeal any Order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain

exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all legal proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court; provided that, solely in the event that the Bankruptcy Court abstains, declines or lacks jurisdiction, or the Chapter 11 Cases have been closed or dismissed, the state and federal courts located in the State of [Delaware] shall have exclusive jurisdiction, and the foregoing clauses (a) and (b) shall instead be read to apply to the state and federal courts located in the State of [Delaware]. The Parties hereby consent to and submit to the jurisdiction and venue of such courts and shall receive Notices at such locations pursuant to Section 2.11. To the extent not prohibited by applicable Law or Bankruptcy Court rule, each Party hereby waives and agrees not to assert, by way of motion, as a defense or otherwise in any such proceeding, any Claim (i) that it is not subject to the jurisdiction of such courts, (ii) that the proceeding is brought in an inconvenient forum, (iii) that it is immune from any legal process with respect to itself or its property, (iv) that the venue of the proceeding is improper, or (v) that this Agreement or the subject matter hereof may not be enforced in or by such court. Each of the Parties hereby (x) irrevocably submits with regard to any such legal proceeding to the exclusive personal jurisdiction of such courts in the event any dispute arises out of this Agreement, (y) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from such courts or that such Litigation is brought in an inconvenient forum, and (z) agrees that it shall not bring any Litigation relating to this Agreement in any court other than such courts in accordance with this Section 2.12; provided, however, that a Party may commence any Litigation in a court other than such courts solely for the purpose of enforcing an Order issued by such courts or the terms of this Section 2.12. The Parties waive personal service of any and all process on each of them and consent that all such service of process shall be made in the manner, to the Party and at the address determined under Section 2.11, and service so made shall be complete as stated in Section 2.11. EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY.

2.13 **Bankruptcy Court Approval**. This Agreement, and the performance by the Parties of their respective obligations hereunder, shall be subject to and authorized by the Sale Order (which the Parties anticipate may be included as part of the Confirmation Order), and the effectiveness of this Agreement is conditioned upon entry of the Sale Order.

2.14 **Equitable Relief**. The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that a Party shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement. Each Party hereby waives: (i) any requirement that the other Party post a bond or other security as a condition for obtaining any such relief, and (ii) any defenses in any action for specific performance, including the defense that a remedy at law would be adequate. Each Party hereby agrees not to raise any objections to the availability of equitable remedies to the extent provided for herein, and the Parties further agree that nothing set forth in this Section 2.14 shall require any Party hereto to institute any proceeding for (or limit any Party's right to institute any proceeding for) specific performance under this Section 2.14 prior to or as a condition to exercising any termination right under this Agreement, nor shall the commencement of any legal action or legal proceeding pursuant to this Section 2.14 restrict or limit any Party's right to terminate this Agreement in accordance with the terms hereof.

2.15 **No Liability**. No past, present or future director, officer, manager, employee, incorporator, member, partner or equityholder or other Affiliate of (a) any Seller (other than such Seller in its capacity as such) or (b) Buyer (other than Buyer in its capacity as such), in each case, shall have any Liability for any obligations or Liabilities of Sellers or Buyer, as applicable, under this Agreement. Any Claim or cause of action based upon, arising out of, or related to this Agreement may only be brought against Persons that are expressly named as parties hereto, and then only with respect to the specific obligations set forth herein.

Other than the Parties, no other Person shall have any Liability or obligation for any of the covenants, agreements, obligations or Liabilities of any Party under this Agreement, in each case whether based on contract, tort, fraud, strict liability, other Law or otherwise and whether by piercing the corporate veil, by a Claim by or on behalf of a Party or another Person or otherwise. For the avoidance of doubt, this Section 2.15 does not release or otherwise waive any Claims, demands or causes of action against any Seller or any Affiliate of any Seller, or against Buyer or any Affiliate of Buyer, except as expressly set forth in this Section 2.15.

2.16 **English Language**. This Agreement shall be written and executed in, and all other communications under or in connection with this Agreement shall be in, the English language. Any translation into any other language shall not be an official version thereof, and in the event of any conflict in interpretation between the English version and such translation, the English version shall control.

2.17 **Non-Business Day**. If the final date of any period provided in this Agreement for the performance of an obligation or for the taking of any action falls on a day that is not a Business Day, then the end of such period will be automatically deemed extended to the next Business Day.

**[Signatures on the following pages.]**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the Closing Date.

**BUYER:**

[CARDINAL FINANCE LLC]

By: ______________________________
Name:
Title:

[ACM-AR INC.]

By: ______________________________
Name:
Title:

[ACM FINANCE INC.]

By: ______________________________
Name:
Title:

[CLAYPOOL HOLDINGS, LLC]

By: ______________________________
Name:
Title:

[CARDINAL ASSET HOLDINGS LLC]

By: ______________________________
Name:
Title:

**SELLERS:**

AMERICA'S CAR-MART, INC.

By: ______________________________
Name:
Title:

[●]

By: ______________________________
Name:
Title:

[●]

By: ______________________________
Name:
Title:

[●]

By: ______________________________
Name:
Title:

# SCHEDULE A
# LICENSES[4]

| DEALER LICENSES AND NON-TRANSFERABLE FINANCE LICENSES[5] | | | | |
|---|---|---|---|---|
| **State** | **License (and Holder Entity)** | **Regulator** | **License Number / Expiration** | **Transfer Restriction / Basis** |
| Alabama | Motor vehicle dealer license (master dealer license); holder: [●] | [●] | No. [●] / Exp. [●] | No transfer or change-of-ownership provision located; the license issues to a named applicant |
| Arkansas | Used motor vehicle dealer license; holder: [●] | Arkansas State Police | No. [●] / Exp. [●] | No transfer provision in the statute or rules; the license is issued to a named applicant and is tied to the licensed location |
| Georgia | Used motor vehicle dealer license; holder: [●] | [●] | No. [●] / Exp. [●] | No express non-transferability provision, but each license covers a single established place of business |
| Illinois | Motor vehicle dealer license (used dealer / buy-here pay-here) and Sales Finance | [●] | No. [●] / Exp. [●] | The Sales Finance Agency license is a non-transferable and non-assignable license; the dealer license names the person licensed.<br>NOTE: the Illinois Sales Finance Agency Act also imposes a pre-filing bankruptcy notice obligation, which is a pre-petition matter for the restructuring team and cannot be addressed by this Agreement |
| Indiana | Motor vehicle dealer license; holder: [●] | [●] | No. [●] / Exp. [●] | A dealer may not transfer or sell the dealer's license or the use of the dealer's license |

[4] **Note to Draft**: List of licenses contemplated by this Schedule to be discussed and confirmed. This Schedule is intended to list only those Licenses that are required to operate the Business and that cannot be transferred to Buyer at the Closing without the approval of the applicable Governmental Authority, namely the dealer licenses and those finance licenses that are non-transferable as a matter of statute.

[5] **Note to Draft**: The following are not included in this Schedule: (a) sales finance or holder licensing for the purchase of motor vehicle retail installment contracts in Arkansas, Georgia, Kentucky and Tennessee: no license exists or is required, and the exposure is rate and consumer credit compliance rather than licensing; (b) the Indiana, Iowa and Oklahoma consumer credit code notifications: these are not transferable as such, and the acquiring entity files its own notification within the statutory period after commencing business; (c) the Alabama consumer credit (Mini-Code) license, the Texas Motor Vehicle Sales Finance license and the Oklahoma supervised lender license: each may be transferred or assigned with the approval of the applicable regulator, and each should be added to this Schedule if that approval is not obtained before the Closing. Buyer's counsel to confirm regulatory analysis and to discuss.

| DEALER LICENSES AND NON-TRANSFERABLE FINANCE LICENSES[5] | | | | |
|---|---|---|---|---|
| **State** | **License (and Holder Entity)** | **Regulator** | **License Number / Expiration** | **Transfer Restriction / Basis** |
| Iowa | Motor vehicle dealer license; holder: [●] | [●] | No. [●] / Exp. [●] | A dealer shall not sell, loan, rent, lease or charge a fee for the use of the license to another person |
| Kentucky | Motor vehicle dealer license; holder: [●] | [●] | No. [●] / Exp. [●] | All licenses issued by the commission are non-transferable; a complete change of ownership requires a new application |
| Mississippi | Used motor vehicle dealer permit; Motor Vehicle Sales Finance license; Small Loan license; holder: [●] | [●] | No. [●] / Exp. [●] | The sales finance and small loan licenses are not transferable or assignable; the dealer permit carries the dealership name and address and the bond must name the exact licensee |
| Missouri | Motor vehicle dealer license; consumer credit loan license / consumer installment lender license; holder: [●] | [●] | No. [●] / Exp. [●] | Lender licenses are not assignable or transferable; on the sale of a currently licensed dealership the department may, on request, authorize retention of the dealer license number, which should be confirmed |
| Oklahoma | Used motor vehicle dealer license; holder: [●] | [●] | No. [●] / Exp. [●] | All bonds and licenses issued are nontransferable |
| Tennessee | Motor vehicle dealer license; holder: [●] | [●] | No. [●] / Exp. [●] | No license is transferable and a separate license is required for each separate place of business |
| Texas | Dealer General Distinguishing Number (GDN); holder: [●] | [●] | No. [●] / Exp. [●] | If the sale or assignment of any portion of the business results in a change of entity, the new entity must obtain its own GDN |

**EXHIBIT G**

FORM OF ESCROW AGREEMENT

**AGREED FORM**

# ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement") is made and entered into as of [●], 2026, by and among America's Car-Mart, Inc., a Texas corporation ("ACM"), on behalf of itself and the other Sellers, Claypool Holdings, LLC, a Georgia limited liability company ("Buyer" and, together with ACM, each, a "Party" and collectively, the "Parties"), and Citibank, N.A., as escrow agent (the "Escrow Agent"). Capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed to them in the Purchase Agreement (as defined below).

## RECITALS

WHEREAS, the Parties, the other Sellers, and the other parties named therein have entered into that certain Asset Purchase Agreement, dated as of November 23, 2026 (as amended, modified, restated or otherwise supplemented from time to time, the "Purchase Agreement"), in connection with the Chapter 11 Cases pending in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court"); and

WHEREAS, the Purchase Agreement contemplates the execution and delivery of this Agreement and the deposit by Buyer with the Escrow Agent of $25,000,000.00 pursuant to Section 2.5(a) of the Purchase Agreement, to be held and released in accordance with this Agreement.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the Parties and the Escrow Agent agree as follows:

1. Appointment. The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and agrees to act as escrow agent in accordance with the terms and conditions set forth herein. ACM is authorized to act on behalf of each Seller hereunder, and the Escrow Agent may rely conclusively on any instruction or certificate delivered by ACM as binding upon all Sellers.

2. Escrow Funds.

(a) Simultaneously with the execution and delivery of this Agreement, Buyer is depositing with the Escrow Agent $25,000,000.00 (the "Deposit Amount") in immediately available funds. The Escrow Agent shall promptly acknowledge receipt of the Deposit Amount in writing to ACM and Buyer and shall hold the Deposit Amount, together with all products and proceeds thereof, including all interest, dividends, gains and other income earned with respect thereto (collectively, the "Escrow Earnings" and, together with the Deposit Amount, collectively, the "Escrow Funds"), in a separate and distinct account (the "Escrow Account"), subject to the terms and conditions of this Agreement.

(b) For greater certainty, all Escrow Earnings shall be retained by the Escrow Agent and reinvested in the Escrow Funds, shall become part of the Escrow Funds, and shall be disbursed as part of the Escrow Funds in accordance with the terms and conditions of this Agreement. Except as expressly provided in Section 14 below, the Escrow Funds shall not be subject to any lien, attachment, trustee process or other judicial process of any creditor of Buyer or the Escrow Agent, and shall not be available to, or used by, the Escrow Agent to set off any amount owed by Buyer or any of its Affiliates to the Escrow Agent in any other capacity.

3. Investment of Escrow Funds.

(a) Unless otherwise instructed in writing by the Parties, the Escrow Agent shall invest the Escrow Funds in an interest-bearing deposit obligation of Citibank, N.A., insured by the Federal Deposit Insurance Corporation ("FDIC") to the applicable limits. The Parties acknowledge that the initial interest rate is subject to change from time to time and shall be reflected in the monthly statement provided to the Parties. The Escrow Funds shall at all times remain available for distribution in accordance with Section 4 below. Any Escrow Earnings shall follow the principal and be distributed to the Party receiving the applicable portion of the Escrow Funds.

(b) The Escrow Agent shall send an account statement to each of the Parties on a monthly basis reflecting activity in the Escrow Account for the preceding month.

(c) The Escrow Agent shall have no responsibility for any investment losses resulting from the investment, reinvestment or liquidation of the Escrow Funds, as applicable, provided that the Escrow Agent has made such investment, reinvestment or liquidation of the Escrow Funds in accordance with the terms, and subject to the conditions, of this Agreement. The Escrow Agent does not have a duty nor will it undertake any duty to provide investment advice.

4. Disposition and Termination of the Escrow Funds.

(a) Escrow Funds. The Parties shall act in accordance with, and the Escrow Agent shall hold and release the Escrow Funds as provided in, this Section 4(a) as follows:

(i) Upon receipt of a Joint Release Instruction, substantially in the form of Exhibit B annexed hereto, the Escrow Agent shall promptly, but in any event within two (2) Business Days after receipt, disburse all or part of the Escrow Funds in accordance with such Joint Release Instruction.

(ii) If Buyer fails to deliver a Joint Release Instruction following a Deposit Retention Termination as required under the Purchase Agreement, ACM may deliver to the Escrow Agent and Buyer a certificate substantially in the form of Exhibit C signed by an Authorized Representative of ACM certifying that a Deposit Retention Termination has occurred and identifying the applicable provision of Section 8.1 of the Purchase Agreement (an "ACM Release Certificate"). The Escrow Agent shall release the Deposit Amount to ACM on the 10th Business Day after receipt of an ACM Release Certificate unless, prior to such date, Buyer has delivered to the Escrow Agent and ACM a written objection stating in reasonable detail the basis therefor, in which case the Escrow Agent shall continue to hold the Deposit Amount until it receives either a joint written instruction of the Parties or a Final Determination of the Bankruptcy Court directing its release. Either Party may seek a determination of the Parties' respective entitlements to the Deposit Amount from the Bankruptcy Court on an expedited basis. Buyer and ACM irrevocably authorize the Escrow Agent to act on an ACM Release Certificate in accordance with this Section 4(a)(ii).

(iii) In the event the Purchase Agreement is terminated other than pursuant to a Deposit Retention Termination, Buyer shall deliver to the Escrow Agent and ACM a certificate substantially in the form of Exhibit C signed by an Authorized Representative of Buyer

certifying that the Purchase Agreement has been terminated other than pursuant to a Deposit Retention Termination and identifying the applicable provision of Section 8.1 of the Purchase Agreement (a "Buyer Release Certificate"). The Escrow Agent shall release the Deposit Amount to Buyer on the 10th Business Day after receipt of a Buyer Release Certificate unless, prior to such date, ACM has delivered to the Escrow Agent and Buyer a written objection stating in reasonable detail the basis therefor, in which case the Escrow Agent shall continue to hold the Deposit Amount until it receives either a joint written instruction of the Parties or a Final Determination of the Bankruptcy Court directing its release. Either Party may seek a determination of the Parties' respective entitlements to the Deposit Amount from the Bankruptcy Court on an expedited basis. Buyer and ACM irrevocably authorize the Escrow Agent to act on a Buyer Release Certificate in accordance with this Section 4(a)(iii).[1]

(iv) If Buyer objects to an ACM Release Certificate, or if ACM objects to a Buyer Release Certificate, and the Bankruptcy Court enters a Final Determination resolving the objection, then upon receipt by the Escrow Agent of a copy thereof from any Party, which copy shall be simultaneously provided to the other Party, the Escrow Agent shall, within two (2) Business Days after receipt, disburse the Escrow Funds as directed by the Final Determination, but only to the extent funds are available. The Escrow Agent shall act on the Final Determination without further inquiry.

(v) All payments of any part of the Escrow Funds shall be made by wire transfer of immediately available funds to the account or accounts specified in the applicable Joint Release Instruction, ACM Release Certificate, Buyer Release Certificate or Final Determination.

(vi) Any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of any funds on deposit in the Escrow Account under the terms of this Agreement (including the Joint Release Instruction, ACM Release Certificate, Buyer Release Certificate or Final Determination, as applicable) must be in writing, executed by the applicable Party or Parties (it being understood that an ACM Release Certificate need be executed only by ACM and a Buyer Release Certificate need be executed only by Buyer, and the payment instructions accompanying a Final Determination need be executed only by the prevailing Party) as evidenced by the signatures of the person or persons set forth on Exhibit A-1 or Exhibit A-2, as applicable (the "Authorized Representatives") and delivered to the Escrow Agent as an attachment to an e-mail received on a Business Day sent to an e-mail address set forth in Section 11 (and receipt by the Escrow Agent confirmed). In the event that any Joint Release Instruction, ACM Release Certificate, Buyer Release Certificate or Final Determination is delivered to the Escrow Agent in accordance with this Section 4(a)(vi), the Escrow Agent is authorized to seek confirmation of the Joint Release Instruction, ACM Release Certificate, Buyer Release Certificate or Final Determination by telephone call back to the person or persons designated on Exhibit A-1 or Exhibit A-2, as applicable (the "Call Back Authorized Individuals"), and the Escrow Agent may rely upon the confirmations of anyone purporting to be a Call Back Authorized Individual. To assure accuracy of the instructions it receives, the Escrow Agent may record such call backs. If the Escrow Agent cannot verify such instructions, or is not reasonably

[1] Note to Sellers: Added Section 4(a)(iii) to address the Return of Deposit Amount provision in Section 8.4 of the Purchase Agreement.

satisfied with the verification it receives, it will not execute the Joint Release Instruction, ACM Release Certificate, Buyer Release Certificate or Final Determination until all such issues have been resolved, it being understood that the Escrow Agent shall use commercially reasonable efforts to resolve all such issues in a timely manner, that call-back confirmation of an ACM Release Certificate shall require confirmation only by a Call Back Authorized Individual of ACM, and that call-back confirmation of a Buyer Release Certificate shall require confirmation only by a Call Back Authorized Individual of Buyer. The persons and telephone numbers for call backs may be changed only in writing, executed by an Authorized Representative of the applicable Party and actually received and acknowledged by the Escrow Agent.

(vii) Each Party shall cooperate in good faith with the other Party and the Escrow Agent to cause the Escrow Funds to be released to the Party entitled thereto under the Purchase Agreement.

(b) Certain Definitions.

(i) "Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by law to be closed in New York, New York.

(ii) "Final Determination" means an order of the Bankruptcy Court (or, if the Bankruptcy Court does not have or declines to exercise jurisdiction, any other court of competent jurisdiction) determining the Parties' respective entitlements to any Escrow Funds, which order shall be final and non-appealable, together with written payment instructions of the prevailing Party executed by an Authorized Representative.

(iii) "Joint Release Instruction" means a joint written instruction executed by an Authorized Representative of each of ACM and Buyer, substantially in the form attached hereto as Exhibit B, directing the Escrow Agent to disburse all or a portion of the Escrow Funds.

(iv) "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

5. Escrow Agent. The Escrow Agent undertakes to perform only such duties as are expressly set forth herein, which shall be deemed purely ministerial in nature, and no other duties, including but not limited to any fiduciary duties, shall be implied, other than the implied duty of good faith and fair dealing. The Escrow Agent shall neither be responsible for, nor charged with knowledge of, nor have any requirements to comply with, the terms and conditions (including any terms defined therein not otherwise defined in this Agreement) of the Purchase Agreement or any other agreement, instrument or document between the Parties, nor shall the Escrow Agent be required to determine whether any Party has complied with any such agreement, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement will control the actions of the Escrow Agent. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any Joint Release Instruction, ACM Release Certificate, Buyer

Release Certificate or Final Determination furnished to it hereunder and believed by it in good faith to be genuine and to have been signed by an Authorized Representative of the proper Party or Parties. Concurrent with the execution of this Agreement, the Parties shall deliver to the Escrow Agent Authorized Representatives' forms in the form of Exhibits A-1 and A-2 attached hereto. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Escrow Agent shall have no duty to solicit any payments which may be due to it or the Escrow Account. In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party which, in its good faith opinion, conflict with any of the provisions of this Agreement, it shall promptly notify the Parties in writing of such uncertainty or apparent conflict and thereafter be entitled to refrain from taking any action and its sole obligation shall be to keep safely the Escrow Funds until it shall be directed otherwise in a Joint Release Instruction, an unopposed ACM Release Certificate, an unopposed Buyer Release Certificate or a Final Determination; provided that any objection or other communication from Buyer or ACM that does not satisfy each requirement of Section 4(a)(ii) or Section 4(a)(iii), respectively, shall not constitute a conflicting instruction, claim or demand for purposes of this sentence, and an ACM Release Certificate and a Buyer Release Certificate shall be deemed "unopposed" if no objection satisfying Section 4(a)(ii) or Section 4(a)(iii), respectively, has been timely delivered. The Escrow Agent may, after ten (10) Business Days' written notice to the Parties, interplead all of the assets held hereunder into the Bankruptcy Court or may seek a declaratory judgment there, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets or any action or nonaction based on such declaratory judgment. The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder. The Escrow Agent will not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that the Escrow Agent's fraud, gross negligence or willful misconduct was the cause of any direct loss to either Party. To the extent practicable, the Parties agree to pursue any redress or recourse in connection with any dispute (other than with respect to a dispute involving the Escrow Agent) without making the Escrow Agent a party to the same. Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for any special, indirect, punitive, incidental or consequential losses or damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such losses or damages and regardless of the form of action, except to the extent such losses or damages are caused by the fraud[2] or willful misconduct of the Escrow Agent, as adjudicated by a court of competent jurisdiction.

6. Resignation and Removal of Escrow Agent. The Escrow Agent (a) may resign and be discharged from its duties or obligations hereunder by giving thirty (30) calendar days' advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect or (b) may be removed, with or without cause, by the Parties acting jointly at any time by providing written notice to the Escrow Agent. Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow

[2] While we agree to be liable for direct damages caused by our fraud, gross negligence and willful misconduct, we do limit consequential damages to intentional acts (i.e., those caused by our own fraud or willful misconduct)

Agent's line of business may be transferred, shall be the Escrow Agent under this Agreement without further act. The Escrow Agent shall use commercially reasonable efforts to provide the Parties with written notice of such merger, conversion or consolidation, to the extent legally permissible. The Escrow Agent's sole responsibility after such thirty (30) calendar day notice period expires or after receipt of written notice of removal shall be to hold and safeguard the Escrow Funds (without any obligation to reinvest the same) and to deliver the same (i) to a substitute or successor escrow agent pursuant to a joint written designation from the Parties, (ii) as set forth in a Joint Release Instruction, an unopposed ACM Release Certificate or an unopposed Buyer Release Certificate or (iii) in accordance with the directions of a Final Determination, at which time the Escrow Agent's obligations hereunder shall cease and terminate. In the event the Escrow Agent resigns, if the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) calendar days following receipt of the notice of resignation, or in the event that the Escrow Agent is removed and the Parties have failed to appoint a successor escrow agent within the timeframe provided in such notice of removal, the Escrow Agent may petition any court of competent jurisdiction for the appointment of such a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

7. Fees and Expenses. All fees and expenses of the Escrow Agent are described in Schedule 1 attached hereto and shall be paid 50% by Buyer, on the one hand, and 50% by ACM, on the other hand; provided that in no event shall any such fees or expenses be charged against or deducted from any Escrow Funds. The fees agreed upon for the services to be rendered hereunder are intended as full compensation for the Escrow Agent's services as contemplated by this Agreement.

8. Indemnity. ACM and Buyer shall jointly and severally indemnify, defend and hold harmless the Escrow Agent and its affiliates and their respective successors, assigns, directors, officers, agents and employees (the "Indemnitees") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including the reasonable fees and expenses of one outside counsel and experts and their staffs and all expenses of document location, duplication and shipment) (collectively, "Escrow Agent Losses") arising out of or in connection with (a) the Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of an Indemnitee, except to the extent that such Escrow Agent Losses, as adjudicated by a court of competent jurisdiction, have been caused by the fraud, gross negligence or willful misconduct of the Escrow Agent or such Indemnitee, or (b) its following any instructions or other directions from ACM or Buyer, except to the extent that its following any such instruction or direction is expressly forbidden by the terms hereof. It is understood and agreed that the Escrow Agent does not have a contractual right of set-off against, or lien of any type on, the Escrow Funds under this Agreement; provided, however, that nothing herein shall be construed as a waiver of any statutory or common law rights to which the Escrow Agent may otherwise be entitled with respect thereto. The provisions of this Section 8 shall survive the resignation or removal of the Escrow Agent or the termination of this Agreement.

9. Tax Matters.

(a) Seller shall be the owner of the Escrow Funds for U.S. federal (and applicable state and local) income tax purposes and responsible for all tax amounts due on the interest or income earned, if any, on the Escrow Funds for the calendar year in which such interest or income is earned. The Escrow Agent shall report any interest or income earned on the Escrow Funds to the Internal Revenue Service ("IRS") or other taxing authority on IRS Form [1099-INT / 1042-S]. On or prior to the date hereof, the Parties shall provide the Escrow Agent with appropriate completed and executed IRS Forms W-9 or W-8, as applicable, and such other forms and documents that the Escrow Agent may reasonably request that are required to be provided under applicable law in connection with the Escrow Agent's tax reporting obligations.

(b) The Escrow Agent shall be responsible only for income reporting to the Internal Revenue Service with respect to income earned on the Escrow Funds. The Escrow Agent shall withhold any taxes required to be withheld by applicable law, including but not limited to required withholding in the absence of proper tax documentation, and shall timely remit such taxes to the appropriate authorities.

(c) The Escrow Agent, its affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Citigroup, Inc. and its affiliates. This Agreement and any amendments or attachments hereto are not intended or written to be used, and may not be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties. Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

10. Covenant of Escrow Agent. The Escrow Agent hereby agrees and covenants with ACM and Buyer that it shall perform all of its obligations under this Agreement and shall not deliver custody or possession of any of the Escrow Funds to anyone except pursuant to the express terms of this Agreement or as otherwise required by law; provided that, to the extent delivery of custody or possession of any of the Escrow Funds is required by law and is not pursuant to the express terms of this Agreement, the Escrow Agent will provide the Parties with written notice of such delivery as promptly as possible, unless prohibited by law.

11. Notices. All notices, requests, demands and other communications required under this Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) on the day of transmission if sent by electronic mail ("e-mail") with a PDF attachment executed by an Authorized Representative of the applicable Party to the e-mail address given below, and written confirmation of receipt is obtained promptly after completion of the transmission, or (iii) by overnight delivery with a reputable national overnight delivery service, on the first (1st) Business Day after deposit with such service. If notice is given to a Party, it shall be given at the address for such Party set forth below. If notice is given by a Party to the Escrow Agent, such Party shall concurrently give a copy of such notice to the other Party. If notice is given by the Escrow Agent to a Party, it shall concurrently give a copy of such notice to the other Party. It shall be the responsibility of each Party to notify the Escrow Agent and the other Party in writing of any name or address changes.

if to ACM, then to:

America's Car-Mart, Inc.
1805 North 2nd Street, Suite 401
Rogers, Arkansas 72756
Attention: Douglas Campbell
Brett Papasan
Email: douglas.campbell@car-mart.com
brett.papasan@car-mart.com

with a copy (which shall not constitute notice) to:

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606
Attention: Ryan H. Ferris
Brian Kent
Louis Chiappetta
Jamie Netznik
Email: RFerris@mayerbrown.com
BKent@mayerbrown.com
LChiappetta@mayerbrown.com
JNetznik@mayerbrown.com

and to:

Mayer Brown LLP
1221 Avenue of the Americas
New York, New York 10020
Attention: Richard Stieglitz
Email: RStieglitz@mayerbrown.com

<u>if to Buyer, then to</u>:

[*Buyer*]
[●]
Attention: [●]
E-mail: [●]

with a copy (which shall not constitute notice) to:

Troutman Pepper Locke LLP
875 Third Avenue
New York, NY 10022
Attention: Matthew Brooks
Email: matthew.brooks@troutman.com

or, if to the Escrow Agent, then to:

Citibank, N.A.
Citi Private Bank
388 Greenwich Street
Tower Building, 22nd Floor
New York, NY 10013
Attn: Escrow Service East;
Boris Treyger
E-mail: EscrowServiceEast@citi.com;
boris.treyger@citi.com

Notwithstanding the above, communications delivered to the Escrow Agent pursuant to this Section 11 shall be deemed given on the date received by the Escrow Agent. If the Escrow Agent determines in its sole discretion that an emergency exists, it may use such other means of communication as it deems appropriate.

12. Termination. This Agreement shall terminate on the first to occur of (a) the distribution of all of the amounts in the Escrow Account in accordance with this Agreement or (b) delivery to the Escrow Agent of a written notice of termination executed jointly by the Parties, after which this Agreement shall be of no further force and effect except that the provisions of Sections 8, 11, 12, 13 and 21 hereof shall survive termination.

13. Miscellaneous. The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all of the parties hereto. Neither the failure nor any delay on the part of any party to exercise any right, remedy, power or privilege hereunder shall operate as a waiver thereof. Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any party hereto without the prior written consent of the other parties hereto, except as provided in Sections 6 and 16. This Agreement shall be governed by and construed under the laws of the State of Delaware. Each party hereto hereby irrevocably waives any objection on the grounds of venue, forum non conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and consents to the exclusive jurisdiction of the Bankruptcy Court for so long as the Chapter 11 Cases are pending and, thereafter, the courts located in the State of Delaware. Each party hereto hereby waives any right to a trial by jury with respect to any lawsuit or judicial proceeding arising from or relating to this Agreement. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. All signatures of the parties to this Agreement may be transmitted by electronic transmission in portable document format (.pdf), and such .pdf will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party. If any provision of this Agreement is determined to be

invalid, illegal or unenforceable under any applicable law in any jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without invalidating the remaining provisions hereof, and any such invalidity, illegality or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction. Each Party represents, warrants and covenants that each document, notice, instruction or request provided by such Party to the Escrow Agent shall comply with applicable laws and regulations. Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written. Except as expressly provided in Section 8 (as to the Indemnitees) and Section 16 (as to ACM's permitted successors and assigns), nothing in this Agreement, whether express or implied, shall be construed to give to any Person other than the Escrow Agent, ACM and Buyer any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any Escrow Funds hereunder.

14. Compliance with Court Orders. In the event that any Escrow Funds shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered affecting the Escrow Funds under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with any writ, order or decree that it is advised by legal counsel of its own choosing is binding upon it and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any Party or any other Person, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated; provided, however, that the Escrow Agent shall as promptly as practicable provide written notice to each Party of the Escrow Agent's receipt of any such writ, order or decree, describing the course of action the Escrow Agent has taken (or intends to take, when practicable) in response thereto (to the extent such notice is not prohibited by such writ, order or decree or by applicable law).

15. Further Assurances. Following the date hereof, each party shall deliver to the other parties such further information and documents and shall execute and deliver to the other parties such further instruments and agreements as any other party shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to any other party the benefits hereof.

16. Assignment. No assignment of the interest of any of the Parties shall be binding upon the Escrow Agent unless and until written notice of such assignment shall be filed with and acknowledged by the Escrow Agent. Notwithstanding the foregoing, ACM may, without prior written consent of the Escrow Agent or Buyer, assign all or a portion of its rights, interests or obligations hereunder to any successor, liquidating trust, plan administrator or wind-down entity established under the Plan or any other plan confirmed in the Chapter 11 Cases, provided that no such assignment shall relieve ACM of any obligation or liability hereunder except to the extent actually performed or satisfied by the assignee, and Buyer may, without prior written consent of the Escrow Agent or ACM, assign all or a portion of its rights, interests or obligations hereunder to any Person to which Buyer's rights under the Purchase Agreement are assigned in accordance with the Purchase Agreement. Any transfer or assignment of the rights, interests or obligations hereunder in violation of the terms hereof shall be void and of no force or effect. In no event shall the Escrow Agent be obligated hereunder to (x) make any payments from the Escrow Funds

directly to any assignee of a Party of any rights under this Agreement, or (y) obey any written instructions delivered pursuant hereto from any assignee of any rights under this Agreement, unless, in the case of clauses (x) and (y), such assignee has become a Party to this Agreement. To comply with federal law including USA Patriot Act requirements, any permitted assignee shall provide to the Escrow Agent the appropriate form W-9 or W-8, as applicable, and such other forms and documentation that the Escrow Agent may request to verify identification and authorization to act.

17. Force Majeure. The Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, but not limited to, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility), it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

18. Compliance with Federal Law. To help the U.S. Government fight the funding of terrorism and money laundering activities and to comply with federal law requiring financial institutions to obtain, verify and record information on the source of funds deposited to an account, the Parties agree to provide the Escrow Agent with the name, address, taxpayer identification number, and remitting bank for all Parties depositing funds at Citibank, N.A. pursuant to the terms and conditions of this Agreement. For a non-individual Person such as a business entity, a charity, a trust or other legal entity, the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity. The Escrow Agent may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

19. Use of Citibank Name. No publicly distributed printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "Citibank" by name or the rights, powers, or duties of the Escrow Agent under this Agreement shall be issued by any Party, or on such Party's behalf, without the prior written consent of the Escrow Agent.

20. Use of Electronic Records and Signatures. As used in this Agreement, the terms "writing" and "written" include electronic records, and the terms "execute," "signed" and "signature" include the use of electronic signatures. Notwithstanding any other provision of this Agreement or the attached Exhibits and Schedules, any electronic signature that is presented as the signature of the purported signer, regardless of the appearance or form of such electronic signature, may be deemed genuine by the Escrow Agent in the Escrow Agent's sole discretion (which shall be exercised in good faith), and such electronic signature shall be of the same legal effect, validity and enforceability as a manually executed, original, wet-ink signature; provided, however, that any such electronic signature must be an actual and not a typed signature. In accordance with Section 8 of this Agreement, the Escrow Agent shall be indemnified and held harmless from any Escrow Agent Losses it incurs as a result of its acceptance of and reliance on electronic signatures that it, in good faith, deems to be genuine. Any electronically signed agreement, instruction or other document shall be an "electronic record" established in the ordinary course of business and any

copy shall constitute an original for all purposes. The terms "electronic signature" and "electronic record" shall have the meaning ascribed to them in 15 U.S.C. § 7006. This Agreement and any instruction or other document furnished hereunder may be transmitted by facsimile or as a PDF file attached to an email.

21. Return of Funds. If the Escrow Agent releases any funds, including the Escrow Funds or any portion thereof, to a Party and subsequently determines, in its good faith discretion, that the payment or any portion of it was made in error (meaning a payment in an amount, or to a payee, other than as directed in the applicable Joint Release Instruction, ACM Release Certificate, Buyer Release Certificate or Final Determination), such Party shall, upon notice, promptly refund the erroneous payment. Any such erroneous payment by the Escrow Agent, and such Party's return thereof to the Escrow Agent, shall not affect any obligation or right of either the Escrow Agent or the Parties. Each of the Parties agrees not to assert discharge for value, bona fide payee, or any similar doctrine as a defense to the Escrow Agent's recovery of any erroneous payment. Nothing in this Section 21 shall limit the liability of the Escrow Agent in the event that a Party incurs losses or damages resulting from the Escrow Agent's fraud, willful misconduct or gross negligence, as adjudicated by a court of competent jurisdiction.

22. Sanctions. None of the Parties or any of their parents or subsidiaries, or any of their respective directors, officers, or employees, or to the knowledge of any Party, the affiliates of such Parties or any of their subsidiaries, will, directly or indirectly, use any part of the Escrow Funds or lend, contribute, or otherwise make available such Escrow Funds in any manner that would result in a violation by any Person of economic, trade, or financial sanctions, requirements, or embargoes imposed, administered, or enforced from time to time by the United States (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury and the U.S. Department of State), the United Kingdom (including, without limitation, His Majesty's Treasury), the European Union and any EU member state, the United Nations Security Council, and any other relevant sanctions authority.

* * * * *

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

**<u>ACM</u>:**

**AMERICA'S CAR-MART, INC.**

By: ______________________________
Name:
Its:

**<u>BUYER</u>:**

**CLAYPOOL HOLDINGS, LLC**

By: ______________________________
Name:
Its:

**<u>ESCROW AGENT</u>:**

**CITIBANK, N.A.**

By: ______________________________
Name:
Its:

# Schedule 1

**ESCROW AGENT FEE SCHEDULE**
**Citibank, N.A., Escrow Agent**

**Acceptance Fee**
To cover the acceptance of the Escrow Agency appointment, the study of the Agreement, and supporting documents submitted in connection with the execution and delivery thereof, and communication with other members of the working group:

**Fee: Waived**

**Administration Fee**
The annual administration fee covers maintenance of the Escrow Account, including safekeeping of assets in the Escrow Account, normal administrative functions of the Escrow Agent, maintenance of the Escrow Agent's records, follow-up of this Agreement's provisions, and other safekeeping duties required by the Escrow Agent under this Agreement. The fee is based on the Escrow Funds being deposited in an interest-bearing deposit obligation of Citibank, N.A., insured by the FDIC to the applicable limits.

**Fee: Waived**

**Tax Preparation Fee**
To cover preparation and mailing of Forms 1099-INT, if applicable for the escrow parties for each calendar year:

**Fee: Waived**

**Transaction Fees**
To oversee all required disbursements or release of property from the Escrow Account to any escrow party, including cash disbursements made via check and/or wire transfer, fees associated with postage and overnight delivery charges incurred by the Escrow Agent as required under the terms and conditions of the Agreement:

**Fee: Waived**

**Other Fees**
Material amendments to the Agreement: additional fee(s), if any, to be discussed at time of amendment.

---

**TERMS AND CONDITIONS**: The above schedule of fees does not include charges for out-of-pocket expenses or for any services of an extraordinary nature that Citibank or its legal counsel may be called upon from time to time to perform. Fees are also subject to satisfactory review of the documentation, and Citibank reserves the right to modify them should the characteristics of the transaction change. Citibank's participation in this program is subject to internal approval of the third party depositing monies into the escrow account to be established hereunder. The Acceptance Fee, if any, is payable upon execution of the Agreement. Should this schedule of fees be accepted and agreed upon and work commenced on this program but subsequently halted and the program is not brought to market, the Acceptance Fee and legal fees incurred, if any, will still be payable in full.

# EXHIBIT A-1

## Certificate as to ACM's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals designated as Authorized Representatives of ACM, and authorized to initiate and approve transactions of all types for the Escrow Account established under this Agreement. The listed persons are also designated Call Back Authorized Individuals and may be contacted by Citibank, N.A. prior to the release of Escrow Funds.

| Name / Title / Telephone | Specimen Signature |
|---|---|
| Name | Signature |
| Title | |
| Phone | Mobile Phone |
| Name | Signature |
| Title | |
| Phone | Mobile Phone |
| Name | Signature |
| Title | |
| Telephone | Mobile Phone |

# EXHIBIT A-2

## Certificate as to Buyer's Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals designated as Authorized Representatives of Buyer and authorized to initiate and approve transactions of all types for the Escrow Account established under this Agreement. The listed persons are also designated Call Back Authorized Individuals and may be contacted by Citibank, N.A. prior to the release of Escrow Funds.

| Name / Title / Telephone | Specimen Signature |
| --- | --- |
| Name | Signature |
| Title | |
| Phone | Mobile Phone |
| Name | Signature |
| Title | |
| Phone | Mobile Phone |
| Name | Signature |
| Title | |
| Telephone | Mobile Phone |

EXHIBIT B

Joint Release Instruction

**[Date]**

**VIA EMAIL**

Citibank, N.A.
Escrow Services
388 Greenwich Street
Tower Building, 22nd Floor
New York, NY 10013
Attn: Escrow Service East
EscrowServiceEast@citi.com

**RE: ACM and Claypool Holdings, LLC– Escrow Agreement dated [●], 2026**
Escrow Account number [●]

We refer to the Escrow Agreement, dated as of [●], 2026, by and among ACM, Claypool Holdings, LLC, and Citibank, N.A., as Escrow Agent (the "Escrow Agreement").

Capitalized terms in this Joint Release Instruction that are not otherwise defined shall have the meanings given to them in the Escrow Agreement.

Pursuant to Section 4(a)(i) of the Escrow Agreement, ACM and Buyer jointly instruct the Escrow Agent to release the amount below, to the specified party as instructed below, in accordance with the Purchase Agreement.

Amount: $[●][3]
To: [ACM / Buyer]
Beneficiary: [●]
Bank Name / ABA Number: [●] / [●]
Account Name / Account Number: [●] / [●]

[To the extent that any interest or other earnings are credited to the Escrow Account following the disbursement of the Escrow Funds pursuant to this Joint Release Instruction, we hereby jointly instruct the Escrow Agent to release such earnings to [●] [pursuant to the wire instructions set forth [above][below]]. [Upon the disbursement of the Escrow Funds (including any interest earnings thereon), we hereby jointly instruct the Escrow Agent to close the Escrow Account.]

Thank you.

| ACM: | BUYER: |
|---|---|
| America's Car-Mart, Inc. | Claypool Holdings, LLC |

[3] Pursuant to Section 3(a), include Escrow Earnings of such principal amount

| | |
|---|---|
| By: ____________________________ | By: ____________________________ |
| Name: | Name: |
| Its: | Its: |

EXHIBIT C

Form of [ACM / Buyer] Release Certificate

**[Date]**

**VIA EMAIL**

Citibank, N.A.
Escrow Services
388 Greenwich Street
Tower Building, 22nd Floor
New York, NY 10013
Attn: Escrow Service East
EscrowServiceEast@citi.com

**RE: ACM and Claypool Holdings, LLC – Escrow Agreement dated [●], 2026**
Escrow Account number [●]

Reference is hereby made to that certain Escrow Agreement, dated as of [●], 2026, by and among ACM, Claypool Holdings, LLC, and Citibank, N.A., as Escrow Agent (the "Escrow Agreement").

Capitalized terms in this [ACM / Buyer] Release Certificate that are not otherwise defined shall have the meanings given to them in the Escrow Agreement.

[ACM / Buyer] hereby certifies, through its undersigned Authorized Representative, that [a Deposit Retention Termination has occurred / the Purchase Agreement has been terminated other than pursuant to a Deposit Retention Termination] under Section 8.1([●]) of the Purchase Agreement. [ACM / Buyer] hereby requests release of all of the Escrow Funds to [ACM on behalf of Sellers / Buyer] in accordance with Section [4(a)(ii) / 4(a)(iii)] of the Escrow Agreement to the specified party as instructed below:

[Bank name]
[ABA number]
[Bank Address]
[Beneficiary name]
[Beneficiary Account number]

[ACM / Buyer] acknowledges that [Buyer / ACM] may object by delivering to [ACM / Buyer] and the Escrow Agent, on or before the tenth (10th) Business Day following the Escrow Agent's receipt of this [ACM / Buyer] Release Certificate, a written objection stating in reasonable detail the basis therefor, as provided in Section [4(a)(ii) / 4(a)(iii)] of the Escrow Agreement.

Sincerely,

[ACM:

America's Car-Mart, Inc.

By: ______________________________

Name:
Its:
cc: [Buyer]]

[Buyer:

Claypool Holdings, LLC

By: ______________________________
Name:
Its:
cc: [ACM]]

**ANNEX I**

ABS PLATFORM

# ANNEX I

ABS PLATFORM

ACMAT 2025-1

1. Note Purchase Agreement, dated as of January 24, 2025, by and among ACM Funding, LLC, as Depositor, America's Car Mart, Inc., as Sponsor, Colonial Auto Finance, Inc., as Seller, BMO Capital Markets Corp., as an Initial Purchaser, MUFG Securities Americas Inc., as an Initial Purchaser, and ATLAS SP Securities, a division of Apollo Global Securities, LLC, as an Initial Purchaser.

2. Purchase Agreement, dated as of January 31, 2025, by and between Colonial Auto Finance, Inc., as Seller, and ACM Funding, LLC, as Purchaser.

3. Sale and Servicing Agreement, dated as of January 31, 2025, by and among ACM Auto Trust 2025-1, as Issuer, ACM Funding, LLC, as Seller, America's Car Mart, Inc., as Servicer, Deutsche Bank National Trust Company, as Indenture Trustee, Calculation Agent and Paying Agent, and Systems & Services Technologies, Inc., as Backup Servicer.

4. Indenture, dated as of January 31, 2025, by and between ACM Auto Trust 2025-1, as Issuer, and Deutsche Bank National Trust Company, as Indenture Trustee.

5. Administration Agreement, dated as of January 31, 2025, by and between ACM Auto Trust 2025-1, as Issuer, America's Car Mart, Inc., as Administrator, and Deutsche Bank National Trust Company, as Indenture Trustee.

6. Backup Servicing Agreement, dated as of January 31, 2025, by and between America's Car Mart, Inc., as Servicer, ACM Auto Trust 2025-1, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, and Systems & Services Technologies, Inc., as Backup Servicer.

7. Amended and Restated Trust Agreement, dated as of January 31, 2025, by and between ACM Funding, LLC, as Depositor, and BNY Mellon Trust of Delaware, as Owner Trustee.

ACMAT 2025-2

1. Note Purchase Agreement, dated as of May 20, 2025, by and among ACM Funding, LLC, as Depositor, America's Car Mart, Inc., as Sponsor, Colonial Auto Finance, Inc., as Seller, BMO Capital Markets Corp., as an Initial Purchaser, and MUFG Securities Americas Inc., as an Initial Purchaser.

2. Purchase Agreement, dated as of May 29, 2025, by and between Colonial Auto Finance, Inc., as Seller, and ACM Funding, LLC, as Purchaser.

3. Sale and Servicing Agreement, dated as of May 29, 2025, by and among ACM Auto Trust 2025-2, as Issuer, ACM Funding, LLC, as Seller, America's Car Mart, Inc., as Servicer,

Deutsche Bank National Trust Company, as Indenture Trustee, Calculation Agent and Paying Agent, and Systems & Services Technologies, Inc., as Backup Servicer.

4. Indenture, dated as of May 29, 2025, by and between ACM Auto Trust 2025-2, as Issuer, and Deutsche Bank National Trust Company, as Indenture Trustee.

5. Administration Agreement, dated as of May 29, 2025, by and between ACM Auto Trust 2025-2, as Issuer, America's Car Mart, Inc., as Administrator, and Deutsche Bank National Trust Company, as Indenture Trustee.

6. Backup Servicing Agreement, dated as of May 29, 2025, by and between America's Car Mart, Inc., as Servicer, ACM Auto Trust 2025-2, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, and Systems & Services Technologies, Inc., as Backup Servicer.

7. Amended and Restated Trust Agreement, dated as of May 29, 2025, by and between ACM Funding, LLC, as Depositor, and BNY Mellon Trust of Delaware, as Owner Trustee.

ACMAT 2025-3

1. Note Purchase Agreement, dated as of August 18, 2025, by and among ACM Funding, LLC, as Depositor, America's Car Mart, Inc., as Sponsor, Colonial Auto Finance, Inc., as Seller, BMO Capital Markets Corp., as an Initial Purchaser, Deutsche Bank Securities Inc., as an Initial Purchaser, and MUFG Securities Americas Inc., as an Initial Purchaser.

2. Purchase Agreement, dated as of August 28, 2025, by and between Colonial Auto Finance, Inc., as Seller, and ACM Funding, LLC, as Purchaser.

3. Sale and Servicing Agreement, dated as of August 28, 2025, by and among ACM Auto Trust 2025-3, as Issuer, ACM Funding, LLC, as Seller, America's Car Mart, Inc., as Servicer, Deutsche Bank National Trust Company, as Indenture Trustee, Calculation Agent and Paying Agent, and Systems & Services Technologies, Inc., as Backup Servicer.

4. Indenture, dated as of August 28, 2025, by and between ACM Auto Trust 2025-3, as Issuer, and Deutsche Bank National Trust Company, as Indenture Trustee.

5. Administration Agreement, dated as of August 28, 2025, by and between ACM Auto Trust 2025-3, as Issuer, America's Car Mart, Inc., as Administrator, and Deutsche Bank National Trust Company, as Indenture Trustee.

6. Backup Servicing Agreement, dated as of August 28, 2025, by and between America's Car Mart, Inc., as Servicer, ACM Auto Trust 2025-3, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, and Systems & Services Technologies, Inc., as Backup Servicer.

7. Amended and Restated Trust Agreement, dated as of August 28, 2025, by and between ACM Funding, LLC, as Depositor, and BNY Mellon Trust of Delaware, as Owner Trustee.

ACMAT 2025-4

1. Note Purchase Agreement, dated as of December 11, 2025, by and among ACM Funding, LLC, as Depositor, America's Car Mart, Inc., as Sponsor, Colonial Auto Finance, Inc., as Seller, and Deutsche Bank Securities Inc., as Initial Purchaser.

2. Purchase Agreement, dated as of December 17, 2025, by and between Colonial Auto Finance, Inc., as Seller, and ACM Funding, LLC, as Purchaser.

3. Sale and Servicing Agreement, dated as of December 17, 2025, by and among ACM Auto Trust 2025-4, as Issuer, ACM Funding, LLC, as Seller, America's Car Mart, Inc., as Servicer, Deutsche Bank National Trust Company, as Indenture Trustee, Calculation Agent and Paying Agent, and Systems & Services Technologies, Inc., as Backup Servicer.

4. Indenture, dated as of December 17, 2025, by and between ACM Auto Trust 2025-4, as Issuer, and Deutsche Bank National Trust Company, as Indenture Trustee.

5. Administration Agreement, dated as of December 17, 2025, by and between ACM Auto Trust 2025-4, as Issuer, America's Car Mart, Inc., as Administrator, and Deutsche Bank National Trust Company, as Indenture Trustee.

6. Backup Servicing Agreement, dated as of December 17, 2025, by and between America's Car Mart, Inc., as Servicer, ACM Auto Trust 2025-4, as Issuer, Deutsche Bank National Trust Company, as Indenture Trustee, and Systems & Services Technologies, Inc., as Backup Servicer.

7. Amended and Restated Trust Agreement, dated as of December 17, 2025, by and between ACM Funding, LLC, as Depositor, and BNY Mellon Trust of Delaware, as Owner Trustee.

Platform-wide documents

1. Calculation Services Agreement, dated as of January 16, 2026, by and between America's Car Mart, Inc., as Servicer, and Deutsche Bank National Trust Company, as Calculation Agent.